## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| PINSTRIPES HOLDINGS, INC., *et al.*,[1] | Case No. 25-11677 (___) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF JAMES KATCHADURIAN IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, James Katchadurian, hereby declare under penalty of perjury to the best of my knowledge, information, and belief:

1.     I am a Senior Managing Director and Partner at CR3 Partners, LLC ("**CR3 Partners**"), a financial consulting firm, and I have been appointed as the chief restructuring officer ("**CRO**") of Pinstripes Holding, Inc. ("**Pinstripes Holdings**") and each of the other above-captioned debtors and debtors in possession (collectively, the "**Debtors**" or the "**Company**").[2] I have more than thirty-five (35) years of financial and operational experience spanning a wide range of industries, including hospitality and entertainment, automotive, healthcare, publishing, energy, oil and gas, real estate, media, and distribution. I specialize in assisting distressed and underperforming companies and, in connection therewith, have served in various roles, including chief restructuring officer, chief financial officer, treasurer, and financial advisor. Before I joined CR3 Partners in December 2016, I served as an Executive Vice President

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Pinstripes Holdings, Inc. (6699); Pinstripes, Inc. (8608); Pinstripes Hillsdale LLC (6064); Pinstripes at Prairiefire, Inc. (7018); and Pinstripes Illinois, LLC (N/A).  For purposes of these chapter 11 cases, the Debtors' service address is 1150 Willow Road, Northbrook, Illinois 60062.

[2]     CR3 Partners began advising the Debtors on or around April 29, 2025, and I was appointed as CRO on the Petition Date.

at Epiq Systems, Inc. for over eighteen (18) years.  I hold a Bachelor of Arts degree in economics and finance from Syracuse University.

2.      Concurrently with the filing of this declaration (this "**Declaration**"), on the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (the "**Court**").  To facilitate the Debtors' transition into chapter 11, the Debtors have requested certain "first day" relief in various motions and an application filed with the Court (collectively, the "**First Day Motions**").   The First Day Motions, as applicable, seek relief intended to avoid immediate and irreparable harm to the Debtors' estates, preserve their value, and facilitate the only value-maximizing process available to the Debtors. The First Day Motions also seek certain procedural relief that will facilitate the Debtors' orderly transition into chapter 11.

3.      As a result of my service with the Company, review of relevant documents, and discussions with other members of the Company's management team and its professionals, I am familiar with the Company and, in particular, the Debtors' day-to-day operations, business affairs, and books and records.  I am authorized to submit this Declaration in support of the Debtors' petitions and the First Day Motions to assist the Court and other parties in interest in understanding the Company's corporate history, business operations, prepetition corporate and capital structure, and the circumstances leading to the commencement of these chapter 11 cases.

4.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Company's management team and the Company's advisors, my review of relevant documents and information concerning the Company's financial affairs and restructuring initiatives, or my opinions based upon my

experience and knowledge.  If called as a witness, I could and would testify competently to the statements set forth in this Declaration on that basis.

## PRELIMINARY STATEMENT[3]

5.    These chapter 11 cases were almost a year in the making and reflect the Debtors' only remaining path to maximize value.  The Debtors operate in a niche segment of the restaurant industry—known as "eatertainment"[4]—pairing Italian-American cuisine with bowling, bocce, and private events.  Unfortunately, economic deterioration over the past year resulted in decreased revenue and eroded the Debtors' restructuring alternatives.  Faced with no other viable options, the Debtors and their largest secured and unsecured creditor, Silverview, agreed to a section 363 sale process—including the submission of the Stalking Horse Bid—to maximize value, preserve certain restaurant locations and operations as a going concern, and save nearly 900 jobs.

6.    To that end, prior to the Petition Date, the Debtors entered into a support agreement (as may be amended, modified, or supplemented from time to time, the "**Support Agreement**")[5] with Silverview (in such capacity, the "**Consenting Lenders**"), which holds the vast majority of the Debtors' secured debt obligations, totaling in excess of $115 million.  Silverview is, by far, the single largest secured and unsecured creditor in these chapter 11 cases, and the Support Agreement is the culmination of almost a year of diligence, discussions, and negotiations between the Debtors and various creditors around the Debtors' future.

---

[3]    Capitalized terms used but not defined in this Preliminary Statement have the meanings ascribed to such terms later in this Declaration.

[4]    "Eatertainment" is defined as "a guest experience that involves food and/or beverage dining before, after, or during other activities."  *See* Eatertainment Explained, available at https://modernrestaurantmanagement.com/eatertainment-explained/.

[5]    The Support Agreement was amended on September 7, 2025 to reflect the Consenting Lenders' and the Debtors' agreement on a substantially final form of Stalking Horse APA and the Approved Budget.

7.     To be clear, as discussed below, the Debtors' sale process began back in January 2025 when the Debtors engaged an investment banker who conducted a thorough and robust process.  Despite their extensive efforts, the Debtors were unable to generate interest sufficient to satisfy their secured obligations or otherwise successfully restructure their operations.  During that time, the Debtors also implemented other measures to address their economic issues, including (i) implementing operational improvement initiatives, (ii) engaging professionals with expertise in complex transactions to analyze strategic alternatives and comprehensive solutions, and (iii) analyzing the profitability of each restaurant location to refine the Debtors' go-forward business strategy.

8.     Ultimately, on August 27, 2025, after months of lengthy, good-faith negotiations and significant diligence exploring various alternatives, the Special Committee determined that it was in the Company's best interests to execute the Support Agreement with the Consenting Lenders and recommended that the Company commence these chapter 11 cases to avail itself of the transactions contemplated by the Support Agreement.  The Support Agreement, and the process contemplated thereby and sought in the Bidding Procedures Motion, allows the Debtors to continue the pre-filing marketing process and hopefully generate a robust auction, with a sale hearing to be held approximately forty-five (45) days after the Petition Date, subject to the Court's availability.  This proposed timeline ensures sufficient time to effectuate a value-maximizing transaction while avoiding the value destruction of a free-fall chapter 7.

9.     This opportunity would not be possible absent (i) the DIP Financing (as defined below) and (ii) the Consenting Lenders' backstop Stalking Horse Bid.  Specifically, the Consenting Lenders committed to provide post-petition financing ("**DIP Financing**") through a debtor-in-possession financing facility (the "**DIP Facility**" and, the lenders thereunder, the "**DIP**

Lenders") in the aggregate principal amount of up to approximately $3,800,000.00, consisting of (i) "new money" loans of approximately $3,260,000.00 and (ii) roll-up loans of approximately $540,000.00, equal to the pre-petition bridge loan provided by the Consenting Lenders on August 27, 2025, through the Eighth Amendment to Loan Agreement (the "**Bridge Loan**"). Notably, the proposed DIP Facility includes a significantly lower interest rate than the prepetition loans provided by the Consenting Lenders—10% PIK interest as compared to 15% to 20%[6] interest— and does not require the payment of any other fees to the DIP Lenders or adequate protection to Silverview as a Second Lien Lender.

10.     Furthermore, the Consenting Lenders agreed to the Stalking Horse Bid for certain of the assets that secure the Existing Silverview First Lien Obligations. The Stalking Horse Bid consists of a credit bid of $15,000,000.00, inclusive of the DIP obligations and certain of the Existing Silverview First Lien Obligations and the assumption of certain specified liabilities, including cure costs, plus a cash component of $1,600,000.00 to satisfy certain obligations as set forth in the asset purchase agreement attached to the Bidding Procedures Motion as Exhibit B (the "**Stalking Horse APA**"). Through the Bidding Procedures Motion, filed contemporaneously herewith, the Debtors have sought authority to designate the Stalking Horse Bid as such, and the Debtors have requested a hearing on that motion within the next fourteen (14) days.

11.     To be blunt, the process proposed to be consummated through these chapter 11 cases is not perfect, and it is not where the Debtors wished they were right now. However, it is the only pathway forward that preserves value for the Debtors' constituents and preserve the Debtors' business as a going concern. Absent Silverview's commitment and the path

---

[6]     The interest rate under the Oaktree Second Lien Loan Documents (as defined below) was 12.5% per annum, plus 7.5% payable at the Debtors' election.

contemplated by the Support Agreement, the Debtors would file for chapter 7, to the detriment of all constituencies.

12.     To assist the Court and parties in interest in understanding the Company's business and the relief the Debtors seek through the First Day Motions, this Declaration is organized in six (6) parts:

- Part I provides an overview of the Company's history and business operations;

- Part II describes the Company's corporate structure;

- Part III describes the Company's prepetition capital structure;

- Part IV describes the circumstances leading to the filing of these chapter 11 cases and the Debtors' pre-petition and ongoing marketing and sale process in accordance with the milestones set forth in the Support Agreement;

- Part V provides support for the Debtors' proposed DIP Facility; and

- Part VI affirms and incorporates the facts that support the relief requested in the First Day Motions.

## BACKGROUND

## I.     The Debtors' History and Business Operations

13.     The Company was founded in 2007 by Dale Schwartz, who serves as the Company's Chief Executive Officer, in Northbrook, Illinois.   The Company was inspired by an appreciation for building authentic connections with others by pairing food with entertainment, and prides itself on being a restaurant with bowling and bocce—not the other way around.

14.     Since its founding, the Company expanded to eighteen (18) locations in Florida, Maryland, Illinois, Ohio, Minnesota, Texas, Connecticut, Kansas, New Jersey, California, and Washington, D.C., with several additional locations under construction in Washington and Florida, and, as of the date hereof, continues to operate eight (8) of those locations.   Each of the Company's locations offers 26,000 to 38,000 square feet of interior space, including bowling alleys, plus

additional outdoor patio space that includes outdoor dining, bocce courts, fire-pits, and decorative fountains.  In addition to offering dining in its dining rooms, the Company hosts thousands of events, including weddings, bar/bat mitzvahs, corporate events, and birthday parties, and also offers catering services.  Each location can host over 900 guests at a time, with dining capacity of approximately 300 guests, bar capacity of 75 guests, 11 to 20 bowling lanes, 6 to 12 indoor/outdoor bocce courts, and multiple private event spaces that can accommodate groups of 20 to 1,000 guests.

15.    Historically, the Company has derived approximately 80% of its revenue from food and beverage sales and approximately 20% of its revenue from games, resulting in a total annual revenue of approximately $129 million in the fiscal year ended April 27, 2025 (unaudited).  On average, each location generates approximately $7.4 million in annual revenue.

## II.    The Debtors' Corporate Structure

16.    On December 29, 2023, the Company went public through the merger of Pinstripes, Inc. with and into Panther Merger Sub Inc., a wholly-owned subsidiary of Banyan Acquisition Corp. ("**Banyan**" and, such transaction, the "**Reverse Recapitalization**").  Pinstripes emerged as a wholly-owned subsidiary of Banyan, and Banyan was renamed Pinstripes Holdings, Inc.

17.    Pinstripes Holdings is registered with the United States Securities and Exchange Commission and, until recently, was listed on the New York Stock Exchange (the "**NYSE**").  The economic headwinds mentioned above significantly impacted the Debtors' financial outlook and share price.  As such, on March 5, 2025, the NYSE notified Pinstripes Holdings of its intent to commence proceedings to delist its Class A Common Stock (the "**Common Stock**").  Trading of the Common Stock on the NYSE was suspended after market close on March 5, 2025, and Pinstripes Holdings elected not to appeal the delisting determination.  As of February 17, 2025, the Debtors had approximately 180 shareholders who collectively held over 40 million shares of Common Stock.

18.    Pinstripes Holdings, a Delaware corporation, is a holding company and wholly-owns Pinstripes, Inc., a Delaware corporation.  Substantially all of the Debtors' business operations are run through Pinstripes, Inc.  Each of the other Debtors is wholly-owned by Pinstripes, Inc. and was formed for a discrete purpose: (i) Pinstripes Hillsdale LLC, a California limited liability company, and Pinstripes at Prairiefire, Inc., a Kansas corporation, hold the liquor licenses for the Debtors' restaurant locations in California and Kansas, respectively, and (ii) Pinstripes Illinois, LLC, an Illinois limited liability company, was formed in connection with the Company's gift card program and handles all gift card-related liability.  A chart summarizing the Debtors' corporate structure is attached hereto as **Exhibit A**.

## III.    Prepetition Indebtedness

19.    As of the Petition Date, the Debtors have an aggregate principal amount of approximately $143,099,345.00 in funded debt obligations, consisting of (i) the Existing Silverview First Lien Obligations, (ii) the Existing Granite First Lien Obligations, (iii) the Existing Second Lien Obligations, (iv) the SBA Loan, (v) the Landlord Loans, and (vi) the Financed Bowling Equipment (each as defined below), as summarized in the below chart and set forth in more detail below.

| Funded Debt | Principal Amount Outstanding |
|---|---|
| Existing Silverview First Lien Obligations | $36,100,000.00 |
| Existing Granite First Lien Obligations | $14,953,125.00 |
| Existing Second Lien Obligations | $85,396,220.00 |
| SBA Loan | $350,000.00 |
| Landlord Loans | $3,700,000.00 |
| Financed Bowling Equipment | $2,600,000.00 |
| **Total Secured Debt Obligations** | **$143,099,345.00** |

### A.    The Existing Silverview First Lien Obligations

20.    On March 7, 2023, Pinstripes, Inc., as borrower, and the remaining Debtors, as guarantors, entered into that certain Loan Agreement (as amended, supplemented or otherwise

modified from time to time, the "**Existing Silverview Loan Agreement**"[7] and together with all documents related thereto and contemplated thereby, the "**Existing Silverview Loan Documents**") with the financial institutions and other institutional investors from time to time party thereto as lenders (the "**Existing Silverview Lenders**") and Silverview Credit Partners LP, as agent for the Silverview Lenders (in such capacity, the "**Existing Silverview Agent**" and, collectively with the Existing Silverview Lenders, "**Silverview**").

21.     Pursuant to the Existing Silverview Loan Documents, Silverview provided the Company with certain loans and obligations (the "**Existing Silverview First Lien Obligations**"). The Existing Silverview First Lien Obligations are collateralized by first lien security interests in substantially all of the Debtors' assets, excluding the Granite Priority Collateral (defined below).

22.     On August 27, 2025, the Company and Silverview entered into an eighth amendment to the Existing Silverview Loan Agreement, pursuant to which Silverview agreed to provide the Company with the Bridge Loan in the amount of $540,000.00 to enable the Company to finalize the Stalking Horse APA and file these chapter 11 cases in an organized manner.  As discussed below, through the DIP Motion (defined below), the Debtors seek to roll-up the Bridge Loan on a dollar-for-dollar basis into the DIP Financing upon entry of the interim order approving the DIP Motion.

23.     As of the Petition Date, the outstanding principal amount of the Existing First Lien Obligations (excluding accrued and unpaid interest and fees) was approximately $36,100,000.00.

**B.      The Existing Granite First Lien Obligations**

24.     On April 19, 2023, Pinstripes, Inc., as borrower, entered into that certain Loan and Security Agreement (and together with all documents related thereto and contemplated thereby,

---

[7]     The Company and Silverview have entered into eight amendments to the Existing Silverview Loan Agreement.

the "**Granite Loan Agreement**" and together with all documents and agreements related thereto, the "**Granite Loan Documents**" and the obligations thereunder, the "**Existing Granite First Lien Obligations**") with the financial institutions and other institutional investors from time to time party thereto as lenders (the "**Granite Lenders**") and GCCP II Agent, LLC, as agent for the Granite Lenders (in such capacity, the "**Granite Agent**").

25.    Pursuant to the Granite Loan Agreement, the Granite Lenders advanced equipment loans to Pinstripes, Inc., which loans are collateralized by specific furniture, fixtures, and equipment of the Debtors, as specified in the Granite Loan Agreement.  On April 19, 2023, the Existing Silverview Agent and the Granite Agent entered into that certain Agreement Regarding Collateral dated as of April 19, 2023 (as amended, restated, supplemented and/or otherwise modified, the "**Silverview-Granite ICA**"), pursuant to which the Existing Silverview Agent and the Granite Agent agreed that (a) all obligations of Pinstripes, Inc. under the Existing Silverview First Lien Loan Documents are secured on a first priority basis by liens on the Silverview Priority Collateral (as defined in the Silverview-Granite ICA) and (b) all obligations of Pinstripes, Inc. under the Granite Loan Documents are secured on a first priority basis by liens on the Granite Priority Collateral (as defined in the Silverview-Granite ICA).

26.    Prior to the Petition Date, the Debtors closed all of their locations that contained Granite Priority Collateral and, on the Petition Date, filed a motion to reject the leases for such locations.  As set forth in the summary chart below, the DIP Collateral expressly excludes the Granite Priority Collateral.  The Granite Priority Collateral is also expressly carved out from the assets proposed to be acquired by the proposed Stalking Horse Bidder in the Stalking Horse APA.

27.    As of the Petition Date, the outstanding principal amount of Existing Granite First Lien Obligations totaled approximately $14,953,125.00 (excluding accrued and unpaid interest

and fees), and such obligations are secured by first lien security interests on the Granite Priority Collateral.

### C.    Existing Second Lien Obligations

28.    On December 29, 2023, in connection with the Reverse Recapitalization described above, Pinstripes, Inc., as borrower, and the other Debtors, as guarantors, entered into that certain Loan Agreement (the "**Existing Second Lien Loan Agreement**" and together with all documents related thereto and contemplated thereby, the "**Existing Second Lien Loan Documents**")[8] with the several financial institutions and lenders from time to time party thereto (the "**Second Lien Lenders**" and, collectively with the Existing Silverview Lenders and the Granite Lenders, the "**Prepetition Secured Lenders**") and Oaktree Fund Administration, LLC ("**Oaktree**"), in its capacity as initial agent for the Second Lien Lenders (such agent and its successors and assigns, the "**Second Lien Agent**" and, collectively with the Existing Silverview Agent and the Granite Agent, the "**Prepetition Agents**").   The initial lenders and agent with respect to the Existing Second Lien Loan Documents were entities associated with Oaktree.   Pursuant to the Existing Second Lien Loan Agreement, the Debtors issued notes to the Second Lien Lenders which mature on December 29, 2028, as well as detachable warrants to purchase Common Stock.   The obligations under the Existing Second Lien Loan Documents are secured by a second priority lien and security interest on the Granite Priority Collateral and the Silverview Priority Collateral on the terms set forth in the respective intercreditor agreements entered into by and between the Granite Agent and the Second Lien Agent (the "**Granite-Second Lien ICA**"), and the Existing Silverview Agent and the Second Lien Agent, respectively.

---

[8]    The Existing Silverview Loan Documents, the Granite Loan Documents, and the Existing Second Lien Loan Documents are collectively referred to herein as the "**Prepetition Loan Documents**."

29.     On July 1, 2025, Silverview closed on the purchase of all principal, interest, fees, costs, and other charges outstanding under the Existing Second Lien Loan Documents (the "**Existing Second Lien Obligations**") and succeeded to all of Oaktree's interest under the Existing Second Lien Loan Documents and the Granite-Second Lien ICA.

30.     As of the Petition Date, the outstanding principal amount of the Existing Second Lien Obligations totaled approximately $85,396,220.00 (excluding accrued and unpaid interest and fees).

### D.     Other Secured Debt

31.     In addition to the Debtors' obligations under the Prepetition Loan Documents, the Debtors have various other secured debt obligations, including (i) approximately $350,000.00 in connection with loans obtained under the Payment Protection Program in 2020 and 2021 (the "**SBA Loan**"), (ii) approximately $3.7 million in connection with allowances and loans provided by landlords under leases (the "**Landlord Loans**"), which amounts are secured by certain collateral obtained by the Debtors with the proceeds of such allowances and loans, and (iii) approximately $2.6 million in connection with a long-term payment plan for bowling equipment (the "**Financed Bowling Equipment**").

### E.     Trade Claims and Other Unsecured Debt

32.     The Debtors incur unsecured obligations to various parties in connection with the operation their business, including vendors, suppliers, landlords, taxing authorities, and trade counterparties, among others, totaling approximately $47 million as of the Petition Date.  In addition, the Debtors estimate that they have approximately $2.4 million in accrued gift card liability.

IV.    **Events Leading to these Chapter 11 Cases**

    A.    **Operational Challenges and Capital Structure Overhang**

    33.    As stated above, these cases have been over a year in the making.  The Company has suffered from a series of challenges, including inflationary pressure across various sectors that have drastically and negatively affected their performance.  In particular, increases in the cost of labor and commodities in recent years have raised the cost of "dining out."  Like many other similarly situated restaurant and entertainment businesses, the Debtors' performance is acutely impacted by consumer preferences.  As inflationary pressures have made consumers increasingly cost-conscious, preferences for out of home experiences began to shift to more cost-efficient alternatives.  As a result, the Debtors began facing an increasingly tight liquidity crunch at the same time that they most needed cash reserves to adapt to industry wide changes.

    34.    While the Debtors were partially able to offset rising costs by gradually increasing menu prices, coupled with more effective purchasing practices, inflation and reduced customer traffic nonetheless placed significant strain on the Debtors' business and liquidity needs.  At the same time, the Debtors continued to expand, incurring costs for new store openings that were not yet generating, and ultimately never did generate, revenue.  As a result of these factors, the Debtors' revenue and EBITDA became insufficient to support their debt service, working capital, and capital expenditure needs, and the Debtors ultimately received default notices from their Prepetition Secured Lenders, and, on January 7, 2025, entered into separate forbearance agreements (collectively the "**Forbearance Agreements**" and each a "**Forbearance Agreement**") with Oaktree, Silverview, and the Granite Lenders, which agreements were subsequently amended and restated on January 17, 2025.

    35.    Pursuant to the Forbearance Agreement with Oaktree, Oaktree agreed to forbear from exercising remedies with respect to the specified defaults set forth in the Forbearance

Agreement until the earlier of January 31, 2025, and the occurrence of any Event of Termination (as defined in each Forbearance Agreement), provided that such deadline could be extended by Oaktree in writing. As a condition precedent to the effectiveness of the Forbearance Agreement, the Debtors and Oaktree entered into a second amendment to the Existing Second Lien Loan Agreement (the "**Second Lien Second Amendment**"), pursuant to which the Oaktree agreed to fund $6 million, subject to Pinstripes, Inc. having satisfied certain conditions, including the achievement of certain milestones related to a debt refinancing or sale transaction. Among other things, these milestones required the Debtors to retain a financial advisor on or prior to January 24, 2025, and set forth various other deadlines in connection with a potential restructuring transaction with Oaktree or a third party.

36.     Pursuant to the Silverview and Granite Lenders' Forbearance Agreements, Silverview and the Granite Lenders agreed to forbear from exercising remedies with respect to the specified defaults set forth in each Forbearance Agreement until the occurrence of any Event of Termination (as defined in each Forbearance Agreement), including the termination or expiration of the Forbearance Agreement with Oaktree, among other Events of Termination.

37.     Shortly after entering into the initial Forbearance Agreements on January 7, 2025, on January 13, 2025, the Board of Directors of Pinstripes Holdings, Inc. (the "**Board**") appointed a special committee of independent, disinterested directors (the "**Special Committee**") to make recommendations to the Board with respect to the events of default under the Prepetition Loan Documents and other issues relating to the Company's financial condition and liquidity needs, including a potential refinancing of the Company's existing indebtedness, a sale of the Company, a recapitalization with one or more of the Company's existing lenders, and/or other strategic alternatives (collectively, the "**Potential Alternatives**"). To assist its mandate, in January 2025,

the Special Committee engaged Ropes & Gray LLP and authorized the Special Committee to engage with Piper Sandler & Co. ("**Piper Sandler**") as the Debtors' initial financial advisor and investment banker.[9]

38.     Following the appointment of the Special Committee, on January 17, 2025, the Forbearance Agreements were amended and restated and the Company entered into the Second Lien Second Amendment described above.  Upon information and believe, the Forbearance Agreements have since expired in accordance with their terms.

**B.     Additional Prepetition Initiatives and the Debtors' Entry into the Support Agreement**

39.     Following its appointment, the Special Committee immediately began working with Piper Sandler and its other professionals to evaluate the Potential Alternatives.  In connection therewith, Piper Sandler contacted no less than eighty (80) parties with experience in the restaurant industry, and at least twenty (20) parties executed non-disclosure agreements.  Unfortunately, the pre-petition marketing and sale process did not ultimately yield any actionable offers from third-party purchasers.

40.     On March 7, 2025, the Debtors entered into a letter of intent with Oaktree for a recapitalization transaction (the "**Oaktree Recapitalization**"), which was subject to definitive documentation and closing conditions.  The Oaktree Recapitalization did not close and, shortly thereafter, in April 2025, the Company engaged CR3 Partners as its restructuring advisor.[10]  CR3 Partners and I immediately engaged with the Prepetition Secured Lenders to continue evaluating

---

[9]     The Company also engaged AP Services, LLC, an affiliate of AlixPartners, LLP ("**APS**"), on March 11, 2025, and appointed Mr. Richard Abby of APS as the interim Chief Financial Officer, but that engagement was subsequently terminated.

[10]    As discussed above, Oaktree subsequently exited its position for a fraction of the face amount of its debt by selling its debt to certain entities associated with the Existing Silverview Agent.

all restructuring alternatives, and Piper Sandler continued its pre-petition marketing process. In connection therewith, CR3 Partners worked with the Debtors to review and analyze their financial results, operational data, and contractual and business arrangements and obligations, and to evaluate the Debtors' existing restaurant portfolio and operating performance to identify underperforming restaurants. In May 2025, the Debtors engaged Young Conaway Stargatt & Taylor, LLP as their restructuring counsel.

41.    With the assistance of their advisors, the Debtors continued to evaluate strategic alternatives with their Prepetition Secured Lenders and to engage with all potential interested parties. Following months of negotiations, the Debtors and the Consenting Lenders ultimately agreed in principle to the following terms, as set forth more fully in the Support Agreement attached hereto as **Exhibit B**:[11]

- Within seven (7) days of executing the Support Agreement, the Company agreed to commence these chapter 11 cases for the purpose of establishing and commencing an expedited sale process for the sale of the Company's assets pursuant to section 363 (the "**363 Sale**") of the Bankruptcy Code, which sale process shall (i) include a backstop Stalking Horse Bid from the Consenting Lenders and their designated Stalking Horse Bidder and (ii) conclude with the consummation of the 363 Sale.

- The Consenting Lenders agreed to, and did, provide the Bridge Loan in the amount of $540,000.00, secured only by the Silverview Priority Collateral, within one (1) business day of execution of the Support Agreement, to fund the Company's operations, negotiations of the Stalking Horse Bid, and the preparation of these chapter 11 cases, consistent with the approved budget.

-  The Consenting Lenders agreed to fund these chapter 11 cases through the DIP Facility, subject to the "Milestones" in the term sheet (the "**DIP Term Sheet**") attached to the Support Agreement as Exhibit A**.** As set forth in the Support Agreement, one of the conditions precedent to entry into the DIP Facility was arrangements and/or mechanics acceptable to the Consenting Lenders providing that all decisions pertaining to, and the control of, the proceeds of the Bridge Loan and any cash of the Debtors would be made by, and residing with, myself as the future CRO.

---

[11]    Capitalized terms used but not otherwise defined in this section have the meaning given to such terms in the Support Agreement.

- The Milestones include: (i) a bid deadline by no later than thirty-five (35) days after the Petition Date; (ii) an auction by no later than forty-five (45) days after the Petition Date; and (iii) a sale hearing by no later than forty-five (45) days after the Petition Date.

- The Stalking Horse Bid will include a credit bid by the Stalking Horse Bidder in an initial amount of $15,000,000.00 (which debt may be conditionally assigned to the Stalking Horse Bidder by the Consenting Lenders prior to the close of the 363 Sale), plus a cash component of $1,600,000.00, plus the payment obligation to the Debtors' investment banker in the amount of $300,000.00, administrative rent incurred through the date of closing, and the assumption of certain other obligations and claims in each case acceptable to the Stalking Horse Bidder; provided that the Stalking Horse Bid may be increased at any subsequent auction for the sale of the Debtors' assets (including through a credit bid of all of the Consenting Lenders' secured debt).  The Stalking Horse Bid does not include a breakup fee or other bid protections.

- The Company agreed to appoint me as the CRO, effective as of the Petition Date.

- The Support Agreement also required the Debtors to close all locations that were not being acquired pursuant to the Stalking Horse Bid and, as noted above, such locations were closed shortly before the Petition Date.[12]

42.     Faced with severe liquidity issues and further deterioration of the Debtors' business (including forced store closures, eviction issues, and utility and liquor license concerns) and considering the benefits of a Court-supervised restructuring process supported by the Consenting Lenders, the Special Committee recommended the Board's approval of the Support Agreement and entry into the DIP Term Sheet in accordance with the Support Agreement.  The Support Agreement and the DIP Term Sheet each contemplate certain agreed-upon milestones in connection with these chapter 11 cases, including:

- the Debtors shall commence these chapter 11 cases on the date hereof;

- the Debtors shall file a motion (the "**DIP Motion**") for approval of the DIP Facility on the Petition Date;

- the Debtors shall appoint a CRO on the Petition Date;

---

[12]   The locations being acquired pursuant to the Stalking Horse Bid are listed on Exhibit 1 to the DIP Term Sheet.

- the Debtors shall file a motion (the "**Bidding Procedures Motion**") for approval of bidding procedures and authority to designate the Consenting Lenders as the Stalking Horse Bidder on the Petition Date;

- the Court shall have entered an interim order authorizing the relief sought under the DIP Motion within three (3) days after the Petition Date;

- the Court shall have entered an order (the "**Bidding Procedures Order**") granting the relief sought in the Bidding Procedures Motion and designating the Consenting Lenders as the Stalking Horse Bidder within fourteen (14) days of the Petition Date;

- the Court shall have entered a final order authorizing the Debtors to enter into the DIP Facility within twenty-eight (28) days after the Petition Date;

- the deadline for submission of final qualified bids in connection with the sale process shall be within thirty-five (35) days of the Petition Date;

- the Debtors shall hold an auction consistent with the Bidding Procedures Order within forty (40) days of the Petition Date;

- the Court shall hold a hearing and enter an order approving the sale of the Debtors' assets consistent with the Bidding Procedures Order within forty-five (45) days of the Petition Date; and

- the sale shall close within fifty (50) days of the Petition Date.

These milestones were the product of extensive, arms'-length negotiations with the Consenting Lenders.

43.     I believe that a Court-supervised sale process consistent with the aforementioned milestones provides the Debtors with the only realistic opportunity to obtain the highest or otherwise best offer for their assets or otherwise maximize value.  As discussed above, the Debtors commenced their marketing and sale process in January 2025 with the assistance of Piper Sandler, who explored all Potential Alternatives, including a potential sale, refinancing, or recapitalization of the Company.  When the Oaktree Recapitalization did not close, the Company continued to engage with its Prepetition Secured Lenders, culminating in the Company's entry into the Support Agreement with the Consenting Lenders, who have agreed to serve as the Stalking Horse Bidder in connection with the 363 Sale.

44.     The Debtors, having run a fulsome pre-petition marketing and sale process with the assistance of experienced restructuring professionals, seek to continue their marketing and sale process post-petition with their newly engaged investment banker, Hilco Corporate Finance ("**Hilco**"), to ensure that the highest or otherwise best offer for the Debtors' assets is obtained, and will seek approval of that offer at the conclusion of the sale process, thereby maximizing value for all interested parties.[13]

## V.     The DIP Motion[14]

45.     As described above, the Debtors commenced these chapter 11 cases to complete a comprehensive, Court-supervised sale process to maximize the value of their assets for their creditors.  To implement the Debtors' sale process and preserve asset value during the pendency of these chapter 11 cases, the Debtors require an immediate infusion of new liquidity.  To that end, in addition to its Stalking Horse Bid, Silverview offered to provide the Debtors with the DIP Facility to fund the Debtors' chapter 11 process.  The DIP Facility has a maximum credit amount of approximately $3,800,000.00, inclusive of the roll-up of the $540,000.00 Bridge Loan Silverview provided to the Debtors less than two (2) weeks prior to the Petition Date, and, other than PIK Interest of 10% per annum, does not require the payment of any fees (the "**DIP Obligations**") or provision of adequate protection for Silverview's prepetition second lien secured debt.  Nor does the DIP Facility require the roll-up of any of the other Existing Silverview First Lien Obligations or Existing Second Lien Obligations, which exceed $115 million. The DIP Obligations are secured by the Silverview Priority Collateral and certain unencumbered assets.

---

[13]    The Debtors recently terminated Piper Sandler and engaged Hilco to continue their marketing process post-petition.

[14]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the DIP Motion.

46.     The Debtors are entering chapter 11 with minimal cash on hand and, in their business judgment, believe that such liquidity is wholly insufficient to administer their estates and these chapter 11 cases.  In short, the Debtors definitively require the incremental liquidity proposed to be provided under their proposed DIP Facility to preserve value for all stakeholders.  The Debtors solicited proposals from other potential sources outside of the Debtors' capital structure with the goal of obtaining debtor-in-possession financing on terms that were most advantageous to them.  However, given the Debtors' financial predicament, lack of liquidity, and existing impairment of their secured creditors, procuring unsecured debt was out of the question, and the Debtors could not afford a priming fight with their secured creditors.  No third parties contacted by the Debtors were interested in providing debtor-in-possession financing except Silverview.

47.     Subject to the Carve-Out and Senior Liens, the Debtors propose to grant the DIP Agent, for the benefit of itself and the applicable DIP Lenders, (i) senior secured priming DIP Liens on the DIP Collateral, as set forth in Exhibit 3 to the Proposed Interim Order, and (ii) allowed superpriority administrative expense claims for the DIP Obligations pursuant to section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities, and indebtedness of any of such Debtors as provided in the superpriority claim priority chart attached as Exhibit 2 to the Proposed Interim Order.  The DIP Collateral expressly excludes (i) all claims and causes of action under chapter 5 of the Bankruptcy Code and Bankruptcy Code section 724(a) and the property received thereby whether by judgment, settlement, or otherwise, whether pursuant to federal law or applicable state law and (ii) the Granite Priority Collateral.

48.     Additionally, in exchange for Silverview's consent to the Debtors' use of the Existing Silverview Priority Collateral and the Cash Collateral on the terms set forth in the DIP Financing Documents, the Debtors propose to provide an adequate protection package to

Silverview, consisting of replacement liens to the extent of any Diminution in Value and, to the extent that such replacement liens do not adequately protect the Diminution in Value of Silverview's interests in the Existing Silverview Priority Collateral, an allowed superpriority administrative expense claim to the extent of such Diminution in Value, in each case and, as applicable, subject to the Carve-Out and Senior Liens, the Lien Priority Chart, the Claim Priority Chart and the Intercreditor Agreement.

49.     The DIP Facility is projected to provide the Debtors with the necessary liquidity to transition smoothly into these chapter 11 cases, administer their estates, and commence the contemplated sale process.  Based on my experience and knowledge of the Debtors' current capital structure, as well as the Debtors' operations, and efforts to obtain financing, I do not believe that the Debtors could have obtained financing on more favorable terms from sources other than the DIP Lenders and are similarly unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  Moreover, the DIP Facility is an essential component of a broader sale transaction contemplated by the Support Agreement, and the Debtors recognized that it would be particularly difficult to secure alternative financing because all of the Debtors' cash and material assets are encumbered by existing liens, and the Consenting Lenders indicated they would not consent to "priming" DIP financing provided by a third-party.  Notably, the terms of the proposed DIP Facility are also favorable to the Debtors and include a significantly lower interest rate than the rates on the Existing Silverview First Lien Loan Agreement and the Existing Second Lien Loan Agreement, and do not include any other fees.

50.     The Debtors have an immediate need to obtain the DIP Facility on an interim basis to, among other things, (i) permit the orderly continuation of their business; (ii) maintain business relationships with their vendors, suppliers, customers, and other parties; (iii) make payroll; (iv) pay

the costs of the administration of these chapter 11 cases and the sale process; and (v) satisfy other working capital and general corporate needs, all as set forth on, and consistent with, the Approved Budget (as defined in the DIP Motion).  The Debtors require immediate access to sufficient working capital and liquidity through the incurrence of the new indebtedness for borrowed money and other financial accommodations to avoid irreparable harm by, among other things, facilitating a value maximizing sale process.  The Debtors will not have sufficient sources of working capital and financing to operate their business or maintain their properties in the ordinary course of business throughout these chapter 11 cases without the DIP Facility.

51.    I believe that the commercial terms of the DIP Facility are reasonable and provide sufficient liquidity to fund these chapter 11 cases and conduct the Debtors' sale process.  I also believe that approval of the DIP Facility will instill much needed confidence in parties that are critical to the success of these chapter 11 cases, including the Debtors' employees, vendors, suppliers, and customers.  In addition, I believe the DIP Facility will increase the opportunity for a robust, competitive postpetition sale process by facilitating the Debtors' efforts to preserve operations and their going-concern value during that process.  Without access to the DIP Facility, the Debtors would be unable to avoid a value-destructive liquidation—which would result in irreparable harm to the Debtors and their stakeholders.

52.    The Debtors, with the assistance of their advisors, have determined that the DIP Facility will be sufficient to support the Debtors' operations through the pendency of these chapter 11 cases and adequate, considering all available assets, to pay administrative expenses due or accruing during the period covered by the Budget.

53.    Absent authority from the Court to obtain secured credit, as requested, on an interim basis pending the final hearing, the Debtors will suffer immediate and irreparable harm and would

likely be forced to liquidate.  Accordingly, I believe that the interim relief requested is critical to preserving and maintaining the going concern value of the Debtors and facilitating their restructuring efforts.

## VI.  First Day Motions

54.     Contemporaneously herewith, the Debtors filed a number of First Day Motions, in addition to the DIP Motion, seeking orders granting various forms of relief intended to facilitate the efficient administration of these chapter 11 cases and otherwise maximize and preserve the value of the estates.  The First Day Motions include:

- *Debtors' Motion for an Order, Pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1, Authorizing the Joint Administration of the Debtors' Chapter 11 Cases;*

- *Debtors' Application for an Order Appointing Epiq Corporate Restructuring, LLC as Claims and Noticing Agent, Effective as of the Petition Date;*

- *Debtors' Motion for Interim and Final Orders (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Payment, (III) Establishing Procedures for Determining Additional Adequate Assurance of Payment, and (IV) Setting a Final Hearing Related Thereto;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and Related Obligations, (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief;*

- *Debtors' Motion for Interim and Final Orders (I) Authorizing (A) Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with the Debtors' Insurance Programs, Including Payment of Policy Premiums and Broker Fees, and (B) Continuation of Premium Finance Agreements; (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay and Honor Certain (A) Prepetition Wages, Benefits, and*

*Other Compensation Obligations; (B) Prepetition Employee Business Expenses; and (C) Workers' Compensation Obligations; (II) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Obligations; and (III) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of (A) Critical Vendors, (B) 503(b)(9) Claimants, and (C) PACA/PASA Claimants; (II) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Obligations; and (III) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing and Approving Continued Use of Cash Management System, (II) Authorizing Use of Prepetition Bank Accounts and Business Forms, (III) Authorizing Performance of Intercompany Transactions in the Ordinary Course of Business and Granting Administrative Expense Status for Postpetition Intercompany Claims, and (IV) Granting Certain Related Relief; and*

- *Debtors' Motion for Entry of Interim and Final Orders (I) (A) Authorizing Continuation of, and Payment of Prepetition Amounts Incurred in Connection with, Customer Programs and (B) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto, and (II) Granting Related Relief.*

55. I am familiar with each First Day Motion, and I believe that the relief sought in each First Day Motion (i) is necessary to minimize disruption due to the commencement of these chapter 11 cases and to permit the Debtors to administer these chapter 11 cases smoothly, (ii) constitutes a critical element in the Debtors' achievement of their goals in this chapter 11 process, and (iii) best serves the Debtors' estates and their stakeholders' interests. I have reviewed each First Day Motion, and the facts and descriptions of the relief set forth therein are true and correct to the best of my information and belief with appropriate reliance on the Debtors' relevant advisors and are incorporated herein in their entirety by reference. If asked to testify as to the facts supporting each of the First Day Motions, I would testify as to such facts.

56. It is my belief that the relief sought in each of the First Day Motions is necessary to the success of the Debtors' chapter 11 efforts and the maximization of the value of the Debtors'

estates through a restructuring process. It is my further belief that, with respect to those First Day

Motions requesting the authority to pay specific prepetition claims, the relief requested is essential

to the Debtors' chapter 11 efforts and necessary to avoid immediate and irreparable harm to the

Debtors' estates.

57.    I hereby certify that the foregoing statements are true and correct to the best of my

knowledge, information, and belief, and respectfully request that all of the relief requested in the

First Day Motions be granted, together with such other and further relief as is just and proper.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge and belief.

Dated: September 8, 2025

/s/ *James Katchadurian*
James Katchadurian
Chief Restructuring Officer
Pinstripes Holdings, Inc., *et al.*

## **EXHIBIT A**

**Organizational Chart**



# **EXHIBIT B**

## **Support Agreement**

## SUPPORT AGREEMENT

**THIS SUPPORT AGREEMENT** (along with the exhibits annexed hereto, this "<u>Agreement</u>") is made and entered into as of August 27, 2025, by and among:

a.　　Silverview Credit Partners LP, a Delaware limited partnership (in its individual capacity, "<u>SCP</u>"), (i) in its capacity as agent under that certain loan agreement dated as of March 7, 2023 (as amended, restated, supplemented, and/or otherwise modified, the "<u>Silverview Loan Agreement</u>," together with related documents and agreements, the "Silverview Loan Documents") (in such capacity, the "<u>Silverview Agent</u>"), by and among Pinstripes, Inc., a Delaware corporation, as borrower ("<u>Borrower</u>"), Pinstripes Holdings, Inc., a Delaware Corporation ("<u>Holdings</u>", and together with Borrower, the "<u>Credit Parties</u>" or "<u>Company</u>"), Silverview Agent and the lenders party thereto (the "<u>Silverview Lenders</u>", and together with Silverview Agent, in their respective capacities pertaining to the Silverview Loan Agreement and the Second Lien Documents, the "<u>Consenting Lenders</u>") and (ii) in its capacity as agent under that certain loan agreement dated as of December 29, 2023 by and between Borrower, Holdings, SCP, in its capacity as agent (in such capacity, "<u>Second Lien Agent</u>") (as successor to Oaktree Fund Administration, LLC) and the lenders party thereto (the "<u>Second Lien Lenders</u>" and together with the Second Lien Agent, in their respective capacities pertaining to the Second Lien Credit Agreement and the Second Lien Documents, the "<u>Second Lien Parties</u>") (as amended, restated, supplement, and/or otherwise modified, the "<u>Second Lien Credit Agreement</u>" and documents related thereto, the "<u>Second Lien Documents</u>");

b.　　Borrower, and each of its subsidiaries;

c.　　Holdings, and each of its subsidiaries; and

d.　　each person or entity party to the Silverview Loan Documents, the Granite Loan Documents, or the Second Lien Documents as a "Guarantor"  (together with Holdings, collectively, "<u>Guarantors</u>" and each a "<u>Guarantor</u>"). Such Guarantors, together with Credit Parties, are hereinafter referred to as, collectively, the "<u>Debtors</u>" and each a "<u>Debtor</u>".

Each of the foregoing entities (a) through (e) above is referred to herein individually as a "<u>Support Party</u>" and collectively as the "<u>Support Parties</u>").  To the extent other entities execute a Joinder in the form attached hereto, such entities shall be "Support Parties" for purposes of this Agreement.

Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Silverview-Granite ICA (as defined below).

# RECITALS

**WHEREAS**, Borrower, Holdings, each of the Guarantors (as defined in the Silverview Loan Documents), Silverview Agent and Silverview Lenders are parties to the Silverview Loan Agreement, pursuant to which the Silverview Lenders agreed to make certain term loans to Borrower;

**WHEREAS**, SCP (or its subsidiaries or affiliates) purchased and now owns all of the claims,  rights and interests of the former lenders and agent to and under the Second Lien Documents;

**WHEREAS**, Borrower, GCCP II Agent, LLC, an Illinois limited liability company, in its capacity as agent under that certain Term Loan and Security Agreement, dated as of April 19, 2023 (as amended, restated, supplemented, and/or otherwise modified, the "Granite Loan Agreement" and together with all documents and agreements related thereto, the "Granite Loan Documents") (in such capacity, the "Granite Agent"), by and among Borrower, Granite Agent and the lenders party thereto (the "Granite Lenders", and together with Granite Agent, the "Granite Parties"), Granite Agent and Granite Lenders are parties to the Granite Loan Agreement, pursuant to which the Granite Lenders agreed to make certain term loans to Borrower;

**WHEREAS**, Granite Agent and Second Lien Agent (as successor to previous agent under the Second Lien) are parties to that certain Intercreditor Agreement dated as of December 29, 2023 (as amended, restated, supplemented and/or otherwise modified, the "Granite-Oaktree ICA");

**WHEREAS**, Silverview Agent and Granite Agent entered into that certain Agreement Regarding Collateral dated as of April 19, 2023 (as amended, restated, supplemented and/or otherwise modified, the "Silverview-Granite ICA");

**WHEREAS**, all of the obligations of Borrower under the Silverview Loan Documents are secured on a first priority basis by Liens on the Silverview Priority Collateral (as defined in the Silverview-Oaktree ICA);

**WHEREAS**, all of the obligations of Borrower under the Granite Loan Documents are secured on a first priority basis by Liens on the Granite Priority Collateral (as defined in the Silverview-Oaktree ICA);

**WHEREAS**, all of the obligations of Borrower under the Second Lien Documents are secured on a second priority basis by Liens on the Silverview Priority Collateral and the Granite Priority Collateral, including as set forth in Granite-Oaktree ICA;

**WHEREAS**, Debtors require funding to stabilize their operations, fund a sale process and maximize value;

**WHEREAS**, in connection with the 363 Sale Process (as defined below), the Consenting Lenders are willing to (i) provide pre-petition and post-petition financing to the Debtors on the

terms and conditions set forth herein and (2) support the sale process in accordance with the terms of this Agreement and exhibits annexed hereto; and

**WHEREAS**, the Support Parties have engaged in good faith and arm's-length negotiations regarding transactions described and defined herein in order to maximize the value of Debtors and with the intention of implementing the transactions set forth herein, and contemplated hereby, subject to the terms and conditions of this Agreement.

**NOW, THEREFORE**, in consideration of the promises and mutual covenants and agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Support Parties hereto covenant and agree as follows:

<u>**AGREEMENT**</u>

<u>**Section 1.**</u>        <u>**Agreement Effective Date**</u>.

1.01    This Agreement and each of the obligations, commitments, representations, warranties, and covenants contained herein shall become effective and binding on each of the Support Parties on the last date (the "<u>Effective Date</u>") on which each of the Support Parties has executed this Agreement and delivered an executed counterpart of this Agreement to the other Support Parties.

<u>**Section 2.**</u>        <u>**The 363 Sale Process and 363 Sale Transaction**</u>

2.01    **Commencement of Chapter 11 Cases**: Debtors agree to commence cases (the "<u>Chapter 11 Cases</u>"), for each of the Debtors, under Chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"), by filing a petition for each Debtor consistent with the Bankruptcy Code, by no later than seven (7) business days from the Debtors' receipt of the Bridge Loan (the "<u>Petition Date</u>"), as such date may be amended with the consent of the Consenting Lenders.

2.02    **Objective and Timeline**: The Chapter 11 Cases are to be commenced with the purpose of establishing and commencing an expedited sale process for the sale of Debtors' assets pursuant to Section 363 of the Bankruptcy Code (the "<u>363 Sale</u>"), which sale process shall (1) include a Stalking Horse Bid (as defined below) from the Consenting Lenders (and their designated Stalking Horse Bidder) and (2) conclude with the consummation of the 363 Sale (the processes and objectives in the foregoing, the "<u>363 Sale Process</u>" and the transactions required to facilitate the 363 Sale Process and consummation the 363 Sale, the "<u>363 Sale</u> <u>Transaction</u>").  During the Chapter 11 Cases, the Debtors will continue to operate as going concern, to the extent of available funding in the Budget (as defined in the DIP Term Sheet), those locations identified by the Consenting Lenders. The Debtors agree to facilitate and consummate the pre-Petition Date closure of all other store locations that the Stalking Horse Bidder does not intend to acquire in connection with the Stalking Horse Bid (as set forth on Exhibit I to the DIP Term Sheet (as defined below)).

2.03    **Financing of Pre-Petition Date Period**: The Consenting Lenders shall provide agreed-upon funding, in a manner acceptable to the Consenting Lenders, in the amount of $540,000, and secured only by the Silverview Priority Collateral, within one (1) business day of execution of this Agreement to fund the Debtors' operations, negotiations of the Stalking Horse Bid and the preparation of the Chapter 11 Cases, consistent with the budget attached hereto as **Exhibit 1** (such budget, the "Pre-Filing Budget"), for the period from the Effective Date until the Petition Date (such financing, the "Bridge Funding"). The Bridge Funding shall be funded by the Consenting Lenders in equal amounts (as further detailed in the DIP Term Sheet). The Bridge Funding shall be subject to definitive documentation and on terms and conditions acceptable to the Support Parties. The Debtors shall not permit (x) disbursements (including with respect to the fees of the Debtors' professionals) for any one week period to exceed one hundred and ten percent (110%)  of the budgeted amount of disbursements set forth in the Pre-Filing Budget for such one week period and (y) receipts for such one weeks period to be less than ninety percent (90%) of the budgeted amount of receipts with respect to the store locations that will not be shuttered prior to the Petition Date as set forth in the Pre-Filing Budget for such one week period, in each case of the foregoing subclauses (x) and (y) on an aggregate basis.  Such Bridge Funding shall be rolled into DIP (as defined below). Condition precedent to entry into, and funding of, the Bridge Funding is the representation by the Debtors that the leases for all store locations set forth on Exhibit 1 to the DIP Term Sheet remain in effect and have not been terminated, except as set forth on Exhibit 1 to the DIP Term Sheet.  Condition precedents to the  entry into the DIP are (i) the currently-operating locations and stores are only those  set forth on Exhibit 1 to the DIP Term Sheet and (ii) arrangements and/or mechanics acceptable to Consenting Lenders providing that all decisions pertaining to, and the control of, the proceeds of the Bridge Funding and any cash of the Debtor are made by, and residing with, James Katchadurian as future CRO (as defined below) and any use of the proceeds of Bridge Funding or other cash shall be consistent with the Pre-Filing Budget.

2.04    **Financing of Chapter 11 Cases**: The Consenting Lenders and the Debtors will negotiate DIP-financing documents pursuant to which Consenting Lenders shall fund the Chapter 11 Cases by a debtor-in-possession financing facility (the "DIP"). The DIP shall be consistent with the terms set forth on the separate term sheet attached hereto as **Exhibit A** and shall contain the "Milestones" as defined therein (such term sheets, the "DIP Term Sheet"), which Milestones shall be consistent with a 45 day sale process and include the following:

- **Bid Deadline**: By no later than 35 days after the Petition Date;
- **Auction**: By no later than 40 days after the Petition Date;
- **Sale Hearing**: By no later than 45 days after the Petition Date; and
- **Sale Closing**: As soon after the Sale Hearing as practicable for the Stalking Horse Bidder.

As used herein, (i) "Stalking Horse Bidder" means the entity identified by the Consenting Lenders to make the Stalking Horse Bid, which may be  Punch Bowl Social, Inc. or one of its subsidiaries or affiliates (collectively, "Punch Bowl") or which Stalking Horse Bidder may be in contractual or other agreement or arrangement with Punch Bowl Social with respect to the operation of any

purchased assets, and (ii) "<u>Stalking Horse Bid</u>" means a bid by the Stalking Horse Bidder for assets of the Debtors including certain Silverview Priority Collateral and unencumbered assets, but excluding any Granite Priority Collateral, and which bid will include a credit bid by the Stalking Horse Bidder of an aggregate amount of the secured obligations (including the DIP but excluding the Second Lien Obligations) in an initial amount of $15 million (which debt may be conditionally assigned to the Stalking Horse Bidder by the Consenting Lenders prior to the closing of the sale to the Stalking Horse Bidder), plus the payment obligation to the Debtors' investment banker in an amount acceptable to Consenting Lenders and Stalking Horse Bidder, administrative rent incurred through the date of closing and the assumption of certain other obligations and claims in each case acceptable to the Stalking Horse Bidder; provided that the Stalking Horse Bid may be increased at any subsequent auction for the sale of the Debtors' assets (including a credit bid of all of the Consenting Lenders' secured debt, including the debt under the Second Lien Documents). For the avoidance of doubt, the Consenting Lenders may designate any entity to be the Stalking Horse Bidder, including to form an acquisition entity ("<u>NewCo</u>") to serve as the Stalking Horse Bidder, and which NewCo may credit bid any debt that is contributed to it. To the extent that the CRO determines, in his or her reasonable judgment after consultation with the Consenting Lenders and the Stalking Horse Bidder, that the Chapter 11 cases are or will become administratively insolvent as a result of insufficient funding to consummate the transaction the Stalking Horse Bidder or other party, the Consenting Lenders and/or Stalking Horse Bidder shall either agree, in their sole discretion, (i) to increase the DIP in such incremental amount as may be required, (ii) assume such additional administrative obligations or (iii) consent to the conversion, dismissal or other disposition of the Chapter 11 cases.

2.05   **Chief Restructuring Officer**: On the Petition Date the Debtors shall appoint a chief restructuring officer acceptable to the Consenting Lenders (such acceptable chief restructuring officer, the "CRO"). The CRO shall be retained by the Debtors on terms (including, without limitation, the scope of services, authority, and renumeration) acceptable in all respects to the Consenting Lenders (this provision 2.05, the "<u>CRO Requirement</u>").

**Section 3.**      **Commitments of the Support Parties**.

(a)        <u>Agreement to Support the 363 Sale Process</u>. Until an Agreement Termination Event (as defined below) has occurred, each Support Party (severally and not jointly) agrees to take (and shall cause its affiliates and subsidiaries, and their respective representatives, agents, and employees to take) such steps as are reasonably necessary to support and achieve approval and consummation of the 363 Sale Transaction, including (but not limited to):

i.        negotiating in good faith with the other Support Parties, and, upon receipt of requisite internal approvals, executing and delivering all the documents necessary to effectuate a 363 Sale Transaction as described herein (the "<u>363 Sale Transaction Documents</u>"), acting reasonably;

ii.        using reasonable efforts to consummate and complete the 363 Sale Transaction, including taking reasonably necessary actions in furtherance of this Agreement; and

iii.    not otherwise commencing any proceeding or opposition to alter any of the terms of the 363 Sale Process, or taking any other action that is materially inconsistent with the approval and consummation of the 363 Sale Transaction.

(b)    Agreement Not to Interfere. Each Support Party agrees that, until an Agreement Termination Event has occurred, it will not, and will cause its affiliates and subsidiaries, and their respective representatives, agents, and employees, not to: object to, delay, postpone, challenge, reject or take any other action to oppose or interfere, directly or indirectly, in any material respect with the approval, acceptance or implementation of the 363 Sale Process and 363 Sale Transaction as set forth herein. Notwithstanding anything herein to the contrary, nothing herein shall limit or otherwise restrict the Consenting Lenders ability to enter into any subsequent transaction with any third party with respect to any assets purchased by Stalking Horse Bidder or Consenting Lenders pursuant to the 363 Sale Process or 363 Sale Transaction.

(c)    Agreement not to Transfer Claims or Interests. Except as otherwise contemplated herein, each Support Party agrees that, until an Agreement Termination Event has occurred, it will not, and will cause its affiliates and subsidiaries, and their respective representatives, agents, and employees not to sell, pledge, hypothecate, or otherwise transfer any claim against, or interest in, Debtors, unless each other Support Party consents to such sale, pledge, hypothecation or transfer and such sale, pledge, hypothecation of transfer is subject to this Agreement and the party to whom the sale, pledge, hypothecation or transfer is made executes and delivers to each Support Party a Joinder to this Agreement agreeing to be bound by this Agreement in all respects.

(d)    Good Faith Cooperation.  The Support Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable and reasonably necessary) in respect of all matters concerning the implementation and consummation of the 363 Sale Process and 363 Sale Transaction.  Debtors shall facilitate lease negotiations between Consenting Lenders, the Consenting Lenders' designee (which may include Punch Bowl Social or another third party), and landlords and other counterparties to the Debtor's various leases. Consenting Lenders, their designee and their consultants will be party to and participate in any lease negotiations and Consenting Lenders' consent is required for any amendments to any Debtor lease. Notwithstanding the foregoing, the Debtors are not restricted in any way from facilitating similar discussions with other potential bidders.

(e)    Information.  Debtors agree to promptly provide to the Consenting Lenders and their professionals: (i) reasonable access to the Company's books, records, and facilities, in their possession or control; (ii) their time during normal business hours for the purposes of answering questions and providing information regarding the Company's assets, liabilities, structure, finances and operations and, if requested, input into the planning process with respect to the 363 Sale Process and 363 Sale Transaction; (iii) any information provided to any existing or prospective financing sources, consultants, advisors or other third parties related to the Company; (iv) any material developments or any material conversations with any third party regarding the 363 Sale Process and 363 Sale Transaction unless prohibited by court order or applicable law; and (v) any all information and documents as Consenting Lenders may reasonably request regarding

6

the Company's finances and operations. For the avoidance of doubt, Consenting Lenders shall keep any confidential information that is provided pursuant to the above confidential to the same extent as if it were their own confidential information.

(f)    Commitment of the Debtors. Subject to the terms and conditions of this Agreement, each Debtor agrees that it shall, and shall cause each of its subsidiaries and affiliates, to:

i.    maintain and preserve, to the extent of available funding under the DIP, its business and operations in the ordinary course, taking into account the 363 Sale Process and 363 Sale Transaction, and maintain and preserve the assets and properties of the Company in a manner consistent with good industry practice and, in any event, in good working order, repair and condition (ordinary wear and tear excepted) consistent with the DIP Term Sheet;

ii.    support and take all actions as are reasonably necessary or appropriate to obtain any and all required regulatory, governmental and/or third-party approvals to timely consummate the 363 Sale Process and 363 Sale Transaction in accordance with the dates set forth in the Milestones;

iii.    adopt any resolutions or authorizations necessary or appropriate in support of the foregoing and the 363 Sale Process and 363 Sale Transaction more generally;

iv.    provide to Consenting Lenders and their professionals the information set forth in Section 3(f) herein, subject to the terms thereof;

v.    not (1) pledge, encumber, assign, sell, or otherwise transfer or contract to pledge, encumber, assign, sell, or otherwise transfer, in whole or in part, any asset of the Company without the prior written consent of the Consenting Lenders (if prior to the Petition Date) or court order after consultation with the Consenting Lender (if after the Petition Date) or (2) otherwise take any action in contravention of the 363 Sale Process;

vi.    not take, or fail to take, any action that would cause a change to the tax status of any entity of the Company, other than as contemplated by this Agreement or directed by Consenting Lenders;

vii.    deliver to Consenting Lenders: (1) the Pre-Filing Budget and (2) a 7-week initial budget (the "Initial Budget"), in form and substance satisfactory to Consenting Lenders, each of the Pre-Filing Budget and Initial Budget to set forth: (i) anticipated cash receipts; (ii) cash disbursements and accruals, (iii) a report setting forth the Company's actual cash receipts and accrued expenditures on a week by week basis compared to the, as applicable, Initial Budget or Pre-Filing Budget, with narrative explanations of key differences; (iv) draws under the applicable financing; and (v) professional fees;

viii.    provide notice to Consenting Lenders of: (i) any termination of any material contract with the Company; and (ii) the occurrence of any event that materially adversely affects the operations or business of the Company or that could materially adversely affect the 363 Sale Process or 363 Sale Transaction, each to the extent it occurs following entry into this Agreement;

ix.    not declare, set aside, or pay any dividends or other distributions (whether in the form of cash, equity, or property, or any combination thereof) without the consent of Consenting Lenders;

x.    not make (x) disbursements (including with respect to the fees of the Debtors' professionals) for any one week period to exceed one hundred and ten percent (110%) of the budgeted amount of disbursements set forth in the applicable Budget for such one week period and not permit (y) receipts for such one weeks period to be less than ninety percent (90%) of the budgeted amount of receipts set forth in applicable Budget for such one week period, in each case of the foregoing subclauses (x) and (y) on an aggregate basis;

xi.    not solicit, negotiate, terminate or enter into any transaction that is material to the business or the assets of the Company other than transactions in the ordinary course of business that are consistent with past practices, except (i) as expressly set forth in this Agreement, (ii) approved by the Bankruptcy Court and consistent with this Agreement or (iii) with the prior written consent of Consenting Lenders; provided that the Debtors shall be permitted to continue to market the Debtors' assets in connection with an ultimate sale of the assets as contemplated herein; provided further that nothing herein shall impact the Debtors' agreement to designate the Stalking Horse Bidder and the Stalking Horse Bid; and

xii.    Notwithstanding anything herein to the contrary, in the event any Debtor receives a proposal or expression of interest with respect to an alternative transaction, the Debtors acknowledge and agree that Debtors are, and will continue to be, bound by its obligations set forth in this Agreement and will proceed with the Stalking Horse Bidder and Stalking Horse Bid as set forth herein, provided further than any offeror of an alternative proposal that qualifies as an "acceptable bidder" under applicable bidding procedures may compete for such assets in an ultimate auction for the Debtors' assets or any portion thereof).

(g)    Additional Provisions Regarding Commitments. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Support Party or applicable board of directors, board of managers, or similar governing body of a Support Party, after consulting with external counsel, to take any action or to refrain from taking any action with respect to the 363 Sale Process and 363 Sale Transaction to the extent taking or failing to take such action would violate applicable Law or its applicable fiduciary obligations under applicable Law.

**Section 4.    Acknowledgements, Representations, Warranties, and Covenants**.

4.01    General. Each of the Support Parties represents, warrants, and covenants as to itself only, severally and not jointly, to each other Support Party, as of the date of this Agreement, as follows (each of which representation, warranty, and covenant shall expire upon entry into, and approval by the Bankruptcy Court of, definitive asset purchase documents):

(a)    Enforceability. To the extent that it is not a natural person, it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. This Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as may be limited by applicable laws relating to or

8

limiting creditors' rights generally (including the Bankruptcy Code) or by equitable principles or a ruling of a court of competent jurisdiction.

(b)    No Consent or Approval. Except as expressly provided in this Agreement, no registration or filing with, consent or approval of, or notice to, or other action, is required by any other person or entity in order for it to carry out its respective obligations in accordance with the 363 Sale Process and 363 Sale Transaction and to perform its respective obligations under this Agreement, subject to Bankruptcy Court approval.

(c)    Power and Authority. To the extent that it is not a natural person, it has all requisite power and authority to enter, and has no conflicts with respect to entry, into this Agreement and to carry out its respective obligations under the 363 Sale Process and 363 Sale Transaction  and to perform its respective obligations under this Agreement, subject to Bankruptcy Court approval. To the extent that it is a natural person, it has full and absolute legal capacity and authority to enter into this Agreement and to carry out its respective obligations under the 363 Sale Process and 363 Sale Transaction  and to perform its respective obligations under this Agreement and the 363 Sale Process and 363 Sale Transaction, subject to Bankruptcy Court approval.

(d)    Authorization. The execution and delivery of this Agreement and the performance of the obligations hereunder have been duly authorized by all necessary action and Support Parties.

(e)    No Conflict. The execution, delivery and performance by it of this Agreement and of the actions in the 363 Sale Process and 363 Sale Transaction does not and shall not, subject to Bankruptcy Court approval: (a) violate any provision of law, rule, or regulation applicable to it or, to the extent it is not a natural person, its certificate of incorporation or by-laws (or other organizational document) or those of any of its subsidiaries; or (b) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under, any material contractual obligation to which it is a party or, to the extent it is not a natural person, under its certificate of incorporation or by-laws (or other organizational documents) or those of any of its subsidiaries.

4.02    Consenting Lenders' Acknowledgements, Representations and Warranties.

(a)    Ownership of Claims. Each Consenting Lender represents and warrants to each of the other Support Parties hereto that, as of the date it executes this Agreement:(i) the Silverview Lenders and Second Lien Lenders are the sole legal and beneficial owners of all amounts owing under  the Silverview Loan Documents and Second Lien Loan Documents, respectively, and hold such amounts free and clear of any pledge, lien, security interest, charge, claim, proxy, voting restriction, right of first refusal (other than any such right among SCP and Granite pursuant to any agreement) or other limitation on disposition of any kind (other than those purchase options contained in certain intercreditor agreements and Purchase Option Agreement dated as of December 29, 2023, between (among others)  Silverview Agent and  Granite Agent, in each case that would adversely affect in any way each Consenting Lenders' performance of its obligations contained in this Agreement at the time such obligations are required to be performed; (ii) has investment or voting discretion or control with respect to all amounts owing under the Silverview Loan Documents and Second Lien Documents and has the power and authority to bind

the beneficial owner(s) of such amounts to the terms of this Agreement; and (iii) has full power and authority to vote on and consent to all matters concerning such amounts and to exchange, assign, and transfer such debt, except as prohibited by this Agreement.

**Section 5.    Termination Events**.

5.01    <u>Agreement Termination Events</u>. This Agreement and the obligations hereunder shall be terminated, unless waived in accordance with <u>Section 6.16</u>, upon the occurrence of any of the following events (each, an "<u>Agreement Termination Event</u>" and collectively, the "<u>Agreement Termination Events</u>"); provided, <u>however</u>, if a voluntary chapter 11 case is commenced for any of the Debtors with the consent of the Consenting Lenders, this Agreement shall continue with respect to such Debtor, and shall not be terminated with respect to such Debtor, until the earlier of: (i) the dismissal of such chapter 11 case; (ii) the conversion of such chapter 11 case to a chapter 7 case; (iii) the closing of the 363 Sale Transaction for such Debtor or any other sale of all or substantially all of the assets of such Debtor ; or (iv) the indefeasible payment in full of (a) all of the DIP (b) all of the Silverview Debt (as defined in the DIP Term Sheet) and (c) all of the Existing Second Lien Obligations.

(a)    mutual written consent by the Support Parties to terminate this Agreement and obligations hereunder;

(b)    in the event that the Chapter 11 Cases are not commenced within 15 days of the Effective Date;

(c)    prior to the Filing Date, the Debtors fail to close certain stores and locations that are not being acquired pursuant to the Stalking Horse Bid;

(d)    the board of directors, board of managers, or such similar governing body of any Support Party determines, after consulting with counsel, that proceeding with the 363 Sale Process or 363 Sale Transaction would be inconsistent with the exercise of its fiduciary duties or applicable Law;

(e)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order declaring this Agreement, the 363 Sale Process, the 363 Sale Transaction or any material portion hereof or thereof to be unenforceable, or enjoining the consummation of such process or transaction, and such ruling, judgment, or order has not been reversed or vacated within 14 calendar days after such issuance;

(f)    the commencement of an involuntary case against the Company or any of the legal entities that comprise the Company under the Bankruptcy Code, if such involuntary case is not contested by the Company within ten days of its commencement and dismissed within 45 days of its commencement (so long as no order for relief is therefore entered);

(g)    the commencement of any voluntary case under the Bankruptcy Code, or any insolvency or similar proceeding under the laws of any state, federal, or foreign jurisdiction, if such case or proceeding is not dismissed within 5 days of its commencement; <u>provided</u>, <u>however</u>,

that this provision shall not apply to the commencement of any voluntary chapter 11 case consistent with, and as contemplated by, this Agreement;

(h)     the material breach of this Agreement by any Support Party, provided that the non-breaching Party provides written notice to the breaching Support Party of the breach and such breach shall continue unremedied for a period of five (5) business days after written notice thereof has been given to such breaching Support Party by the non-breaching Support Party; provided further than unless so terminated by the non-breaching party, the obligations of breaching party under this Agreement shall continue in all respects; provided further, for the avoidance of doubt, any violation of the CRO Requirement or other default of the requirements in Section 2.05 herein shall constitute a material breach of this Agreement and an Agreement Termination Event.

(i)     automatically without any further required action or notice by any Support Party on the closing of the 363 Sale Transaction; and

(j)     the failure by the Debtors to abide by, and expend funds consistent with section 3(g)x. of this Agreement, the Pre-Filing Budget, the Initial Budget or the Budget.

5.02     Effect of Agreement Termination Event. Upon the occurrence of an Agreement Termination Event and following the conclusion of any applicable notice period: (a) this Agreement shall be of no further force and effect and each Support Party hereto shall be released thereafter from its future commitments, undertakings and agreements under or related to this Agreement, and shall have the rights and remedies that it would have had with respect to such future commitments, undertakings and agreements had it not entered into this Agreement, and in connection therewith shall be entitled to take all actions that it would have been entitled to take had it not entered into this Agreement; provided, however, the right to terminate this Agreement under this Section 5 shall not be available to any Support Party whose failure to fulfill any material obligation under this Agreement has been the cause of, or resulted in, the occurrence of an Agreement Termination Event; and (b) any Agreement Termination Event may be waived by the non-breaching party(ies) and only in accordance with this Agreement and the procedures established by Section 6.16(a), in which case the Agreement Termination Event so waived shall be deemed not to have occurred, this Agreement shall be deemed to continue in full force and effect, and the rights and obligations of the Support Parties shall be restored, subject to any modification set forth in such waiver. Notwithstanding the foregoing, this Section 5.02 shall survive termination of this Agreement.

### Section 6.     Miscellaneous.

6.01     No Solicitation. Notwithstanding anything to the contrary, this Agreement is not and shall not be deemed to be an offer for the issuance, purchase, sale, exchange, hypothecation, or other transfer of securities or a solicitation of an offer to purchase or otherwise acquire securities for purposes of the Securities Act and the Securities Exchange Act of 1934, as amended (the "Exchange Act").

6.02     Cooperation on Tax Matters. All Support Parties shall cooperate in all reasonable respects in connection with the tax structuring of the 363 Sale Transaction, in connection with the filing of any and all tax returns, arising out of the 363 Sale Process and 363 Sale Transaction, and

any audit, litigation or other proceeding arising out of the 363 Sale Process or 363 Sale Transaction. Such cooperation shall include the provision of and access to all such records and information that are deemed by Consenting Lenders or their advisors to be relevant to any such tax matters, to the extent such records or information exist within the control of the Company, and making employees of the Company, and their respective affiliates, and the Company's accounting firms available on a mutually convenient basis to provide an explanation of any records, information and other material provided hereunder.  Notwithstanding anything to the contrary in this <u>Section 6.02</u>, Consenting Lenders agree to maintain all information received pursuant to this <u>Section 6.02</u> confidential. For the avoidance of doubt, by entering into 363 Sale Transaction contemplated by this Agreement, no Support Party hereto or thereto guarantees any tax-related outcome, even if such outcome is sought or intended by such 363 Sale Transaction.

6.03    <u>Purpose of Agreement</u>. Each of the Support Parties acknowledges and agrees that this Agreement is being executed in connection with negotiations concerning, and implementation of, the 363 Sale Process and 363 Sale Transaction.

6.04    <u>Complete Agreement</u>. This Agreement, and all exhibits hereto, constitutes the entire agreement between the Support Parties with respect to the 363 Sale Process as set forth herein and supersedes all prior agreements, oral or written, between the Support Parties with respect thereto; <u>provided</u>, <u>however</u>, the Silverview Loan Documents, Existing Second Lien Loan Documents) and all documents and agreements executed or delivered in connection therewith, are not included with this Agreement and remain separate and distinct agreements. No claim of waiver, modification, consent or acquiescence with respect to any provision of this Agreement shall be made against any Support Party, except on the basis of a written instrument executed by or on behalf of such Party. Each of the exhibits hereto are fully incorporated by reference herein and made a part of this Agreement as if fully set forth herein and all references to this Agreement shall include and incorporate such exhibits. To the extent there is a conflict between the DIP Term Sheet, on the one hand, and this Agreement, on the other, the terms and provisions of the Agreement will govern.

6.05    <u>Representation by Counsel</u>. Each Support Party hereto acknowledges that it has been represented by counsel (or had the opportunity to and waived its right to do so) in connection with this Agreement, the 363 Sale Process, the 363 Sale Transaction, the Bridge Funding and the DIP. Accordingly, any rule of law or any legal decision that would provide any Support Party hereto with a defense to the enforcement of the terms of this Agreement against such Support Party based upon lack of legal counsel shall have no application and is expressly waived. The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent of the Support Parties hereto.

6.06    <u>Independent Due Diligence and Decision Making</u>. Each Support Party confirms that its decision to execute this Agreement and enter into the 363 Sale Process has been based upon its independent investigation of the operations, businesses, financial and other conditions and prospects of the Company and its interests therein.

6.07    <u>Admissibility of this Agreement</u>. Each of the Support Parties hereby agrees that this Agreement and all documents, agreements and negotiations relating thereto shall not, pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, be admissible into

evidence or constitute an admission or agreement in any proceeding involving a Support Party, other than a proceeding to enforce the terms of this Agreement or as required by law; provided, however, that if the Debtors commence a Chapter 11 case, this Agreement may be disclosed and may be attached to any pleading as an exhibit.

6.08    <u>Several, Not Joint, Obligations</u>. The agreements, representations, and obligations of the Support Parties under this Agreement are, in all respects, several and not joint.

6.09    <u>Parties, Succession and Assignment</u>. This Agreement shall be binding upon, and inure to the benefit of, the Support Parties and their respective successors, assigns, heirs, executors, administrators and representatives. No rights or obligations of any Support Party under this Agreement may be assigned or transferred to any other person or entity except as otherwise expressly provided herein.

6.10    <u>No Waiver of Participation and Reservation of Rights</u>. Except as expressly provided in this Agreement, nothing herein is intended to, nor does, in any manner waive, limit, impair, or restrict any right of any Support Party or the ability of each of the Support Parties to protect and preserve its respective rights, remedies and interests.

6.11    <u>No Third-Party Beneficiaries</u>. This Agreement shall not confer any rights or remedies upon any person other than the Support Parties and their respective successors and permitted assigns as expressly set forth in this Agreement.

6.12    <u>No Damages; Remedy</u>. Each Support Party hereto recognizes and acknowledges that a breach by it of any covenants or agreements contained in this Agreement will cause the other Support Parties to sustain injury for which such Support Parties would not have an adequate remedy at law for money damages, and therefore each Support Party hereto agrees that in the event of any breach the other Support Parties shall be entitled to the remedy of injunctive relief to enforce such covenants and agreements. Each Support Party further agrees that no other Support Party or any other person shall be required to obtain, furnish, or post any bond or similar instrument in connection with or as a condition to obtaining any remedy referred to in this <u>Section 6.12</u>, and each Support Party (a) irrevocably waives any right it may have to require the obtaining, furnishing or posting of any such bond or similar instrument; and (b) shall cooperate fully in any attempt by the other Support Party to obtain such injunctive relief.

6.13    <u>Interpretation</u>. This Agreement is the product of negotiations between the Support Parties, and the enforcement or interpretation hereof is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Support Party by reason of that Support Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.

6.14    <u>Counterparts</u>. This Agreement may be executed and delivered in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Delivery of an executed copy of this Agreement shall be deemed to be a certification by each person executing this Agreement on behalf of an Support Party that such person and Support Party have been duly authorized and empowered to execute and deliver this Agreement and each other Support Party may rely on such certification.

Delivery of any executed signature page of this Agreement by telecopier, facsimile, or electronic mail shall be as effective as delivery of a manually executed signature page of this Agreement.

6.15    <u>Further Assurances</u>. Subject to the other terms of this Agreement, the Support Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, from time to time, to effectuate, as applicable, the intent of this Agreement and the 363 Sale Process more generally.

6.16    <u>Amendments and Waivers</u>.

(a)    Unless otherwise specified in this Agreement, any amendment of any term or provision of this Agreement or any waiver of any term or provision of this Agreement shall require the prior written consent (with email from counsel being sufficient) of Debtors and Consenting Lenders.

(b)    Any waiver shall not be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation, or breach of warranty or covenant.

(c)    The failure of any Support Party to exercise any right, power or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity, or to insist upon compliance by any other Support Party with its obligations hereunder shall not constitute a waiver by such Support Party of its right to exercise any such or other right, power, or remedy or to demand such compliance.

(d)    If the 363 Sale Transaction is not consummated, or following the occurrence of an Agreement Termination Event, nothing shall be construed herein as a waiver by any Support Party of any or all of such Support Party's rights, claims and defenses, and the Support Parties expressly reserve any and all of their respective rights, claims and defenses.

6.17    <u>Notices</u>. All notices hereunder shall be in writing and delivered by facsimile, e-mail, courier or registered or certified mail (return receipt requested) to the address, facsimile number or e-mail address (or at such other address, facsimile number or e-mail address as shall be specified by like notice) set forth on the signature page for such Support Party. Any notice, if mailed and properly addressed with postage prepaid or if properly addressed and sent by pre-paid courier service, shall be deemed given when received; any notice, if transmitted by facsimile, shall be deemed given when the confirmation of transmission thereof is received by the transmitter; and any notice, if transmitted by e-mail, shall be deemed given upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); <u>provided that</u> if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next business day for the recipient.

6.18    <u>Releases, Covenant Not To Sue and Exculpation</u>.

(a)    Except as otherwise set forth in this Agreement, all releases, covenants not to sue, exculpation or similar stipulations or agreements in favor of the Consenting Lenders, the Stalking Horse Bidder and any of their affiliated parties shall be subject, in all respects, to a Challenge Period (as defined below) in any cases commenced under Chapter 11 of the Bankruptcy Code. The "Challenge Period" shall be defined in the interim order approving the DIP for all parties in interest (other than the Debtors, whose releases, covenants not to sue, exculpation or similar stipulations in favor of the Consenting Lenders, the Stalking Horse Bidder or any of their affiliated parties shall be set forth in the final order approving the DIP) to object to or challenge the amount, validity, perfection, enforceability, priority or extent of the Prepetition Secured Obligations, the Prepetition Liens or the Prepetition Collateral, with the exception of the Bridge Loan, as a period of time that is the earlier of (a) the date that the Bankruptcy Court approve a Sale Transaction, or (b) seventy-five (75) days from entry of the interim order approving the DIP.

(b)    Subject to entry of a final order of a bankruptcy court approving the DIP, Debtors shall release the Consenting Lenders Released Claims (as defined below) in favor of Consenting Lenders, and each of their respective current and former affiliates, subsidiaries, members, managers, equity owners, employees, professionals, directors and officers (in each case in their respective capacities as such), and other persons and entities acceptable to Consenting Lenders (the "<u>Consenting Lender Released Parties</u>"), <u>provided</u>, <u>however</u>, that such release shall not release, waive or discharge: (a) any rights or obligations of any Support Party hereto under this Agreement or the definitive documents, or (b) any Consenting Lender Released Party from any claims, obligations or liabilities based on intentional fraud, gross negligence, or willful misconduct (in each case as determined by a court of competent jurisdiction).  Further, upon entry of a final order of a bankruptcy court approving the DIP, Debtors covenant and agree not to sue, institute, maintain, or proceed individually or as a member of any class, on any Consenting Lenders Released Claims, against Consenting Lenders and each of their respective current and former affiliates, subsidiaries, members, managers, equity owners, employees, professionals, directors and officers (in each case their respective capacities as such), and other persons and entities acceptable to Consenting Lenders.

(c)    For purposes hereof: any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims and avoidance actions, that a person would have been legally entitled to assert (whether individually or collectively), or on behalf of the holder of any claim or equity interest (whether individually or collectively) or other entity, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place at any time or arising from or related in any way in whole or in part to the Company, Silverview Loan Documents, Second Lien Documents or the negotiation, formulation, or preparation of this Agreement and the exhibits hereto, and the definitive documentation or related agreements, instruments, or other documents are herein referred to as "<u>Consenting Lenders Released Claims</u>."

(d)    Upon the effective date of the Debtors' release of the Consenting Lenders Released Claims, Consenting Lenders release the Debtor Released Claims (as defined below) in favor of Debtors and each of their respective current and former affiliates, subsidiaries, members,

15

heirs, family members, managers, equity owners, employees, professionals, directors and officers (in each case in their respective capacities as such), and other persons and entities acceptable to Debtors (the "Debtor Released Parties"), provided, however, that such release shall not release, waive or discharge: (a) any rights or obligations of any Support Party hereto under this Agreement or the definitive documents, or (b) any Debtor Released Party from any claims, obligations or liabilities based on intentional fraud, gross negligence, or willful misconduct (in each case as determined by a court of competent jurisdiction).   Further, upon execution of the 363 Sale Transaction Documents, Consenting Lenders covenant and agree not to sue, institute, maintain, or proceed individually or as a member of any class, on any Debtors Released Claims, against Debtors and each of their respective current and former affiliates, subsidiaries, members, heirs, family members, managers, equity owners, employees, professionals, directors and officers (in each case their respective capacities as such).

      (e)    For purposes hereof: any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims and avoidance actions, that a person would have been legally entitled to assert (whether individually or collectively), or on behalf of the holder of any claim or equity interest (whether individually or collectively) or other entity, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place at any time or arising from or related in any way in whole or in part to the Company, Silverview Loan Documents, Second Lien Documents or the negotiation, formulation, or preparation of this Agreement and the exhibits hereto, and the definitive documentation or related agreements, instruments, or other documents are herein referred to as "Debtors Released Claims"; provided, for the avoidance of doubt, "Debtors Release Claims" shall not release, waive, or otherwise modify or diminish any claims related to, or obligations of the Debtors with respect to, any of the (i) Silverview Loan Documents, (ii) Second Lien Documents, (iii) Bridge Funding,  and (iv) DIP, each of which shall continue in full force and effect.

      6.19    Construction. Except where the context otherwise requires, words importing the masculine gender shall include the feminine and the neutral, if appropriate, and words importing the singular number shall include the plural number and vice versa.

      6.20    Severability. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

      6.21    Headings. The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit or aid in the construction or interpretation of any term or provision hereof and shall not affect in any way the meaning or interpretation of this Agreement.

      6.22    WAIVER OF TRIAL BY JURY. EACH SUPPORT PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

6.23     Submission to Jurisdiction. Each of the Support Parties hereby irrevocably and unconditionally submits to the exclusive jurisdiction of the state or federal courts located within Delaware for purposes of any action, suit, or proceeding arising out of or relating to this Agreement or any of the transactions contemplated hereby. Each Support Party irrevocably waives, to the fullest extent permitted by applicable laws, any objection it may have now or hereafter to the venue of any action, suit, or proceeding brought in such courts or to the convenience of the forum.

6.24     GOVERNING LAW. THIS AGREEMENT, SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO THE CONFLICT OF LAWS RULES THEREOF. EACH OF THE SUPPORT PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

6.25     Public Disclosure. Prior to the consummation of the 363 Sale Process and 363 Sale Transaction, the Support Parties shall consult with one another prior to issuing any press releases or other public notices with respect to the 363 Sale Transaction, and shall provide each other with a reasonable amount of time (and not less than one business day, unless otherwise agreed) to review and comment on any such press release or other notice before it is made and shall consider in good faith any comments made by such reviewing party. The Support Parties are expressly permitted to disclose this Agreement or its terms in accordance with any applicable law, rule, or regulation. Notwithstanding the foregoing, any press releases, public documents, or any filings required by applicable state or federal law in each case disclosed by the Company shall be in form and substance reasonably acceptable in all material respects to Consenting Lenders.

6.26     No Liability. Each of the Support Parties acknowledges and agrees that none of the Support Parties shall have any liability to any other Support Party as a result of a breach by any Support Party other than the breaching Support Party of any term of this Agreement, or by any action or failure to take any action by or on behalf of any other Support Party in connection with this Agreement.

6.01     Non Disparagement. Each of the Support Parties agrees that it will not at any time make, publish, or communicate to any person or entity or in any public forum any defamatory remarks, comments, or statements concerning any other Support Party.

6.02     No Novation.  Each of the Support Parties agrees that this Agreement does not constitute a novation of any existing obligations, agreements, or liabilities of the Support Parties. All prior agreements, rights, and obligations remain in full force and effect, except as expressly modified or amended herein.

6.03     Time is of the Essence.  Each of the Support Parties agrees that time is of the essence with respect to the performance of all obligations, deadlines, and deliverables under this Agreement. Any delay in performance may be deemed a material breach, subject to the terms herein.

*[Remainder of page intentionally left blank.]*

**SILVERVIEW CREDIT PARTNERS LP**,
as Silverview Agent and Second Lien Agent

By: _____

Name:  Vaibhav Kumar
Title:  Partner

BORROWER:

**PINSTRIPES, INC.**

By: _____
Name: Dale Schwartz
Title:   CEO

GUARANTORS:

**PINSTRIPES HILLSDALE LLC**

By: _____
Name: Dale Schwartz
Title:   CEO

**PINSTRIPES AT PRAIRIEFIRE, INC.**

By: _____
Name: Dale Schwartz
Title:   CEO

**PINSTRIPES ILLINOIS, LLC**

By: _____
Name: Dale Schwartz
Title:   CEO

HOLDINGS:

**PINSTRIPES HOLDINGS, INC.**


By: _____
Name:    Dale Schwartz
Title:    CEO

**Exhibit A**

**DIP Term Sheet**

**DEBTOR IN POSSESSION CREDIT FACILITY TERM SHEET**

*Unless otherwise defined herein, capitalized terms used herein and in the accompanying Annexes shall have the meanings set forth in the Support Agreement ("**Support Agreement**") to which this Term Sheet is attached and the Existing Loan Agreement (as defined below).*

*The terms outlined below in this Debtor In Possession Credit Facility Term Sheet (this "**DIP Term Sheet**") are the terms and conditions for a senior secured, super-priority debtor-in-possession financing facility that Silverview (as defined below) would consider making available to the Debtors (as defined in the Support Agreement) pursuant to definitive documentation reflecting the definitive agreement among the parties to the DIP (as defined below), including this DIP Term Sheet and the Interim Order and Final Order (each as defined below). This DIP Term Sheet is a framework for a proposed debtor-in-possession credit facility, and the DIP terms set forth in this Term Sheet are subject in all respects to further modification by DIP Lenders (as defined below) (without the consent or approval of any other person or entity). The terms of the DIP shall be subject in all respects to definitive terms set forth in this DIP Term Sheet, the Interim Order, Final Order and other documents executed in connection therewith, and are subject to internal credit approvals, satisfactory review of documentation, and such other terms and conditions as determined by the DIP Lenders in their sole discretion.*

| | |
|---|---|
| ***Borrowers:*** | The "Borrowers" under the DIP Credit Agreement shall be (i) Pinstripes, Inc., a Delaware corporation ("***Pinstripes***"), as "borrower" party to the Existing Loan Documents (defined below), (ii) Pinstripes Holdings, Inc., a Delaware corporation ("***Holdings***"), and (iii) each subsidiary of Holdings party to the Existing Loan Documents as a "Guarantor" and any other subsidiary of Holdings that files a petition under the Bankruptcy Code (defined below) (collectively, "***Borrowers***" and each a "***Borrower***") as a debtor and debtor-in-possession in jointly-administered cases (such cases, the "***Chapter 11 Cases***")) pending as of the filing date (the "***Filing Date***") under chapter 11 of the United States Bankruptcy Code (11 U.S.C. §§ 101, et seq., "***Bankruptcy Code***") in the United States Bankruptcy Court for the District of Delaware ("***Bankruptcy Court***"). |
| ***Existing Facilities:*** | (i)      That certain Loan Agreement, dated as of March 7, 2023 (as amended, supplemented or otherwise modified from time to time, the "***Existing Silverview Loan Agreement***" and together with all documents related thereto and contemplated thereby, the "***Existing Silverview Loan Documents***"), among Pinstripes, Holdings, the |

financial institutions and other institutional investors from time to time party thereto as lenders (the "***Existing Silverview Lenders***") and Silverview Credit Partners LP, a Delaware limited partnership, as agent for the Existing Silverview Lenders (in such capacity, the "***Existing Silverview Agent***") (the Existing Silverview Lenders and the Existing Silverview Agent, collectively, "***Silverview***" or the "***DIP Lenders***"), pursuant to which existing loans and other obligations are outstanding as of the Filing Date, including all principal, interest, fees, costs and other charges (the "***Existing Silverview First Lien Obligations***").

(ii)     That certain Loan Agreement, dated as of December 29, 2023 (as amended, supplemented or otherwise modified from time to time, the "***Existing Second Lien Loan Agreement***" and together with all documents related thereto and contemplated thereby, the "***Existing Second Lien Loan Documents***") (the Existing Second Lien Loan Documents, together with the Existing Silverview Loan Documents, the "***Existing Loan Documents***"), by and among Pinstripes, Holdings, the lenders party thereto (the "***Existing Second Lien Lenders***" and together with the Existing Silverview Lenders,, the "***Existing Lenders***") and Silverview Credit Partners LP (as successor-in-interest to Oaktree Fund Administration, LLC), as agent for the lenders party thereto (in such capacity, the "***Existing Second Lien Agent***" and together with the Existing Second Lien Lenders, the "***Existing Second Lien Parties***") (the Existing Second Lien Agent, together with the Existing Silverview Agent, the "***Existing Agents***"), pursuant to which existing loans and other obligations are outstanding as of the Filing Date, including all principal, interest, fees, costs and other charges (the "***Existing Second Lien Obligations***") (the Existing Silverview First Lien Obligations and the Existing Second Lien Obligations, collectively, the "***Existing Obligations***").

***Facility:***          A super-priority, senior secured, debtor-in-possession credit facility (the "***DIP***") with a maximum credit amount of

Pinstripes
August 27, 2025
Page 3 of 20

|  | $3,000,000 ("***Maximum DIP Amount***") provided by Silverview. |
|---|---|
| ***DIP/Cash Collateral Use:*** | The DIP would consist of multi-draw term loans in an aggregate funded amount of up to the Maximum DIP Amount ("***DIP Loans***", together with all other obligations and liabilities under the DIP, the "***DIP Obligations***") provided that, notwithstanding the foregoing, the aggregate DIP Loans made during any week shall not exceed the amounts set forth in the Budget, subject to the Permitted Variance (such amount of available DIP Loans, the "***Availability***"). Pursuant to the Interim Order (as defined below), any bridge financing provided by Silverview to any Debtor on or after August 20, 2025, whether pursuant to the Existing Silverview Loan Documents or otherwise (such loan, the "***Bridge Loan***"), shall be "rolled" into the DIP Obligations and constitute DIP Loans, and the Bridge Loan together with the other DIP Loans shall not exceed the Maximum DIP Amount. |
|  | The Borrowers would only be permitted to request that DIP Lenders make DIP Loans to the extent required to pay, when due, those expenses enumerated in the Budget (defined below), subject to the Permitted Variance. |
|  | Borrowers shall be authorized to use cash collateral to pay, when due, those expenses enumerated in the Budget (defined below), subject to the Permitted Variance. |
| ***Repayment:*** | No amortization. |
|  | All unpaid principal, interest, fees, costs and expenses and all other obligations and liabilities in respect of the DIP shall be due and payable in full on the Maturity Date (as defined below), in any case whether at maturity, upon acceleration or otherwise, and if such amounts are not indefeasibly paid in full to the satisfaction of the DIP Lenders, interest, fees, costs, and expenses in respect of the DIP shall continue to accrue until all DIP Obligations are indefeasibly paid in full to the satisfaction of the DIP Lenders. |
| ***Use of Proceeds:*** | To (i) fund certain fees and expenses associated with the DIP, (ii) finance the ongoing working capital and general corporate needs of Debtors to the extent set forth in the Budget, and (iii) pay for those administrative expenses incurred during the Chapter 11 Cases that are  set forth in the Budget. |

Notwithstanding the foregoing, no portion or proceeds of the DIP or the DIP Collateral (as defined below) may be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against Silverview (including with respect to the Existing Second Lien Obligations and Existing Second Lien Loan Documents) or the DIP Lenders, except for permitted investigation costs of any official statutory committee of unsecured creditors appointed pursuant to Bankruptcy Code § 1102, subject to the limitation set forth in the Budget.

**Fees and Interest Rates:** Fees as set forth in definitive documents and acceptable to Support Parties.

Interest on all outstanding DIP Obligations shall accrue at an interest rate of 10% per annum. Interest on the outstanding DIP Obligations shall be calculated on the basis of a 360-day year and actual number of days elapsed as though it had accrued daily and as though it was deemed at the end of each calendar month to be part of the DIP Obligations for all purposes of the DIP (the "***PIK Interest***").

**Term:** The earliest to occur of (a) the date that is 50 days after the Filing Date; (b) 28 days after the Filing Date if the Final Order (as defined below) has not been entered; (c) acceleration of the obligations under the DIP after the occurrence of an Event of Default or any breach or failure to comply with the terms of the Interim Order or Final Order; (d) the effective date of a confirmed plan that provides for indefeasible payment in full, in cash of all obligations owing under the DIP and is otherwise acceptable to the DIP Lenders in their sole discretion; (e) occurrence of an Event of Default; or (f) the date which is the closing date of any sale of all or substantially all of the Debtors' assets acceptable to the DIP Lenders (provided that a sale to the Stalking Horse Bidder is acceptable to the DIP Lenders) ("***Maturity Date***").

**Collateral:** Subject to the Carve-Out (as defined below) and any valid, perfected, and unavoidable liens existing as of the Filing Date held by parties other than Silverview and the Existing Second Lien Parties and permitted under the Existing Silverview Loan Documents and Existing Second Lien Loan Documents to be senior to the liens securing the Existing Obligations (the "***Permitted Prior Liens***"), all DIP Obligations of the Debtors under the DIP shall be secured by (1) pursuant to Section

364(d) of the Bankruptcy Code, a first priority senior lien on the Silverview Priority Collateral (as defined in the Silverview-Granite ICA) and such liens to be pari passu with the liens granted to Silverview under the Existing Silverview Loan Documents and (2) pursuant to Section 364(c) and effective upon entry of a Final Order, a first priority senior lien on all assets of the Debtors not subject to any valid, enforceable, perfected and unavoidable lien as of the Filing Date (such assets, the "***Unencumbered Collateral***"); provided that the liens described in the foregoing (1) and (2) shall extend to all real and personal property of the Debtors (the "***DIP Collateral***"), except with respect to all proceeds of all claims and causes of action under chapter 5 of the Bankruptcy Code. For the avoidance of doubt, the DIP Collateral excludes the Granite Priority Collateral.

All obligations of the Debtors in respect of the DIP shall be (i) entitled to super-priority administrative expense claim status pursuant to § 364(c)(1) of the Bankruptcy Code with priority over all administrative expenses of the kind that are specified in Bankruptcy Code §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code ("***Superpriority Claims***"), subject to the Carve-Out; and (ii) secured, as described above, pursuant to § 364 of the Bankruptcy Code by a security interest and lien on the DIP Collateral, subject only to the Carve-Out, Permitted Prior Liens, and those other charges permitted in this DIP Term Sheet.

|  |  |
|---|---|
| ***Adequate Protection:*** | As adequate protection for the use of the collateral securing the Existing Silverview First Lien Obligations (including cash collateral) (collectively, the "***Prepetition Collateral***"), Silverview will, during the pendency of the Chapter 11 Cases and in respect of the Existing Silverview First Lien Obligations (excluding, for the avoidance of doubt, the Existing Second Lien Obligations) (until the Existing Silverview First Lien Obligations are indefeasibly paid in full), (i) be granted replacement liens, in each case, to the extent of any post-petition diminution in value of the Prepetition Collateral, in each case and as applicable, subject to (x) the Carve-Out and Permitted Prior Liens, and (y) the liens on such assets securing the DIP Obligations pursuant to Section 364 described above. No Existing Second Lien Party shall receive any adequate protection on account of the Existing Second Lien Obligations and the Existing Second Lien Loan Documents. The foregoing |

shall be without prejudice to Silverview's or any Existing Second Lien Party's right to later request or otherwise seek additional forms of adequate protection with respect to any Existing Silverview Loan Documents, Existing Second Lien Loan Documents, or Existing Obligations or otherwise.

| | |
|---|---|
| ***Representations and Warranties:*** | To be usual and customary with respect to Chapter 11 Cases of this nature. |
| ***Affirmative Covenants:*** | The DIP shall be governed by this DIP Term Sheet and the Interim Order (as defined below) and Final DIP Order, each as acceptable to the DIP Lenders in their sole discretion. |
| ***Negative Covenants:*** | The DIP will include certain of the negative covenants substantially similar to those set forth in the Existing Silverview Loan Document and Existing Second Lien Loan Documents and such other negative covenants applicable to the Debtors and their respective subsidiaries as are usual and customary for Chapter 11 financings of this type including, without limitation, that the Debtors shall not (other than pursuant to exceptions to be mutually agreed or contemplated by the Milestones and Support Agreement): incur indebtedness; incur liens; merge, consolidate, liquidate or dissolve; sell assets; make restricted payments; or execute certain transactions with affiliates. |
| ***Budget:*** | As used herein, "***Budget***" means the following, which, in any case and all respects, must be acceptable to the DIP Lenders: (i) an operating budget setting forth the projected financial operations of the Debtors, which budget shall be in form and substance satisfactory to Silverview and shall in any event include available cash, cash flow, occupancy costs, trade payables, total disbursements on a weekly basis (identified by, over the remaining forecast period on a consolidated basis, core, non-core or combined operating segments, or overhead) and projected Availability under the DIP during the term of the DIP. The Budget will be updated and delivered to DIP Lenders by 12:00 p.m. Eastern Time on Thursday of each week during the continuance of the Chapter 11 Cases for the upcoming 7 week period (or such other period as may be required by the DIP Lenders) to the extent approved by the DIP Lenders; such update to include a comparison of actual disbursements to budgeted disbursements on a week-by-week basis. At the Filing Date, Debtors shall provide evidence satisfactory to the |

Pinstripes
August 27, 2025
Page 7 of 20

DIP Lenders showing that Debtors have a minimum of $1,500,000 in immediately available funds on balance sheet.

**Financial Covenants:**    Measured as of the last day of the first full week after the Filing Date and the last day of each week thereafter, the Debtors shall not permit (x) disbursements for the applicable Measurement Period to exceed one hundred and ten percent (110%) of the budgeted amount of disbursements (including with respect to the fees of the Debtors' professionals) set forth in the Budget for such Measurement Period, and (y) receipts for the applicable Measurement Period to be less than ninety percent (90%) of the budgeted amount of receipts set forth in the Budget for such Measurement Period, in each case of the foregoing subclauses (x), and (y) on an aggregate basis (such permitted variances from the Budget set forth in subclauses (x) and (y), the "***Permitted Variance***").

As used herein, "***Measurement Period***" means (i) the period of one week ending on Sunday of the first full week after the Filing Date, (ii) the period of two consecutive weeks ending on Sunday of the second full week after the Filing Date, (iii) the period of three consecutive weeks ending on Sunday of the third full week after the Filing Date and (iv) each period of four consecutive weeks ending on Sunday of the fourth full week after the Filing Date and on Sunday of each week thereafter.

**Carve-Out:**    The liens of the DIP Lenders on the DIP Collateral, the liens of the Existing Agents and the Existing Lenders on any portion of the DIP Collateral, and the Superpriority Claims shall be subject to a carve-out (the "***Carve-Out***"), which shall mean an amount equal to the sum of the following: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in clause (ii) below); (ii) to the extent allowed by the Bankruptcy Court at any time, whether by interim order, final order, or otherwise, and consistent with the Budget, accrued and unpaid fees, disbursements, costs and expenses incurred by persons or firms retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code (the "***Debtor Professionals***") at any time before or on the first business day following delivery by DIP Lenders of a Carve-Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice; (iii) Allowed Professional Fees of Debtor

Pinstripes
August 27, 2025
Page 8 of 20

Professionals in an aggregate amount not to exceed $325,000 incurred after the first business day following delivery by DIP Lenders of a Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, final order, or otherwise (the amounts set forth in this clause (iii), the "***Post-Carve Out Trigger Notice Cap***") and (iv) $25,000 for any Chapter 7 trustee appointed after conversion of the Debtors' Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code. For purposes of the foregoing, "***Carve-Out Trigger Notice***" shall mean a written notice (which may be delivered by e-mail (or other electronic means)) by the DIP Lenders to the Debtors and their counsel, the United States Trustee, and lead counsel to any Committee appointed in the Chapter 11 Cases, which notice shall state that the Post-Carve Out Trigger Notice Cap has been invoked and which may be delivered following the earliest of: (x) the occurrence of a default or event of default under the DIP and notification to Borrowers of such uncured default or event of default, (y) the date on which the Existing Obligations and DIP Obligations have been indefeasibly paid in full and (z) the Maturity Date.

On a weekly basis, the fees of the Debtor Professionals provided in the Budget shall be funded into an escrow account with Young Conaway Stargatt & Taylor, LLP to satisfy the professional fees included within the Carve-Out (the "***Professional Fee Reserve***"). The funds on deposit in the Professional Fee Reserve shall be available to satisfy the obligations owed to the Debtor Professionals benefiting from the Carve-Out, and the DIP Lenders shall have a security interest upon any residual interest in the Professional Fee Reserve available following satisfaction in cash in full of all obligations benefiting from the Carve-Out.

For the avoidance of doubt and notwithstanding anything to the contrary herein, the Carve-Out shall be senior to all liens and claims securing the DIP, and all other forms of adequate protection, liens, or claims securing the DIP Obligations.

***Events of Default and Remedies:***

The DIP shall include customary defaults and events of default (each an "***Event of Default***") for transactions of this type, including, without limitation, failure to comply with the Milestones (defined below), the filing of any plan, dismissal or other disposition of the Chapter 11 Cases that is not consented to by the DIP Lenders, the entry of an order dismissing or

Pinstripes
August 27, 2025
Page 9 of 20

converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, the appointment of a trustee, the entry of an order staying, reversing or vacating the Interim Order or Final Order, the sale of all or substantially all of the Debtors' assets without the DIP Lenders' consent and in contravention of the Support Agreement, the entry of an order granting any other superpriority administrative claim or lien equal to or superior to that granted the DIP Lenders without the DIP Lender's consent, the entry of an order granting relief from the automatic stay to allow any creditor to exercise remedies with respect to any collateral exceeding an amount to be mutually agreed, the Maturity Date, termination of the Support Agreement, the Debtors' loss or other impairment of any lease for any of the stores or locations set forth on Exhibit 1 hereto, except as qualified on Exhibit 1 hereto, and other bankruptcy matters.

Upon an Event of Default, the DIP Lenders are  fully authorized, in their sole discretion to: (a) cease making DIP Loans to the Debtors; (b) revoke their consent to the Debtors' use of any collateral (including, without limitation, cash collateral); and/or (c) immediately terminate the DIP and demand immediate repayment, in cash, of the DIP Obligations then outstanding.  The foregoing remedies (a)-(c) of the DIP Lenders shall not be subject to any restraint on remedies. Notwithstanding the foregoing, the DIP Lenders shall remain obligated to fully fund the Carve-Out (to the extent not fully funded and to the extent such funding would not cause the DIP Loans to exceed the Maximum DIP Amount) and, following a Carve-Out Trigger Notice, the full amount up to the Post-Carveout Trigger Notice Cap shall be funded into the Professional Fee Reserve (to the extent such funding would not cause the DIP Loans to exceed the Maximum DIP Amount).

Any exercise of remedies by the DIP Lenders  shall be subject in all respects to the terms of the Interim Order and Final Order, including a requirement that the DIP Lenders provide five (5) days written notice of such Event of Default to the Borrowers prior to any exercise of remedies; provided that such five (5) days written notice shall not be required with respect to the remedies described in subclause (a) above.

| | |
|---|---|
| ***Conditions Precedent to Closing the DIP Facility:*** | The closing of the DIP shall be subject to customary conditions precedent, including, without limitation: (a) approval of the Budget (including any interim Budget) by the DIP Lenders, |

together with all financial information and projections regarding the Debtors requested by the DIP Lenders, all in form and substance satisfactory to the DIP Lenders, in their sole discretion; (b) entry of an Interim Order (i) approving the DIP and its superpriority administrative claims and all first-priority claims and other liens securing the DIP and (ii) containing such other orders and findings as the DIP Lenders may require, which Interim Order or Final Order (as applicable) shall not have been modified or amended without approval of the DIP Lenders, and shall not have been reversed, vacated or stayed pending appeal, in form and substance satisfactory to the DIP Lenders; (c) the satisfaction of the DIP Lenders with all adequate-protection payments (if any), critical-vendor payments, and all other material motions and orders filed in the Chapter 11 Cases; (d) continuation of the Debtors' present cash management system with modifications as requested by Silverview to consummate and facilitate the 363 Sale Transaction; (e) payment in kind of all fees payable to the DIP Lenders  on the closing date of the DIP, together with all other fees and expenses of Silverview; and (f) customary closing deliverables.

**_Additional Conditions to Each Borrowing Under the DIP:_**

The DIP shall contain customary further conditions to each borrowing under the  DIP, including, without limitation:

• There shall exist no Default or Event of Default under any of the DIP financing documents, and the representations and warranties therein shall be true and correct in all material respects;

• There shall have occurred no material adverse change in the Debtors' operations, performance, or properties (other than the commencement of the Chapter 11 Cases), since the date of this DIP Term Sheet, that has or could be expected to have a material adverse effect on the rights and remedies of Silverview or on the ability of the Debtors to perform their obligations under the DIP;

• The Debtors shall be continuing to take action and demonstrating progress toward the 363 Sale Process  in accordance with the Milestones;

• The Interim Order or the Final Order, as the case may be, shall be in full force and effect and shall not have been vacated, reversed or stayed in any respect or, except as

expressly permitted by the DIP, modified or amended in any manner; and

•       The Debtors shall have provided a borrowing notice three (3) Business Days prior to the draw request and a certificate certifying the use of the proceeds is consistent with, and permitted by, the Budget.

**Chapter 11 Cases and Milestones:**

The Debtors shall commence the Chapter 11 Cases with the purpose of effectuating the 363 Sale Process and consummating the 363 Sale Transaction.

The DIP Lenders, Silverview and the Existing Second Lien Parties shall have the absolute right to credit bid, in their discretion, all or any portion of the aggregate outstanding amount of Existing Obligations, with any allocation between use of Existing Obligations and DIP Obligations to be determined by Silverview.

The Debtors shall provide or cause to be provided to the DIP Lenders a report from a financial consultant, investment banker or similar professional, at such times as the DIP Lenders may reasonably request addressing such items as are requested by the DIP Lenders, including addressing the status of the marketing and sale process of the Debtors, together with periodic telephonic updates of such reports to the DIP Lenders from time to time (but not less than weekly), as requested by the DIP Lenders.

The Debtors shall be required to comply with the following DIP milestones (the "***Milestones***" and each a "***Milestone***"), provided each Milestone may be amended with the consent of the DIP Lenders:

(a) <u>**Within Seven (7) Business Days of Debtors' Receipt of Bridge Funding**</u>: Debtors shall commence the Chapter 11 Cases;

(b) <u>**Filing Date**</u>: Debtors shall file a motion seeking approval of the DIP, which motion and related orders must be acceptable to the DIP Lenders (such motion, the "***DIP Motion***");

(c) <u>**Filing Date**</u>: Debtors shall satisfy the CRO Requirement.

(d) <u>**Filing Date**</u>: Debtors shall file a motion seeking approval of bidding procedures and ability to designate the Stalking Horse Bidder consistent with the Support

Agreement, which motion, bidding procedures and form of order must be acceptable to the DIP Lenders, and which motion shall attach an asset purchase agreement acceptable to the Stalking Horse Bidder and DIP Lenders (such motion, the "***Bidding Procedures Motion***");

(e) **3 Days after Filing Date**: The Bankruptcy Court shall have entered an interim order (the "***Interim Order***") authorizing the relief sought under the DIP Motion on an interim basis, in form and substance acceptable to the DIP Lenders in their sole discretion;

(f) **14 Days after Filing Date**: The Bankruptcy Court shall have entered an order granting the relief sought by the Bidding Procedures Motion (such order, the "***Bidding Procedures Order***"), including the designation of the Stalking Horse bidder, in form and substance acceptable to the DIP Lenders in their sole discretion;

(g) **28 Days after Filing Date**: The Bankruptcy Court shall have entered a final order (the "***Final Order***") authorizing the relief sought under the DIP Motion on a final basis, in form and substance acceptable to the DIP Lenders in their sole discretion;

(h) **35 Days after Filing Date**: Bid deadline pursuant to the Bidding Procedures Order.

(i) **40 Days after Filing Date**: The Debtors shall have held the auction consistent with the Bidding Procedures Order;

(j) **45 Days after Filing Date**: The Bankruptcy Court shall have held a hearing and entered an order (in form and substance acceptable to the DIP Lenders) approving the sale of Debtors' assets consistent with the Bidding Procedures Order (such approved sale, the "***Sale***"); and

(k) **50 Days after Filing Date**: The Sale shall close.

| | |
|---|---|
| ***Application of Sale Proceeds and Proceeds of Collateral Outside the Ordinary Course of Business:*** | Subject to approval of the Bankruptcy Court if after the Petition Date, proceeds from any non-ordinary course sale of DIP Collateral to a party other than Silverview (including any subsidiary or affiliate thereof) shall be paid to Silverview upon the closing of any such sale and shall be applied: (i) first, to reduce outstanding obligations under the DIP (including all fees and professional fees payable pursuant to the DIP financing documents); (ii) second, to outstanding Existing Silverview First Lien Obligations; and (iii) third, to outstanding Existing Second Lien Obligations. |

Pinstripes
August 27, 2025
Page 13 of 20

| | |
|---|---|
| ***Assignments:*** | The DIP Lenders are permitted to assign their respective rights and obligations under the loan documents, or any part thereof, to any person or entity (and no consent of Borrowers will be required).   Subject to customary voting limitations, DIP Lenders are  permitted to sell participations in such rights and obligations, or any part thereof to any person or entity without the consent of Borrowers. |
| ***Amendment/Waiver/Modification of DIP Term Sheet or Interim Order:*** | Any consents, amendments, modifications or waivers of any term of this DIP Term Sheet, the Interim Order or Final Order will require the consent of Silverview. |
| ***Waiver/Modification of the Automatic Stay:*** | The automatic stay provisions of section 362 of the Bankruptcy Code will be modified, pursuant to customary terms in the Interim Order and the Final Order, to the extent necessary to permit the DIP Lenders, Silverview, and the Existing Second Lien Parties  to perform any act authorized or permitted under the Interim Order, the Final Order, or the  DIP documents, as applicable, including, without limitation, (i) any action to create, validate, evidence, attach or perfect any lien, security interest, right or claim in any of the assets securing the DIP, and (ii) any exercise of any rights and remedies provided to it by the Interim Order, the Final Order, the DIP financing documents or applicable law upon the occurrence of an Event of Default. |
| ***Governing Law and Forum:*** | Delaware with appropriate modifications for the Chapter 11 Cases. |
| ***Voting Rights:*** | To be defined in a manner customary for financings of this type. |

Pinstripes
August 27, 2025
Page 14 of 20

**Exhibit 1**
**List of Stores and Locations**

1. Northbrook
2. Oakbrook
3. Bethesda
4. San Mateo
5. Barrington
6. Edina
7. Georgetown.  Counsel to JAMESTOWN Premier Georgetown Park Corp. sent a letter to Pinstripes, Inc. on August 5, 2025 purporting to terminate the lease for the Georgetown location (the "Termination Letter").  To the extent the Termination Letter was legally effective, Silverview hereby agrees that the termination of the Georgetown lease pursuant to such Termination Letter shall not constitute an Event of Default under, or a breach of the representations and warranties set forth in, the DIP, the Support Agreement, or the Eighth Amendment to Loan Agreement.
8. Cleveland
9. Any additional stores and locations identified by Silverview within three (3) business days of the effective date of the Support Agreement.

## AMENDMENT TO SUPPORT AGREEMENT

**THIS AMENDMENT TO SUPPORT AGREEMENT** (along with the exhibits annexed hereto, this "Amendment") is made and entered into as of September 7, 2025, by and among:

a.  Silverview Credit Partners LP, a Delaware limited partnership (in its individual capacity, "SCP"), (i) in its capacity as agent under that certain loan agreement dated as of March 7, 2023 (as amended, restated, supplemented, and/or otherwise modified, the "Silverview Loan Agreement," together with related documents and agreements, the "Silverview Loan Documents") (in such capacity, the "Silverview Agent"), by and among Pinstripes, Inc., a Delaware corporation, as borrower ("Borrower"), Pinstripes Holdings, Inc., a Delaware Corporation ("Holdings", and together with Borrower, the "Credit Parties"), Silverview Agent and the lenders party thereto (together with Silverview Agent, in their respective capacities pertaining to the Silverview Loan Agreement and the Second Lien Documents, the "Consenting Lenders") and (ii) in its capacity as agent under that certain loan agreement dated as of December 29, 2023 by and between Borrower, Holdings, SCP, in its capacity as agent (as amended, restated, supplement, and/or otherwise modified, and collectively, with the documents related thereto, the "Second Lien Documents");

b.  Borrower, and each of its subsidiaries;

c.  Holdings, and each of its subsidiaries; and

d.  each person or entity party to the Silverview Loan Documents or the Second Lien Documents as a "Guarantor" (together with Holdings, collectively, "Guarantors" and each a "Guarantor"). Such Guarantors, together with Credit Parties, are hereinafter referred to as, collectively, the "Debtors" and each a "Debtor".

Each of the foregoing entities (a) through (d) above is referred to herein individually as a "Support Party" and collectively as the "Support Parties").

Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Support Agreement, dated August 27, 2025 (the "Support Agreement"), by and among the Support Parties.

## RECITALS

**WHEREAS**, on August 27, 2025, the Support Parties entered into the Support Agreement, pursuant to which the Consenting Lenders committed, among other things, to (i) provide pre-petition and post-petition financing to the Debtors on the terms and conditions set forth in the Support Agreement and (2) support the sale process in accordance with the terms of the Support Agreement and exhibits annexed hereto;

**WHEREAS**, the Support Parties have continued to engage in good faith and arm's-length negotiations regarding the transactions described and defined in the Support Agreement in order

to maximize the Debtors' value and with the intention of implementing the transactions set forth in the Support Agreement, and contemplated thereby, subject to the terms and conditions of the Support Agreement and this Amendment; and

**WHEREAS**, the Support Parties have agreed to amend the Support Agreement in accordance with Section 6.16 thereof to reflect (i) the Support Parties' commitment to execute the asset purchase agreement for the Stalking Horse Bid, which is attached hereto, in substantially final form, as **Exhibit A** (the "Stalking Horse APA"), within one (1) day of the execution of this Amendment and prior to the Petition Date; and (ii) the Consenting Lenders' agreement to the revised Budget for the 363 Sale Process in the Chapter 11 Cases, attached hereto as **Exhibit B** (the "Approved Budget"), including an amendment to the DIP Term Sheet to reflect that the Maximum DIP Amount is $3,800,000 and that the Debtors consent to conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code upon a default under the DIP after the expiration of the Debtors' notice period to contest any such default under the DIP and subject to the applicable fiduciary obligations of the Debtors' board of directors, board of managers, or similar governing body;

**NOW, THEREFORE**, in consideration of the promises and mutual covenants and agreements herein contained and contained in the Support Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Support Parties hereto covenant and agree as follows:

## AGREEMENT

**Section 1.**    **Amendment Effective Date**.

1.01    This Amendment and each of the obligations, commitments, representations, warranties, and covenants contained herein shall become effective and binding on each of the Support Parties on the last date (the "Effective Date") on which each of the Support Parties has executed this Amendment and delivered an executed counterpart of this Amendment to the other Support Parties.

**Section 2.**    **Amendments**.

2.01    Stalking Horse APA: The Support Parties, as applicable, agree to execute (or, as applicable, instruct their affiliates, successors and/or assigns to execute), the Stalking Horse APA, attached hereto as **Exhibit A**, which is in substantially final form, no later than one (1) day after the Effective Date of this Amendment and prior to the Petition Date.

2.02    Financing of Chapter 11 Cases: The Consenting Lenders agree to fund the Section 363 Sale Process in the Chapter 11 Cases in accordance with the Approved Budget attached hereto as **Exhibit B** and the DIP Term Sheet shall be amended to reflect (i) a Maximum DIP Amount of $3,800,000 and (ii) the Debtors' consent to the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code upon a default under the DIP after the expiration of the Debtors' notice period to contest any such default under the DIP and subject to the applicable fiduciary obligations of the Debtors' board of directors, board of managers, or similar governing body.

**Section 3.        Acknowledgements, Representations, Warranties, and Covenants**.

3.01    <u>General</u>.  Each of the Support Parties represents, warrants, and covenants as to itself only, severally and not jointly, to each other Support Party, as of the date of this Amendment, as follows (each of which representation, warranty, and covenant shall expire upon entry into, and approval by the Bankruptcy Court of, definitive asset purchase documents):

(a)    <u>Enforceability</u>. To the extent that it is not a natural person, it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. This Amendment is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as may be limited by applicable laws relating to or limiting creditors' rights generally (including the Bankruptcy Code) or by equitable principles or a ruling of a court of competent jurisdiction.

(b)    <u>No Consent or Approval</u>. Except as expressly provided in this Amendment, no registration or filing with, consent or approval of, or notice to, or other action, is required by any other person or entity in order for it to carry out its respective obligations under this Amendment.

(c)    <u>Power and Authority</u>. To the extent that it is not a natural person, it has all requisite power and authority to enter, and has no conflicts with respect to entry, into this Amendment and to carry out its respective obligations under this Amendment, subject to Bankruptcy Court approval. To the extent that it is a natural person, it has full and absolute legal capacity and authority to enter into this Amendment and to carry out its respective obligations under this Amendment, subject to Bankruptcy Court approval.

(d)    <u>Authorization</u>. The execution and delivery of this Amendment and the performance of the obligations hereunder have been duly authorized by all necessary action as required by each of the Support Parties.

**Section 4.        Acknowledgements, Representations, Warranties, and Covenants**.

4.01    <u>Support Agreement</u>.  The Support Parties hereby agree that, other than as expressly set forth herein with respect to the execution of the Stalking Horse APA and the Consenting Lenders' agreement to the Approved Budget and amendment to Maximum DIP Amount, the Support Agreement and all of the terms and conditions thereof remain in full force and effect.

*[Remainder of page intentionally left blank.]*

IN WITNESS WHEREOF, the parties have entered into this Amendment as of the date first above written.

CONSENTING LENDERS:

**SILVERVIEW CREDIT PARTNERS, LP**, as Silverview Agent and Second Lien Agent

By: _____
Name: Vaibhav Kumar
Title:  Partner

BORROWER:

**PINSTRIPES, INC.**

By: _____
Name: Dale Schwartz
Title: CEO

GUARANTORS:

**PINSTRIPES HILLSDALE LLC**

By: _____
Name: Dale Schwartz
Title: CEO

**PINSTRIPES AT PRAIRIEFIRE, INC.**

By: _____
Name: Dale Schwartz
Title: CEO

**PINSTRIPES ILLINOIS, LLC**

By: _____
Name: Dale Schwartz
Title: CEO

HOLDINGS:

**PINSTRIPES HOLDINGS, INC.**

By: _____
Name:    Dale Schwartz
Title:    CEO

**EXHIBIT A**

**Stalking Horse APA**

Draft: September 7, 2025

**ASSET PURCHASE AGREEMENT**

by and among

**PINSTRIPES HOLDINGS, INC.,**

**PINSTRIPES, INC.,**

**PINSTRIPES HILLSDALE, LLC**

**AND**

**PINSTRIPES ILLINOIS, LLC,**

as the Sellers

and

**[●],**

as the Buyer

Dated as of September 8, 2025

*This is a draft agreement only, is intended solely to facilitate discussions among the parties identified herein and is subject to revision by the Buyer at any time. Delivery or discussion of this draft agreement is not, and will not be deemed or construed to be, an offer or commitment with respect to the proposed transaction to which this draft agreement relates. Notwithstanding the delivery of this draft agreement or any other past, present or future written or oral indications of assent, or indications of the result of negotiations or agreements, no party to the proposed transaction (and no person or entity related to any such party) will be under any legal obligation whatsoever unless and until the definitive agreement providing for the transaction has been executed and delivered by all parties thereto.*

# TABLE OF CONTENTS

**Page**

ARTICLE I. DEFINITIONS.................................................................................5

    Section 1.1    Certain Defined Terms ........................................5
    Section 1.2    Table of Definitions ..........................................18

ARTICLE II. PURCHASE AND SALE.............................................................19

    Section 2.1    Purchase and Sale ...........................................19
    Section 2.2    Excluded Assets .............................................21
    Section 2.3    Assumed Liabilities.........................................22
    Section 2.4    Excluded Liabilities ........................................23
    Section 2.5    Consents to Certain Assignments.....................25
    Section 2.6    Assumption/Rejection of Certain Contracts........26
    Section 2.7    Consideration.................................................28
    Section 2.8    Closing.........................................................28
    Section 2.9    Intended Tax Treatment; Tax Allocation; Tax Sharing Agreements ...............................................30
    Section 2.10    Withholding..................................................31
    Section 2.11    Exclusion of Transferred Assets.......................31

ARTICLE III. REPRESENTATIONS AND WARRANTIES OF THE SELLERS ....................31

    Section 3.1    Organization .................................................31
    Section 3.2    Authority .....................................................31
    Section 3.3    No Conflict; Required Filings and Consents........32
    Section 3.4    Transferred Assets.........................................33
    Section 3.5    Financial Statements; No Undisclosed Liabilities....33
    Section 3.6    Absence of Certain Changes or Events .............34
    Section 3.7    Compliance with Law; Permits .......................34
    Section 3.8    Litigation .....................................................35
    Section 3.9    Employee Benefit Plans ..................................35
    Section 3.10    Labor and Employment Matters.......................37
    Section 3.11    Real Property................................................39
    Section 3.12    Intellectual Property .......................................40
    Section 3.13    Taxes ..........................................................42
    Section 3.14    Environmental Matters....................................44
    Section 3.15    Material Contracts .........................................45
    Section 3.16    Affiliate Transactions .....................................48
    Section 3.17    Insurance .....................................................48
    Section 3.18    Suppliers......................................................49
    Section 3.19    Working Capital Assets; Equipment; Inventory .....49
    Section 3.20    Books and Records.........................................49
    Section 3.21    Bank Accounts ..............................................50
    Section 3.22    OFAC and Related Matters ..............................50

Section 3.23    Anti-Corruption; Anti-Bribery ....................................................51
Section 3.24    Exclusivity of Representations and Warranties...........................51

ARTICLE IV. REPRESENTATIONS AND WARRANTIES OF THE BUYER ......................52

Section 4.1    Organization .............................................................................52
Section 4.2    Authority ..................................................................................52
Section 4.3    No Conflict; Required Filings and Consents............................52
Section 4.4    Brokers ....................................................................................53
Section 4.5    Litigation .................................................................................53
Section 4.6    Exclusivity of Representations and Warranties........................53
Section 4.7    Financial Capacity ...................................................................53

ARTICLE V. BANKRUPTCY COURT MATTERS ............................................................54

Section 5.1    Bankruptcy Actions .................................................................54

ARTICLE VI. COVENANTS ................................................................................................57

Section 6.1    Conduct of Business Prior to the Closing ................................57
Section 6.2    Covenants Regarding Information ...........................................61
Section 6.3    Notification of Certain Matters ...............................................61
Section 6.4    Employee Matters.....................................................................61
Section 6.5    Consents and Filings; Further Assurances ...............................63
Section 6.6    Refunds and Remittances .........................................................64
Section 6.7    Public Announcements .............................................................65
Section 6.8    Seller Use of Transferred Marks; Use of Seller Marks ............65
Section 6.9    Sale Free and Clear..................................................................66
Section 6.10   Intellectual Property Registrations .........................................66
Section 6.11   Confidentiality.........................................................................66

ARTICLE VII. TAX MATTERS ...........................................................................................67

Section 7.1    Transfer Taxes.........................................................................67
Section 7.2    Tax Cooperation ......................................................................67
Section 7.3    Allocation of Taxes .................................................................67
Section 7.4    Bulk Sales ...............................................................................67
Section 7.5    Deferred Revenue ....................................................................68

ARTICLE VIII. CONDITIONS TO CLOSING .....................................................................68

Section 8.1    General Conditions...................................................................68
Section 8.2    Conditions to Obligations of the Sellers..................................68
Section 8.3    Conditions to Obligations of the Buyer....................................69

ARTICLE IX. TERMINATION .............................................................................................70

Section 9.1    Termination ..............................................................................70

33521550.7

2

Section 9.2      Effect of Termination ...................................................................72

ARTICLE X. GENERAL PROVISIONS........................................................................72

Section 10.1     Non-Survival of Representations, Warranties and Covenants .................72
Section 10.2     Fees and Expenses.........................................................................72
Section 10.3     Amendment and Modification................................................................73
Section 10.4     Waiver .....................................................................................73
Section 10.5     Notices....................................................................................73
Section 10.6     Interpretation ...........................................................................74
Section 10.7     Entire Agreement .........................................................................74
Section 10.8     Parties in Interest ......................................................................75
Section 10.9     Governing Law.............................................................................75
Section 10.10    Submission to Jurisdiction................................................................75
Section 10.11    Disclosure Generally .....................................................................76
Section 10.12    No Recourse ..............................................................................76
Section 10.13    Assignment; Successors ...................................................................76
Section 10.14    Enforcement ..............................................................................77
Section 10.15    Severability..............................................................................77
Section 10.16    Waiver of Jury Trial .....................................................................77
Section 10.17    Counterparts .............................................................................77
Section 10.18    No Presumption Against Drafting Party ....................................................77

**INDEX OF EXHIBITS**

EXHIBIT A          FORM OF SALE PROCEDURES ORDER

## ASSET PURCHASE AGREEMENT

**ASSET PURCHASE AGREEMENT**, dated as of September 8, 2025 (this "Agreement"), by and among (i) Pinstripes Holdings, Inc., a Delaware corporation ("Holdings"), Pinstripes, Inc., a Delaware corporation ("Pinstripes"), Pinstripes Hillsdale, LLC, a California limited liability company ("Hillsdale"), and Pinstripes Illinois, LLC, an Illinois limited liability company (together with Holdings, Pinstripes, and Hillsdale, each a "Seller" and collectively, the "Sellers"), and (ii) [●], a [●] (the "Buyer").

## RECITALS

A.    The Sellers are engaged in the business of experiential dining and entertainment, focused on combining Italian-American cuisine with recreational activities like bowling and bocce (such business as and to the extent performed at the locations set forth on Schedule 1.1 hereto, the "Business").

B.    The Sellers intend to file voluntary cases (collectively, the "Bankruptcy Case") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on September 8, 2025 (the "Petition Date").

C.    The Sellers desire to sell to the Buyer all of the Transferred Assets and transfer to the Buyer the Assumed Liabilities, and the Buyer desires to purchase from the Sellers the Transferred Assets and assume the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105, 363 and 365 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and the Sale Order.

D.    The execution and delivery of this Agreement and the Sellers' ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Sale Order under, *inter alia*, sections 105, 363 and 365 of the Bankruptcy Code, as further set forth herein.  The Parties desire to consummate the proposed transaction as promptly as practicable after the Bankruptcy Court enters the Sale Order.

## AGREEMENT

In consideration of the foregoing and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE I.
## DEFINITIONS

Section 1.1    Certain Defined Terms.  For purposes of this Agreement:

"Accounts Receivable" means any and all (a) accounts receivable, notes receivable, trade accounts, unbilled receivables, rights to payment, negotiable instruments, chattel paper, contract billings and other amounts owed to any Seller (whether current or non-current), together

with all security or collateral therefor and any interest or unpaid financing charges accrued thereon, including all causes of action pertaining to the collection of amounts payable, or that may become payable, to any Seller with respect to products sold or services performed on or prior to the Closing Date, (b) license and royalty receivables, (c) rebate receivables from suppliers or vendors, (d) any other amounts due to any Seller, classified as accounts receivable in accordance with GAAP, (e) all accounts receivable and other amounts owed to any Seller (whether current or non-current) in connection with any customer purchases that are made with credit cards or any other related amounts owing (including deposits or holdbacks to secure chargebacks, offsets or otherwise) from credit card processors to the Sellers, and (f) any and all claims, remedies or other rights relating to any of the foregoing, together with any interest or unpaid financing charges accrued thereon.

"Action" means any claim, charge, investigation, audit, complaint, action, suit, arbitration or proceeding (including any civil, criminal, administrative, investigative or appellate proceeding or any informal proceeding) by or before any Governmental Authority, other than an Avoidance Action.

"Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person, where "control," "controlled by" and "under common control with," means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, as trustee or executor, as general partner or managing member, by Contract or otherwise. Notwithstanding the foregoing, except with respect to Section 6.7, Section 10.12 and Section 10.13, in no event shall Buyer be considered an Affiliate of Silverview Credit Partners LP or any portfolio company Affiliated with or managed by Silverview Credit Partners LP or any of its Affiliates.

"Alternative Transaction" means any proposal, offer or transaction with respect to a plan of reorganization or dissolution, winding up, liquidation, reorganization, assignment for the benefit of creditors, merger, consolidation, business combination, joint venture, partnership, sale of assets or equity interests, financing (debt or equity), refinancing or restructuring involving the Sellers (other than the transactions contemplated in this Agreement) that competes with or renders consummation of this Agreement or the transactions contemplated hereby unable to be consummated or would reasonably be expected to materially frustrate the purposes of this Agreement.  For the avoidance of doubt, any proposal, offer, or transaction involving the sale of any of, any portion of or any subset of the Transferred Assets, including in connection with the Auction, shall be deemed to constitute an "Alternative Transaction" for purposes of this Agreement.

"Ancillary Agreements" means, collectively, the agreements to be executed in connection with the transactions contemplated by this Agreement, including the Assignment Agreement, the Bill of Sale, the IP Assignment Agreement and the Transition Services Agreement.

"Anti-Bribery and Anti-Corruption Laws" means all Laws of any applicable jurisdiction related to anti-bribery or anti-corruption (governmental or commercial) including, without limitation, the U.S. Foreign Corrupt Practices Act and all national and international Laws

enacted to implement the OECD Convention on Combating Bribery of Foreign Officials in International Business Transactions.

"Anti-Terrorism and Money Laundering Laws and Regulations" means applicable Laws (a) prohibiting transactions with Persons who (i) commit, threaten to commit, or support terrorism, (ii) engage in transactions or conduct operations that are illegal, nefarious, and/or criminal in nature, and (iii) participate in monetary transactions in property derived from specified unlawful activity, or (b) otherwise relating to prohibitions regarding the illegal laundering of the proceeds of any criminal activity and preventing the funds, proceeds and revenue of the Business and the Transferred Assets from being used in connection with the advancement of criminal activity, including the USA PATRIOT Act of 2001 and all "know your customer" rules and other applicable regulations.

"Auction" has the meaning set forth in the Sale Procedures Order.

"Avoidance Actions" means any and all claims for relief of the Sellers under chapter 5 of the Bankruptcy Code or state fraudulent conveyance, fraudulent transfer, or similar Laws.

"Backup Bidder" has the meaning set forth in the Sale Procedures Order.

"Books and Records" means the files, documents, instruments, books, reports and records, in each case whether hard copy, electronic or otherwise, maintained by or on behalf of the Sellers that are related to the Business, the Transferred Assets, the Hired Employees or the Assumed Liabilities.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in the State of New York.

"Business Employees" means all individuals employed by (or providing consulting services to) the Sellers whose duties relate primarily to the Business.

"Buyer Material Adverse Effect" means any event, change, occurrence or effect that would materially and adversely affect the ability of the Buyer to perform its obligations under this Agreement or the Ancillary Agreements or to consummate the transactions contemplated hereby or thereby.

"Cash and Cash Equivalents" means all of Sellers' cash (including (i) Restaurant Petty Cash and (ii) checks received on the Closing Date whether or not then deposited or cleared), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, credit card receivables, accounts receivable, commodity Contracts, commodity accounts, government securities and any other cash equivalents, in each case whether on hand, in transit, in banks or other financial institutions, or otherwise held.

"Code" means the Internal Revenue Code of 1986, as amended.

"Competing Bid" means any bid contemplating an Alternative Transaction.

"<u>Contract</u>" means any contract, agreement, insurance policy, lease, sublease, indenture, mortgage, guaranty, loan or credit agreement, note, bond, license, sublicense, sales order, purchase order, instrument, or other commitment (whether written or oral), that is binding on any Person or any part of its assets or properties under applicable Law.

"<u>Credit Bid</u>" means a credit bid by Buyer, pursuant to 363(k) of the Bankruptcy Code, equal to the Credit Bid Amount.

"<u>Credit Bid Amount</u>" means Buyer's secured debt against the Seller in an amount equal to $15,000,000, consisting of $3,800,000 of DIP Loan Claims and $11,200,000 of Silverview Loan Claims (as defined in the Interim Financing Order and Final Financing Order).

"<u>Data Room</u>" means the electronic data room established by the Sellers or any of their Affiliates or Representatives and to which the Buyer or any of its Affiliates or Representatives had access.

"<u>DIP</u>" means that certain debtor in possession financing facility reflected by the DIP Term Sheet, Interim Financing Order and Final Financing Order and which facility was approved by the Bankruptcy Court pursuant to the Interim Financing Order and Final Financing Order, together with any documents and agreements required or otherwise contemplated by the DIP Term Sheet, Interim Financing Order and Final Financing Order.

"<u>DIP Agent</u>" means the administrative agent and collateral agent under the DIP (as defined in the Interim Financing Order and Final Financing Order), including any successor thereto.

"<u>DIP Loan Claims</u>" means any and all claims against the Sellers arising from or based upon the DIP, including, without limitation, all accrued but unpaid principal, interest, premiums, costs, fees, expenses and indemnities.

"<u>DIP Term Sheet</u>" means that certain debtor in possession credit facility term sheet approved by the Bankruptcy Court pursuant to the Interim Financing Order and Final Financing Order.

"<u>DIP Obligations</u>" means as defined in the Interim Financing Order and Final Financing Order.

"<u>Disclosure Schedule Delivery Date</u>" means September 15, 2025.

"<u>Economic Sanctions and Trade Controls Laws and Regulations</u>" means (a) all applicable U.S. and applicable international economic and trade sanctions, including any sanctions or regulations administered or enforced by the U.S. Department of State, the U.S. Department of Treasury (including the Office of Foreign Assets Control) and any executive Orders, rules and regulations relating thereto; (b) all applicable Laws concerning exportation, including rules and regulations administered by the U.S. Department of Commerce, the U.S. Department of State or the Bureau of Customs and Border Protection of the U.S. Department of Homeland Security; and (c) any applicable federal or international anti-boycott Laws, including any executive Orders, rules and regulations.

"<u>Employee Benefit Plans</u>" means each (a) "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA, (b) other benefit and compensation plan, Contract, policy, program, practice, arrangement or agreement, including pension, profit-sharing, savings, termination, executive compensation, phantom stock, change-in-control, retention, salary continuation, vacation, sick leave, disability, death benefit, insurance, hospitalization, medical, dental, life (including all individual life insurance policies as to which any Seller is an owner or a beneficiary), employee loan, educational assistance, fringe benefit, deferred compensation, retirement or post-retirement, severance, equity or equity-based compensation, incentive and bonus plan and (c) other employment, consulting or other individual agreement, plan, practice, policy, contract, program, and arrangement, or plans or arrangements providing compensation to employee and non-employee directors, in each case, (i) that is sponsored or maintained or contributed to by any Seller or any of their respective ERISA Affiliates in respect of any current or former employees, directors, independent contractors, consultants or leased employees of any Seller or (ii) with respect to which any Seller has any actual or contingent Liability (including any such plan or arrangement formerly maintained by any Seller or any current or former ERISA Affiliates thereof).

"<u>Encumbrance</u>" shall have the broadest meaning possible pursuant to the Bankruptcy Code including any lien, encumbrance, claim, right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interest, title defect, hypothecation, easement, right of way, restrictive covenant, encroachment, right of first refusal, preemptive right, judgment, conditional sale or other title retention agreement, and all other impositions, imperfections, defects, limitations, or restrictions of any nature or kind whatsoever.

"<u>Environmental Claim</u>" means any action, cause of action, claim, suit, proceeding, investigation, enquiry, Order, demand or notice by any Person alleging Liability (including Liability for investigatory costs, governmental response costs, remediation or clean-up or the costs thereof, natural resources damages, property damages, personal injuries, attorneys' fees, fines or penalties) arising out of, based on, resulting from or relating to (a) the presence, Release or threatened Release of, or exposure to any Hazardous Material; (b) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law; or (c) any other matters for which liability is or may be imposed under any Environmental Law.

"<u>Environmental Law</u>" means any Law relating to pollution, the protection of, restoration or remediation of the environment (including natural resources and endangered or threatened species), or the protection of human health and safety (to the extent relating to exposure to Hazardous Material), including the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et. seq.*, as amended, and other Laws relating to: (a) the exposure to, or Releases or threatened Releases of, Hazardous Material; (b) the presence, generation, manufacture, processing, labeling, distribution, use, transport, treatment, containment, storage, disposal, or handling of Hazardous Material; or (c) recordkeeping, notification, disclosure and reporting requirements respecting Hazardous Material.

"<u>Environmental Permit</u>" means any Permit required under or issued pursuant to any Environmental Law.

"Equity Interest" means, with respect to any Person, any share of capital stock of, or other equity interest in, such Person or any security exercisable or exchangeable for, or convertible into, any share of capital stock of, or other equity interest (including any security exercisable or exchangeable for, or convertible into, any share of capital stock or other equity interest) in, such Person, including any warrant, option, convertible or exchangeable note or debenture, profits interest or phantom equity right, whether voting or non-voting.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any employers (whether or not incorporated) that would be treated together with the Sellers as a single employer within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"Excluded Cash" means an amount of cash of the Sellers (including cash received by the Sellers from loans made to the Sellers under the DIP on the Closing Date) equal to the Wind-Down Amount.

"Final Financing Order" means that certain final order, dated on or prior to October 13, 2025, by the Bankruptcy Court approving the DIP on a final basis.

"Final Order" means an Order of the Bankruptcy Court or any other court of competent jurisdiction (a) as to which the time to appeal shall have expired and as to which no appeal shall then be pending or (b) if a timely appeal shall have been filed or sought, either (i) no stay of the Order shall be in effect, (ii) no motion or application for a stay of the Order shall be filed and pending or such motion or application shall have been denied, or (iii) if such a stay shall have been granted, then (A) the stay shall have been dissolved or (B) a final Order of the district court or circuit court having jurisdiction to hear such appeal shall have affirmed the Order and the time allowed to appeal from such affirmance or to seek review or rehearing (other than a motion pursuant to Rule 60(b) of the Federal Rules of Civil Procedure) thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible, and if a timely appeal of such district court or circuit court Order or timely motion to seek review or rehearing of such Order shall have been made, any appellate court having jurisdiction to hear such appeal or motion (or any subsequent appeal or motion to seek review or rehearing) shall have affirmed the district court's (or lower appellate court's) Order upholding the Order of the Bankruptcy Court and the time allowed to appeal from such affirmance or to seek review or rehearing thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible; provided, however, that the Buyer in its sole discretion may treat any Order for which a motion or application for a stay is filed or pending as a Final Order by affirmatively agreeing to such treatment in a writing signed by the Buyer; provided, further, that any Sale Order that waives Bankruptcy Rule 6004(h) shall be considered and deemed, upon its entry by the Bankruptcy Court, a Final Order for purposes of this Agreement.

"Fundamental Representations" means the representations and warranties set forth in Section 3.1, Section 3.2, Section 3.3, Section 3.4 and Section 3.6(b)(i).

"<u>GAAP</u>" means United States generally accepted accounting principles as in effect from time to time.

"<u>Government Official</u>" means any officer or employee of a Governmental Authority, or any person acting in an official capacity for or on behalf of any such Governmental Authority, or any political party, party official or candidate thereof.

"<u>Governmental Authority</u>" means any United States or non-United States national, federal, municipal, state, provincial, territorial, or local governmental or quasi-governmental, administrative, Taxing or regulatory authority, department, agency, board, bureau, official, court, commission or any other judicial or arbitral body or other similar authority or instrumentality (including any self-regulatory authority, securities exchange, court or similar tribunal), including the Bankruptcy Court.

"<u>Hazardous Material</u>" means any material, substance, chemical, or waste (or combination thereof) that (a) is listed, defined, designated, regulated or classified as hazardous, toxic, radioactive, dangerous, a pollutant, a contaminant, petroleum, petroleum products and byproducts, oil, or words of similar meaning or effect under any Environmental Law, including without limitation asbestos, radon, urea-formaldehyde, per- or polyfluoroalkyl substances or other emerging contaminants, explosives, polychlorinated biphenyls (PCBs) or substances containing PCBs, radioactive materials, Stachybotrys mold and Legionella bacteria, and known carcinogens; or (b) pursuant to which Liability is or could be imposed under any Environmental Law.

"<u>Indebtedness</u>" means, as to any Person as of any date of determination, without duplication, all obligations of such Person (a) for borrowed money, (b) evidenced by notes, bonds, debentures or similar instruments, (c) for the deferred purchase price of goods or services (other than trade payables or accruals incurred in the ordinary course of business consistent with past practice), (d) any off-balance sheet financings, (e) for amounts drawn with respect to any letter of credit issued on behalf of such Person, (f) in the nature of guaranties by such Person made with respect to the obligations described in <u>clauses (a)</u> through <u>(e)</u> of this definition of any other Person, and (g) all accrued or unpaid interest, premiums, penalties, breakage costs, unwind costs, fees, termination costs, redemption costs, expenses, and other charges with respect thereto, in each case with respect to the obligations described in <u>clauses (a)</u> through <u>(f)</u> of this definition.

"<u>Intellectual Property</u>" means any and all intellectual property and any and all right, title and interest therein or thereto, of every kind and description throughout the world in any jurisdiction, including (a) trade names, trademarks, service marks, business names, corporate names, domain names, internet protocol addresses, certification marks, trade dress, logos, slogans, design rights, brand names, and other similar designations of source or origin whether registered or unregistered (including all translations, adaptations, derivations, and combinations of the foregoing), together with the goodwill connected with the use of and symbolized by any of the foregoing ("<u>Trademarks</u>"); (b) patents, patent applications, invention disclosures, patent disclosures and improvements to any of the foregoing, together with all provisionals, continuations, continuations-in-part, divisionals, revisions, reissues, re-examinations, substitutions, and restorations thereof, and all foreign counterparts and all rights in any of the foregoing ("<u>Patents</u>"); (c) works of authorship (whether copyrightable or not), copyrights and copyrightable subject matter (whether registered or unregistered), including copyrights in

Software, and all moral rights and special rights of authorship or attribution associated with any of the foregoing ("Copyrights"); (d) computer software, programs and applications (whether in source code, object code, or other form), systems, algorithms, databases, compilations and data, tools, firmware, specifications, application programming interfaces, scripts, executables, libraries and other technology, and all documentation, including user manuals and training materials, and all versions, updates, releases, patches, corrections, enhancements and modifications, related to any of the foregoing ("Software"); (e) any information and materials, whether proprietary or not and whether patentable or not, including trade secrets and other proprietary or confidential information, ideas, concepts, unpatented inventions (whether patentable or unpatentable and whether or not reduced to practice), formulas, recipes, methods, processes, procedures, designs, compositions, plans, documents, inventions, discoveries, components, materials, drawings, specifications, financial, accounting, customer and other sensitive business data, technical data, personal information, customer lists, supplier lists, business plans, know-how, and rights in any data ("Know-How"); (f) rights of publicity, privacy rights, and rights in all social media usernames and accounts, (g) all rights in the foregoing and in other similar intangible assets; (h) all copies and tangible embodiments of all of the foregoing (in whatever form or medium); (i) all applications, registrations, issuances, renewals, reversions, or extensions for any of the foregoing; (j) rights of any kind accruing under any of the foregoing provided by applicable law of any jurisdiction, by international treaties and conventions, and otherwise throughout the world, as well as all rights of indemnity, warranty rights, rights of contribution, refund, reimbursement or other rights of recovery possessed by Sellers (regardless of whether such rights are currently exercisable); (k) royalties, fees, income, payments, and other proceeds now or hereafter due or payable with respect to any and all of the foregoing; and (l) claims and causes of action with respect to any of the foregoing, whether accruing before, on, or after the date hereof, including all rights to and claims for damages, restitution, and injunctive and other legal and equitable relief for past, present, and future infringement, dilution, misappropriation, violation, misuse, breach, or default, with the right but not the obligation to sue for such legal and equitable relief and to collect, or otherwise recover, any such damage.

"Inter-Company Payable" means any accounts payable, trade accounts payable and other amounts payable owed to a Seller by or from a Seller.

"Inter-Company Receivable" means any accounts receivable, trade accounts and other amounts receivable owed to a Seller by or from a Seller.

"Interim Financing Order" means that certain interim order, dated on or prior to September 11, 2025, by the Bankruptcy Court approving the DIP on an interim basis.

"IRS" means the Internal Revenue Service of the United States.

"IT Assets" means any and all computers, Software, databases, hardware, servers, workstations, routers, hubs, switches, platforms, data communications lines, websites (including the content thereon) and all other information technology equipment, rights, and assets, including those provided pursuant to outsourced or cloud computing arrangements.

"Knowledge" with respect to the Sellers means the actual knowledge of the persons listed in Section 1.1(a) of the Disclosure Schedule after reasonable due inquiry.

"<u>Law</u>" means any federal, state, provincial, local, municipal, foreign or other statute, law, legislation, constitution, principle of common law, resolution, ordinance, code, regulation, rule, proclamation, treaty, convention, code, injunction, judgment, decree, ruling, directive, pronouncement, requirement, determination, decision, opinion, Order, ordinances and regulations (including binding determinations and interpretations) of any Governmental Authority.

"<u>Lease</u>" means a lease, sublease, license, or other use or occupancy agreement with respect to the real property to which a Seller is a party as lessee, sublessee, tenant, subtenant or in a similar capacity.

"<u>Leased Real Property</u>" means the leasehold interests held by a Seller under a Lease (other than any Leases withdrawn pursuant to <u>Section 2.6</u>).

"<u>Liability</u>" means any debt, adverse claim, loss, claim, lien, damage, demand, fine, Taxes, judgment, penalty, liability, duty, responsibility, expense (including interest, court costs, reasonable fees of attorneys, accountants and other experts or other reasonable expenses of litigation or other Action or of any claim, default or assessment) or obligation of any kind, character, or description (whether known or unknown, asserted or unasserted, direct or indirect, fixed, absolute or contingent, matured or unmatured, accrued or unaccrued, ascertained or ascertainable, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, vested or unvested, executory, determined, determinable, in contract, tort, strict liability, or otherwise, or otherwise due or to become due).

"<u>Liquor Licenses</u>" means all liquor licenses (including, without limitation, beer and wine licenses) held or used by each Seller, including the Seller in whose name such license is issued, date of issuance and renewal date.

"<u>Material Adverse Effect</u>" means any event, change, condition, occurrence or effect that individually or in the aggregate has had, or would reasonably be expected to have, a material adverse effect on (a) the business, properties, liabilities, financial condition or results of operations of the Business, including the Transferred Assets and Assumed Liabilities, taken as a whole, or (b) the ability of the Sellers to perform their obligations under this Agreement or the Ancillary Agreements or to consummate the transactions contemplated hereby or thereby, in each case of the preceding <u>clause (a)</u>, other than any event, change, condition, occurrence or effect to the extent arising out of, attributable to or resulting from, alone or in combination, (i) general changes or developments in the industry in which the Business operates, (ii) changes in general domestic or foreign economic, social, political, financial market or geopolitical conditions (including the existence, occurrence, escalation, outbreak or worsening after the date hereof of any hostilities, war, police action, acts of terrorism or military conflicts, whether or not pursuant to the declaration of an emergency or war), (iii) natural disasters or calamities, (iv) changes in any applicable Laws or GAAP after the date of this Agreement, (v) the announcement of this Agreement or the transactions contemplated hereby, (vi) the commencement of the Bankruptcy Case, or (vii) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics (but, for the avoidance or doubt, not the underlying causes of any such failure to the extent such underlying cause is not otherwise excluded from the definition of Material Adverse Effect); <u>provided</u>, <u>however</u>, that the events, changes, conditions, occurrences or effects set forth in <u>clauses (i)</u>, <u>(ii)</u>, <u>(iii)</u> or <u>(iv)</u> may be taken into account in

determining whether there has been or is a Material Adverse Effect if such event, change, condition, occurrence or effect has a disproportionate impact on the Business, taken as a whole, relative to the other participants in the industries and markets in which the Business operates.

"OFAC" means the U.S. Department of Treasury's Office of Foreign Assets Control.

"OFAC Blocked Parties List" means the list of "Specially Designated Nationals and Blocked Persons" maintained by OFAC.

"Off-the-Shelf Software" means non-exclusive licenses for Software that are (a) licensed under "shrink-wrap" or "click-through" Contracts, (b) generally commercially available on reasonable nondiscriminatory terms through commercial distributors or in a retail store, or (c) licensed from a third-party for amounts less than $15,000 annually.

"Order" means any award, writ, injunction, judgment, order, decree, rule, ruling, directive, determination or award entered, issued, made, or rendered by any Governmental Authority, whether preliminary, interlocutory or final, including by the Bankruptcy Court in the Bankruptcy Cases (including the Sale Order).

"Ordinary Course of Business" means the operation of the Business in the ordinary and usual course consistent with past practice of the Sellers in accordance with applicable Law.

"Organizational Documents" means, with respect to any Person that is not a natural person (a) the articles or certificate of incorporation, formation or organization, memorandum of association, articles of association and by-laws, limited partnership agreement, partnership agreement, limited liability company agreement or operating agreement or such other organizational documents of such Person or which establish the legal personality of such Person and (b) the minute books, membership interest certificates and membership interest transfer ledgers of such Person.

"Owned IP" means any and all Intellectual Property owned (or purported to be owned), in whole or in part, by, or exclusively licensed to, in whole or in part, any of the Sellers, and includes all Intellectual Property required to be set forth on Section 3.12(a) of the Disclosure Schedule.

"Party" or "Parties" means, individually or collectively, the Buyer and the Sellers.

"Permit" means any authorization, approval, consent, license (including any Liquor License), permit, variance, waiver, certificate of authority, franchise, ruling, tariff, certification, exemption, filing, notice to, declaration of, or registration by or with any Governmental Authority.

"Permitted Encumbrance" means (a) statutory liens for current Taxes not yet due and payable or the validity or amount of which is being contested in good faith by appropriate proceedings, in each case for which adequate reserves have been established on the Seller Financial Statements in accordance with GAAP and for which there is no material risk of seizure of any property or asset, (b) mechanics', carriers', workers', repairers' and other similar liens arising or incurred in the Ordinary Course of Business relating to obligations (i) as to which there is no

default on the part of any of the Sellers, (ii) for a period with respect to amounts not yet overdue (<u>provided</u> that such amounts arising or accruing prior to Closing remain Excluded Liabilities) and (iii) that are not individually or in the aggregate material to the continued use, value or operation of the Transferred Assets in the conduct of the Business as currently conducted, or pledges, deposits or other liens securing the performance of bids, trade Contracts, leases or statutory obligations, (c) with respect to the Leased Real Property, minor title defects or irregularities that do not, individually or in the aggregate, materially impair the value or the current use of such Leased Real Property, and (d) any Encumbrances that will be removed or released by operation of the Sale Order on or prior to the Closing Date.

"<u>Person</u>" means an individual, corporation, partnership, limited liability company, limited liability partnership, syndicate, person, trust, association, organization or other entity, including any Governmental Authority, and including any successor, by merger or otherwise, of any of the foregoing.

"<u>Post-Closing Tax Period</u>" means any Tax year or Tax period that begins after the Closing Date, and with respect to the Straddle Period, the portion of such period that begins after the Closing Date.

"<u>Post-Closing Wind-Down Budget</u>" means a budget in form and substance agreed upon by the Parties that provides for the funding of all fees, costs and expenses arising out of or relating to the Bankruptcy Case and all other transactions contemplated by this Agreement, which fees, costs and expenses in the aggregate shall not exceed the Wind-Down Amount, that are expected to be incurred by the Sellers to wind-down their respective corporate existence and operations following the Closing Date, including (but not limited to) professional advisor and legal fees, noticing fees and any other fees, costs and expenses incurred for the Bankruptcy Case to be compliant with the Bankruptcy Code.

"<u>Pre-Closing Tax Period</u>" means any Tax year or Tax period that ends on or before the Closing Date and, with respect to the Straddle Period, the portion of such period that ends on, and including, the Closing Date.

"<u>Related Party</u>" means (a) any Seller or (b) any Affiliate of any Seller.

"<u>Release</u>" means any release, spill, emission, discharge, leaking, pouring, dumping or emptying, pumping, injection, deposit, disposal, dispersal, leaching or migration into the indoor or outdoor environment (including soil, ambient air, surface water, groundwater and surface or subsurface strata) or into or out of any property, including the migration of Hazardous Materials through or in the air, soil, surface water, groundwater or property.

"<u>Representatives</u>" means, with respect to any Person, the officers, managers, directors, principals, employees, agents, attorneys, accountants, auditors, advisors, bankers and other representatives of such Person.

"<u>Restaurant Petty Cash</u>" means any cash of the Sellers on the premises of any restaurant operated by the Sellers.

"Sale Hearing" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement.

"Sale Procedures" means the bidding procedures reflected in the Sale Procedures Order.

"Sale Procedures Motion" means the motion filed in the Bankruptcy Court by the Sellers seeking entry of the Sale Procedures Order.

"Sale Procedures Order" means the Order of the Bankruptcy Court, dated on or prior to September 26, 2025, that, among other things, approves (a) bidding procedures, (b) the form and manner of notice of Auction(s), sale transaction(s), and Sale Hearing(s), and the conduct of the Auction, (d) the procedures for assumption and assignment of Contracts and Leases, and (e) the date for the Auction, if necessary, and Sale Hearing, the form of which Order is attached hereto as Exhibit A, with such changes as may be required by the Bankruptcy Court that are in form and substance reasonably acceptable to the Buyer and the Sellers.

"Sale Order" means an Order of the Bankruptcy Court approving this Agreement and the transactions contemplated hereby, acceptable to Buyer in all respects.

"Silverview Agent" means Silverview Credit Partners LP, in its capacity as agent under the Silverview Loan Agreement and the other "Loan Documents" (as defined in the Silverview Loan Agreement), including any successor thereto.

"Silverview Loan Agreement" means that certain Loan Agreement, dated as of March 7, 2023, by and among Pinstripes, as borrower, Holdings, as holdings, the lenders party thereto from time to time, and the Silverview Agent, as amended, modified, supplemented, or amended and restated from time to time.

"Silverview Loan Claims" means any and all claims against the Sellers arising from or based upon the Silverview Loan Agreement or the other "Loan Documents" (as defined in the Silverview Loan Agreement), including, without limitation, all accrued but unpaid principal, interest, premiums, costs, fees, expenses and indemnities.

"Straddle Period" means any taxable period beginning on or before the Closing Date and ending after the Closing Date.

"Subsidiary" of any Person means any entity (a) of which 50% or more of the outstanding share capital, voting securities or other voting equity interests are owned, directly or indirectly, by such Person, (b) of which such Person is entitled to elect, directly or indirectly, at least 50% of the board of directors or similar governing body of such entity or (c) if such entity is a limited partnership or limited liability company, of which (i) such Person or one of its Subsidiaries is a general partner or managing member or has the power to direct the policies, management or affairs or (ii) such Person possesses, directly or indirectly, a 50% or greater interest in the total capitalization or total income of such partnership, limited liability company or similar entity.

"Successful Bidder" has the meaning set forth in the Sale Procedures Order.

"<u>Support Agreement</u>" means that certain Support Agreement, dated as of August 27, 2025, by and among the Sellers, Silverview Credit Partners LP and the Guarantors (as defined therein).

"<u>Target of Sanctions</u>" means any Person that is located in, incorporated under the Laws of, or owned or (directly or indirectly) controlled by Persons with which applicable Economic Sanctions and Trade Controls Laws and Regulations prohibit or restrict dealings.

"<u>Tax Return</u>" means any return, document, declaration, report, claim for refund, statement, estimation, disclosure, information statement or other information or filing relating to Taxes, including any schedule or attachment thereto or amendment thereof, that is filed with or supplied to, or required to be filed with or supplied to, any Governmental Authority.

"<u>Taxes</u>" means (a) any and all U.S. federal, state and local, non-U.S., and other taxes, charges, fees, duties, levies, tariffs, imposts, tolls, customs or other assessments, including all net income, gross income, capital gains, gross receipts, sales, use, ad valorem, transfer, franchise, profits, branch profits, profit share, license, lease, service, service use, value added, unclaimed property, escheat, withholding, payroll, employment, fringe, fringe benefits, excise, estimated, severance, stamp, occupation, premium, property, windfall profits, wealth, net wealth, net worth, payment or fee in lieu of taxes (or similar arrangement), export and import fees and charges, registration fees, tonnage, vessel, deposits, or other taxes, fees, assessments, customs, duties, levies, tariffs, imposts, tolls, or charges of any kind whatsoever imposed by any Governmental Authority, together with any interest, penalties, inflationary adjustments, additions to tax, fines or other additional amounts imposed thereon, with respect thereto, or related thereto, or in lieu thereof, wherever and whenever imposed, (b) any and all liability for the payment of any items described in <u>clause (a)</u> above arising from, through, attributable to, or with respect to a place of business, permanent establishment, or a branch or as a result of being (or ceasing to be) a member of a fiscal unity, affiliated, consolidated, combined, unitary, or other similar group or being included (or ceasing to be included) in any Tax Return related to such group, (c) any and all liability for the payment of any amounts as a result of any successor or transferee liability, or by operation of law, in respect of any items described in <u>clause (a)</u> or <u>(b)</u> above, and (d) any and all liability for the payment of any items described in <u>clause (a)</u> or <u>(b)</u> above as a result of, or with respect to, any express or implied obligation to indemnify any other Person pursuant to any tax sharing, tax indemnity or tax allocation agreement or similar agreement or arrangement with respect to taxes.

"<u>Transferred Contracts</u>" means all Contracts and Leases of each Seller that are listed in <u>Section 1.1(a)</u> of the Disclosure Schedules, which schedule shall be provided by Buyer to the Sellers as provided in, and may be adjusted pursuant to, <u>Section 2.6</u>.

"<u>Treasury Regulations</u>" means the final and temporary regulations promulgated by the U.S. Department of the Treasury pursuant to the Code.

"<u>United States Person</u>" means a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"<u>Wind-Down Amount</u>" means an amount not to exceed $50,000.

Section 1.2    Table of Definitions.  The following terms have the meanings set forth in the Sections referenced below:

| Definition | Location |
|---|---|
| Agreement | Preamble |
| Allocation | Section 2.9(b) |
| AML Laws | Section 3.23(b) |
| Assignment Agreement | Section 2.8(b)(i) |
| Assumed Liabilities | Section 2.3(a) |
| Audited Financial Statements | Section 3.5(a) |
| Balance Sheet Date | Section 3.5(a) |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bill of Sale | Section 2.8(b)(i) |
| Business | Recitals |
| Business Permits | Section 2.1(e) |
| Buyer | Preamble |
| Closing | Section 2.8(a) |
| Closing Date | Section 2.8(a) |
| Consent or Governmental Authorization | Section 2.6(c) |
| Cure Costs | Section 2.3(a)(ii) |
| Current Receivables | Section 3.19(b) |
| Credit Bid Amount | Section 2.7 |
| Disclosure Limitations | Section 6.2 |
| Disclosure Schedule | Article III |
| Enforceability Exceptions | Section 3.2 |
| Equipment | Section 2.1(c) |
| Event | Section 1.1 |
| Excluded Assets | Section 2.2 |
| Excluded Contracts | Section 2.2(f) |
| Excluded Liabilities | Section 2.4 |
| Excluded Plans | Section 2.2(e) |
| Go-Shop Actions | Section 5.1(a)(i) |
| Go-Shop Period | Section 5.1(a)(i) |
| Hillsdale | Preamble |
| Hired Employee | Section 6.4(a) |
| Holdings | Preamble |
| Improvements | Section 3.11(c) |
| Inactive Employee | Section 6.4(a) |
| Insurance Policies | Section 3.17 |
| Intended Tax Treatment | Section 2.9(a) |
| Inventory | Section 2.1(d) |
| IP Assignment Agreement | Section 2.8(b)(iii) |
| Know-How | Section 1.1 |
| Latest Balance Sheet | Section 3.5(a) |

Legal Restraint ........................................................Section 8.1(a)
Material Contract ....................................................Section 3.15(a)
Material Supplier ....................................................Section 3.18
Non-Party Affiliates................................................Section 10.12
OFAC Rep Party ....................................................Section 3.22(a)
Offered Employee ...................................................Section 6.4(a)
Outside Date............................................................Section 9.1(b)(iii)
Patents ...................................................................Section 1.1
Pinstripes................................................................Preamble
Petition Date............................................................Recitals
Prairiefire ...............................................................Preamble
Purchase Price ........................................................Section 2.7
Registered IP ..........................................................Section 3.12(a)
Related Orders ........................................................Section 5.1(b)(iii)
Related Party Agreement ........................................Section 3.16
Seller ......................................................................Preamble
Seller Financial Statements......................................Section 3.5(a)
Software .................................................................Section 1.1
Terminated Employee ..............................................Section 6.4(b)
Terrorism Order ......................................................Section 3.22(a)
Trademarks .............................................................Section 1.1
Transfer Taxes ........................................................Section 7.1
Transferred Assets ..................................................Section 2.1
Transferred Tax Assets ...........................................Section 2.1(g)
Unaudited Financial Statements ..............................Section 3.5(a)
WARN ...................................................................Section 3.10(f)

## ARTICLE II.
## PURCHASE AND SALE

Section 2.1    <u>Purchase and Sale</u>.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, upon the terms and subject to the conditions of this Agreement, at the Closing, the Sellers shall sell, assign, transfer, convey and deliver to the Buyer, or any subsidiary, affiliate or designee of Buyer designated in writing prior to the Closing, all of the Sellers' right, title and interest in, to and under the Transferred Assets, and the Buyer, or any subsidiary, affiliate or designee of Buyer designated in writing prior to the Closing, shall purchase, acquire and accept the Transferred Assets free and clear of all Encumbrances (other than Permitted Encumbrances). "<u>Transferred Assets</u>" shall mean all of the properties, rights, interests and other assets of the Sellers of every kind and description, wherever located, whether real, personal or mixed, tangible or intangible, in each case, relating to the Business, including all right, title and interest of the Sellers in, to or under the following properties, rights, interests and other assets (but excluding in each case, any Excluded Assets):

(a)    all Transferred Contracts (as may be adjusted pursuant to <u>Section 2.6</u>);

(b)    all Leased Real Property (subject to <u>Section 2.6</u>) and other interests in real property, together in each case with the Sellers' right, title and interest in and to all structures,

fixtures, facilities or improvements located thereon and all easements, licenses, rights, privileges and appurtenances relating to the foregoing;

(c)    all machinery, equipment, consumables, supplies, furniture, furnishings, parts, spare parts, vehicles and other tangible personal property and fixed assets owned, leased (to the extent the underlying lease is a Transferred Contract) or used (or held for use) by the Sellers (the "<u>Equipment</u>");

(d)    all inventory (including raw materials, component parts, spare parts, works-in-progress, finished goods and goods in transit, supplies and packaging materials, consumable food, alcoholic beverages, and other beverages, all of Sellers' tangible property used in the preparation of, serving, and cleaning up from, food and drinks, including napkins, silverware, plates and dining ware, cups, glassware, mugs, cooking and cleaning utensils, packaging materials, paper products, ingredients, miscellaneous consumables, materials, supplies, inventories and all of Sellers' tangible property used in connection with bowling, bocce and other entertainment) owned or used (or held for use) by any of the Sellers, wherever located and whether in the Sellers' facilities, held by any third parties or otherwise (the "<u>Inventory</u>");

(e)    all Permits issued to, or for the benefit of, any Seller (the "<u>Business Permits</u>"), all rights and benefits thereunder and all pending applications or filings therefor and renewals thereof, in each case, which are related to the Transferred Assets or the Business, but only to the extent such Permits may be transferred under applicable Law;

(f)    all Cash and Cash Equivalents, all bank accounts, all cash collateral held by third parties as security for the Assumed Liabilities, and all deposits (including maintenance deposits, customer deposits, and security deposits for rent, electricity, telephone, utilities or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by any Seller, but excluding the Excluded Cash;

(g)    any interest in or right to any Tax refund, rebate, credit or attribute or other Tax asset, benefit or receivable, in each case, that relates to, or with respect to, the Transferred Assets or the Business (collectively, the "<u>Transferred Tax Assets</u>"), including (for the avoidance doubt) any Transferred Tax Assets that become available or utilizable to, or received by, any Seller in a Post-Closing Tax Period in respect of a Tax paid or incurred by the Buyer with respect to the Transferred Assets;

(h)    copies of all Tax Returns of, with respect to, or related to the Transferred Assets or the Business (and all Tax books and records, including note papers and work papers, related thereto);

(i)    all Accounts Receivable (including Inter-Company Receivables);

(j)    all rights under non-disclosure or confidentiality, non-compete, non-solicitation, non-interference, non-disparagement or similar agreements to which any Seller is a party, with respect to which any Seller is a beneficiary or has any rights thereunder, including any such agreement with current or former directors, managers, officers, employees or agents, or with third parties;

(k)    all rights (including lien rights), claims (including commercial tort claims), credits, settlement proceeds, causes of action, choses in action, rights of recovery, rights of recoupment, rights of set off, equity rights and defenses relating or with respect to the Business, any of the Transferred Assets (including, for the avoidance of doubt, those arising under, or otherwise relating to, any of the Transferred Contracts) or any of the Assumed Liabilities, including all rights under vendors', manufacturers' and contractors' representations, warranties, indemnities and guarantees;

(l)    except as contemplated by Section 2.2(b), all of such Seller's insurance policies and rights and benefits thereunder (including (i) all rights to indemnification for losses, defense costs and settlements, credits, refunds, proceeds, claims (including first party and third party insurance claims), causes of action or other rights arising under or relating to such insurance policies, (ii) all claims, demands, proceedings and causes of action asserted or that may be asserted by any Seller under such insurance policies relating, directly or indirectly, to the Business, any Transferred Asset or any Assumed Liability and (iii) any letters of credit or other credit support related thereto);

(m)    all Owned IP and any and all other Intellectual Property owned, licensed, used or held for use by any of the Sellers, in each case, that is used (or held for use in) or otherwise relates to the Business;

(n)    all goodwill, customer and referral relationships, other intangible assets and all privileges associated with, or relating to, the Business, the Transferred Assets or the Assumed Liabilities;

(o)    all IT Assets owned, licensed, leased, used, or held for use by any of the Sellers, in each case, that is used (or held for use in) or otherwise relates to the Business (collectively, the "Transferred IT Assets");

(p)    all rights to the social media accounts, telephone and facsimile numbers and e-mail account contents and addresses used by any Seller, as well as rights to receive mail and other communications addressed to any Seller (including mail and communications to and from customers, vendors, suppliers, distributors, agents and Governmental Authorities);

(q)    except to the extent set forth in Section 2.2(a), all Books and Records; and

(r)    the properties, rights, interests and other assets set forth on Section 2.1(r) of the Disclosure Schedules.

Section 2.2    Excluded Assets.    Notwithstanding anything contained in Section 2.1 to the contrary, the Sellers are not selling, transferring, assigning, conveying or delivering, and the Buyer is not purchasing, any of the Sellers' right, title and interest to, in and under, the following assets, properties, rights and interests of the Sellers, all of which shall be retained by the Sellers (collectively, the "Excluded Assets"):

(a)    the Sellers' documents, written files, papers, books, reports and records (i) prepared in connection with this Agreement or the transactions contemplated hereby or relating to the Bankruptcy Case or (ii) that any Seller is required by Law to retain; provided that, to the

extent not prohibited by applicable Law or any of any Seller's reasonable applicable privacy policies or contractual restrictions and to the extent materially relevant to the Transferred Assets, Assumed Liabilities, or the Business, Buyer shall be entitled to copies of all or any portions of such documents;

(b)    all director and officer insurance policies, fiduciary policies (in each case of the foregoing, including any automatic or purchased extended reporting periods, tail policies or coverage thereon), and any of such Seller's rights, benefits, indemnifications, claims, demands, proceedings, credits, causes of action or rights of set off thereunder;

(c)    all rights, claims and causes of action to the extent relating to any Excluded Asset or any Excluded Liability;

(d)    shares of capital stock or other Equity Interests of any Seller or securities convertible into or exchangeable or exercisable for shares of capital stock or other Equity Interests of any Seller;

(e)    all Employee Benefit Plans, along with the assets under each Employee Benefit Plan (collectively, the "Excluded Plans"), together with all funding arrangements related thereto (including all assets, trusts, insurance policies and administrative service Contracts);

(f)    any Contract to which any of the Sellers is a party that is not a Transferred Contract, including those set forth on Section 2.2(f) of the Disclosure Schedule (the "Excluded Contracts"), which schedule shall be provided by Buyer to the Sellers as provided in, and may be adjusted pursuant to, Section 2.6;

(g)    all retainers or similar prepaid amounts paid to the accountants, attorneys, consultants, advisors, investment bankers or other professional service providers of the Sellers;

(h)    the Excluded Cash;

(i)    the assets of the Sellers listed in Section 2.2(i) of the Disclosure Schedules;

(j)    all Avoidance Actions; and

(k)    all rights of the Sellers under this Agreement and the Ancillary Agreements.

Section 2.3    Assumed Liabilities.

(a)    On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Closing, Buyer, or any subsidiary of Buyer designated in writing prior to the Closing, shall assume from the Sellers (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and the Sellers shall irrevocably convey, transfer, and assign to Buyer (or any subsidiary of Buyer designated in writing prior to the Closing), only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (the "Assumed Liabilities"):

(i)      all Liabilities of the Sellers under the Transferred Contracts solely to the extent first arising from and after the Closing, excluding with respect to events, circumstances or occurrences that first arise prior to the Closing or as otherwise agreed between Buyer and counterparty to such Transferred Contracts;

(ii)      cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Transferred Contracts or as otherwise agreed between Buyer and counterparty or landlord to applicable Transferred Contracts (the "Cure Costs");

(iii)      the payment obligation, in an amount up to $300,000, to the Sellers' proposed investment banker, Hilco Corporate Finance; and

(iv)      all Inter-Company Payables.

(b)      The transactions contemplated by this Agreement shall in no way expand the rights or remedies of any third party against the Buyer or the Sellers as compared to the rights and remedies that such third party would have had against the Sellers or the Buyer absent the Bankruptcy Case or the Buyer's assumption of such Assumed Liabilities.  Notwithstanding the foregoing and for the avoidance of doubt, (i) all post-petition administrative rent costs for the month of September, if any, for the locations set forth on Schedule 1.1, in each case accrued in accordance with the budget and treated as a Cure Cost, for the Transferred Contracts are Assumed Liabilities, and (ii) Assumed Liabilities shall not include any (1) Excluded Liability, (2) any obligation to pay any expenses for winding down the Bankruptcy Case, other than the Wind-Down Amount in accordance with the Post-Closing Wind-Down Budget, (3) fees and expenses for any professional employed by the Sellers or their estates, (4) any post-petition Liabilities of any of the Sellers that were incurred in violation of the Interim Financing Order, the Final Financing Order, or the DIP, or (5) Liability relating to or arising out of any violation of Law by, or any Action against, any Seller or any breach, default or violation by any Seller or any of its Affiliates of or under any Transferred Contracts, all of which shall constitute Excluded Liabilities.  Other than the Assumed Liabilities, the Buyer is not assuming and shall not be liable for any Liabilities of the Sellers.

Section 2.4      Excluded Liabilities.  Buyer and its designated subsidiaries shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, the Sellers or the Business or relating to the Transferred Assets, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "Excluded Liabilities"), including but not limited to the following:

(a)      any and all Liabilities for (i) any Taxes related to, arising from or with respect to the Transferred Assets, the Assumed Liabilities or the operation of the Business, in each case that are incurred in, or attributable to, any Pre-Closing Tax Period (determined, in the case of any Straddle Period, in accordance with Section 7.3), including any such Taxes which are not due

or assessed until after the Closing Date, (ii) any Taxes related to, arising from or with respect to the Excluded Assets or other Excluded Liabilities for any taxable period, (iii) any Taxes of or with respect to the Sellers or any direct or indirect equityholder or former equityholder of the Sellers or any of their respective Affiliates thereof for any taxable period, or (iv) any Taxes of or with respect to any Person (other than the Sellers) imposed on the Buyer as a transferee or successor to the Transferred Assets, the Assumed Liabilities or the operation of the Business, by Contract or assumption, or pursuant to any law, rule, or regulation, which Taxes are incurred in, relate to, or attributable to, any Pre-Closing Tax Period;

(b)     any and all Liabilities of the Sellers under any Excluded Contract whether accruing prior to, at, or after the Closing Date (including, for the avoidance of doubt, any and all Liabilities relating to the return of deposits or other prepaid amounts to counterparties to any Excluded Contract);

(c)     any and all Liabilities resulting from the failure to comply with any applicable "bulk sales," "bulk transfer" or similar Law;

(d)     any Liabilities arising out of, resulting from or relating to (i) the employment or service or termination of employment or service, or the provision of compensation, severance, benefits or payments of any nature owed to any current or former employees, officers, directors or service providers of the Sellers, whenever arising and whether or not such Persons become Hired Employees or are otherwise employed by or perform other services for Buyer or their Affiliates after the Closing, relating to services performed, or claims accrued or incurred on or prior to the Closing, (ii) the employment or termination of employment of any Business Employee by the Sellers on or prior to the Closing, including any gratuity payment, severance, notice or other payment or benefit due on the termination of employment of any such Business Employee by the Sellers at the Closing, (iii) claims incurred on or prior to the Closing under any Employee Benefit Plan and all Liabilities with respect thereto, including all wages, commission, severance, bonus, damages for wrongful dismissal, paid-time-off, accrued vacation, and other post-termination payments so incurred on or prior to the Closing, and (iv) Liabilities expressly retained by the Sellers pursuant to <u>Section 6.4</u>;

(e)     any Indebtedness of the Sellers;

(f)     any Liability to distribute to any Seller's shareholders (or other equity holders) or otherwise apply all or any part of the consideration received hereunder;

(g)     any and all Liabilities arising under any Environmental Law or with respect to Hazardous Materials or any other environmental matter and arising from or related to (i) the ownership or operation of the Business or the Transferred Assets on or before the Closing Date, (ii) any action or inaction of the Sellers or any third party relating to the Business or Transferred Assets on or before the Closing Date, (iii) any formerly owned, leased or operated properties of the Sellers that are not the Leased Real Property, or (iv) any condition first occurring or arising on or before the Closing Date with respect to the Business or the Transferred Assets;

(h)     except with respect to the Wind-Down Amount provided by Buyer pursuant to the Post-Closing Wind-Down Budget, any and all Liability for: (i) costs and expenses incurred

by the Sellers or owed in connection with the administration of the Bankruptcy Case (including the U.S. Trustee fees, the fees and expenses of attorneys, accountants, financial advisors, consultants and other professionals retained by the Sellers, and any official or unofficial creditors' or equity holders' committee and the fees and expenses of the post-petition lenders or the pre-petition lenders incurred or owed in connection with the administration of the Bankruptcy Case); (ii) all costs and expenses of the Sellers incurred in connection with the negotiation, execution and consummation of the transactions contemplated under this Agreement; and (iii) all costs and expenses arising out of or related to any third party claims against the Sellers, pending or threatened, including any warranty or product claims;

(i)     any Liability of the Sellers under this Agreement or the Ancillary Agreements; and

(j)     any Liability or obligation to the extent relating to an Excluded Asset.

Section 2.5     Consents to Certain Assignments.

(a)     Notwithstanding anything in this Agreement or any Ancillary Agreement to the contrary, this Agreement and the Ancillary Agreements shall not constitute an agreement to transfer or assign any asset, Permit, claim or right or any benefit arising thereunder or resulting therefrom if an attempted assignment thereof, without the consent of a third party, would constitute a breach or other contravention under any Contract or Law to which any Seller is a party or by which it is bound, or materially and adversely affect the rights of the Sellers or, upon transfer, the Buyer under such asset, Permit, claim or right, unless the applicable provisions of the Bankruptcy Code permits and/or the Sale Order authorizes the assumption and assignment of such asset, Permit, claim, or right irrespective of the consent or lack thereof of a third party.  If, with respect to any Transferred Asset, such consent is not obtained or such assignment is not attainable pursuant to the Bankruptcy Code or the Sale Order, then such Transferred Asset shall not be transferred hereunder, and, subject to Section 8.3(g), the Closing shall proceed with respect to the remaining Transferred Assets and the Sellers shall, through the earlier of such time as such consent or assignment is so obtained and eighteen (18) months following the Closing, use commercially reasonable efforts, and the Buyer shall cooperate with the Sellers, to obtain any such consent and to resolve the impracticalities of assignment after the Closing; provided, however, that Sellers shall only be obligated to provide such post-Closing assistance so long as Buyer complies with the Post-Closing Wind-Down Budget.

(b)     Except with respect to Transferred Contracts and Business Permits that are governed by Section 2.6(c) below, if (i) notwithstanding the applicable provisions of sections 363 and 365 of the Bankruptcy Code and the Sale Order and the commercially reasonable efforts of the Sellers, any consent is not obtained prior to Closing and as a result thereof the Buyer shall be prevented by a third party from receiving the rights and benefits with respect to a Transferred Asset intended to be transferred hereunder, (ii) any attempted assignment of a Transferred Asset would adversely affect the rights of the Sellers thereunder so that the Buyer would not in fact receive all the rights and benefits contemplated, or (iii) any Transferred Asset is not otherwise capable of sale and/or assignment (after giving effect to the Sale Order and the Bankruptcy Code), then, in any such case, the Sellers shall, subject to any approval of the Bankruptcy Court that may be required and at the request of the Buyer, cooperate with Buyer in any lawful arrangement under which the

Buyer would, to the extent practicable, obtain the economic claims, rights and benefits under such asset and assume the economic burdens and obligations with respect thereto in accordance with this Agreement, including by subcontracting, sublicensing or subleasing to the Buyer. The Sellers shall as promptly as practicable pay to the Buyer when received all monies received by the Sellers or their Affiliates attributable to such Transferred Asset from and after the Closing Date and the Buyer shall indemnify and promptly pay the Sellers for all Liabilities of the Sellers associated with such arrangement.

Section 2.6    Assumption/Rejection of Certain Contracts.

(a)    Assumption and Assignment of Executory Contracts. The Sellers shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to any executory Contracts or unexpired leases to which any Seller is a party that are Transferred Contracts and take all other actions necessary to cause such Contracts to be assumed by the Sellers and assigned to Buyer or its designee pursuant to section 365 of the Bankruptcy Code to the extent that such Contracts are Transferred Contracts at Closing. At the Closing, the Sellers shall, pursuant to the Sale Order, and the Assignment Agreement, assume and assign to Buyer, or any subsidiary, affiliate or designee of Buyer designated in writing prior to the Closing (the consideration for which is included in the Purchase Price), all Transferred Contracts that may be assigned by any such Seller to Buyer (or any subsidiary, affiliate or designee of Buyer designated in writing prior to the Closing) pursuant to sections 363 and 365 of the Bankruptcy Code, subject to adjustment pursuant to Section 2.6(b). At the Closing, Buyer or its applicable designee shall (i) pay all Cure Costs, (ii) cure any and all other defaults and breaches under the Transferred Contracts so that such Contracts may be assumed by the applicable Seller and assigned to Buyer (or any subsidiary, affiliate or designee of Buyer designated in writing prior to the Closing) in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement, and (iii) assume, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and perform all of the obligations under each Transferred Contract pursuant to section 365 of the Bankruptcy Code.

(b)    Excluding or Adding Transferred Contracts Prior to Closing. Section 2.6(b) of the Disclosure Schedule sets forth a list of each executory Contract (including Leases) of the Sellers and the Sellers' good faith estimate of the amount of Cure Costs applicable to each such executory Contract (and, if no Cure Cost is estimated to be applicable with respect to any particular executory Contract, the estimated amount of any such Cure Cost for such executory Contract shall be designated as "$0.00"). Notwithstanding anything to the contrary set forth herein, Buyer shall have the right to notify the Sellers in writing of (i) any Transferred Contract that it does not wish to assume up to one (1) Business Day prior to the Closing Date and any such previously considered Transferred Contract that Buyer no longer wishes to assume shall be automatically deemed removed from Section 1.1(a) of the Disclosure Schedule and automatically deemed added to Section 2.2(f) of the Disclosure Schedules, in each case, without any adjustment to the Purchase Price and (ii) any Contract to which any Seller is a party that Buyer wishes to add as a Transferred Contract up to five (5) Business Days after the Closing Date (which time period may be extended by mutual consent of the Parties) and any such previously considered Excluded Contract that Buyer wishes to assume as a Transferred Contract shall be automatically deemed added to Section 1.1(a) of the Disclosure Schedule related to Transferred Contracts, automatically deemed removed from Section 2.2(f) of the Disclosure Schedules, and assumed by Sellers to sell and assign

to Buyer (or any subsidiary, affiliate or designee of Buyer designated in writing prior to the Closing), in each case, without any adjustment to the Purchase Price. If any Contract is added to (or excluded from) the Transferred Contracts or Excluded Contracts pursuant to this Section 2.6(b), the Sellers shall promptly take such steps as are reasonably necessary, including, if applicable, prompt delivery of notice to the non-Seller counterparty to such Contract to cause such Contract to be assigned to Buyer (or any subsidiary, affiliate or designee of Buyer designated in writing), or excluded or rejected, as applicable. Promptly following any such changes to the information set forth on Section 1.1(a) of the Disclosure Schedule or Section 2.2(f) of the Disclosure Schedules, the Sellers shall provide an updated schedule setting forth the Cure Costs applicable to each Contract set forth on Section 1.1(a) of the Disclosure Schedules.

(c)    Non-Assignment. Notwithstanding the foregoing, a Contract shall not be a Transferred Contract hereunder and shall not be assigned to, or assumed by, Buyer (or any subsidiary, affiliate or designee of Buyer) to the extent that such Contract (i) is rejected by a Seller or terminated by a Seller or any other party thereto, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Buyer (or any subsidiary, affiliate or designee of Buyer) as a Transferred Contract hereunder and is not continued or otherwise extended upon assumption; provided, however, the Buyer may irrevocably designate any such Contract as a Transferred Contract in accordance with Section 2.6(b) and the Sellers shall not move to reject such Contract; or (ii) requires an approval or Order from, or consent by, any Governmental Authority or other Person (other than, and in addition to, that of the Bankruptcy Court), except for any such approval, Order, or consent that is not required due to the Sale Order ("Consent or Governmental Authorization") in order to permit the sale or transfer to Buyer (or any subsidiary, affiliate or designee of Buyer designated in writing prior to the Closing) of the applicable Seller's rights under such Contract, and such Consent or Governmental Authorization has not been obtained prior to such time as it is to be assumed by Buyer (or any subsidiary, affiliate or designee of Buyer designated in writing prior to the Closing) as a Transferred Contract hereunder or the Bankruptcy Court has not issued an Order that such Consent or Governmental Authorization is not required. In the event that any Transferred Contract is deemed not to be assigned pursuant to clause (ii) of the first sentence of this Section 2.6(c), the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Consent or Governmental Authorization is obtained and eighteen (18) months following the Closing (or the remaining term of such Contract or the closing of the Bankruptcy Case, if shorter), Sellers and Buyer shall (A) use reasonable best efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by Buyer, including subcontracting, licensing, or sublicensing to Buyer (or any subsidiary, affiliate or designee of Buyer designated in writing prior to the Closing) any or all of any Seller's rights and obligations with respect to any such Transferred Contract, under which (1) Buyer (or any subsidiary, affiliate or designee of Buyer designated in writing prior to the Closing) shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits under such Transferred Contract with respect to which the Consent or Governmental Authorization has not been obtained and (2) Buyer (or any subsidiary, affiliate or designee of Buyer designated in writing prior to the Closing) shall assume any related burden (taking into account the amount of any related Tax benefit obtained by Sellers or their respective Affiliates) and obligation (including performance) with respect to such Transferred Contract; provided, however, that Sellers shall only be obligated to provide such post-Closing assistance so long as Buyer complies with the

Post-Closing Wind-Down Budget.  Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Transferred Contract after the Closing, such Transferred Contract shall promptly be transferred and assigned to Buyer (or any subsidiary, affiliate or designee of Buyer designated in writing prior to the Closing) in accordance with the terms of this Agreement.

(d)    Negotiations.  Notwithstanding anything herein to the contrary, each Seller hereby authorizes, consents to, and agrees that, Buyer and its Affiliates and designees shall be permitted to discuss, negotiate and/or communicate directly with any of the counterparties on any matters relating to any of the Contracts of the Sellers (including, without limitation, Cure Costs related thereto and/or the terms of such Contracts).  The Sellers hereby undertake to take all steps and actions and use commercially reasonable efforts to cooperate with Buyer and its Affiliates and designees to facilitate any such discussions, negotiations and/or communications as may be requested by Buyer and/or its Affiliates or designees.  If a non-debtor counterparty to a Contract objects to the assumption or assignment or to the proposed Cure Costs asserted by the Sellers with regard to any Contract (a "Disputed Contract"), the Sellers shall use commercially reasonable efforts to either settle the objection of such party or shall litigate such objection under procedures as the Bankruptcy Court shall approve and proscribe, provided, however, that (i) if the Disputed Contract is identified on Section 2.6(a) of the Disclosure Schedule, the Sellers shall not settle a Cure Cost objection without the express written consent of Buyer and (ii) Sellers shall only be obligated to provide such post-Closing assistance so long as Buyer complies with the Post-Closing Wind-Down Budget.

Section 2.7    Consideration.  In consideration for the transfer of the Transferred Assets to the Buyer (or any subsidiary, affiliate or designee of Buyer) and the other undertakings set forth herein, the purchase price (the "Purchase Price") for the Transferred Assets shall be (a) the assumption of the Assumed Liabilities by the Buyer (or any subsidiary, affiliate or designee of Buyer designated in writing prior to the Closing) at Closing, plus (b) the Credit Bid plus (c) the provision of an amount equal to the Wind-Down Amount for the Post-Closing Wind-Down Budget plus (d) $1,600,000 in cash (the "Cash Component").  Notwithstanding anything to the contrary herein, (i) under no circumstances shall any portion of the Credit Bid Amount be converted into or otherwise require a cash payment and the Cash Component is the only cash portion of the Purchase Price and (ii) each dollar of DIP Loan Claims, or Silverview Loan Claims, as applicable, that is subject to the Credit Bid or assumed as Assumed Liabilities shall be treated as the same as a dollar of cash.

Section 2.8    Closing.

(a)    The sale and purchase of the Transferred Assets and the assumption of the Assumed Liabilities contemplated by this Agreement shall take place at a closing (the "Closing") to be held by electronic exchange of documents at 10:00 a.m. New York Time on the second (2nd) Business Day following the satisfaction or, to the extent permitted by applicable Law, waiver of all conditions to the obligations of the Parties set forth in Article VIII (other than such conditions as may, by their terms, only be satisfied at the Closing or on the Closing Date, but subject to the satisfaction or waiver of such conditions), or at such other place or at such other time or on such other date as the Sellers and the Buyer mutually may agree in writing.  The day on which the Closing takes place is referred to as the "Closing Date."

33521550.7

28

(b)      At or prior to the Closing, the Sellers shall deliver or cause to be delivered to the Buyer:

(i)      the bill of sale substantially in form and substance agreed upon by the Parties (the "Bill of Sale"), duly executed by the applicable Sellers;

(ii)      the assignment and assumption agreement substantially in form and substance agreed upon by the Parties (the "Assignment Agreement"), duly executed by the applicable Sellers;

(iii)      the intellectual property assignment agreement substantially in form and substance agreed upon by the Parties (the "IP Assignment Agreement"), duly executed by the applicable Sellers;

(iv)      the Transition Services Agreement substantially in form and substance agreed upon by the Parties (the "Transition Services Agreement"), duly executed by the applicable Sellers;

(v)      a copy of the Sale Order, as entered by the Bankruptcy Court, which must be a Final Order;

(vi)      an IRS Form W-9 from each Seller duly executed by each such Seller, dated as of the Closing Date, certifying that such Seller (or if such Seller is a disregarded entity within the meaning of Treasury Regulation Section 301.7701-3, its regarded owner for U.S. federal income Tax purposes) is a United States Person and is not subject to backup withholding; and

(vii)      a duly executed certificate of a duly authorized officer of each Seller certifying the satisfaction of the conditions set forth in Section 8.3(a),  Section 8.3(b) and Section 8.3(e).

(c)      At or prior to the Closing, the Buyer shall deliver or cause to be delivered to the Sellers:

(i)      a payoff letter, release letter or other similar document acknowledging the Credit Bid of the Credit Bid Amount pursuant to section 363(k) of the Bankruptcy Code as partial consideration for the transfer of the Transferred Assets;

(ii)      a payoff letter, release letter or other similar document acknowledging the Credit Bid of the DIP Loan Claims pursuant to section 363(k) of the Bankruptcy Code as partial consideration for the transfer of the Transferred Assets;

(iii)      the Bill of Sale, duly executed by the Buyer and, to the extent applicable, any subsidiary, affiliate or designee of Buyer designated in writing prior to the Closing to receive the Transferred Assets;

(iv)    the Assignment Agreement, duly executed by the Buyer and, to the extent applicable, any subsidiary, affiliate or designee of Buyer designated in writing prior to the Closing to receive the Transferred Assets;

(v)    the IP Assignment Agreement, duly executed by the Buyer and, to the extent applicable, any subsidiary, affiliate or designee of Buyer designated in writing prior to the Closing to receive the Transferred Assets;

(vi)    the Transition Services Agreement, duly executed by the Buyer; and

(vii)    a duly executed certificate of a duly authorized officer of the Buyer certifying the satisfaction of the conditions set forth in <u>Section 8.2(a)</u> and <u>Section 8.2(b)</u>.

Section 2.9    <u>Intended Tax Treatment; Tax Allocation; Tax Sharing Agreements</u>.

(a)    For U.S. federal income Tax purposes (and applicable state and local income Tax purposes), the sale of the Transferred Assets by each Seller to Buyer under this Agreement shall be treated as an asset sale governed by Treasury Regulations Section 1.166-6 and Section 1001 of the Code (the "<u>Intended Tax Treatment</u>").  The Parties will, and will cause each of their respective Affiliates to, prepare and file all Tax Returns in a manner consistent with the Intended Tax Treatment, and none of the Parties or their respective Affiliates will take any position with any Governmental Authority or otherwise that is inconsistent with the Intended Tax Treatment, except as Sellers and Buyer may otherwise agree or as may be otherwise required by a final, non-appealable "determination" within the meaning of Section 1313(a) of the Code (or any corresponding or similar provision of state, local, or non-U.S. Tax Law).

(b)    The Purchase Price (including the applicable Assumed Liabilities and any other amounts, to the extent properly taken into account under applicable Tax Law, and including any adjustments thereto), shall be allocated among the applicable Transferred Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (such allocation, the "<u>Allocation</u>").  The Allocation shall be prepared by the Buyer and delivered to the Sellers promptly following the Closing Date.   Buyer and Sellers shall, and shall cause their respective Affiliates to, prepare and file all Tax Returns, including Internal Revenue Service Form 8594 (Asset Acquisition Statement under Section 1060 of the Code), in a manner consistent with the Allocation, as finally determined under this <u>Section 2.9(b)</u>, and none of the Sellers or Buyer (or any of their respective Affiliates) shall take any position inconsistent therewith on any Tax Return or in connection with any Tax audit, claim or similar Action, in each case, unless otherwise required by a "determination" within the meaning of Section 1313(a) of the Code. Sellers shall use commercially reasonable efforts to timely and properly deliver all such documents, forms and other information as Buyer may reasonably request to the extent necessary to prepare the Allocation and any adjustments thereto. Buyer, on the one hand, and Sellers, on the other hand, shall notify the other if it receives notice that any Governmental Authority proposes any allocation different from the Allocation (as finally determined under this <u>Section 2.9(b)</u>.

(c)    All Tax sharing agreements or similar agreements and all powers of attorney that relate in any way to the Transferred Assets or the Business will be terminated effective as of the Closing and, after the Closing, no such agreement or power of attorney will have any effect on

the Transferred Assets, and Buyer and its Affiliates shall not have any Liability with respect thereto.

Section 2.10   Withholding.  Buyer and its Affiliates (and any person who is a withholding agent for applicable Tax purposes) shall be entitled to deduct and withhold from amounts payable pursuant to this Agreement to any Person such amounts as are required by applicable Law to be deducted and withheld from such payment.  To the extent that amounts are so deducted or withheld, such deducted or withheld amounts shall be treated for all purposes of this Agreement as having been paid to such Person in respect of which such deduction and withholding was made.

Section 2.11   Exclusion of Transferred Assets.   Except with respect to the Transferred Contracts (which are subject to Section 2.6), at any time on or prior to the third (3rd) Business Day after the date of the Auction, the Buyer may, in its discretion by written notice to the Sellers, designate any of the Transferred Assets as additional Excluded Assets, which notice shall set forth in reasonable detail the Transferred Assets so designated; provided that (a) there shall be no reduction in the Purchase Price if the Buyer elects to designate any Transferred Asset as an Excluded Asset and (b) the Liabilities of the Sellers under or related to any Transferred Asset excluded under this paragraph will constitute Excluded Liabilities.

# ARTICLE III.
# REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except as set forth in the Disclosure Schedules delivered by the Sellers to the Buyer which are consistent with the Support Agreement and satisfactory to the Buyer in its sole discretion (the "Disclosure Schedules") (with specific reference to the representations and warranties in this Article III to which the information in such schedule relates; provided, however, that, disclosure in the Disclosure Schedule as to a specific representation or warranty shall qualify any other sections of this Agreement to the extent (notwithstanding the absence of a specific cross reference) it is readily apparent on its face that such disclosure relates to such other sections), as of the Disclosure Schedule Delivery Date and as of the Closing Date (other than representations and warranties made as of a specified date), each of the Sellers jointly and severally represents and warrants to the Buyer as follows:

Section 3.1   Organization.  Each Seller (a) is an entity duly incorporated or organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, as applicable, and (b) has all requisite power and authority to own and operate its properties and assets and to carry on its businesses as now conducted, subject to the provisions of the Bankruptcy Code. Each Seller is qualified to do business and is in good standing (or its equivalent) in every jurisdiction in which its ownership of property or the conduct of its business as now conducted requires it to qualify, except where the failure to be so qualified is not and would not reasonably be expected to be material to the Business, taken as a whole.

Section 3.2   Authority.  Subject to required Bankruptcy Court approvals, (i) each Seller has all requisite legal capacity and the full power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it is or will be a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby

and thereby, (ii) the execution, delivery and performance by such Seller of this Agreement and each of the Ancillary Agreements to which it is or will be a party and the consummation by such Seller of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate (or equivalent) action and (iii) this Agreement has been, and upon its execution each of the Ancillary Agreements to which such Seller will be a party will have been, duly executed and delivered by such Seller and, assuming due execution and delivery by each of the other parties hereto and thereto, this Agreement constitutes, and upon its execution each of the Ancillary Agreements to which such Seller will be a party will constitute, the legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with their respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether considered in a proceeding in equity or at Law) (the "Enforceability Exceptions").

Section 3.3    No Conflict; Required Filings and Consents.

(a)    Except as set forth in Section 3.3(a) of the Disclosure Schedule and assuming that (x) requisite Bankruptcy Court approvals are obtained, and (y) the notices, authorizations, approvals, Orders, permits or consents set forth in Section 3.3(b) of the Disclosure Schedule are made, given or obtained (as applicable), the execution, delivery and performance by the Sellers of this Agreement and the Ancillary Agreements to which they are (or will be) a party and the consummation by the Sellers of the transactions contemplated hereby and thereby, will not: (i) conflict with or result in any violation or breach of or default under or give rise to a right of termination, cancellation, modification or acceleration of any obligation, to any put or call or similar rights or to loss of a benefit under, any provision of the Organizational Documents of any Seller; (ii) conflict with or result in a violation or breach of any Law or Order applicable to any Seller or by which any Transferred Asset or any property or asset of any Seller is bound; (iii) violate or render void or voidable any Permit or Order applicable to the Sellers or by which any Transferred Asset is bound or (iv) conflict with or result in a violation or breach of, constitute (with or without notice or lapse of time) a default under, require any Seller to obtain consent or approval from any Person under the terms of, give rise to any right of termination, cancellation, acceleration or modification under the terms of, or result in the creation or imposition of any Encumbrance (other than Permitted Encumbrances) upon any properties or assets of any Seller under the terms of, in each case, any Lease or Contract to which any Seller is a party; except, with respect to clauses (ii), (iii) or (iv), for any such conflicts, violations, breaches, defaults or other occurrences which have not had and would not reasonably be expected to have a Material Adverse Effect.

(b)    Except as set forth in Section 3.3(b) of the Disclosure Schedule, no Seller is required to file, seek or obtain any notice, authorization, approval, Order, Permit, or consent of or with any Governmental Authority in connection with the execution, delivery and performance by the Sellers of this Agreement and each of the Ancillary Agreements to which they are or will be a party or the consummation by the Sellers of the transactions contemplated hereby or thereby, except (i) requisite Bankruptcy Court approvals (including the entry of the Sale Procedures Order and the Sale Order), or (ii) as would be required solely as a result of the specific identity or the specific legal or regulatory status of the Buyer or any of its Affiliates as compared to any other unaffiliated third party purchaser.

Section 3.4    Transferred Assets.

(a)    Each Seller, as applicable, has indefeasible title to, and owns and possesses all rights and interests in, including the right to use, each of the Transferred Assets, or with respect to leased Transferred Assets, valid leasehold interests in such Transferred Assets, or with respect to licensed Transferred Assets, valid licenses to use such Transferred Assets.

(b)    This Agreement and the instruments and documents to be delivered by the Sellers to the Buyer at the Closing shall be adequate and sufficient to transfer (i) Sellers' entire right, title and interest in and to the Transferred Assets and (ii) to the Buyer, good title to the Transferred Assets, free and clear of all Encumbrances (other than Permitted Encumbrances), claims, and interests, other than Assumed Liabilities, subject to entry of the Sale Order.

(c)    Except (a) as has not had and would not reasonably be expected to have, individually or in the aggregate, an adverse effect on the Business or the Transferred Assets, taken as a whole, in any material respect and as would not materially impair or delay the ability of any Seller to consummate the transactions contemplated hereby, or (b) as set forth on Section 3.4(c) of the Disclosure Schedule, the right, title and interest of the Sellers in the Transferred Assets constitute substantially all of the assets of Sellers owned or held by, used or intended for use, leased, licensed or accrued in connection with the conduct of the Business as currently conducted, and immediately after the Closing, the Transferred Assets shall be sufficient for Buyer to continue to operate and conduct the Business as currently conducted.

(d)    Except as set forth on Section 3.4(d) of the Disclosure Schedules, all tangible assets of the Transferred Assets are (i) in good working order and condition in all material respects, ordinary wear and tear excepted, (ii) have been reasonably maintained, (iii) are suitable in all material respects for the uses for which they are being utilized in the Transferred Assets and the Businesses as conducted by the Sellers as of the date hereof, (iv) do not require more than regularly scheduled maintenance in the Ordinary Course of Business and the established maintenance policies of Sellers in order to keep them in good operating condition, and (v) comply in all material respects with all requirements under any Laws and any licenses which govern the use and operation thereof.

(e)    There are no existing Contracts, options, commitments or rights with, to or in any third party to acquire the Transferred Assets or any interest therein or in the Business or the Business itself.

Section 3.5    Financial Statements; No Undisclosed Liabilities.

(a)    The Sellers have delivered to the Buyer true, correct and complete copies of (x) the audited consolidated balance sheets of the Sellers as of April 28, 2024, together with the related consolidated statements of operations, redeemable convertible preferred stock and stockholders' deficit and cash flows for the fiscal year then ended (the "Audited Financial Statements"), and (y) the unaudited consolidated balance sheets of the Sellers as of January 5, 2025 (the "Balance Sheet Date", and, such balance sheets the "Latest Balance Sheet"), together with the related consolidated statements of operations, redeemable convertible preferred stock and stockholders' deficit and cash flows for that portion of the fiscal year then ended (the "Unaudited

Financial Statements" and, together with the Audited Financial Statements, the "Seller Financial Statements").  The Seller Financial Statements (i) are based on the Books and Records, (ii) have been prepared in accordance with GAAP, applied on a consistent basis (except as may be indicated in the notes thereto) and, in the case of the Unaudited Financial Statements, subject to (A) normal year-end audit adjustments (none of which are expected to be material, individually or in the aggregate) and (B) the absence of notes (none of which, if presented, would materially differ in amount or nature from those included in the Audited Financial Statements) and (iii) fairly present, in all material respects, the financial position of the Sellers and the Business as of the respective dates therein indicated and the results of operations and cash flows for the periods therein specified.

(b)    Sellers do not have any Liabilities, whether or not required to be set forth on a balance sheet of Sellers prepared in accordance with GAAP, except for Liabilities (i) set forth on Section 3.5(b) of the Disclosure Schedule, (ii) arising under any Material Contract, Permit, or applicable Law, or otherwise in the Ordinary Course of Business since the Balance Sheet Date (other than Liabilities arising out of any breach or default under any such Material Contract or failure to comply with any such Permit or applicable Law), (iii) which would not reasonably be expected to be material to the Business, taken as a whole, or (iv) which are expressly reflected or reserved against in the Seller Financial Statements.

Section 3.6    Absence of Certain Changes or Events.  Since the Balance Sheet Date through the date of this Agreement, (a) each Seller has (i) conducted the Business in the Ordinary Course of Business, (ii) maintained all of their respective assets, Permits, business relationships and operations, in each case, in accordance with past custom and practice and applicable Law, and (iii) used the same book or Tax accounting methods, except as required by GAAP, and (b) there has not (i) been any event, change, condition, occurrence or effect that, individually or in the aggregate, has had, or would be reasonably expected to have, a Material Adverse Effect or (ii) without limiting the generality of the foregoing, except (x) for the solicitation of, discussions and negotiations with, presentations and provision of other diligence to and similar engagement with other potential bidders for the Transferred Assets, the negotiation and execution of this Agreement, or (y) as set forth on Section 3.6 of the Disclosure Schedule, from the Balance Sheet Date until the date hereof, no Seller has taken any action that, if taken after the Disclosure Schedule Delivery Date, would require Buyer's consent pursuant to Section 6.1.

Section 3.7    Compliance with Law; Permits.

(a)    The Business is being conducted in material compliance with, and the Sellers have in all material respects complied with all applicable Laws, Permits, and Orders relating to the operation of the Business and the Transferred Assets.  No investigation with respect to actual or alleged noncompliance with applicable Laws, and Orders by any Seller has been threatened or commenced, and no notice, charge, claim, action or assertion has been received by any Seller with respect to any actual or alleged noncompliance with applicable Laws and Orders.

(b)    The Sellers are in possession of all material Permits (which, for the avoidance of doubt, includes all Liquor Licenses) necessary for them to own, lease or otherwise hold their assets and properties and to carry on the Business as currently conducted.  All such Permits, and the holders thereof, are set forth on Section 3.7(b) of the Disclosure Schedule.  The Sellers have delivered to Buyer a true, correct and complete copy of each Permit.

(c)       No event has occurred that permits or would permit any material adverse modification, revocation, suspension, or termination of, or any other material adverse change in, or would prevent any Seller from obtaining, or any Seller's compliance with, any Permit.  Each such Permit (i) is held in the name of the applicable Seller, (ii) is valid and in full force and effect, (iii) is final and, if the statute or regulation pursuant to which such Permit is issued establishes a limited administrative or judicial appeal period, all such periods have expired and (iv) has not expired or been terminated, suspended, revoked or modified in any material respect (except for such modifications as have been delivered to Buyer).  No Seller is in material breach or default (nor, with the giving of notice or lapse of time, would be in material breach or default) under any such Permit.

(d)       No event has occurred and is continuing that could reasonably be expected to result in any adverse modification, revocation, suspension, or termination of, or any other material adverse change in, any Permit.  No Seller has received notice from any Governmental Authority regarding (i) any material breach or default under any Permit listed on Section 3.7(b) of the Disclosure Schedule, (ii) the expiration, revocation, suspension or termination of, or any material modification of the requirements under, any such Permit or (iii) any administrative investigation, administrative appeal, or judicial proceeding with respect to any such Permit (other than rulemaking proceedings of general applicability).

(e)       Subject to the entry of the Sale Order, each such Permit (including each Liquor License) may be transferred or reissued to the Buyer in accordance with this Agreement and without the approval of any Person (other than the Bankruptcy Court).  Such Permits are readily transferable to the Buyer without material expense and without causing such Permits to be revoked, cancelled, suspended or modified.

Section 3.8       Litigation.  Except for the Bankruptcy Case, and any Order entered in the Bankruptcy Case, and except as set forth on Section 3.8 of the Disclosure Schedule there is not, and has not been for the past three (3) years, any Action pending, or to the Knowledge of the Sellers, threatened by or against any Seller involving any of the Transferred Assets, the Assumed Liabilities or the Business.  In the past three (3) years, there has been no Order to which any of the Transferred Assets, the Assumed Liabilities or the Business is subject, except as has not resulted in and would not reasonably be expected to be material to the Sellers, taken as a whole.  None of the Sellers or any of their respective Affiliates has received written notice of any such Order described in this Section 3.8.

Section 3.9       Employee Benefit Plans.

(a)       Section 3.9(a) of the Disclosure Schedule sets forth a true and complete list of each Employee Benefit Plan. True, complete and correct copies of the following documents, with respect to each Employee Benefit Plan, where applicable, has been made available to Buyer: (i) all documents embodying or governing such Employee Benefit Plan (or for unwritten Employee Benefit Plans a written description of the material terms of such Employee Benefit Plan) and any funding medium for the Employee Benefit Plan; (ii) the most recent IRS determination or opinion letter; (iii) the most recently filed Form 5500; (iv) the most recent actuarial valuation report; (v) the most recent summary plan description (or other descriptions provided to employees) and all

modifications thereto; (vi) the last three years of non-discrimination testing results; and (vii) all non-routine correspondence to and from any Governmental Authority.

(b)    With respect to the Employee Benefit Plans, (i) each of the Employee Benefit Plans has been operated and administered in all respects in accordance with applicable Law and administrative or governmental rules and regulations, including ERISA, the Patient Protection and Affordable Care Act and the Code, and with any applicable collective bargaining agreement and all other agreements or instruments applicable to any Employee Benefit Plan, (ii) there is no pending or threatened Action by, on behalf of or against any Employee Benefit Plan or any administrator or fiduciary thereof (other than routine claims for benefits), nor, to the Knowledge of the Sellers, is there any basis for such Action.

(c)    Each Employee Benefit Plan intended to be "qualified" within the meaning of Section 401(a) of the Code is so qualified and has received a favorable determination or opinion letter as to such qualification from the IRS and, to the Knowledge of the Sellers, has, in operation, been qualified under the Code from the effective date of such Employee Benefit Plan.  No event has occurred, either by reason of any action or failure to act, which would reasonably be expected to cause the loss of any such qualification or require corrective action to the IRS or Employee Plan Compliance Resolution System to maintain such qualification.

(d)    None of the Sellers or any of their ERISA Affiliates has ever maintained, sponsored, contributed to, or had an obligation to maintain, sponsor or contribute to, or has any Liability with respect to (i) a "defined benefit plan," as defined in Section 3(35) of ERISA and Section 414(j) of the Code, (ii) a plan subject to Title IV of ERISA or Sections 412 or 430 of the Code or to the minimum funding standards of Section 302 of ERISA, (iii) a "multiemployer plan," as defined in Section 3(37) of ERISA or (iv) a "multiple employer welfare arrangement", as defined in Section 3(4) of ERISA.

(e)    Neither any Seller, nor any ERISA Affiliate of any Seller, provides, nor have they ever provided, coverage under any welfare plan, as defined in Section 3(1) of ERISA, (including, but not limited to, life insurance, disability, medical, dental, prescription drugs or accidental death or dismemberment) to any of their former employees, other than any continuation coverage which any such former employee may have purchased at his or her own expense.

(f)    The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement could not, alone or in combination with any other event, (i) entitle any Business Employee to any payment (including severance pay, unemployment compensation or any other compensation), (ii) accelerate the time of payment or vesting, or increase the amount of compensation due to any Business Employee or (iii) cause any individual to accrue or receive additional benefits, service or accelerated rights to payment of benefits under any Employee Benefit Plan or employment agreement, (iv) directly or indirectly cause the Sellers or any of their ERISA Affiliates to transfer or set aside any assets to fund or otherwise provide for benefits for any individual, (v) limit or restrict the right to merge, materially amend, terminate or transfer the assets of any Employee Benefit Plan on or following the Closing Date, or (vi) require a "gross-up," indemnification for, or payment to any individual for any taxes imposed under Section 409A or Section 4999 of the Code or any other tax.

(g)     The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement will not result in any payment or benefit that would constitute an "excess parachute payment" (as such term is defined in Section 280G(b)(1) of the Code) or subject any Person to Liability for Tax under Section 4999 of the Code or cause the loss of deduction to any Seller under Section 280G of the Code.

(h)     Each Employee Benefit Plan that is a "nonqualified deferred compensation plan" within the meaning of Section 409A(d)(1) of the Code and any award thereunder, in each case that is subject to Section 409A of the Code, (i) has at all times been operated in compliance in all respects with Section 409A of the Code and all applicable IRS guidance promulgated thereunder, and (ii) either (A) has at all times been in a form which complies with the requirements of Section 409A of the Code or (B) has been timely amended under guidance issued pursuant to Section 409A of the Code so that its terms and provisions comply with the requirements of Section 409A of the Code.

(i)     There have been no statements, either written or oral, or communications made, or materials provided to any Business Employee by Sellers, or, to the Knowledge of Sellers, any of Sellers' officers, that provide for or could be construed as a Contract or promise regarding employment or terms and conditions of employment with the Buyer or its Affiliates following the Closing.

(j)     All contributions and premiums required by Law or by the terms of any Employee Benefit Plan have been timely made to any funds or trusts established thereunder or in connection therewith in all material respects.

Section 3.10    Labor and Employment Matters.

(a)     Section 3.10(a) of the Disclosure Schedule contains a true and correct list of all of the Business Employees as of the Disclosure Schedule Delivery Date, specifying their position, employer, date of hire, exempt or non-exempt status, hourly wage rate or annual base salary, all bonus opportunities, and accrued vacation, sick leave time and other paid time off, earned and accrued wages, salaries, commissions, bonuses, and any other material compensation, whether the employee is absent from active employment on approved leave, and, if so, the nature of such leave, the date such employee commenced such leave, and the anticipated date of return to active employment.

(b)     Except as disclosed in Section 3.10(b) of the Disclosure Schedules, no Seller is a party to or bound by any organized labor agreement, collective bargaining agreement, or any similar labor-related agreements or arrangements with any labor union, labor organization, or works council applicable to the Business Employees; there are no labor agreements, collective bargaining agreements, or any similar labor-related agreements or arrangements that pertain to any Business Employees; and no Business Employees are represented by any labor union, labor organization or works council with respect to their employment with the Sellers.

(c)     There are no material unfair labor practice charges, work stoppages, slowdowns, strikes, lockouts, grievances, picketings, or other similar material activities relating to labor matters pending or threatened against any Seller that pertain to the Business Employees.

(d)     No labor union, labor organization, works council or group of Business Employees has made a pending demand for recognition or certification, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or threatened to be brought or filed with the National Labor Relations Board or any other labor relations tribunal or authority pertaining to the Business Employees. There are no labor union organizing activities with respect to any Business Employees.

(e)     As of the Closing Date, the Sellers will have satisfied any material legal or Contractual requirement to provide notice to, or to enter into any consultation procedure with, any labor union, labor organization or works council, which is representing any Business Employee, in connection with the execution, delivery or performance of this Agreement or the transactions contemplated by this Agreement.

(f)     Each Seller is in compliance in all material respects with all applicable Laws respecting labor, labor relations, employment and employment practices pertaining to the Business Employees, including but not limited to all Laws respecting collective bargaining, the terms and conditions of employment, wages, hours, equal employment opportunity, employment discrimination, worker classification (including the proper classification of workers as independent contractors and consultants, and employees as exempt or non-exempt for overtime pay), immigration, work authorization, occupational health and safety, workers' compensation, paid sick leave, vacation pay, the payment of social security and other employment Taxes, disability rights or benefits, plant closures and layoffs, affirmative action, labor relations, employee leave issues and unemployment insurance. As of the Closing Date, the Sellers will not incur, nor have they incurred, Liabilities or other charges under the Worker Adjustment and Retraining Notification Act or any similar state law (collectively referred to as "WARN"), and none of the Sellers reasonably expects to conduct a layoff of employees of any of the Sellers as of or following the date hereof (other than individual terminations for just cause), regardless of whether any such layoff shall be deemed to effectuate or cause to be effectuated a "plant closing" or "mass layoff" (each as defined under WARN) or to trigger any statutory notice requirements under similar state law.

(g)     No employee of any of the Sellers is in any material respect in violation of any term of any employment agreement, nondisclosure agreement, common law nondisclosure obligation, fiduciary duty, non-competition agreement, restrictive covenant or other obligation: (i) to any of the Sellers or (ii) to a former employer of any such employee relating (A) to the right of any such employee to be employed by any such Seller or (B) to the knowledge or use of trade secrets or proprietary information.

(h)     Within the past three (3) years, there have not been any (i) unfair labor practice charges or complaints pending or threatened before the National Labor Relations Board or any other Governmental Authority against them, (ii) complaints, grievances, or arbitrations arising out of any collective bargaining agreement or any other complaints, grievances, or arbitration procedures against them, (iii) charges or complaints with respect to or relating to them pending before the Equal Employment Opportunity Commission or any other Governmental Authority responsible for the prevention of unlawful employment practices, (iv) written notice of the intent of any Governmental Authority responsible for the enforcement of labor, employment, wages and hours of work, child labor, immigration, or occupational safety and health laws to

conduct an investigation with respect to or relating to them or notices that such investigation is in progress, or (v) Actions pending or threatened in any forum by or on behalf of any present or former employee of such entities, any applicant for employment, or classes of the foregoing alleging breach of any express or implied Contract of employment, any applicable law governing employment or the termination thereof, or other discriminatory, wrongful, or tortious conduct in connection with the employment relationship.

(i)    The execution of this Agreement and the consummation of the transactions contemplated by this Agreement will not result in any breach or other violation of any collective bargaining agreement, employment agreement, consulting agreement or any other labor-related agreement to which the Sellers are a party that is applicable to the Business Employees.

(j)    The Sellers have in their files a U.S. Citizenship and Immigration Services Form I-9 that is validly and properly completed and, if necessary, that has been properly updated, in accordance with applicable Law for each Business Employee with respect to whom such form is required to be maintained under applicable Law.  The Sellers have not knowingly hired or continued to employ unauthorized workers.  No Seller has used the services of any individual through a staffing agency, Contract or subcontract knowing that the individual was an unauthorized worker.

(k)    Within the past three (3) years, (i) the Sellers have not been a party to any material settlement agreement with any Person resolving any allegation of sexual harassment or sexual misconduct by the Sellers or any of their respective employees; and (ii) there have been no material legal proceedings pending or threatened, against the Sellers involving allegations that an employee or a current or former officer or director of the Sellers engaged in sexual harassment or sexual misconduct with respect to any employee of the Sellers.

(l)    Section 3.10(l) of the Disclosure Schedule includes a list of employees of the Sellers whose employment has been involuntarily terminated within the ninety (90) day period preceding the date hereof and includes such employees' position and title (if any), their date of hire, the then-current rate of compensation as of his or her termination date and whether such employee is exempt or non-exempt.  Except as disclosed on Section 3.10(l) of the Disclosure Schedules, the Sellers have no unsatisfied Liability to any such previously terminated employee, officer, director, consultant, or independent contractor.

Section 3.11    Real Property.

(a)    None of the Sellers own, or have ever owned, any real property.

(b)    Section 3.11(b) of the Disclosure Schedule sets forth the address of each Leased Real Property, and a true, correct and complete list of all Leases to which the Sellers are a party (including all amendments, extensions, renewals, guaranties and other agreements with respect thereto) for such Leased Real Property.  Except as set forth on Section 3.11(b) of the Disclosure Schedules, the Sellers do not own, lease, license or otherwise have and have not had any interests (including option interests) in any real property other than the Leases.

(c)    To the Knowledge of the Sellers, the buildings, material building components, structural elements of the improvements, roofs, foundations, parking and loading

areas and mechanical systems (including all heating, ventilating, air conditioning, plumbing, electrical, elevator, security, utility and fire/life safety systems) (collectively, the "Improvements") included in the Leased Real Property and used by any of the Sellers in the operation of its business as currently conducted are, in all material respects, in good working condition and repair and sufficient for the operation of the business by each applicable Seller as currently conducted. There are no material structural deficiencies or material latent defects affecting any of the Improvements and, to the Knowledge of the Sellers, there are no facts or conditions affecting any of the Improvements, in each case, which would, individually or in the aggregate, interfere with the use or occupancy of the Improvements or any portion thereof in the operation of the Sellers in a manner that is or would be reasonably expected to be material to the Sellers, taken as a whole. No Seller has received notice of (i) any condemnation, eminent domain or similar Action affecting any parcel of Leased Real Property; (ii) any special assessment or pending improvement liens to be made by any Governmental Authority affecting any parcel of Leased Real Property; or (iii) violations of any building codes, zoning ordinances, governmental regulations or covenants or restrictions affecting any Leased Real Property that would be reasonably expected to result in a Material Adverse Effect. Each parcel of Leased Real Property has direct access to a public street adjoining such Leased Real Property, and such access is not dependent on any land or other real property interest which is not included in the Leased Real Property. None of the Improvements or any portion thereof is dependent for its access, use or operation on any privately owned land, building, improvement or other real property interest which is not included in the Leased Real Property. To the Knowledge of the Sellers, there are no recorded or unrecorded agreements, easements or encumbrances that materially interfere with the continued access to or operation of the Business of the Sellers as currently conducted on the Leased Real Property.

(d)     Each Seller has enjoyed the continuous and uninterrupted quiet possession, use and operation of the Leased Real Property, without complaint or objection by any Person.

Section 3.12   Intellectual Property.

(a)     A true, correct and complete list of all U.S. and foreign (1) issued Patents and pending Patent applications, (2) registered Trademarks (including domain names) and applications to register any Trademarks (including domain names), (3) registered Copyrights and applications for registration of Copyrights, and (4) domain name registrations, (5) other registered, issued or applied for Intellectual Property, (items (1) through (5), collectively, "Registered IP"), (6) any material unregistered Trademarks, and (7) any material Software, in each case, which is owned by (or purportedly owned by) whether in whole or part, or registered to a Seller is set forth on Section 3.12(a) of the Disclosure Schedule. The Sellers are the sole and exclusive beneficial and record owners of all of the Intellectual Property set forth in Section 3.12(a) of the Disclosure Schedules, and all Registered IP is subsisting, enforceable and valid.

(b)     All Registered IP has been duly registered in, filed in, or issued by the United States Patent and Trademark Office, United States Copyright Office, a duly accredited and appropriate domain name registrar, or corresponding appropriate state or foreign Governmental Entity. None of the Registered IP has been cancelled, abandoned, rejected, repudiated, or otherwise terminated and Sellers have paid all fees (including registration, renewal, maintenance and other relevant filing fees) and filed all documents and taken all actions due prior to the date hereof that are necessary to obtain or maintain such Registered IP in force and effect and no such

filings, payments, or other actions must be made, paid, or taken within one hundred eighty (180) days following the Closing Date.

(c)    The Sellers possess and solely and exclusively own (and upon Closing, Buyer will possess and be the sole and exclusive owner of) all right, title and interest in and to all of the Owned IP and have a valid right to use, free and clear of all Encumbrances (other than Permitted Encumbrances), all other Intellectual Property and IT Assets used or held for use in the Business.

(d)    The conduct of the Business (including the products and services of the Sellers) does not infringe, misappropriate, dilute, or otherwise violate (and, in the past six (6) years, has not infringed, misappropriated, diluted, or otherwise violated), in each case, any Person's Intellectual Property rights, and in the past six (6) years there has been no such Action asserted or, to the Knowledge of the Sellers, threatened against any Seller or, to the Knowledge of the Sellers, any other Person.

(e)    To the Knowledge of the Sellers, no Person is infringing, misappropriating, diluting, using without authorization, or otherwise violating, any Owned IP, and in the past six (6) years no such Actions have been asserted or threatened against any Person by any Seller.

(f)    All Persons (including all past and current employees, contractors and consultants of the Sellers) who have (i) had access (or been privy) to any material Know-How or confidential information or Intellectual Property contained in the Transferred IP or (ii) participated in or contributed to the creation, conception, authoring, reduction to practice, or development of any Owned IP have executed and delivered to the Sellers a valid written agreement, respectively, that (x) sufficiently restricts the disclosure and use by such Person of any such Know-How and such confidential information and Intellectual Property and (y) validly and presently assigns from such Person to one of the Sellers all of the entire right, title, and interest in and to such Owned IP (or, in the case of (y), all such right, title, and interest have vested in one of the Sellers by operation of Law), or where such rights are moral or similar rights that are incapable of assignment, they have been waived.  To the Knowledge of the Sellers, no Person is in breach of any such agreement. There are no royalties, fees, honoraria or other payments payable by the Sellers to any Person by reason of the ownership, development, use, license, sale or disposition of any Owned IP.

(g)    All officers, and consultants of the Sellers have executed agreements or have existing obligations under applicable Law and obligating the individual to maintain as confidential all Know-How and other confidential information and Intellectual Property of the Sellers and the Business; and the Sellers have taken all reasonable precautions to preserve the confidentiality of all Know-How and confidential information and Intellectual Property included in the Transferred Assets.

(h)    The Sellers have in place privacy policies regarding the collection, use and disclosure of personal information in their possession, custody or control.  Each Seller has at all times in the past three (3) years complied with all applicable Laws, as well as its own rules, policies, and procedures, relating to privacy, data protection, data security and the collection and use of personal information collected, used, or held for use by the Sellers.  In the past three (3) years, no Actions have been asserted or threatened against any Seller alleging a violation of any

Laws relating to a Person's privacy or personal information or data rights or any information security related incidents. No Seller has notified in writing or been required by applicable Law or Contract to notify in writing, any person or entity of any personal data or information security-related incident. The consummation of the transactions contemplated by this Agreement will not result in any violation of any data privacy or cybersecurity Laws.

(i)     Each Seller has implemented, and required that its third party vendors implement, adequate policies and commercially reasonable security (a) regarding the collection, use, disclosure, retention, processing, transfer, confidentiality, integrity and availability of personal data and business proprietary or sensitive information, in its possession, custody or control, or held or processed on its behalf, and (b) regarding the integrity and availability of the Transferred IT Assets. No Seller has experienced any information security incident that has compromised the integrity or availability of the Transferred IT Assets, and there has been no loss, damage or unauthorized access, disclosure, use or breach of security of any information in the possession, custody or control, or otherwise held or processed on behalf of such Seller. The Transferred IT Assets (i) are adequate for, and operate and perform in material conformance with their documentation and functional specifications; (ii) operate and perform in all material respects as currently required and as currently contemplated to be required to conduct and operate the Business, and (iii) do not contain any "time bombs," "Trojan horses," "back doors," "trap doors," worms, viruses, spyware, keylogger software or other vulnerability, faults or malicious code or damaging devices designed or reasonably expected to adversely impact the functionality of or permit unauthorized access or to disable or otherwise harm any information technology or software applications.

(j)     In the past three (3) years, (i) the Sellers have not experienced any material defects in the Software used in the Business or the Transferred IT Assets that have not been remediated as of the date hereof, (ii) there have been no security breaches of the Transferred IT Assets, and (iii) there have been no disruptions in any of the Transferred IT Assets that adversely affected the Business and that have not been remediated as of the date hereof.

Section 3.13    Taxes.    Except as set forth in Section 3.13 of the Disclosure Schedules:

(a)     (i) the Sellers have duly and timely filed (taking into account valid extensions) all required Tax Returns relating to the Transferred Assets, the Assumed Liabilities, and the Business, in each case, required to be filed by any Seller, as the case may be, (ii) all such Tax Returns are true, correct and complete in all material respects; (iii) each Seller has timely paid in full all Taxes (whether or not required to be shown on any Tax Return) relating to the Transferred Assets, the Assumed Liabilities, or the Business; and (iv) no Liability for Taxes has been incurred outside the Ordinary Course of Business by or with respect to the Transferred Assets, the Assumed Liabilities, or the Business since the date of the Seller Financial Statements.

(b)     All Taxes relating to or arising in connection with the Transferred Assets, the Assumed Liabilities or the Business, in each case, that are required to be withheld and collected and, to the extent required by applicable Law, paid and remitted (including in connection with any amounts owing to any employee, independent contractor, creditor, stockholder or other third party), have been timely withheld, collected, paid and remitted to the appropriate Governmental

Authority, and all IRS Forms W-2 and 1099 and all other Tax Returns required to be filed with respect thereto have been properly completed and timely filed.

(c)     There is no Action pending, proposed (tentatively or definitively), contemplated or asserted, or threatened in writing, by any Governmental Authority with respect to Taxes or Tax Returns of or with respect to the Transferred Assets, the Assumed Liabilities, or the Business, and no Governmental Authority has indicated in writing an intent to investigate, commence or open such an Action with respect to any such Tax or Tax Return.  No deficiencies for Taxes have been claimed, proposed or assessed by any Governmental Authority against any of the Sellers with respect to the Transferred Assets, the Assumed Liabilities or the Business, except for deficiencies which have been fully satisfied by payment, settled or withdrawn.

(d)     No Seller has received any claim from a Governmental Authority in a jurisdiction where such Seller has not filed a Tax Return that such Seller is or may be subject to taxation, or required to file a Tax Return in, such jurisdiction with respect to the Transferred Assets, the Assumed Liabilities, or the Business, which such claim has not been fully resolved.

(e)     There are no Encumbrances for Taxes upon the Transferred Assets other than for Taxes not yet due and payable.

(f)     Neither the Business, any of the Transferred Assets nor any of the Assumed Liabilities is subject to any Tax allocation, indemnity or sharing agreement or similar agreement, arrangement or understanding, other than any such agreement entered into in the Ordinary Course of Business and the principal purpose of which is not to address Taxes.

(g)     No agreement, waiver, extension or consent regarding the application of the statute of limitations with respect to any Taxes or Tax Returns of or with respect to the Transferred Assets, the Assumed Liabilities or the Business is outstanding, nor is there pending any request for such an agreement, waiver, extension or consent and Sellers have not agreed to any extension of time with respect to an assessment or deficiency for such Taxes (other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course of Business), which waiver or extension is currently in effect.  The Sellers have not agreed to any extension of time for filing any Tax Return with respect to the Transferred Assets, the Assumed Liabilities or the Business that has not been filed. No power of attorney has been granted with respect to any matter relating to Taxes payable by or with respect to any of the Transferred Assets, Assumed Liabilities or the Business, in each case that is currently in force.

(h)     No Seller (i) has received any ruling from a Governmental Authority relating exclusively to Taxes due with respect to any of the Transferred Assets, Assumed Liabilities or the Business that will remain in effect following the Closing or (ii) has withdrawn a request for such a ruling before the ruling was issued. No Seller is subject to any voluntary disclosure or similar agreement with any taxing authority with respect to the Transferred Assets, the Assumed Liabilities or the Business that is still pending or otherwise has not been fully resolved.

(i)     Each of the Sellers is a "United States person" within the meaning of Section 7701(a)(30) of the Code.

(j)       None of the Transferred Assets constitute stock, partnership interests or other equity interests in any Person for U.S. federal, state, local, or non-U.S. Tax purposes.

(k)       There is no taxable income of any Seller, or for which successor liability may attach to the Transferred Assets, that will be required under applicable Tax law to be reported by the Buyer or any of its Affiliates for a taxable period beginning on or after the Closing Date which taxable income was realized (and reflects economic income arising) prior to the Closing Date.

(l)       None of the Sellers have engaged in, or have been a party to, any reportable transaction described in Treasury Regulation Section 1.6011-4. Each Seller has disclosed on its federal income Tax Returns all positions taken therein that could give rise to a substantial understatement of federal income Tax within the meaning of Section 6662 of the Code.

(m)       Each of the Sellers is in compliance with all U.S. federal, state, local and non-U.S. Law applicable to abandoned or unclaimed property or escheat and has timely paid, remitted or delivered to each jurisdiction all unclaimed or abandoned property required by any applicable Laws to be paid, remitted or delivered to that jurisdiction, in each case with respect to the Transferred Assets and the Business.  None of the Sellers hold any property or owe any amount that is presumed abandoned under the Laws of any state or other jurisdiction, in each case with respect to the Transferred Assets or the Business.

(n)       No Seller has a permanent establishment or other taxable presence in any foreign country, as determined pursuant to non-U.S. applicable Laws and any applicable Tax treaty or convention between the United States and such foreign country.

Section 3.14   Environmental Matters.

(a)       The Sellers, the Transferred Assets and the Business are, and have for the past three (3) years been, in compliance in all material respects with all applicable Environmental Laws, which compliance includes obtaining, maintaining and complying with all Environmental Permits required in connection with the conduct or operation of the Business and the ownership or use of the Transferred Assets.  There is no claim or action currently pending or, to the Knowledge of the Sellers, threatened, that is or would reasonably be expected to result in the cancellation, revocation, non-renewal or other adverse or limiting modification or amendment of any such Environmental Permit.

(b)       There is no material Environmental Claim pending or, to the Knowledge of the Sellers, threatened against or affecting any Seller, Transferred Asset or the Business.  Neither the Sellers, the Transferred Assets nor the Business is or has been the subject or a party to any claim, action, investigation or proceeding relating to an Environmental Claim where there is an outstanding actual or potential material Liability.  Other than Orders of general applicability, none of the Transferred Assets is subject to any Order with respect to it relating to or arising under Environmental Law that would reasonably be expected to impose any restriction, value impairment or burdensome requirement on any of the Transferred Assets after Closing.  For the avoidance of doubt and without limitation, there are no pending claims against the Sellers, the Transferred Assets or the Business from any alleged exposure to asbestos or asbestos-containing materials.

(c)     Neither the Sellers, the Transferred Assets nor the Business (1) has breached any Environmental Law or (2) has any actual or contingent liabilities under any Environmental Law, including any liability for the disposal of waste material, which in either case is outstanding.

(d)     Neither the Sellers, Transferred Assets nor the Business has assumed or agreed to assume any Liability of a third party under Environmental Law.

(e)     There are no circumstances or environmental conditions which would be reasonably likely to form the basis of any material Liability of the Business or any Transferred Asset, or of any Environmental Claim against or affecting any Seller or the Business.

(f)     No former property, including the ground and groundwater underlying or the surface water at such former property, is or has been contaminated or polluted by any Hazardous Material in circumstances which could result in an Environmental Claim against or involving any Seller, Transferred Asset or the Business.

Section 3.15    Material Contracts.

(a)     Section 3.15(a) of the Disclosure Schedule sets forth, as of the Disclosure Schedule Delivery Date, a true, correct and complete list of the following Contracts to which any Seller is a party or is bound or by which any Transferred Assets are subject (each, a "Material Contract" and collectively, the "Material Contracts"):

(i)     each organized labor agreement, collective bargaining agreement or other Contract with any labor union, labor organization, works council, or other employee representative;

(ii)     each Contract with any Material Supplier;

(iii)     each Contract that creates or evidences any Liabilities or sources of revenue of the Business in an amount in excess of $100,000 in a calendar year or $200,000 in the aggregate over the life of such Contract;

(iv)     each Contract involving any severance, change of control, retention or similar payments or benefits;

(v)     each Contract evidencing the granting of any Encumbrance (other than any Permitted Encumbrance) on any material portion of the Transferred Assets;

(vi)     each Contract for the development of (x) material Intellectual Property that is embodied in or distributed with any products or services of a Seller or is otherwise material Intellectual Property of a Seller (other than Contracts with any employee or contractor entered into in the Ordinary Course of Business under which such employee or contractor presently assigns all right, title and interest in and to any developed Intellectual Property to one (1) or more of the Sellers) and (y) any Intellectual Property for any Person by the Sellers under which Contract any Sellers has any material unperformed obligations (other than Contracts with any employee or contractor entered into in the Ordinary Course of Business under which such employee or

contractor presently assigns all right, title and interest in and to any developed Intellectual Property to one (1) or more of the Sellers);

(vii)    each (x) Contract entered into for the settlement or avoidance of any dispute regarding the ownership, use, validity or enforceability of Intellectual Property (including consent-to-use and similar contracts) with material ongoing obligations of any Seller, (y) Contract pursuant to which any Seller licenses such Seller's owned Intellectual Property or (z) Contract or license under which the Sellers acquire or license any material Intellectual Property from any Person other than Off-the-Shelf Software;

(viii)    each Contract providing for aggregate future payments to or from any Seller in excess of $100,000 in any calendar year, other than those that can be terminated without material penalty by such Seller upon ninety (90) days' notice or less and can be replaced with a similar Contract on materially equivalent terms in the Ordinary Course of Business;

(ix)    each Contract pursuant to which any Seller has formed or agreed to form a partnership, joint venture, strategic alliance or other similar arrangement;

(x)    each power of attorney that relates to the Business, any Transferred Asset or any Assumed Liability;

(xi)    each Contract that restricts, or purports to limit or restrict, any Seller's freedom or ability to (x) engage or compete in any line of business or business activity, compete with any Person or operate in any geographic area, or (y) acquire any product or receive any service from any Person or sell any product or asset or perform any service for any Person;

(xii)    each Contract containing (v) "most-favored-nation," "most-favored-customer" or similar pricing provisions for the benefit of any Person (other than any Seller); (w) a provision providing for the sharing of any revenue or cost-savings with any other Person (other than any Seller); (x) a "minimum purchase" requirement; (y) rights of first refusal or first offer (other than those related to the Leased Real Property); or (z) a "take or pay" provision;

(xiii)    each Contract pursuant to which any Seller has granted any sponsorship rights, exclusive marketing, sales representative relationship, franchising consignment, distribution or any other similar right to any third party (including in any geographic area or with respect to any product of the Business of the Sellers);

(xiv)    each Contract involving the settlement, conciliation or similar agreement (x) of any Action within the past three (3) years, (y) with any Governmental Authority or (z) with respect to any dispute pursuant to which any Seller will have any material outstanding obligation after the date hereof;

(xv)    each Contract concerning non-solicitation obligations that are on-going (other than non-solicitation agreements with any of the Sellers' employees set forth in the applicable Seller's standard terms and conditions of sale or standard form of employment agreement or offer letter, copies of which have previously been delivered to the Buyer, or non-disclosure agreements entered into by any of the Sellers with respect to possible business transactions);

33521550.7

46

(xvi)   each Contract or group of related Contracts for the lease or use of any Equipment by any Seller or for the storage of any Equipment of the Sellers (including any warehousing Contracts), except for any Contract under which the aggregate annual rental payments do not exceed $50,000;

(xvii)   each Contract under which any Seller is lessor of or permits any third party to hold or operate, in each case, any Equipment, except for any Contract under which the aggregate annual rental payments do not exceed $50,000;

(xviii)  each Contract requiring any capital commitment or capital expenditure (or series of capital commitments or expenditures) by any Seller in an amount in excess of $50,000 annually or $100,000 over the life of such Contract;

(xix)   each Contract evidencing or relating to Indebtedness for borrowed money (including leases which are or should be, in accordance with GAAP, recorded as finance leases) or any extension of credit,

(xx)   each Contract requiring any Seller to guarantee the Liabilities of any Person (other than any other Seller) or pursuant to which any Person (other than a Seller) has guaranteed the Liabilities of a Seller;

(xxi)   each material interest rate, currency, option or other hedging Contract;

(xxii)   each Contract providing for indemnification by any Seller, except for any such Contract that is entered into in the Ordinary Course of Business and is not material to any Seller;

(xxiii)  each Contract that relates to the future disposition or acquisition by any Seller of (x) any business (whether by merger, consolidation or other business combination, sale of securities, sale of assets or otherwise) or (y) any material assets or properties, except for (i) any agreement related to the transactions contemplated hereby, (ii) any non-disclosure or similar agreement entered into in connection with the potential sale of a Seller or (iii) any agreement for the purchase or sale of Inventory in the Ordinary Course of Business;

(xxiv)  each Contract that relates to any completed disposition or acquisition by any Seller of (x) any business (whether by merger, consolidation or other business combination, sale of securities, sale of assets or otherwise) or (y) any material assets or properties, in each case, entered into or consummated within the past three (3) years, other than sales of Inventory in the Ordinary Course of Business;

(xxv)   each Contract involving the payment of any earn-out or similar contingent payment on or after the date hereof;

(xxvi)  each Related Party Agreement;

(xxvii) each Lease;

(xxviii) each Tax sharing, allocation, indemnification or similar agreement;

(xxix) any assignments, amendments, modifications and supplements of any of the foregoing; and

(xxx) each Contract to enter into any of the foregoing.

(b)     Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, each of the Material Contracts is in full force and effect and is a valid, binding and enforceable obligation of the applicable Seller party thereto and, to the Knowledge of the Seller, each of the other parties thereto, except as may be limited by the Enforceability Exceptions. Except as set forth on Section 3.15(b) of the Disclosure Schedule, as a result of the commencement of the Bankruptcy Case or as would not reasonably be expected to be material to the Business taken as a whole, none of the Sellers is in material default, or is alleged by the counterparty thereto to have materially breached or to be in material default, under any Material Contract, and, to the Knowledge of the Seller, the other party to each Material Contract is not in material default thereunder. The Sellers have made available to Buyer complete and correct copies of all Material Contracts. None of the Material Contracts has been canceled or otherwise terminated, and none of the Sellers has received any written notice from any Person regarding any such cancellation or termination. There are no claims pending or threatened against any Seller under any Material Contract.

Section 3.16    Affiliate Transactions. Except (a) as set forth on Section 3.16 of the Disclosure Schedule, (b) employment or consulting agreements with any employee, officer or consultant of the Sellers, entered into in the Ordinary Course of Business that have been made available to the Buyer, (c) participation by employees, officers and directors in any Employee Benefit Plan and (d) rights to indemnification or insurance as an officer or director of any Seller, no Seller is party to or otherwise bound by any transaction or Contract with any Related Party (a "Related Party Agreement"), and no Related Party, (i) has any material interest in any material property used by the Sellers or (ii) owns any material interest in, or is an officer, director, employee or consultant of, any Person which is, or is engaged in business as a material supplier or customer of the Sellers.

Section 3.17    Insurance. Section 3.17 of the Disclosure Schedule includes, as of the Disclosure Schedule Delivery Date, a true and complete list of all insurance policies maintained by or covering the Business, the Transferred Assets and the Assumed Liabilities (the "Insurance Policies"), inclusive of insurer, policy holder, coverage type, limits, deductibles and expiry dates for all current claims-made and occurrence-based policies. Each such Insurance Policy is in full force and effect, all premiums due and payable thereunder have been paid in full, and no Seller has received a written notice of cancellation or termination of any such Insurance Policy. The insurance coverage provided by any of the Insurance Policies will not terminate or lapse by reason of the transactions contemplated by this Agreement. There are no pending or unpaid claims under any Insurance Policy.

Section 3.18    Suppliers.   Section 3.18 of the Disclosure Schedule sets forth a complete and accurate list of the ten (10) largest distributors and suppliers (measured by fees paid or payable) of the Business (collectively, the "Material Suppliers") for the twelve (12) month period ended July 31, 2025 and the amount for which the Business was invoiced by such Material Supplier during the applicable period.   Except as disclosed on Section 3.18 of the Disclosure Schedule, (i) no Material Supplier has materially reduced, or indicated in writing its intention to materially reduce, its business with the Business, and (ii) no Seller has received any written notice or written communication to the effect that (A) any such Material Supplier has cancelled or terminated, or presently intends to cancel or terminate, its relationship with the Business, (B) any such Material Supplier intends to amend any material terms of any Contract with any Seller, cease to sell to, or substantially reduce sales, or (C) except in the Ordinary Course of Business, any such Material Supplier has increased or will increase the prices it charges the Business or has reduced, will reduce or has threatened to reduce the discounts it offers to the Business.   Except as set forth on Section 3.18 of the Disclosure Schedule, no Seller is, and within the past three (3) years no Seller has been, involved in any Action, or entered into any written settlement agreement, with any Material Supplier.

Section 3.19    Working Capital Assets; Equipment; Inventory.

(a)      All Inventory is owned by a Seller free and clear of all Encumbrances (other than Permitted Encumbrances) and is valued on the books and records of such Seller at the lower of cost or fair market value thereof, based upon the "first in, first out" method of accounting, and is in good condition and consists of a quality and quantity useable and saleable in the Ordinary Course of Business, except for obsolete items and items of below standard quality, all of which have been written off or written down to net realizable value in the Latest Balance Sheet.   Except as set forth on Section 3.19(a) of the Disclosure Schedule, all inventory not written off has been valued in accordance with GAAP and, with respect to inventory intended for sale, was or will be saleable within a reasonable time.   Inventory that was acquired subsequent to the Balance Sheet Date was acquired in the Ordinary Course of Business.

(b)      All of the accounts and notes receivable of the Business (the "Current Receivables") represent amounts receivable for products actually delivered or services actually provided (or, in the case of non-trade accounts or notes represent amounts receivable in respect of other bona-fide business transactions), have arisen in the Ordinary Course of Business and have been or will be billed.   All such Current Receivables are fully collectible in the normal and Ordinary Course of Business.

(c)      No Inventory that is Inventory is materially damaged in any significant way, except for any such damage which would not be material to the purchased Inventory taken as a whole.   The Inventory is in material compliance with applicable Law for such products as of the Disclosure Schedule Delivery Date, except for any such noncompliance which would not be material to the Business taken as a whole.

Section 3.20    Books and Records.   The Sellers have delivered to the Buyer true, correct and complete copies of all the Books and Records of each Seller required by applicable Law and maintained by or in the possession or control of (or otherwise reasonably accessible to)

any Seller, and such Books and Records have been maintained and reported in accordance with applicable Law and GAAP, where applicable.

Section 3.21    Bank Accounts.  Section 3.21 of the Disclosure Schedule sets forth a true and correct list of each bank account, credit line or safety deposit box maintained by or for the benefit of the Business, including the name and location of each bank and the names of all Persons authorized to draw thereon or, with respect to safety deposit boxes, to have access thereto.

Section 3.22    OFAC and Related Matters.

(a)    None of the transactions contemplated by this Agreement violate (i) the United States Trading with the Enemy Act, (ii) any of the foreign assets control regulations of the U.S. Department of the Treasury (31 C.F.R., Subtitle B, Chapter V) or any enabling legislation or executive Order relating thereto, (iii) Executive Order No. 13,224, 66 Fed. Reg. 49,079 (2001), issued by the President of the United States (Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism) (the "Terrorism Order") or (iv) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, Public Law 107-56 (October 26, 2001). For purposes of this Section 3.22, the term "OFAC Rep Party" shall mean (A) each Seller, (B) any Affiliate of any Seller that is a counterparty to a Material Contract and (C) the officers, directors or agents of the entities listed in clauses (A) and (B). No OFAC Rep Party (1) is a "blocked person" as described in Section 1 of the Terrorism Order, (2) engages in any dealings or transactions, or is otherwise associated, with any such blocked person or (3) appears on the OFAC Blocked Parties List. To the Knowledge of Sellers, no OFAC Rep Party: (I) is owned by, controlled by, acting for or on behalf of, providing assistance, support, sponsorship, or services of any kind to, any of the Persons referred to or described in the OFAC Blocked Parties List; or (II) has conducted business with or engaged in any transaction with any Person named on the OFAC Blocked Parties List. Each OFAC Rep Party has complied with all U.S. and applicable international economic and trade sanctions, including as applicable any sanctions or regulations administered and enforced by the U.S. Department of State, the U.S. Department of Treasury (including the OFAC) and any executive Orders, rules and regulations relating thereto.

(b)    Neither any Seller nor any of its respective officers, directors, employees or agents, has (i) violated any provision of any applicable Anti-Bribery and Anti-Corruption Laws or (ii) directly or indirectly offered, paid, promised to pay, or authorized the offer, payment or promise of anything of value to any representative or agent of a Governmental Authority while knowing or having reason to know that all or a portion of such thing of value would be offered, given, or promised to such representative or agent of a Governmental Authority for the purposes of (A) (1) influencing any act or decision of any such representative or agent of a Governmental Authority in his or her official capacity or (2) rewarding the improper performance by any Person of its business or official activities; or (B) assisting any member of any Seller, or any of their respective Affiliates, in obtaining or retaining business or a business advantage for the Business.

(c)    The operations of each Seller have been conducted at all times in compliance with Anti-Terrorism and Money Laundering Laws and Regulations.

(d)        Each OFAC Rep Party has complied with all Economic Sanctions and Trade Controls Laws and Regulations.

(e)        Each OFAC Rep Party is now in compliance with Anti-Bribery and Anti-Corruption Laws, Anti-Terrorism and Money Laundering Laws and Regulations and applicable Economic Sanctions and Trade Controls Laws and Regulations and the Sellers have implemented and maintain in effect policies and procedures designed to ensure compliance by each such Seller, and each of their respective directors, officers and agents, with Anti-Bribery and Anti-Corruption Laws, Anti-Terrorism and Money Laundering Laws and Regulations and applicable Economic Sanctions and Trade Controls Laws and Regulations.

(f)        Neither any Seller nor any of its respective officers, directors or agents, or any agent that will act in any capacity in connection with the transactions contemplated by this Agreement, is a Target of Sanctions.

(g)        No part of the transactions contemplated by this Agreement will cause any of the Sellers to violate Anti-Bribery and Anti-Corruption Laws, Anti-Terrorism and Money Laundering Laws and Regulations or applicable Economic Sanctions and Trade Controls Laws and Regulations.

Section 3.23    Anti-Corruption; Anti-Bribery.  Neither any Seller nor any of their respective Representatives authorized to act, and acting, on behalf of any Seller has, directly or indirectly, in connection with the Business:

(a)        used any corporate funds to make or offer any unlawful payment, loan or transfer of anything of value to or for the benefit of any Government Official, candidate for public office, political party or political campaign, in each case, in violation of applicable AML Laws, for the purpose of (i) influencing any act or decision of such Government Official, candidate, party or campaign, (ii) inducing such Government Official, candidate, party or campaign to do or omit to do any act in violation of a lawful duty, (iii) obtaining or retaining business for or with any Person, (iv) expediting or securing the performance of official acts of a routine nature or (v) otherwise securing any improper advantage; or

(b)        received written notice from any Governmental Authority alleging that such Person has violated any provision of the Foreign Corrupt Practices Act of 1977, 15 U.S.C. §§78dd-1, *et seq.,* or any other applicable anticorruption or anti-bribery Laws (collectively, "AML Laws").

Section 3.24    Exclusivity of Representations and Warranties.  None of the Sellers or any of their Affiliates or Representatives is making, and none of the Buyer or any of its Affiliates or Representatives is relying on, any representation or warranty of any kind or nature whatsoever, oral or written, express or implied (including any relating to financial condition or results of operations of the Business or maintenance, repair, condition, design, performance, value, merchantability or fitness for any particular purpose of the Transferred Assets), except as expressly set forth in this Article III (as modified by the Disclosure Schedules), and the Sellers hereby disclaim all Liability and responsibility for any such other representations or warranties, including any representation, warranty, projection, forecast, statement or information made, communicated or furnished (orally or in writing) to Buyer or its Affiliates or Representatives (including any

opinion, information, projection or advice that may have been or may be provided to Buyer by any director, officer, agent, consultant or Representative of Sellers or any of their Affiliates).

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Sellers as follows:

Section 4.1    <u>Organization</u>.  The Buyer is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization and has all necessary corporate (or equivalent) power and authority to perform its obligations hereunder and under any Ancillary Agreement to which it is or will be a party.

Section 4.2    <u>Authority</u>.  The Buyer has all requisite legal capacity and the full power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it is or will be a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by the Buyer of this Agreement and each of the Ancillary Agreements to which it will be a party and the consummation by the Buyer of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate (or equivalent) action and this Agreement has been, and upon its execution each of the Ancillary Agreements to which the Buyer will be a party will have been, duly executed and delivered by the Buyer and assuming due execution and delivery by each of the other parties hereto and thereto, this Agreement constitutes, and upon its execution each of the Ancillary Agreements to which the Buyer will be a party will constitute, the legal, valid and binding obligations of the Buyer, enforceable against the Buyer in accordance with its respective terms, except as enforcement may be limited by the Enforceability Exceptions.

Section 4.3    <u>No Conflict; Required Filings and Consents</u>.

(a)    The execution, delivery and performance by the Buyer of this Agreement and each of the Ancillary Agreements to which the Buyer is or will be a party, and the consummation by the Buyer of the transactions contemplated hereby and thereby, will not:

(i)    conflict with or result in any violation or breach of or default under, the Organizational Documents of such Buyer;

(ii)    conflict with or result in a violation or breach of any Law or Order applicable to the Buyer or by which any property or asset of such Buyer is bound; or

(iii)    conflict with, result in a violation or breach of, constitute (with or without notice or lapse of time) a default under, require the Buyer to obtain consent or approval from any Person under the terms of, or give rise to a right of termination, cancellation, acceleration or modification under the terms of any Contract to which such Buyer is a party;

except, in the case of <u>clause (ii)</u> and <u>(iii)</u>, for any such conflicts, violations, breaches, defaults or other occurrences which have not had and would not reasonably be expected to have a Buyer Material Adverse Effect.

33521550.7

(b)      The Buyer is not required to file, seek or obtain any notice, authorization, approval, Order, Permit or consent of or with any Governmental Authority in connection with the execution, delivery and performance by the Buyer of this Agreement and each of the Ancillary Agreements to which it is or will be a party or the consummation of the transactions contemplated hereby or thereby, except (i) for the entry of the Sale Procedures Order and the Sale Order by the Bankruptcy Court or (ii) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to have a Buyer Material Adverse Effect.

Section 4.4      Brokers.  No broker, finder or investment banker or other Person is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated hereby as a result of an engagement by the Buyer that that would be payable by the Sellers.

Section 4.5      Litigation.  There is no Action pending or threatened in writing against the Buyer which would result in the issuance of an Order restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by this Agreement and the other Ancillary Agreements.

Section 4.6      Exclusivity of Representations and Warranties.  None of the Buyer or any of its Affiliates or Representatives is making, and none of the Sellers or any of their Affiliates or Representatives is relying on, any representation or warranty of any kind or nature whatsoever, oral or written, express or implied, except as expressly set forth in this Article IV, and the Buyer hereby disclaims all Liability and responsibility for any such other representations or warranties, including any representation, warranty, projection, forecast, statement or information made, communicated or furnished (orally or in writing) to the Sellers or their Affiliates or Representatives (including any opinion, information, projection or advice that may have been or may be provided to any Seller by any director, officer, agent, consultant or Representative of the Buyer or any of its Affiliates).

Section 4.7      Financial Capacity.  At the Closing, the Buyer will have sufficient available funds to permit the Buyer to pay all amounts to be paid by the Buyer under this Agreement to the extent payable on or about the Closing Date, including amounts to be paid for the Cure Costs.

Section 4.8    Certain    Acknowledgments.    BUYER    HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ARTICLE III ABOVE, SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE TRANSFERRED ASSETS INCLUDING EXPENSES TO BE INCURRED IN CONNECTION WITH THE TRANSFERRED ASSETS, THE PHYSICAL CONDITION OF ANY PERSONAL PROPERTY COMPRISING A PART OF THE TRANSFERRED ASSETS OR THAT IS THE SUBJECT OF ANY OTHER ASSUMED LEASE OR TRANSFERRED CONTRACT TO BE ASSUMED BY BUYER AT THE CLOSING, THE ENVIRONMENTAL CONDITION OR OTHER MATTER RELATING TO THE PHYSICAL CONDITION OF ANY LEASED REAL PROPERTY OR IMPROVEMENTS THAT ARE THE SUBJECT OF ANY REAL PROPERTY LEASE TO BE ASSUMED BY BUYER AT THE

CLOSING, THE ZONING OF ANY SUCH LEASED REAL PROPERTY OR IMPROVEMENTS, THE VALUE OF THE TRANSFERRED ASSETS (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF PROPERTY, THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY OR ANY OTHER PORTION OF THE TRANSFERRED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER OR THING RELATING TO THE TRANSFERRED ASSETS OR ANY PORTION THEREOF.  WITHOUT IN ANY WAY LIMITING THE FOREGOING, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ARTICLE III ABOVE, SELLERS HEREBY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE TRANSFERRED ASSETS. BUYER FURTHER ACKNOWLEDGES THAT BUYER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE TRANSFERRED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE TRANSFERRED ASSETS AS BUYER DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH BUYER'S ACQUISITION OF THE TRANSFERRED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE III, BUYER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, SUBJECT TO THE FOREGOING, BUYER WILL ACCEPT THE TRANSFERRED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS." BUYER HEREBY EXPRESSLY ACKNOWLEDGES THAT THE ASSIGNMENT AND ASSUMPTION OF THE ASSUMED LEASES AND TRANSFERRED CONTRACTS FORMING PART OF THE TRANSFERRED ASSETS WILL BE CONSUMMATED IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT NOTWITHSTANDING ANY AND ALL OUTSTANDING DEFAULTS AND OTHER CLAIMS FOR FAILURES TO COMPLY WITH THE PROVISIONS OF SUCH ASSUMED LEASES AND TRANSFERRED CONTRACTS, CERTAIN OF WHICH DEFAULTS OR CLAIMS MAY NOT BE SUBJECT TO CURE OR WAIVER.

## ARTICLE V.
## BANKRUPTCY COURT MATTERS

Section 5.1    Bankruptcy Actions.

(a)    Competing Transaction.

(i)    This Agreement is subject to approval of the procedures set forth in the Sale Procedures Order and the consideration by Sellers of higher or better Competing Bids in respect of all or any part of the Transferred Assets in accordance with the Sale Procedures Order. From the date hereof (and any prior time) and until (i) the completion of the Auction in accordance with the Sale Procedures Order, or (ii) if no Qualified Bids (as defined in the Sale Procedures Order) are received by the Bid Deadline (as defined in the Sale Procedures Order), the Bid Deadline (such period being the "Go-Shop Period"), Sellers are permitted to and to cause their Representatives and Affiliates to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its Affiliates and Representatives) in connection with a Competing Bid, including, to (and to cause their

Representatives and Affiliates to) respond to any inquiries or offers to purchase all or any part of the Transferred Assets (including supplying information relating to the Business and the assets of Sellers to prospective purchasers) (the "Go-Shop Actions"); provided, that, from and after the date hereof, the Sellers' consideration of other bids for the Transferred Assets or the Business (including the taking by the Sellers or any of their respective Representatives and Affiliates of any of the Go-Shop Actions) shall be exercised solely in compliance with, and not in a manner inconsistent with, the Sale Procedures (it being understood that, prior to the time at which the Sale Procedures Order is entered by the Bankruptcy Court, the Sellers shall comply with the Sale Procedures as if the Bankruptcy Court had entered the Sale Procedures Order and such Sale Procedures Order was in effect).

(ii)    The Sellers shall provide (x) notice of any Competing Bid or combination of Competing Bids (whether written or oral) which Sellers deem higher or better than the terms of this Agreement and (y) a copy of each such Competing Bid to Buyer within 48 hours after the time of receiving such Competing Bid. In addition to the foregoing, the Sellers shall (i) promptly (and in any event within 48 hours of receipt thereof by Sellers or any Representative or Affiliate of the Sellers) advise the Buyer in writing of any proposal that may reasonably be expected to lead to a Competing Bid, (ii) keep the Buyer reasonably informed in all material respects on a reasonably current basis of the status and details (including any change to the terms thereof) of any Competing Bid, and (iii) provide to the Buyer as soon as practicable after receipt or delivery thereof copies of all material documentation exchanged between the Sellers or any of their Representatives and any Person that describes any of the material terms or conditions of any Competing Bid. The Sellers shall also notify the Buyer promptly if the board of directors, board of managers or similar governing body of any Seller determines that the failure of the board of directors, board of managers or similar governing body of any Seller to pursue such Competing Bid would reasonably be expected to result in a breach of or be inconsistent with the fiduciary duties of the board of directors, board of managers or similar governing body of any Seller under applicable Law, and in any event no later than 24 hours following such determination.

(iii)    Following the Go-Shop Period and until the Closing or the earlier valid termination of this Agreement in accordance with its terms, the Sellers and their Affiliates are neither permitted to, nor permitted to cause their Representatives or Affiliates to, (i) initiate contact with, solicit or knowingly encourage, induce or facilitate any Competing Bid or any inquiry or proposal that would reasonably be expected to lead to a Competing Bid or (ii) participate or engage in any discussions or negotiations with any Person regarding, or furnish to any Person any information with respect to, or cooperate in any way with any Person (whether or not a Person making a Competing Bid) with respect to, any Competing Bid or any inquiry or proposal that would reasonably be expected to lead to a Competing Bid.

(iv)    Anything in this Agreement or any of the Ancillary Agreements to the contrary notwithstanding, the Buyer, the DIP Agent and the Silverview Agent shall be entitled to participate in the Auction and shall be permitted, pursuant to section 363(k) of the Bankruptcy Code, to credit bid all or any portion of the DIP Loan Claims or the Silverview Loan Claims, as applicable, to acquire the Transferred Assets (each dollar of such obligations that is so credit bid shall be treated the same as a dollar of cash). The Sellers shall not seek (or support any other Person in seeking) to limit the Buyer's, the DIP Agent's or the Silverview Agent's ability to make such credit bid "for cause" under section 363(k) of the Bankruptcy Code.

(b)    Bankruptcy Court Filings.

(i)    On the Petition Date, Sellers shall file with the Bankruptcy Court a motion seeking entry of the Sale Procedures Order and shall diligently prosecute such motion. Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Procedures Order.  In the event the entry of the Sale Procedures Order shall be appealed, Sellers and Buyer shall use their respective commercially reasonable efforts to defend such appeal.

(ii)    The Sellers shall: (i) obtain entry by the Bankruptcy Court of the Sale Procedures Order no later than the date that is fourteen (14) calendar days after the Petition Date, subject to the Bankruptcy Court's availability, (ii) ensure that Qualified Bids are due no later than the date that is thirty-five (35) calendar days after the Petition Date, (iii) ensure that the Auction, which will be conducted in accordance with the Sale Procedures Order, shall be held and closed no later than the date that is forty (40) calendar days after the Petition Date; provided, that the Sellers shall not have to comply with this clause (iii) if the Sellers are not required to hold an Auction pursuant to the Sale Procedures (as approved by the Sale Procedures Order), (iv) obtain entry by the Bankruptcy Court of the Sale Order no later than on or before the date that is forty-five (45) calendar days after the Petition Date, subject to the Bankruptcy Court's availability, and (v) subject to the satisfaction or waiver of the conditions precedent contained in this Agreement, consummate the Closing as soon as reasonably practicable after the entry by the Bankruptcy Court of the Sale Order.

(iii)    Provided Buyer is selected as the winning bidder in respect of the Transferred Assets at the Auction, if any, undertaken in accordance with the Sale Procedures Order, or if no Competing Bid is submitted with respect to the Transferred Assets, Sellers shall diligently seek entry of the Sale Order and any other necessary orders to close the sale of the Transferred Assets (the "Related Orders") by the Bankruptcy Court in accordance with the terms and conditions of the Sale Procedures Order.  Buyer and Sellers understand and agree that the consummation of the transactions contemplated by this Agreement is subject to approval by the Bankruptcy Court.  Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and any Related Orders including a finding of adequate assurance of future performance by Buyer, including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code and entitled to a finding that section 363(n) of the Bankruptcy Code does not apply. Buyer shall not, without the prior written consent of Sellers, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Transferred Assets hereunder.  In the event the entry of the Sale Order shall be appealed, Sellers and Buyer shall use their respective commercially reasonable efforts to defend such appeal.

(iv)    The proposed forms of any Orders of the Bankruptcy Court relating to this Agreement or the Business to be filed by the Sellers shall be in form and substance acceptable to the Buyer and consistent with the terms of this Agreement.  Sellers shall file such motions or pleadings, in form and substance reasonably acceptable to Buyer, as may be appropriate or necessary to assume and assign the Transferred Contracts and to determine the amount of the

Cure Costs; <u>provided</u>, that nothing herein shall preclude Sellers from filing such motions, including upon commencement of the Bankruptcy Cases, subject to <u>Section 2.6</u>, to reject any Contracts that are not Transferred Contracts.

(v)     The Sellers shall provide draft copies of all motions, notices, statements, schedules, applications, reports and other papers the Sellers intend to file with the Bankruptcy Court in connection with the Sale Procedures Order, the Sale Order or any other Bankruptcy Court Order to the Buyer within a reasonable period of time prior to the date the Sellers intend to file any of the foregoing and consult in advance in good faith with the Buyer regarding the form and substance of any such proposed filing with the Bankruptcy Court.

(vi)     The Sellers covenant and agree that, after the Closing, the terms of any reorganization plan or plan of liquidation it submits to the Bankruptcy Court for confirmation, if any, shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement, including any transaction contemplated by or approved pursuant to the Sale Procedures Order or the Sale Order.

(c)     <u>Backup Bidder</u>.  Sellers and Buyer agree that, in the event that Buyer is not the winning bidder at the Auction, if and only if (i) Buyer submits the second highest or second best bid at the Auction for the Transferred Assets which is memorialized by an agreement reasonably acceptable to Buyer that incorporates the terms established at the Auction, or the terms of this Agreement constitute the second highest or best bid for the Transferred Assets, and (ii) Sellers give written notice to Buyer on or before the date that is ten (10) Business Days from the entry of an Order of the Bankruptcy Court approving the winning bidder's definitive agreement, stating that Sellers (A) failed to consummate the sale of the Transferred Assets with the winning bidder, and (B) terminated the purchase agreement with the winning bidder, so long as Buyer has not previously terminated this Agreement in accordance with its terms, Buyer shall promptly consummate the transactions contemplated hereby upon the terms and conditions as set forth herein, or as set forth on the record of the Auction, including the Purchase Price, as the same may be increased by Buyer at the Auction.

## ARTICLE VI.
## COVENANTS

Section 6.1     <u>Conduct of Business Prior to the Closing</u>.  From the date of this Agreement until the Closing Date or earlier valid termination of this Agreement in accordance with its terms:

(a)     Except (1) as otherwise expressly required by this Agreement, (2) as required by Law, or (3) with the prior written consent of the Buyer, from the date of this Agreement until the Closing Date or earlier valid termination of this Agreement in accordance with its terms, each of the Sellers shall:

(i)     conduct the Business in the Ordinary Course of Business consistent with the Budget and preserve its material business relationships with customers, suppliers,

partners, licensors, licensees, distributors, Governmental Authorities and others with whom any of the Sellers deal in the Ordinary Course of Business;

(ii)    maintain the Transferred Assets in good working condition and repair (normal wear and tear excepted); and

(iii)    use commercially reasonable efforts to maintain from Governmental Authorities all Permits required to conduct the Business in the Ordinary Course of Business.

(b)    Except (1) as otherwise expressly required by this Agreement, (2) as required by Law, or (3) with the prior written consent of the Buyer, from the date of this Agreement until the Closing Date or earlier valid termination of this Agreement in accordance with its terms, each of the Sellers shall not:

(i)    sell, transfer, lease, sublease, encumber or otherwise dispose of any Transferred Assets other than Inventory sold or disposed of in the Ordinary Course of Business;

(ii)    issue, sell, grant, pledge, dispose or transfer any Equity Interests in any Seller;

(iii)    acquire (A) any material assets or properties, tangible or intangible, other than in the Ordinary Course of Business or (B) any corporation, partnership, limited liability company, other business organization or division thereof;

(iv)    merge or consolidate with or into any legal entity, dissolve, liquidate or otherwise terminate its existence;

(v)    split, combine, consolidate, subdivide or reclassify any of their capital stock, other Equity Interests or voting securities, or securities convertible into or exchangeable or exercisable for capital stock or other Equity Interests or voting securities, or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for its capital stock, other Equity Interests or voting securities or enter into silent partnership agreements granting the silent partner entitlements to its proceeds;

(vi)    declare, set aside or pay any dividend or other distribution (whether in cash, stock or property or any combination thereof) in respect of any securities of any Seller, or repurchase, redeem or otherwise acquire, or offer to repurchase, redeem or otherwise acquire, any capital stock or voting securities of, or Equity Interests in, any Seller or any securities of any Seller convertible into or exchangeable or exercisable for capital stock or voting securities of, or Equity Interests in, any Seller, or any warrants, calls, options or other rights to acquire any such capital stock, securities or interests, other than any transfers among Sellers;

(vii)    amend the Organizational Documents of any Seller;

(viii)    enter into any joint venture agreement that involves a sharing of profits, cash flows, expenses or losses with other Persons related to or affecting the Business or the Transferred Assets;

(ix)    take any action (other than any actions required by the Bankruptcy Court or applicable Law) in breach of the Sale Procedures or the Sale Order;

(x)    (1) reject or terminate (other than by expiration in accordance with its terms, except as a result of a breach by any Seller) any Material Contract or seek Bankruptcy Court approval to do so or otherwise reject any Material Contract, (2) fail to use commercially reasonable efforts to oppose any action by a third party to so terminate (including any action by a third party to obtain Bankruptcy Court approval to terminate) any Material Contract, except in each case, to the extent the Buyer has indicated in writing that it wishes the Sellers to reject such Contract, (3) waive, release or assign any material rights or claims under any Material Contract or any Contract that would be a Material Contract if in effect on the date hereof, (4) amend or modify any Material Contract, or (5) enter into any Contract that would have been a Material Contract had it been entered into prior to the date hereof;

(xi)    with respect to any Transferred Asset (1) agree to allow any form of relief from the automatic stay in the Bankruptcy Cases; or (2) fail to use commercially reasonable efforts to oppose any action by a third party to obtain relief from the automatic stay in the Bankruptcy Cases;

(xii)    change, make or revoke any Tax election, change any method of accounting with respect to Taxes, file any amended Tax Return, surrender or compromise any right to claim a Tax refund, settle or compromise any audit, claim, notice, audit, assessment or other Action related to Taxes, enter into any agreement affecting any Tax Liability or any Tax refund or file any request for rulings or special Tax incentives with any Governmental Authority, enter into any Tax allocation, sharing or indemnity agreement, extend or waive the statute of limitations period applicable to any Tax or Tax Return or take or cause (or cause any other Person to take or cause) any other action, in each case for this clause (xii), to the extent such action could reasonably be expected to (1) increase the Buyer's or any of its Affiliates' Liability for Taxes with respect to the Transferred Assets, the Assumed Liabilities or the Business or (2) adversely impact any of the Transferred Assets, the Assumed Liabilities or the Business;

(xiii)    make any change in any method of accounting or accounting practice or policy, except as required by applicable Law or GAAP;

(xiv)    fail to maintain in full force and effect existing insurance policies;

(xv)    (1) fail to maintain in full force and effect, or allow to lapse, any Permits, (2) cancel, modify or terminate (other than by expiration in accordance with its terms) any Permit or seek Bankruptcy Court approval to do so, or (3) fail to use commercially reasonable efforts to oppose any action by a third party to so terminate (including any action by a third party to obtain Bankruptcy Court approval to terminate) any Permit;

(xvi)    make any loans, advances or capital contributions to, or investments in, any other Person (other than to a Seller);

(xvii)    voluntarily pursue or seek, or fail to use commercially reasonable efforts to oppose any third party in pursuing or seeking, a conversion of the Bankruptcy Cases to

cases under chapter 7 of the Bankruptcy Code, the appointment of a trustee under chapter 11 or chapter 7 of the Bankruptcy Code and/or the appointment of an examiner with expanded powers;

(xviii)  subject any of the Transferred Assets to any Encumbrance;

(xix)  other than the DIP, incur any Indebtedness for borrowed money, enter into any capital lease or guarantee any such Indebtedness;

(xx)  enter into any commitment for capital expenditures or otherwise make any capital expenditures, except as permitted by the DIP;

(xxi)  (1) make or grant any wage or salary increase to any Business Employee (other than standard merit increases to individuals who are not officers or directors consistent with past practice within the past three (3) years that are less than 5% individually or 3% in the aggregate), (2) make any increase in the payment of benefits under any Employee Benefit Plan, (3) take any action with respect to the grant of any severance or termination pay (other than pursuant to policies or agreements in effect on the date of this Agreement) which will become due, (4) adopt, amend or terminate any Employee Benefit Plan, or plan or agreement that would be an Employee Benefit Plan, if adopted, (5) grant, amend or modify, or accelerate the vesting or payment of, any award under any Employee Benefit Plan, (6) enter into any employment, consulting or similar agreement or amend any existing employment agreement with respect to a Business Employee, (7) cause the funding of any rabbi trust or similar arrangement or take any action to fund or in any other way secure the payment of compensation or benefits under any Employee Benefit Plan, (8) enter into, amend or terminate any collective bargaining agreement or other agreement with a labor union, works council or similar organization, (9) forgive any loans, or issue any loans (other than routine travel advances issued in the ordinary course of business) to any Business Employee or (10) hire or engage any new Business Employee, or terminate the employment or engagement, other than for cause, of any Business Employee, if such Business Employee will receive, or has received, annual base compensation in excess of $100,000, other than in the ordinary course of business;

(xxii)  (1) transfer, assign, abandon, dispose, permit to lapse or grant any license or sublicense of, or any rights to use, any rights under or with respect to any Intellectual Property; (2) take any action or fail to take any action that would reasonably be expected to result in the abandonment, cancellation or unenforceability of any Intellectual Property; (3) enter into any settlement regarding breach or infringement of any Intellectual Property; or (4) disclose to any Person any Intellectual Property not heretofore a matter of public knowledge;

(xxiii)  institute, settle or agree to settle any litigation, proceeding or other Action;

(xxiv)  agree to any limitations on any Seller from engaging or competing in any line of business or in any geographic area or location or otherwise with any Person or from soliciting or hiring any Person;

(xxv)  permit or suffer to exist any event of default under the DIP, Interim Financing Order or Final Financing Order;

(xxvi)  return Inventory with an aggregate value of more than $5,000 unless defective;

(xxvii) make any material change in the nature of the Business; or

(xxviii) agree or commit to any of the foregoing.

Section 6.2     Covenants Regarding Information.  From the date hereof until the Closing Date or earlier valid termination of this Agreement in accordance with its terms, upon reasonable request, the Sellers shall afford the Buyer and its Affiliates and each of their respective Representatives reasonable access to make investigation of the properties, offices, plants and other facilities, books and records (including Tax books and records) of the Sellers, and shall furnish the Buyer with such financial, operating and other data and information, and access to all the officers, accountants and other Representatives of the Sellers as the Buyer may reasonably request and to make extracts and copies of such books and records.  Notwithstanding anything to the contrary in this Agreement, the Sellers shall not be required to disclose any information to the Buyer or its Representatives if such disclosure would cause the forfeiture of any attorney-client or other legal privilege or contravene any applicable Laws (the "Disclosure Limitations"); provided that the Parties shall reasonably cooperate in seeking to find a way to allow disclosure of such information to the extent doing so would not (in the good faith belief of the Sellers after consultation with outside counsel) reasonably be likely to cause such privilege to be undermined with respect to such information.

Section 6.3     Notification of Certain Matters.  The Sellers shall promptly notify the Buyer in writing of any fact, change, condition, circumstance or occurrence or nonoccurrence of any event of which it is aware that will or is reasonably likely to result in any of the conditions set forth in Section 8.3(a),  Section 8.3(b) or Section 8.3(e) becoming incapable of being satisfied.

Section 6.4     Employee Matters.

(a)     Prior to the Closing, the Buyer or its designee shall make an offer of employment, to commence as of the Closing, to some or all of the Business Employees employed or engaged by any of the Sellers immediately prior to the Closing (in the sole discretion of Buyer) (each such Business Employee, an "Offered Employee"); provided, however, that with respect to a Business Employee that it makes an offer of employment or other service offer to who is on a leave of absence as of the Closing (an "Inactive Employee"), such offer shall be for employment or other service as of the date he or she is able to again commence employment, but only to the extent such date is within six (6) months following the Closing.  Each Offered Employee who receives and accepts such an offer of employment or other service with the Buyer or its designee (and commences employment or other service) is referred to herein as a "Hired Employee", and the Buyer or its designee shall employ or engage each Hired Employee in accordance with such accepted offer as of the Closing.  In addition, any offer of employment or other service to any such Offered Employee will require, as a condition to the acceptance of such offer of employment or other service, that such employee waive in writing his or her right to receive any severance from the Sellers, the Buyer or any of its Affiliates arising from such employee's termination of employment or other service with any of the Sellers; provided, however, that the Buyer or any of its Affiliates shall be entitled to waive such condition, without any liability to the Sellers or any

other parties, if such employee does not agree to provide such waiver. Notwithstanding the foregoing, nothing in this Agreement will, after the Closing Date, impose on the Buyer or its designee any obligation to retain any Hired Employee in its employment or engagement or the employment or engagement of any of its Affiliates.

(b)    Effective at or immediately prior to the Closing, the Sellers shall terminate, or cause to be terminated, the employment of each Offered Employee (other than an Inactive Employee) who does not accept an offer of employment with the Buyer or its designee prior to the Closing (each, a "Terminated Employee") and will be responsible for all Liabilities associated with such terminations, including all Liabilities under the WARN Act. Neither the Buyer nor its designee shall have any Liability with respect to any employee of a Seller prior to the time he or she becomes a Hired Employee and neither the Buyer nor its designee shall have any Liability with respect to any current or former employee, independent contractor or service provider of a Seller that does not become a Hired Employee.

(c)    In respect of any employees of the Sellers or their Affiliates or the Business Employees who will not become Hired Employees whether on account of not being offered employment by Buyer or its designee hereunder or declining an offer of employment from Buyer or its designee hereunder, including the Terminated Employees, the Sellers shall be responsible for (i) any and all Liabilities to any such individuals, including Liabilities arising out of such termination, (ii) all current compensation, all compensation reflected on Section 6.4(c) of the Disclosure Schedules, salary, wages, unused vacation pay, overtime pay, holiday pay, sick days, personal days or leave earned and/or accrued through the Closing, (iii) statutory, Contractual, and/or common law notice, pay in lieu of notice and/or any severance obligations or Liabilities, including any obligations or Liabilities that arise under any Employee Benefit Plan and (iv) any Liabilities arising under an employee incentive or retention program or similar arrangement. For the avoidance of doubt and notwithstanding anything to the contrary herein, none of Buyer or its Affiliates shall have any Liability or obligation with respect to any Business Employee who does not become a Hired Employee and any Hired Employee for any period prior to the time he or she becomes a Hired Employee.

(d)    At the Closing, the Sellers shall furnish the Buyer with information concerning the location, identity, date of termination and reason for termination with respect to any Business Employee involuntary terminated during the ninety (90) days immediately preceding the Closing. The Sellers shall be solely responsible, on a joint and several basis, for any obligations or other Liabilities under the WARN Act that might arise on or prior to the Closing Date, or as a consequence of the transactions contemplated by this Agreement, including providing any notice of layoff or plant closing, or maintaining the employees of any Seller on such Seller's payroll for any period of notice required by the WARN Act. The Sellers shall retain all Liabilities, if any, for any severance or termination costs relating to employees of any Seller who, on, prior to or at the Closing, experience a termination of employment by any Seller as a result of the transactions contemplated by this Agreement.

(e)    For the avoidance of doubt, the Sellers shall retain all Liabilities for (i) the payment or provision of severance, separation pay or similar benefits in connection with the termination of employment of any Hired Employee as of the Closing Date, or the termination of employment of any current or former employee of a Seller who is not a Hired Employee (whether

before, as of, or after the Closing Date) and (ii) the payment or provision of any change in control payment, transaction bonus, retention payment or similar benefits arising as a result of the transactions described herein, and no such Liabilities shall be assumed by the Buyer or its designee under this Section 6.4 or Section 2.3.

(f)    Nothing express or implied in this Section 6.4 or this Agreement shall (i) confer upon any Business Employee, or legal representative or beneficiary thereof, any rights or remedies, including any third-party beneficiary rights with respect to the compensation, terms and conditions of employment and/or benefits that may be provided to any Business Employee by Buyer or its designee or the Sellers under any benefit plan or compensation arrangement or a right to employment or benefits for any specified period, of any nature or kind whatsoever, under or by reason of this Agreement, (ii) be treated as an amendment to, or prevent the termination of any Employee Benefit Plan, or any other employee benefit plan, program, arrangement or agreement sponsored or maintained by the Buyer or its designee, the Sellers or their respective Affiliates, as applicable, or (iii) obligate the Buyer or its designee, the Sellers or any of their respective Affiliates to maintain any particular employee benefit plan, program or arrangement.

Section 6.5    Consents and Filings; Further Assurances.

(a)    Each of the Parties shall use commercially reasonable efforts to take, or cause to be taken, all appropriate action to do, or cause to be done, all things necessary, proper or advisable under applicable Law or otherwise to consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements and to confirm the Buyer's ownership of the Transferred Assets as promptly as practicable, including to obtain all necessary waivers, consents and approvals and effecting all necessary registrations and filings, including all necessary waivers, consents and approvals from other parties. Without limiting the generality of the previous sentence, the Parties shall (i) use commercially reasonable efforts to obtain from Governmental Authorities all consents, approvals, authorizations, qualifications and Orders as are necessary for the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements; (ii) promptly make all necessary filings, and thereafter make any other required submissions, with respect to this Agreement under applicable Law, as may be required to consummate the transactions contemplated herein, in accordance with the terms of this Agreement; and (iii) coordinate and cooperate with each other in exchanging such information and supplying such reasonable assistance as may be reasonably requested by each in connection with the foregoing.

(b)    From time to time, whether at or following the Closing, the Sellers and the Buyer shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions and releases and such other instruments, and shall, and shall cause their respective Affiliates to, take such further actions, as may be necessary or appropriate to vest in the Buyer all the right, title, and interest in, to or under the Transferred Assets, to provide the Buyer and the Sellers all rights and obligations to which they are entitled and subject pursuant to this Agreement and the Ancillary Agreements, and to otherwise make effective as promptly as practicable the transactions contemplated by this Agreement and the Ancillary Agreements. Each of the Parties will use commercially reasonable efforts to cause all of the obligations imposed upon it in this Agreement to be duly complied with and to cause all conditions precedent to such obligations to be satisfied.

(c)     The Sellers and the Buyer shall cooperate with each other and, as promptly as practicable after the date of this Agreement use commercially reasonable efforts to obtain the issuance, transfer or reissuance to the Buyer or its designee of all Permits (including Liquor Licenses) necessary to lawfully own and operate the Business and Transferred Assets.  The Parties shall use commercially reasonable efforts to respond promptly to any requests for additional information made by such Governmental Authorities or agencies, use their respective commercially reasonable efforts to participate in any presentations, hearings, settlement proceedings or other proceedings ordered with respect to applications to transfer or reissue such Permits (including Liquor Licenses), and use respective commercially reasonable efforts to cause approval to be obtained as soon as practicable after the date of filing.  Each Party will bear its costs of the preparation and review of any such filing.  The Sellers and the Buyer shall have the right to review in advance all characterizations of the information relating to the transactions contemplated by this Agreement which appear in any filing made in connection with any filings to transfer the Permits (including Liquor Licenses) and the filing Party shall consider in good faith any revisions reasonably requested by the non-filing Party.

(d)     To the extent that, as of the Closing Date, the Buyer or its designee has not obtained all of the Permits included in the Transferred Assets that are necessary for the Buyer or its designee to take title to all of the Transferred Assets at the Closing and to operate all aspects of the Business as of, and immediately following, the Closing in the same manner in all material respects as it was operated by the Sellers immediately prior to the Closing, the Sellers shall, to the extent permitted by applicable Laws, maintain after the Closing, and permit Buyer or its designee full use of, the Liquor Licenses and such other Permits that the Buyer or its designee reasonably requests, at the Buyer's sole expense, until the earlier of the time the Buyer or its designee has obtained such Permits and eighteen (18) months following the Closing; provided, however, that Sellers shall only be obligated to provide such post-Closing assistance so long as Buyer complies with the Post-Closing Wind-Down Budget.

Section 6.6     Refunds and Remittances.

(a)     After the Closing: (i) if the Sellers or any of their Affiliates receive any refund, cash, checks with appropriate endorsements, payment of an Account Receivable or other account, any Transferred Tax Asset, trade, note receivable or other payment or other property or asset that is a Transferred Asset or is otherwise properly due and owing to the Buyer in accordance with the terms of this Agreement, the Sellers shall hold such amounts in trust for the Buyer's benefit and accounts and promptly shall remit, or shall cause to be remitted, such amount to the Buyer from time to time as and when received and (ii) if the Buyer or any of its Affiliates receive any refund or other amount that is an Excluded Asset or is otherwise properly due and owing to the Sellers or any of their Affiliates in accordance with the terms of this Agreement, the Buyer shall hold such amounts in trust for the Sellers' benefit and accounts and promptly shall remit, or shall cause to be remitted, such amounts to the Sellers.  For the avoidance of doubt, except as otherwise provided in this Agreement, following the Closing, if any payments due with respect to the Business are paid to any Seller or any of their Affiliates, the Sellers shall, or shall cause the applicable Affiliate to, promptly remit by wire or draft such payment to an account designated in writing by the Buyer.

(b)     In the event that, from and after the Closing, (i) Sellers or any of their Affiliates have retained ownership of a Transferred Asset, then, for no additional consideration to the Sellers or any of their Affiliates, the Sellers shall, and shall cause their Affiliates to, promptly notify the Buyer and as soon as practicable thereafter, convey, assign, transfer or deliver such Transferred Asset to the Buyer or its designees, and the Parties shall execute all other documents and instruments, and take all other lawful actions reasonably requested, in order to assign and transfer such Transferred Asset to the Buyer or its designees or (ii) any Excluded Asset has been conveyed to or is received by the Buyer, then, without any consideration payable to the Buyer or any of its Affiliates, the Buyer shall promptly notify the Sellers and as soon as practicable thereafter, convey, assign, transfer or deliver such Excluded Asset to the Sellers, and the Parties shall execute all other documents and instruments, and take all other lawful actions reasonably requested, in order to assign and transfer such Excluded Asset to Sellers or their designees.

Section 6.7     Public Announcements.  From and after the date hereof, the Parties shall consult with each other before making any press release or otherwise making any public statements with respect to this Agreement or the transactions contemplated hereby, and neither the Buyer nor the Sellers shall make any such press release or any public statement prior to obtaining Holding's (in the case of the Buyer) or the Buyer's (in the case of the Sellers) written approval, which approval shall not be unreasonably withheld, except that no such approval shall be necessary to the extent disclosure is made in any filing made to any court or may be required by applicable Law or by the Bankruptcy Court or as required by the rules of any stock exchange; provided, that, promptly following the Closing, the Parties hereto will release a mutually agreed upon joint press release with respect to this Agreement and the transactions contemplated by this Agreement; provided, further, that nothing in this Agreement shall restrict or prohibit (a) the Sellers, the Buyer or their respective Affiliates from making any announcement to their respective customers and other business relations to the extent that such announcement consists solely of, or is otherwise consistent in all material respects with previous press releases, public disclosures or public statements made by any Party hereto in accordance with this Agreement, in each case, to the extent such disclosure is still accurate in all material respects (and not misleading), (b) any Party from making any announcement to any of their or any of their Affiliates' respective auditors, attorneys, financing sources, actual or potential investors or limited partners or other agents, in each case so long as the disclosing party informs the recipient of the confidential nature of such information and instructs such recipient to keep such information confidential or (c) the Buyer or its Affiliates from making any announcement to their employees or existing or prospective limited partners or other investors.

Section 6.8     Seller Use of Transferred Marks; Use of Seller Marks.  The Sellers shall, as promptly as practicable (but in no event later than ten (10) days) after the Closing, cease using and displaying any Trademarks that are included in the Transferred Assets, including the names and marks set forth in Section 6.8 of the Disclosure Schedule or any derivatives thereof, and in accordance with such requirement, the Sellers shall use commercially reasonable efforts to, no later than fifteen (15) days after the Closing, legally change their corporate and business names (to the extent such names include such Trademarks or confusingly similar Trademarks) to names that are not confusingly similar to such Trademarks, and file notices of such name changes with the Bankruptcy Court.  Within fifteen (15) days of Closing, Sellers shall file a motion with the Bankruptcy Court requesting entry of an Order authorizing change of case caption to remove references to "Pinstripes".  Under no circumstance shall the Sellers, after the Closing, use or

otherwise exploit the Trademarks included in the Transferred Assets or any other indicia confusingly similar to the Trademarks included in the Transferred Assets, Copyrights included in the Transferred Assets, or any work substantially similar to the Copyrights included in the Transferred Assets, as a source identifier in connection with any Seller product, service or corporate, business or domain name.  Notwithstanding the foregoing, the Sellers are not prohibited from using such Trademarks for non-trademark uses, including to factually describe their prior ownership of the Business or in a manner that constitutes fair use under applicable Law.

Section 6.9    Sale Free and Clear.  The Sellers acknowledge and agree, and the Sale Order shall be drafted to provide, without limitation, that, (a) on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, Liabilities and Encumbrances, against or created by the Sellers, any of their Affiliates, or the bankruptcy estate, to the fullest extent permitted by section 363 of the Bankruptcy Code, shall be fully released from and with respect to the Transferred Assets and that the Buyer shall be a good faith purchaser within the meaning of Bankruptcy Code Section 363(m) and (b) the Buyer is not a successor to any Seller or the bankruptcy estate by reason of any theory of Law or equity, and the Buyer shall not assume or in any way be responsible for any Liability of the Sellers, any of their Affiliates and/or the bankruptcy estate, except as expressly provided in this Agreement.  On the Closing Date, the Transferred Assets shall be transferred to the Buyer free and clear of all obligations, Liabilities and Encumbrances (other than Permitted Encumbrances) to the fullest extent permitted by section 363 of the Bankruptcy Code.

Section 6.10    Intellectual Property Registrations.  Prior to the Closing Date, upon the reasonable request of Buyer, the Sellers shall use commercially reasonable efforts to effect the necessary change of ownership and recordals with all patent, trademark, and copyright offices and domain name registrars and other similar authorities (i) where Intellectual Property of any Seller is still recorded in the name of legal predecessors of any Seller or any Person other than a Seller or (ii) where, to the Knowledge of the Sellers, the relevant recordals of the patent, copyright, and trademark offices, and domain name registrars, and other similar authorities, with respect to any Seller's Intellectual Property, are materially incorrect for any other reason.

Section 6.11    Confidentiality.  Following the Closing, the Sellers shall, and the Sellers shall cause their respective Affiliates and Representatives to, maintain as confidential and not use or disclose, (a) any confidential, proprietary or non-public information or materials relating to the Business, the Transferred Assets, or the Assumed Liabilities and (b) any materials developed by the Buyer or any of its Representatives or provided by the Buyer or any of its Representatives to any Seller.  In the event any Seller or any of their respective Affiliates or Representatives is required by applicable Law to disclose any such information or materials, such Seller shall, to the extent not prohibited by applicable Law, promptly notify the Buyer in writing, which notification shall include the nature of the legal requirement and the extent of the required disclosure, and shall reasonably cooperate with the Buyer, at the Buyer's sole expense, to obtain a protective Order and otherwise preserve the confidentiality of such information or materials consistent with applicable Law.  Information and materials subject to the confidentiality obligations in this Section 6.11 do not include any information or materials which (i) at the time of disclosure is or thereafter becomes generally available to or known by the public (other than as a result of the disclosure of such information or materials by the Sellers or their Affiliates or Representatives in breach of this Section 6.11) or (ii) becomes available to any of the Sellers or their Affiliates and Representatives

on a non-confidential basis from a Person (other than the Buyer or any of its Affiliates) who is not bound by a confidentiality agreement with the Buyer or any of its Affiliates.

## ARTICLE VII.
## TAX MATTERS

Section 7.1    Transfer Taxes.  Any and all sales, harmonized sales, use, property transfer or gains, real estate or land transfer or gains, documentary, stamp, registration, recording, filing, goods and services, value-added or other similar Taxes payable as a result of or with respect to the sale or transfer of the Transferred Assets and the Business and the assumption of the Assumed Liabilities pursuant to this Agreement ("Transfer Taxes") shall be borne by the Buyer and Buyer shall timely file all Tax Returns related to any Transfer Taxes.  The Sellers and the Buyer shall use commercially reasonable efforts and cooperate in good faith to mitigate, reduce, or eliminate any such Transfer Taxes.

Section 7.2    Tax Cooperation.  The Buyer and the Sellers agree to furnish or cause to be furnished to each other, upon reasonable request, as promptly as practicable, such information (including access to books and records relating to Taxes) and assistance relating to the Business, the Transferred Assets and the Assumed Liabilities with respect to Pre-Closing Tax Periods as is reasonably necessary for determining any Liability for Taxes, the filing of any Tax Returns, the making of any election relating to Taxes, the preparation for any audit or any other Action relating to any Tax by any Governmental Authority and the prosecution or defense of any Action relating to any Tax; provided, however, that the Buyer shall not be required to disclose the contents of its Tax Returns to any Person.  Any reasonable expenses incurred in furnishing such information or assistance pursuant to this Section 7.2 shall be borne by the Party requesting it.

Section 7.3    Allocation of Taxes.  To the extent it is necessary for purposes of this Agreement to determine the allocation of Taxes relating to a Straddle Period between the Pre-Closing Tax Period and the Post-Closing Tax Period, (a) the amount of any such Taxes that are based on or measured by income or receipts or that are sales or use taxes, employment taxes, or withholding taxes and any other Taxes not described in clause (b) of this Section 7.3 for the portion of such Straddle Period ending on the Closing Date shall be determined based on an interim closing of the books as of the close of business at the end of the day on the Closing Date, and (b) the amount of any property, ad valorem Taxes and any other Taxes imposed on a periodic basis for such Straddle Period that relates to the portion of such Straddle Period ending on the Closing Date shall be deemed to be the amount of such Tax for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of days in such Straddle Period ending as of the close of business on the Closing Date and the denominator of which is the total number of days in such Straddle Period.  In the case of clause (b) of the preceding sentence, exemptions, allowances or deductions that are calculated on an annual basis (including depreciation and amortization deductions computed as if the Closing Date was the last day of the Straddle Period) shall be allocated between the portion of the Straddle Period ending on the Closing Date and the portion of the Straddle Period thereafter in proportion to the number of days in each such portion.

Section 7.4    Bulk Sales.  Notwithstanding any other provisions in this Agreement, the Buyer and the Sellers hereby waive compliance with all "bulk sales," "bulk

transfer" and similar Laws that may be applicable with respect to the sale and transfer of any or all of the Transferred Assets to the Buyer or any designee thereof.

Section 7.5    Deferred Revenue.    Notwithstanding anything to the contrary herein, the Parties agree that no cash payment is being made actually or constructively by the Sellers to Buyer for the assumption of any deferred revenue in connection with this Agreement, and accordingly the Parties agree that Rev. Rul. 68-112 and Rev. Rul. 71-450 shall not apply to the assumption of any deferred revenue in connection with this Agreement.

# ARTICLE VIII.
# CONDITIONS TO CLOSING

Section 8.1    General Conditions.    The respective obligations of the Buyer and the Sellers to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may, to the extent permitted by applicable Law, be waived in a joint writing by the Buyer and Holdings (provided that such waiver shall only be effective as to the obligations of the Sellers, in the case of a waiver by Holdings, and the Buyer, in the case of the Buyer):

(a)    No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law or Order (whether temporary, preliminary or permanent), or shall have initiated and be actively pursuing any legal proceedings seeking any such Order, that enjoins, restrains, prevents, makes illegal or otherwise prohibits the consummation of the transactions contemplated by this Agreement or the Ancillary Agreements (any such Law or Order, a "Legal Restraint").

(b)    The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be a Final Order.

Section 8.2    Conditions to Obligations of the Sellers.    The obligations of the Sellers to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may, to the extent permitted by applicable Law, be waived in writing by Holdings in its sole discretion:

(a)    The representations and warranties of the Buyer contained in this Agreement shall be true and correct in all respects both as of the Disclosure Schedule Delivery Date and as of the Closing Date (other than in the case of representations and warranties that are made as of a specified date, which representations and warranties shall be true and correct in all material respects as of such specified date), without giving effect to any limitation or qualification by a materiality standard (including "in all material respects," "material" or "Buyer Material Adverse Effect") set forth therein, except where the failure to be so true and correct has not had or would not reasonably be expected to have, individually or in the aggregate, a Buyer Material Adverse Effect.

(b)    The Buyer shall have, in all material respects, performed all obligations and agreements and complied with all covenants and conditions required by this Agreement to be performed or complied with by it prior to or at the Closing.

33521550.7

68

(c)    The Sellers shall have received the documents listed in <u>Section 2.8(c)</u>.

Section 8.3    <u>Conditions to Obligations of the Buyer</u>.  The obligations of the Buyer to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may, to the extent permitted by applicable Law, be waived in writing by the Buyer in its sole discretion:

(a)    Representations and Warranties.

(i)    Each Fundamental Representation shall be true and correct in all respects both as of the Disclosure Schedule Delivery Date and as of the Closing Date (other than in the case of Fundamental Representations that are made as of a specified date, which Fundamental Representations shall be true and correct in all respects as of such specified date).

(ii)    The representations and warranties of the Sellers contained in this Agreement (other than the Fundamental Representations) shall be true and correct in all respects both as of the Disclosure Schedule Delivery Date and as of the Closing Date (other than in the case of representations and warranties that are made as of a specified date, which representations and warranties shall be true and correct in all material respects as of such specified date), without giving effect to any limitation or qualification by a materiality standard (including "in all material respects," "material" or "Material Adverse Effect") set forth therein, except where the failure to be so true and correct has not had or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    The Sellers shall have, in all material respects, performed all obligations and agreements and complied with all covenants and conditions required by this Agreement to be performed or complied with by them prior to or at the Closing.

(c)    The Buyer shall have received the documents listed in <u>Section 2.8(b)</u>.

(d)    (i) A "Termination Date" (as defined in the DIP) shall not have occurred, (ii) an "Event of Default" (as defined in the DIP) shall not have occurred and be continuing and (iii) the Indebtedness outstanding under the DIP shall not have otherwise been paid off.

(e)    There shall not have occurred and be continuing any event, change, condition, occurrence or effect that has, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(f)    The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be a Final Order.

(g)    Sellers shall (i) have delivered to the applicable counterparty the notices, and obtained from the applicable counterparty the consents, approvals and authorizations, listed on <u>Section 8.3(g)</u> of the Disclosure Schedule, and (ii) have delivered evidence thereof to the Buyer.

## ARTICLE IX.
## TERMINATION

Section 9.1    <u>Termination</u>.  This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written consent of the Buyer and Holdings;

(b)    either Holdings or the Buyer, if:

(i)    a Legal Restraint is in effect that has become final and non-appealable; <u>provided</u>, that the right to terminate this Agreement under this <u>Section 9.1(b)(i)</u> shall not be available to (x) Holdings if any Seller is then in material breach or violation of this Agreement and such breach or violation proximately caused such Legal Restraint or (y) Buyer if Buyer is then in material breach or violation of this Agreement and such breach or violation proximately caused such Legal Restraint;

(ii)    subject to compliance with <u>Section 5.1</u>, any Seller enters into a definitive agreement with respect to an Alternative Transaction because the Buyer is not the Successful Bidder at the Auction; <u>provided, however</u>, that if the Buyer is the Backup Bidder, then the Buyer may not terminate this Agreement pursuant to this <u>Section 9.1(b)(ii)</u> for a period of ten (10) Business Days from the entry of an Order of the Bankruptcy Court approving such definitive agreement and the transactions contemplated thereby (for the avoidance of doubt, nothing in this <u>Section 9.1(b)(ii)</u> shall restrict the ability of the Buyer to terminate this Agreement in accordance with any other provision of this Agreement); or

(iii)    the Closing shall not have occurred on or before November 14, 2025 (the "<u>Outside Date</u>"); <u>provided</u> that the right to terminate this Agreement under this <u>Section 9.1(b)(iii)</u> shall not be available to (x) Holdings if any Seller is then in material breach or violation of this Agreement and such breach or violation proximately caused the failure of the Closing to occur prior to such date or (y) Buyer if Buyer is then in material breach or violation of this Agreement and such breach or violation proximately caused the failure of the Closing to occur prior to such date;

(c)    by the Buyer, if:

(i)    the Buyer is not in material breach of this Agreement such that the conditions in <u>Section 8.2(a)</u> or <u>Section 8.2(b)</u> would not be satisfied, and the Sellers breach or fail to perform in any respect any of their representations, warranties or covenants contained in this Agreement and such breach or failure to perform (1) would give rise to the failure of a condition set forth in <u>Section 8.3(a)</u> or <u>Section 8.3(b)</u> and (2) cannot be or has not been cured before the earlier to occur of (A) fifteen (15) days following delivery of written notice of such breach or failure to perform and (B) one (1) day prior to the Outside Date;

(ii)    the Bankruptcy Court has not entered the Sale Procedures Order on or before the date that is fourteen (14) calendar days after the Petition Date, or if approval of the Sale Procedures Order is delayed due to the Bankruptcy Court's unavailability, the next Business Day on which the Bankruptcy Court is available;

(iii)    the Sale Hearing is not held on or before the date that is forty-five (45) calendar days after the Petition Date, or if the Sale Hearing is delayed due to the Bankruptcy Court's unavailability, the next Business Day on which the Bankruptcy Court is available;

(iv)    the Auction, if any, is not held on or before the date that is forty (40) calendar days after the Petition Date;

(v)    the Bankruptcy Court has not entered the Sale Order on or before the date that is forty-five (45) calendar days after the Petition Date, or if approval of the Sale Order is delayed due to the Bankruptcy Court's unavailability, the next Business Day on which the Bankruptcy Court is available;

(vi)    the Bankruptcy Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code, and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement;

(vii)    the Sellers withdraw or seek authority to withdraw the Sale Procedures Motion or, after entry of the Sale Procedures Order, the Sellers withdraw the request for authority to sell the Transferred Assets and assign the Transferred Contracts;

(viii)    the Sellers modify or amend the Sale Procedures (as defined in the Sale Procedures Order) in a manner adverse to the Buyer without the prior written consent of the Buyer unless such modification or amendment is permitted by the Sale Procedures Order or required by the Bankruptcy Court;

(ix)    any of the Sellers or any chapter 11 trustee appointed for any Seller file any pleading with the Bankruptcy Court for relief that would not permit the Closing without the prior written consent of the Buyer; provided, that taking any action in respect of soliciting Competing Bids, or accepting a winning bid, in connection with the Auction shall not entitle the Buyer to terminate this Agreement pursuant to this Section 9.1(c)(ix).

(x)    a Material Adverse Effect has occurred since the Petition Date;

(xi)    the Sellers publicly announce any plan of reorganization or plan of liquidation or support any such plan filed by any third party, other than any such transaction related to the wind down of the Sellers and that would not prevent or materially delay the Closing from occurring in accordance with the terms of this Agreement; or

(xii)    (i) any Seller enters into one or more Alternative Transactions with one or more Persons other than Buyer or the Successful Bidder or the Backup Bidder at the Auction or (ii) the Bankruptcy Court approves an Alternative Transaction other than with the Buyer or the Successful Bidder or the Backup Bidder;

(xiii)    for any reason the Buyer is unable, pursuant to section 363(k) of the Bankruptcy Code, to credit bid all or any portion of the Credit Bid Amount in payment of the Purchase Price as set forth in Section 2.7;

(xiv)    any party receives relief under Section 362 of the Bankruptcy Code with respect to any Lease, Leased Real Property or other or Material Contract of any Debtor;

(xv)    the occurrence of any "Event of Default" under the DIP; or

(xvi)    the Support Agreement is validly terminated in accordance with its terms;

(d)    by Holdings, if the Sellers are not in material breach of this Agreement such that the conditions in Section 8.3(a) or Section 8.3(b) would not be satisfied, and the Buyer breaches or fails to perform in any respect any of its representations, warranties or covenants contained in this Agreement and such breach or failure to perform (1) would give rise to the failure of a condition set forth in Section 8.2(a) or Section 8.2(b) and (2) cannot be or has not been cured before the earlier to occur of (A) fifteen (15) days following delivery of written notice of such breach or failure to perform and (B) one (1) day prior to the Outside Date.

The Party seeking to terminate this Agreement pursuant to this Section 9.1 (other than Section 9.1(a)) shall, if such Party is Holdings, give prompt written notice of such termination to the Buyer, and if such Party is the Buyer, give prompt written notice of such termination to the Sellers.

Section 9.2    Effect of Termination.  In the event of termination of this Agreement as provided in Section 9.1, this Agreement shall forthwith become void and there shall be no liability on the part of any Party except (i) for the provisions of Article V (Bankruptcy Court Matters), Section 6.7 (Public Announcements), Section 10.2 (Fees and Expenses), Section 10.5 (Notices), Section 10.8 (Parties in Interest), Section 10.9 (Governing Law), Section 10.10 (Submission to Jurisdiction) and this Article IX and (ii) that no such termination shall relieve any Party from liability for any fraud or willful and material breach of this Agreement.

## ARTICLE X.
## GENERAL PROVISIONS

Section 10.1    Non-Survival of Representations, Warranties and Covenants.  The respective representations, warranties and covenants of the Sellers and the Buyer contained in this Agreement and any certificate delivered pursuant hereto shall terminate at, and not survive, the Closing; provided that this Section 10.1 shall not limit any covenant or agreement of the Parties to the extent that its terms require performance after the Closing, which shall survive in accordance with their terms.

Section 10.2    Fees and Expenses.  Except as otherwise provided herein (including Section 5.1 and Section 7.1) or in the Interim Financing Order, the Final Financing Order or the DIP, all fees and expenses incurred in connection with or related to this Agreement and the Ancillary Agreements and the transactions contemplated hereby and thereby shall be paid by the Party incurring such fees or expenses, whether or not such transactions are consummated.  For the avoidance of doubt, Buyer shall pay all recording fees arising from the transfer of the Transferred Assets.

33521550.7

Section 10.3    <u>Amendment and Modification</u>.    This Agreement may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing specifically designated as an amendment hereto, signed on behalf of each Party.

Section 10.4    <u>Waiver</u>.  No failure or delay of any Party in exercising any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right or power.  Any agreement on the part of either Party to any such waiver shall be valid only if set forth in a written instrument executed and delivered by a duly authorized officer on behalf of such Party.

Section 10.5    <u>Notices</u>.  All notices and other communications hereunder shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally, (b) on the first Business Day following the date of dispatch if delivered utilizing a next-day service by a recognized next-day courier, (c)  if sent via email transmission to the email address(es) given below upon non-auto generated confirmation of receipt or (d) on the earlier of confirmed receipt or the fifth (5th) Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid.  All notices hereunder shall be delivered to the addresses set forth below, or pursuant to such other instructions as may be designated in writing by the Party to receive such notice:

(i)    if to the Sellers, to:

Pinstripes, Inc.
1150 Willow Road
Northbrook, IL 60062
Attention: James Katchadurian
Email: james.katchadurian@cr3partners.com

with a copy (which shall not constitute notice) to:

Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
Attention:    Sean M. Beach and Elizabeth Justison
Email:  sbeach@ycst.com; ejustison@ycst.com

(ii)      if to the Buyer, to:

        Silverview Credit Partners
        100 South Ashley Drive, Suite 600
        Tampa, FL 33602
        Attention: Nelson Sproat
        Email: nelson.sproat@silverview.com

        with a copy (not constituting notice) to:

        Alston & Bird LLP
        90 Park Avenue, 15th Floor
        New York, NY 10016
        Attention: James Vincequerra
        Email: james.vincequerra@alston.com

Section 10.6    Interpretation.    When a reference is made in this Agreement to a Section, Article, Exhibit or Schedule such reference shall be to a Section, Article, Exhibit or Schedule of this Agreement unless otherwise indicated. The table of contents and headings contained in this Agreement or in any Exhibit or Schedule are for convenience of reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. All words used in this Agreement will be construed to be of such gender or number as the circumstances require. Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall have the meaning as defined in this Agreement. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth herein. The word "including" and words of similar import when used in this Agreement will mean "including, without limitation," unless otherwise specified. The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to the Agreement as a whole and not to any particular provision in this Agreement. The term "or" is not exclusive and the use of the word "or" to connect two or more phrases shall be construed as inclusive of all such phrases (*e.g.*, "A or B" means "A or B, or both"). The word "will" shall be construed to have the same meaning and effect as the word "shall." References to days mean calendar days unless otherwise specified. All references to "dollars" or "$" in this Agreement or any Ancillary Agreement refer to United States dollars, which is the currency used for all purposes in this Agreement and any Ancillary Agreement. Any reference to any federal, state, provincial, territorial, local or foreign statute or Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day. For purposes of this Agreement, the Sellers shall be deemed to have "delivered" or "made available" information and documents if such information or documents were uploaded to the Data Room at least two (2) Business Days prior to the Closing Date, and remained in the Data Room through to the Closing Date.

Section 10.7    Entire Agreement.    This Agreement (including the Exhibits and Schedules hereto) and the Ancillary Agreements constitute the entire agreement, and supersede all prior written agreements, arrangements, communications and understandings and all prior and

contemporaneous oral agreements, arrangements, communications and understandings between the Parties with respect to the subject matter hereof and thereof. Neither this Agreement nor any Ancillary Agreement shall be deemed to contain or imply any restriction, covenant, representation, warranty, agreement or undertaking of any Party with respect to the transactions contemplated hereby or thereby other than those expressly set forth herein or therein or in any document required to be delivered hereunder or thereunder, and none shall be deemed to exist or be inferred with respect to the subject matter hereof.

Section 10.8    <u>Parties in Interest</u>. This Agreement shall be binding upon and inure solely to the benefit of each Party, and nothing in this Agreement, express or implied, is intended to or shall confer upon any Person (including employees of the Sellers) other than the Parties and their respective successors and permitted assigns any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement. Notwithstanding anything herein to the contrary, this Agreement and any Sale Order shall be binding on the Debtors' successors and assigns, including any trustee appointed in any of the Bankruptcy Cases and, if the Debtors' Bankruptcy Cases convert to cases under chapter 7 of the Bankruptcy Code, any trustee appointed in such chapter 7 case.

Section 10.9    <u>Governing Law</u>. Except to the extent of the mandatory provisions of the Bankruptcy Code, this Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby (in contract or tort) shall be governed by, and construed in accordance with the internal Laws of the State of Delaware, without regard to the Laws of any other jurisdiction that might be applied because of the conflicts of Laws principles of the State of Delaware.

Section 10.10    <u>Submission to Jurisdiction</u>. Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (b) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or proceeding; <u>provided</u>, <u>however</u>, that, if the Bankruptcy Court is closed or declines jurisdiction, each of the Parties irrevocably agrees that any Action or proceeding arising out of or relating to this Agreement brought by another Party or its successors or assigns shall be heard and determined in a Delaware state court or a federal court sitting in Delaware, and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action arising out of or relating to this Agreement and the transactions contemplated hereby. Each of the Parties further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient, without limiting any other manner of service permitted by Law. Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any Action arising out of or relating to this Agreement or the transactions contemplated hereby, (i) any claim that it is not personally subject to the jurisdiction of the courts in Delaware as described herein for any reason, (ii) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process

commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise), and (iii) that (A) the Action in any such court is brought in an inconvenient forum, (B) the venue of such Action is improper or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.

Section 10.11 <u>Disclosure Generally</u>.   The fact that any item of information is disclosed in any Disclosure Schedule shall not be construed to be an admission by any Party to any third party of any liability or obligation with respect thereto or to mean that such information is material or immaterial, within or outside of the Ordinary Course of Business, or required to be disclosed by this Agreement.   Such information and the dollar thresholds set forth herein shall not be used as a basis for interpreting the terms "material" or "Material Adverse Effect" or other similar terms in this Agreement.   No information set forth in the Disclosure Schedule will be deemed to broaden in any way the scope of the Parties' representations, warranties or covenants set forth in this Agreement.

Section 10.12 <u>No Recourse</u>.   All Actions, obligations, Liabilities, or causes of action (whether in contract or in tort, in Law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to this Agreement or any Ancillary Agreement, or the negotiation, execution, or performance of this Agreement and the other Ancillary Agreements (including any representation or warranty made in, in connection with, or as an inducement to, this Agreement), may be made only against the parties hereto.   No Person who is not a party hereto, including any past, present or future director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, representative or assignee of, and any financial advisor or lender to, any party hereto, or any past, present or future director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, representative or assignee of, and any financial advisor or lender to, any of the foregoing (collectively, the "<u>Non-Party Affiliates</u>"), shall have any Liability (whether in contract or in tort, in Law or in equity, or granted by statute) for any Liabilities or causes of action arising under, out of, in connection with, or related in any manner to this Agreement or the other Ancillary Agreements or based on, in respect of, or by reason of this Agreement or the other Ancillary Agreements or their negotiation, execution, performance, or breach, and, to the maximum extent permitted by Law, each party hereto hereby waives and releases all such Liabilities and causes of action against any such Non-Party Affiliates (except pursuant to this Agreement or the other Ancillary Agreements to which they are a party).   Without limiting the foregoing, to the maximum extent permitted by Law, each party hereto disclaims any reliance upon any Non-Party Affiliate with respect to the performance of this Agreement or the other Ancillary Agreements or any representation or warranty made in, in connection with, or as an inducement to this Agreement.

Section 10.13 <u>Assignment; Successors</u>.   Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned or delegated, in whole or in part, by operation of Law or otherwise, by any Seller without the prior written consent of the Buyer, and by the Buyer without the prior written consent of Holdings, and any such assignment without such prior written consent shall be null and void; <u>provided</u>, <u>however</u>, that Buyer may assign all or any portion of its rights or obligations hereunder to (a) one or more of its Affiliates or (b) New PBS HoldCo, LLC or one or more of its Affiliates, in either case without the prior written

consent of any other Party.  Subject to the preceding sentences, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the Parties and their respective successors and assigns.

Section 10.14 <u>Enforcement</u>.  The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement.  Accordingly, (a) each of the Parties shall be entitled to specific performance of the terms hereof or other equitable relief, including an injunction or injunctions, to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, without proof of damages or otherwise (this being in addition to any other remedy to which any such Party may be entitled under this Agreement) and (b) the right of specific performance and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither the Sellers nor Buyer would have entered into this Agreement.  Each of the Parties hereby further waives (i) any defense in any Action for specific performance that a remedy at Law would be adequate and (ii) any requirement under any Law to post security as a prerequisite to obtaining equitable relief.

Section 10.15 <u>Severability</u>.  Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable Law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or portion of any provision in such jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision or portion of any provision had never been contained herein.

Section 10.16 <u>Waiver of Jury Trial</u>.  EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 10.17 <u>Counterparts</u>.  Notwithstanding anything else herein to the contrary, this Agreement may be executed in two or more counterparts, all of which shall be considered one and the same instrument and shall become effective when one or more counterparts have been signed by each of the Parties and delivered to the other Parties.  Delivery of an executed counterpart of a signature page to this Agreement via electronic mail, portable document format (.pdf) or any electronic signature complying with the U.S. federal ESIGN Act of 2000 (including DocuSign), shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

Section 10.18 <u>No Presumption Against Drafting Party</u>.  Each of the Buyer and the Sellers acknowledges that each Party to this Agreement has been represented by legal counsel in connection with this Agreement and the transactions contemplated by this Agreement.  Accordingly, any rule of Law or any legal decision that would require interpretation of any claimed

ambiguities in this Agreement against the drafting Party has no application and is expressly waived.

[The remainder of this page is intentionally left blank.]

33521550.7

IN WITNESS WHEREOF, the Sellers and the Buyer have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**<u>SELLERS</u>:**

**PINSTRIPES HOLDINGS, INC.**

By: _____
       Name: Dale Schwartz
       Title: CEO

**PINSTRIPES, INC.**

By: _____
       Name: Dale Schwartz
       Title: CEO

**PINSTRIPES HILLSDALE, LLC**

By: _____
       Name: Dale Schwartz
       Title: CEO

**PINSTRIPES ILLINOIS, LLC**

By: _____
       Name: Dale Schwartz
       Title: CEO

*[Signature Page to Asset Purchase Agreement]*

**<u>BUYER</u>:**

**[BUYER]**

By: _____
      Name:
      Title:

*[Signature Page to Asset Purchase Agreement]*

**Schedule 1.1**

*Acquired Locations*

- 1150 Willow Road, Northbrook, IL 60062

- 7 Oakbrook Center Mall, Oak Brook, IL 60523

- 11920 Grand Park Ave., North Bethesda, MD 20852

- 36 Hillsdale Mall, San Mateo, CA 94403

- 100 W. Higgins Road, South Barrington, IL 60010

- 3849 Gallagher Drive, Edina, MN 55435

- 1064 Wisconsin Ave NW, Washington, DC 20007

- 111 Park Avenue, Beachwood, OH 44122

**EXHIBIT B**

**Approved Budget**

**Pinstripes Holdings Inc.**
**Weekly Cashflow / DIP Forecast**

($000's)

| | Prepetition | Mon | Postpetition Tue-Fri | 1 Week End | 2 Week End | 3 Week End | 4 Week End | 5 Week End | 6 Week End | 7 Week End | Postpetition Trailing Costs | Weeks 1-7 | Post-petition Excl Trailing | Post-petition Incl Trailing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fiscal Period | P5 | P5 | P5 | P5 | P6 | P6 | P6 | P6 | P7 | P7 | | | | |
| Week Ending | 9/7/2025 | 9/8/2025 | 9/12/2025 | 9/14/2025 | 9/21/2025 | 9/28/2025 | 10/5/2025 | 10/12/2025 | 10/19/2025 | 10/26/2025 | | | | |
| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | | | | |
| **TOTAL RECEIPTS** | 1,775 | 900 | 600 | 1,500 | 1,412 | 1,412 | 1,412 | 1,412 | 1,304 | 1,304 | | 9,757 | 8,857 | 8,857 |
| **Total Personnel and Benefits** | (838) | (25) | (1,685) | (1,710) | (623) | (788) | (515) | (734) | (507) | (726) | (1,161) | (5,603) | (5,578) | (6,739) |
| **Disbursements - COGS and Operating Expense:** | | | | | | | | | | | | | | |
| SALES / USE TAX / OTHER TAX(Outflow) | (38) | - | - | - | - | - | (35) | - | - | (381) | (325) | (416) | (416) | (741) |
| RENT | - | - | - | - | - | - | (1,134) | - | - | - | | (1,134) | (1,134) | (1,134) |
| AP GENERAL | (83) | - | (46) | (46) | (42) | (42) | (42) | (42) | (39) | (39) | | (293) | (293) | (293) |
| AP F&B (Sysco & Other) | - | - | (217) | (217) | (197) | (197) | (197) | (197) | (182) | (182) | | (1,367) | (1,367) | (1,367) |
| F&B (Fintech liquor) | (44) | (15) | (31) | (46) | (46) | (46) | (46) | (46) | (42) | (42) | | (312) | (297) | (297) |
| EXPENSE REPORTS / OTHER | (11) | (10) | (21) | (31) | (31) | (31) | (31) | (31) | (31) | (31) | | (215) | (205) | (205) |
| PROPERTY TAXES | - | - | - | - | - | - | - | - | - | - | | - | - | - |
| SUPPLIES | (46) | - | (24) | (24) | (22) | (22) | (22) | (22) | (20) | (20) | | (153) | (153) | (153) |
| UTILITIES | (13) | - | - | - | (63) | (63) | (63) | (63) | (63) | - | | (315) | (315) | (315) |
| TECH & IT SYSTEMS | - | - | (29) | (29) | (14) | (14) | (14) | (14) | (14) | (14) | | (113) | (113) | (113) |
| INSURANCE | (101) | (212) | - | (212) | - | - | (335) | - | - | - | (100) | (547) | (335) | (435) |
| REPAIRS & MAINTENANCE | - | - | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | | (55) | (55) | (55) |
| MARKETING | - | (15) | (135) | (150) | - | - | - | - | (150) | - | | (300) | (285) | (285) |
| MISCELLANEOUS | (106) | (45) | (100) | (145) | (49) | (49) | (49) | (49) | (49) | (49) | | (437) | (392) | (392) |
| **Total COGS and Operating Expense** | (442) | (297) | (610) | (907) | (471) | (471) | (1,975) | (471) | (597) | (765) | (425) | (5,657) | (5,360) | (5,785) |
| **Total Operating Disbursements** | (1,280) | (322) | (2,295) | (2,617) | (1,093) | (1,259) | (2,490) | (1,205) | (1,105) | (1,492) | (1,586) | (11,260) | (10,938) | (12,524) |
| **Total Net Operating Cashflow** | 495 | 578 | (1,695) | (1,117) | 319 | 154 | (1,078) | 208 | 199 | (188) | (1,586) | (1,503) | (2,081) | (3,667) |
| **Non-Operating Disbursements:** | | | | | | | | | | | | | | |
| DEBTOR PROFESSIONAL FEE - PREPETITION | | (25) | - | (25) | | | | | | | | (25) | - | - |
| I-BANKER RETAINER | | (25) | - | (25) | | | | | | | | (25) | - | - |
| PROFESSIONAL FEE RESERVE: | | | | | | | | | | | | - | - | - |
| YOUNG CONAWAY STARGATT & TAYLOR | | | (108) | (108) | (108) | (109) | (108) | (108) | (109) | | | (650) | (650) | (650) |
| CR3 PARTNERS | | | (108) | (108) | (108) | (109) | (108) | (108) | (109) | | | (650) | (650) | (650) |
| EPIQ SYSTEMS | | | (33) | (33) | (33) | (34) | (33) | (33) | (34) | | | (200) | (200) | (200) |
| ROPES & GRAY | | | (17) | (17) | (17) | (16) | (17) | (17) | (16) | | | (100) | (100) | (100) |
| UCC / UST FEES | | | - | | | | | (100) | | (46) | | (146) | (146) | (146) |
| PACA / PASA | | | - | | (100) | (100) | (100) | (100) | (100) | | | (500) | (500) | (500) |
| UTILITY DEPOSIT | | | - | | (125) | | | | | | | (125) | (125) | (125) |
| **Total Non-Operating Disbursements** | - | (50) | (266) | (316) | (491) | (368) | (366) | (466) | (368) | (46) | - | (2,421) | (2,371) | (2,371) |
| **Total Net Cashflow** | 495 | 528 | (1,961) | (1,433) | (172) | (214) | (1,444) | (258) | (169) | (234) | (1,586) | (3,924) | (4,452) | (6,038) |
| **Cash Roll forward** | | | | | | | | | | | | | | |
| Beg Cash Balance | 162 | 657 | 1,185 | 657 | 49 | 77 | 62 | 69 | 60 | 42 | (0) | 657 | 1,185 | 1,185 |
| Net Cashflow | 495 | 528 | (1,961) | (1,433) | (172) | (214) | (1,444) | (258) | (169) | (234) | (1,586) | (3,924) | (4,452) | (6,038) |
| Post-petition DIP Financing | | | 825 | 825 | 200 | 200 | 1,450 | 250 | 150 | 192 | 1,586 | 3,267 | 3,267 | 4,853 |
| Outstanding Checks - estimate | | | | | | | | | | | | | | |
| **End Cash Balance - Book Basis** | 657 | 1,185 | 49 | 49 | 77 | 62 | 69 | 60 | 42 | (0) | 0 | (0) | (0) | 0 |