## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PINSTRIPES HOLDINGS, INC., *et al.*,[1] | Case No. 25-11677 (___) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF (I) AN ORDER
(A) APPROVING BIDDING PROCEDURES IN CONNECTION WITH
THE SALE OF THE DEBTORS' ASSETS, (B) APPROVING FORM AND
MANNER OF NOTICE, (C) APPROVING DESIGNATION OF STALKING HORSE
BIDDER AND STALKING HORSE BID, (D) SCHEDULING AUCTION AND SALE
HEARING, (E) AUTHORIZING PROCEDURES GOVERNING ASSUMPTION
AND ASSIGNMENT OF CERTAIN CONTRACTS AND UNEXPIRED LEASES, AND
(F) GRANTING RELATED RELIEF; AND (II) AN ORDER (A) APPROVING
PURCHASE AGREEMENTS, AND (B) AUTHORIZING A SALE FREE AND
CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") hereby submit this motion (this "**Motion**") for entry of: (i) an order, substantially in the form attached hereto as **Exhibit A** (the "**Bidding Procedures Order**"), (a) approving bidding procedures, substantially in the form attached as Annex 1 to the Bidding Procedures Order (the "**Bidding Procedures**"), to govern the marketing and sale of all or substantially all of the Debtors' assets (the "**Assets**"), (b) authorizing the Debtors to schedule an auction to sell the Assets (the "**Auction**") and scheduling the hearing to approve a sale of the Assets (the "**Sale Hearing**"), (c) approving the designation of the Stalking Horse Bidder and the Stalking Horse Bid (each as defined below), (d) approving the form and manner of notice of the proposed sale

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Pinstripes Holdings, Inc. (6699); Pinstripes, Inc. (8608); Pinstripes Hillsdale LLC (6064); Pinstripes at Prairiefire, Inc. (7018); and Pinstripes Illinois, LLC (6432). For purposes of these chapter 11 cases, the Debtors' service address is 1150 Willow Road, Northbrook, Illinois 60062.

transactions, the Bidding Procedures, the Auction, the Sale Hearing, and related dates and deadlines, (e) authorizing procedures governing the assumption and assignment of certain executory contracts and unexpired leases (the "**Assumed Contracts**") to the prevailing bidder(s) acquiring the Assets (a "**Successful Bidder**"), and (f) granting related relief; and (ii) one or more orders (collectively, the "**Sale Order**") (a) approving the applicable form(s) of purchase agreement between the Debtors and the Stalking Horse Bidder (as defined below) (the "**Stalking Horse Agreement**") or any other Successful Bidder(s), and (b) authorizing the sale(s) (collectively, the "**Sale**") of the Assets and the assumption and assignment of the Assumed Contracts to the Stalking Horse Bidder or such other Successful Bidder free and clear of all liens, claims, encumbrances, and other interests (collectively, the "**Liens**"), other than any permitted Liens as set forth in the applicable form(s) of purchase agreement. In support of this Motion, the Debtors rely upon and incorporate by reference the *Declaration of James Katchadurian in Support of Chapter 11 Petitions and First Day Motions* (the "**First Day Declaration**"),[2] filed contemporaneously herewith.  In further support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the District of Delaware (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012 (the "**Amended Standing Order**").  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration, the Bidding Procedures, or the Stalking Horse Agreement (as defined below), as applicable.

and 1409.  Pursuant to Rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court

for the District of Delaware (the "**Local Rules**"), the Debtors consent to the entry of a final

judgment or order with respect to this Motion if it is determined that the Court would lack

Article III jurisdiction to enter such final judgment or order absent consent of the parties.

2.      The statutory and legal predicates for the relief requested herein are sections

105(a), 363, 365, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the

"**Bankruptcy Code**"), Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of

Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Rules 2002-1 and 6004-1.

## GENERAL BACKGROUND

3.      On the date hereof (the "**Petition Date**"), each of the Debtors commenced a

voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to operate

their business and manage their properties as debtors in possession pursuant to sections 1107(a)

and 1108 of the Bankruptcy Code.  No official committees have been appointed in these chapter

11 cases and no request has been made for the appointment of a trustee or an examiner.

Simultaneously herewith, the Debtors have filed a motion seeking to have these chapter 11 cases

jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

4.      Additional information regarding the Debtors' businesses, their capital structure,

and the circumstances leading to the filing of these chapter 11 cases is set forth in the First Day

Declaration.

## INTRODUCTION AND BACKGROUND
## REGARDING THE DEBTORS' MARKETING AND SALE PROCESS

5.      The Bidding Procedures, and the truncated marketing and sales process

contemplated thereby, is the only option available to the Debtors and their last remaining avenue

to maximize value.  As described in the First Day Declaration and herein, these chapter 11 cases

are over a year in the making, during which time the Debtors' financial situation has plummeted and lenders and vendors started disassociating with the Debtors and their restructuring efforts. The Silverview Agent, and the parties its represents, which hold in excess of $115 million in secured debt, have agreed to a structure that contemplates a DIP and Stalking Horse Bid that provides a stabilizing last-gasp opportunity for the Debtors to maximize value through an Auction, while providing a backstop Stalking Horse Bid that preserves the going concern and jobs for the Debtors' eight (8) remaining locations.

6.      As set forth more fully in the First Day Declaration, prior to the commencement of these chapter 11 cases, the Debtors operated eighteen (18) restaurant locations in Florida, Maryland, Illinois, Ohio, Minnesota, Texas, Connecticut, Kansas, New Jersey, California, and Washington, D.C., with several additional locations under construction in Washington and Florida.  Each of the Debtors' locations offers 26,000 to 38,000 square feet of interior space, including bowling alleys, plus additional outdoor patio space that includes outdoor dining, bocce courts, fire-pits, and decorative fountains. In addition to offering dining room service, the Debtors hosted, and continue to host, thousands of events, including weddings, bat mitzvahs, corporate events, and birthday parties, and also offer catering services.

7.      These cases have been over a year in the making.  The Debtors have suffered from a series of challenges, including inflationary pressure across various sectors that have drastically and negatively affected the Debtors' performance.   In particular, increases in the cost of labor and commodities in recent years have raised the cost of "dining out."  Like many other similarly situated restaurant and entertainment businesses, the Debtors' performance is acutely impacted by consumer preferences.  As inflationary pressures have made consumers increasingly cost-conscious, preferences for out-of-home experiences began to shift to more cost-efficient

alternatives. As a result, the Debtors began facing an increasingly tight liquidity crunch at the same time that they most needed cash reserves to adapt to industry-wide changes.

8.      While the Debtors were partially able to offset rising costs by gradually increasing menu prices, coupled with more effective purchasing practices, inflation and reduced customer traffic nonetheless placed significant strain on the Debtors' business and liquidity needs. At the same time, the Debtors continued to expand, incurring costs for new store openings that were not yet generating revenue. As a result of these factors, the Debtors' revenue and EBITDA became insufficient to support their debt service, working capital, and capital expenditure needs. As a result, in January 2025, the Debtors received default notices from their Prepetition Secured Lenders, and, on January 7, 2025, entered into initial Forbearance Agreements.

9.      Shortly thereafter, on January 13, 2025, the Board of Directors of Pinstripes Holdings, Inc. (the "**Board**") appointed a special committee of independent, disinterested directors (the "**Special Committee**") to make recommendations to the Board with respect to the events of default under the Prepetition Loan Documents and other issues relating to the Company's financial condition and liquidity needs, including a potential refinancing of the Company's existing indebtedness, a sale of the Company, a recapitalization with one or more of the Company's existing lenders, and/or other strategic alternatives (collectively, the "**Potential Alternatives**"). To assist its mandate, in January 2025, the Special Committee engaged Piper Sandler & Co. ("**Piper Sandler**") as the Debtors' initial financial advisor and investment banker and immediately began working with Piper Sandler and its other professionals to evaluate the Potential Alternatives.

10.     As described in the First Day Declaration, the Debtors, with Piper Sandler's assistance, explored all Potential Alternatives in the approximately nine months leading to the

Petition Date.  In connection therewith, Piper Sandler contacted no less than eighty (80) parties with experience in the restaurant industry, and at least twenty (20) parties executed non-disclosure agreements.  Unfortunately, the pre-petition marketing and sale process did not yield any actionable offers from third-party purchasers.

11.     As a result of the pre-petition marketing and sale process, on March 7, 2025, the Debtors entered into a letter of intent with their then second lien lender, Oaktree Capital Management, L.P., an affiliate of Oaktree Fund Administration, LLC ("**Oaktree**"), for a recapitalization transaction (the "**Oaktree Recapitalization**"), which was subject to definitive documentation and closing conditions.  The Oaktree Recapitalization did not close, the Debtors' financial position continued to deteriorate, and Oaktree subsequently exited its position for a fraction of the face amount of its debt by selling its debt to certain entities associated with the Existing Silverview Agent.

12.     Thereafter, the Debtors continued to engage with all potential interested parties, ultimately culminating in the Debtors' entry into the Support Agreement (as amended, supplemented, or modified from time to time, the "**Support Agreement**")[3] with the Consenting Lenders on August 27, 2025.[4]

13.     Pursuant to the Support Agreement, the Consenting Lenders agreed to support an expedited, forty-five day sale process for the Debtors' assets pursuant to section 363 of the Bankruptcy Code, including by (a) submitting a proposed Stalking Horse Bid from the Consenting Lenders (and their designated Stalking Horse Bidder) that will allow portions of the

---

[3]     The Support Agreement was amended on September 7, 2025 to include, among other things, a substantially final form of the Stalking Horse Agreement.

[4]     The Consenting Lenders include the Silverview Lenders, together with Silverview Agent, in their respective capacities pertaining to the Existing Silverview Loan Documents and the Existing Second Lien Loan Documents.

Debtors' business to continue as a going concern, (b) providing a pre-petition bridge loan to fund the Debtors' operations, negotiations of the Stalking Horse Bid, and the preparation of these chapter 11 cases, and (c) providing DIP financing to fund these chapter 11 cases. Notably, the Stalking Horse Bid does not require approval of any bid protections. Prior to the Petition Date, the Debtors consummated the pre-Petition Date closure of the store locations that the Stalking Horse Bidder does not intend to acquire in connection with the Stalking Horse Bid, as set forth in Exhibit 1 to the DIP Term Sheet, in an effort to streamline their operations and maximize dwindling resources.

14.     Prior to the Petition Date, the Debtors terminated Piper Sandler's engagement and engaged Hilco Corporate Finance, LLC ("**Hilco**") as their investment banker to continue marketing their assets in connection with the sale process contemplated herein and in the Support Agreement.

15.     The Debtors seek the relief requested in this Motion—including an expedited marketing and sale timeline—to ensure that a value-maximizing sale process is implemented, and to provide alternative purchasers with as much information as possible as soon as possible, so that they may frame competitive offers for the Debtors' eight (8) remaining operating restaurant locations and other assets. The Debtors submit that the proposed procedures set forth herein are reasonable, value-maximizing, and in the best interest of their estates and all interested parties under the circumstances of these chapter 11 cases.

## THE ASSETS AND THE STALKING HORSE AGREEMENT

### I.     The Assets

16.     The Assets consist of, without limitation, certain intellectual property, inventory, cash and cash equivalents, accounts receivable, executory contracts and unexpired leases, permits, licenses, customer lists, books and records, claims and causes of action, and other

related personal property, but exclude any assets subject to the Granite Parties' liens.[5]  Subject to the terms of the Bidding Procedures, interested parties may bid on the Assets (i) in individual lots; (ii) as a collective whole; or (iii) in any combination.

## II.    The Stalking Horse Agreement

17.    The following table sets forth a summary of the material terms and conditions of the Stalking Horse Agreement, including required disclosures under Local Rule 6004-1(b)(iv):[6]

| Term (Agreement Citation) | Detail |
| --- | --- |
| **Sellers** <br> **(Recitals)** | Pinstripes Holdings, Inc., Pinstripes, Inc., Pinstripes Hillsdale, LLC, and Pinstripes Illinois, LLC |
| **Stalking Horse Bidder** <br> **Local Bankr. R. 6004-1(b)(iv)(A)** <br> **(Recitals)** | An entity identified by the Consenting Lenders to make the Stalking Horse Bid (the "**Stalking Horse Bidder**"), which may be Punch Bowl Social, Inc. or one of its subsidiaries or affiliates (collectively, "**Punch Bowl**") or which Stalking Horse Bidder may be in contractual or other agreement or arrangement with Punch Bowl Social with respect to the operation of any purchased assets.  The Consenting Lenders may designate any entity to be the Stalking Horse Bidder, including Silverstrike, LLC ("**Silverstrike**"), and Silverstrike or any entity designated by the Consenting Lenders as the Stalking Horse Bidder may credit bid any debt that is contributed to it. |
| **Consideration; Credit Bid** <br> **Local Bankr. R. 6004-1(b)(iv)(N)** <br> **Art. I, § 1.1** | The Stalking Horse Bid will include cash in the amount of $1.6 million, plus a credit bid by the Stalking Horse Bidder of an aggregate amount of $15 million for the Transferred Assets (which debt may be conditionally assigned to the Stalking Horse Bidder by the Consenting Lenders prior to the closing of the Sale), plus the payment obligation to the Debtors' investment banker in the amount of up to $300,000,[7] administrative rent incurred through the date of closing and the assumption of certain other obligations and claims, including, but not limited to, Cure Costs related to Transferred Contracts, in each case acceptable to the Stalking Horse Bidder, provided that the Stalking |

---

[5]    As set forth in the First Day Declaration, the Granite Lenders advanced equipment loans to Debtor Pinstripes, Inc., which loans are collateralized by specific furniture, fixtures, and equipment of the Debtors.

[6]    If there are any inconsistencies between the summary set forth herein and the Stalking Horse Agreement, the terms and conditions of the Stalking Horse Agreement shall govern.

[7]    In the event that a third-party purchaser is the Successful Bidder, the investment banker's fee shall not exceed $500,000, to be paid from the proceeds of the Successful Bid.

| Term (Agreement Citation) | Detail |
|---|---|
| | Horse Bid may be increased at any subsequent Auction for the Sale of the Assets (including a credit bid of all of the Consenting Lenders' secured debt, including the debt under the Second Lien Documents). |
| **Agreements with Management** **Local Bankr. R. 6004-1(b)(iv)(B)** **Art. VI, § 6.4** | The Stalking Horse Agreement contemplates the Buyer or its designee offering employment to some of the Business Employees, in which case such employees shall become Hired Employees. |
| **Releases** **Local Bankr. R. 6004-1(b)(iv)(C)** | N/A |
| **Private Sale/No Competitive Bidding** **Local Bankr. R. 6004-1(b)(iv)(D)** | N/A |
| **Closing Deadlines** **Local Bankr. R. 6004-1(b)(iv)(E)** **Art. II, § 2.8; Art. VIII** | The Closing shall take place on the second Business Day following the satisfaction of, to the extent permitted, waiver of, all conditions set forth in Article VIII of the Stalking Horse Agreement.  The Closing is contemplated as October 28, 2025. |
| **Good Faith Deposit** **Local Bankr. R. 6004-1(b)(iv)(F)** | N/A |
| **Interim Arrangements** **Local Bankr. R. 6004-1(b)(iv)(G)** **Art. II, § 2.8** | The Stalking Horse Agreement contemplates the Sellers and the Buyer entering into a Transition Services Agreement. |
| **Use of Proceeds** **Local Bankr. R. 6004-1(b)(iv)(H)** | N/A |
| **Tax Exemptions** **Local Bankr. R.** | N/A |

| Term (Agreement Citation) | Detail |
|---|---|
| 6004-1(b)(iv)(I)<br><br>Art. II, § 2.9 | |
| Record Retention<br><br>Local Bankr. R. 6004-1(b)(iv)(J)<br><br>Art. VI, § 6.2 | The Sellers shall have access to their books and records until the Closing. |
| Sale of Avoidance Actions<br><br>Local Bankr. R. 6004-1(b)(iv)(K)<br><br>Art. II, § 2.2 | The Stalking Horse Agreement does not contemplate the sale of Avoidance Actions. |
| No Successor Liability<br><br>Local Bankr. R. 6004-1(b)(iv)(L)<br><br>Art. VI, § 6.9 | The Stalking Horse Agreement provides that the Buyer is not a successor to any Seller or the bankruptcy estate of any Seller by reason of any theory of Law or equity. |
| Free and Clear of Unexpired Leases or Other Rights<br><br>Local Bankr. R. 6004-1(b)(iv)(M)<br><br>Art. VI, § 6.9 | The Stalking Horse Agreement contemplates that all obligations, Liabilities, and Encumbrances against or created by the Sellers, any of their Affiliates, or the estates, to the fullest extent permitted by section 363 of the Bankruptcy Code, shall be fully released from and with respect to the Transferred Assets and that on the Closing Date, the Transferred Assets shall be transferred to the Buyer free and clear of all obligations, Liabilities, and Encumbrances (other than any Permitted Encumbrances) to the fullest extent permitted by section 363 of the Bankruptcy Code. |
| Relief from Bankruptcy Rule 6004(h)<br><br>Local Bankr. R. 6004-1(b)(iv)(O)<br><br>Art. I | The Stalking Horse Agreement contemplates, but does not require, a waiver of Rule 6004. |

## THE PROPOSED SALE TIMELINE AND BIDDING PROCEDURES

18.     To ensure that the highest or otherwise best offer is received for the Assets, the

Debtors crafted the proposed Bidding Procedures to govern the submission of competing bids at

an Auction, all of which are contemplated and expressly permitted under the Stalking Horse Agreement. Accordingly, the Debtors seek the Court's approval of the Bidding Procedures set forth as <u>Annex 1</u> to the Bidding Procedures Order and incorporated herein in their entirety by this reference.

19. The Debtors' proposed timeline with respect to the Bidding Procedures, the Auction, the Sale Hearing, and the Sale is as follows:[8]

| Event | Date |
|---|---|
| Hearing to Consider Approval of Bidding Procedures | **September 22, 2025, subject to the Court's availability** |
| Service of Sale Notice and Cure Notice | **Three (3) business days after the entry of the Bidding Procedures Order** |
| Contract Objection Deadline | **October 9, 2025 at 4:00 p.m. (ET); Fourteen (14) days after service of a Cure Notice for Previously Omitted Contracts** |
| Sale Objection Deadline | **October 9, 2025 at 4:00 p.m. (ET)** |
| Bid Deadline | **October 13, 2025 at 4:00 p.m. (ET)** |
| Auction (if applicable) | **October 17, 2025 at 10:00 a.m. (ET)** |
| Deadline to file Notice of Successful Bidder | **Within twenty-four (24) hours of the conclusion of the Auction (if applicable)** |
| Buyer Specific Objection Deadline | **October 21, 2025 at 4:00 p.m. (ET)** |
| Sale Hearing | **October 23, 2025, subject to the Court's availability** |

20. The Debtors propose the following notice and objection timeline as it relates to the Sale, the Auction, and the Sale Hearing (the "**Sale Notice Procedures**"), and request notice of the Sale, the Auction, the Sale Hearing, and the Bidding Procedures Order be deemed adequate and sufficient if:

---

[8] The dates in this timeline are subject to the terms of the Bidding Procedures Order and the Bidding Procedures.

No later than three (3) business days after the entry of the Bidding Procedures Order, the Debtors (or their agent) shall serve by email or, if email is unavailable, by first class mail, a notice regarding the Sale (the "**Sale Notice**"), substantially in the form attached to the Proposed Order as __**Annex 2**__, on the following entities; *provided*, *however*, that the Debtors need not serve the Sale Notice on any party for whom the Debtors are unable to obtain, after reasonable diligence, an email or physical address as of the entry of the Bidding Procedures Order; *provided, further* that the Debtors shall not be obligated to provide supplemental service of the Sale Notice with respect to any Sale Notice that is returned to the Debtors as undeliverable so long as the Debtors have confirmed that any such Sale Notice was sent to the applicable email or physical address on file in the Debtors' books and records and no other email or physical address could be obtained after reasonable diligence:

(a)   the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**");

(b)   proposed counsel for any official committee (the "**Committee**") appointed in these chapter 11 cases;

(c)   counsel for the Stalking Horse Bidder, the DIP Agent, and the Existing Silverview Agent;

(d)   counsel for GCCP II Agent, LLC;

(e)   the United States Attorney for the District of Delaware;

(f)   the attorneys general for each of the states in which the Debtors conduct business operations;

(g)   the Internal Revenue Service;

(h)   the United States Securities and Exchange Commission;

(i)   all known taxing authorities for the jurisdictions to which the Debtors are subject;

(j)   all environmental authorities having jurisdiction over any of the Assets;

(k)   all entities known or reasonably believed to have asserted a Lien on any of the Assets;

(l)   counterparties to the Debtors' executory contracts and unexpired leases;

(m)   all persons that have expressed to the Debtors an interest in a transaction with respect to the Assets during the past six (6) months;

(n)   all of the Debtors' other known creditors and equity security holders;

(o)   the office of unclaimed property for each state in which the Debtors conduct business; and

(p)   those parties who have formally filed a request for notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002.

21.   In addition, the Debtors will upload an electronic copy of the Sale Notice and the Bidding Procedures Order (which will include the Bidding Procedures) to the data room maintained by Hilco.  The Debtors will also post the Sale Notice and the Bidding Procedures Order on the website of the Debtors' proposed claims and noticing agent: **https://dm.epiq11.com/pinstripes.**

22.   The Debtors also request the establishment of an objection deadline prior to the Sale Hearing such that any objections related to the proposed Sale be served upon (so as to be <u>actually received</u> by) the following parties (the "**Objection Notice Parties**") on or before **<u>4:00 p.m. (prevailing Eastern time) on October 9, 2025</u>** (the "**Sale Objection Deadline**"):

(a)   proposed counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: Michael R. Nestor, Esq. (mnestor@ycst.com), Sean M. Beach, Esq. (sbeach@ycst.com), Elizabeth S. Justison, Esq. (ejustison@ycst.com), and Shella Borovinskaya, Esq. (sborovinskaya@ycst.com);

(b)   the U.S. Trustee, 844 King Street, Room 2207, Wilmington, Delaware 19801, Attn: Benjamin A. Hackman, Esq. (Benjamin.A.Hackman@usdoj.gov);

(c)   counsel to the DIP Agent and the Existing Silverview Agent; and

(d)   proposed counsel to any Committee appointed in these chapter 11 cases.

23.   Certain of the key terms of the Bidding Procedures are highlighted below, in accordance with Local Rule 6004-1(c)[9]:

---

[9]   If there are any inconsistencies between the summary set forth herein and the Bidding Procedures, the terms and conditions of the Bidding Procedures shall govern.  Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures.

| Term | Detail |
|---|---|
| **Qualification of Bidders**<br><br>**Local Bankr. R. 6004-1(c)(i)(A)** | To participate in the bidding process or otherwise be considered for any purpose under the Bidding Procedures, a person or entity (other than any Stalking Horse Bidder) interested in consummating a Sale (a "**Potential Bidder**") must deliver or have previously delivered:<br><br>• an executed confidentiality agreement on terms acceptable to the Debtors to the extent not already executed;<br><br>• information demonstrating (in the Debtors' reasonable business judgment) that the Potential Bidder has the financial capability to consummate the applicable Sale, including, but not limited to, the most current audited and latest unaudited financial statements (the "**Financials**") of the Potential Bidder (or such other form of financial disclosure acceptable to the Debtors in their discretion) (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, (x) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtors, in consultation with (a) the legal and financial advisors for the Committee, if any, and (b) solely to the extent they are not an active or prospective bidder with respect to the relevant Assets, or are participating in any way in any active or prospective bid with respect to such relevant Assets, the legal advisors for the Consenting Lenders (collectively, the "**Consultation Parties**"), and (y) a written funding commitment acceptable to the Debtors and their advisors, in consultation with the Consultation Parties, of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the applicable Sale); and<br><br>A "**Qualified Bidder**" is a Potential Bidder whose Financials, or the Financials of its equity holder(s), as applicable, demonstrate the financial capability to consummate the applicable Sale and whose Bid is a Qualified Bid (as defined below), that the Debtors, in consultation with the Consultation Parties, determine should be considered a Qualified Bidder. Prior to the commencement of the Auction, the Debtors' advisors will (i) notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder; and (ii) provide to the Qualified Bidders for such Assets copies of all Qualified Bids with respect to such Assets. The Stalking Horse |

| Term | Detail |
|------|--------|
| | Bidder shall be deemed a Qualified Bidder at all times and for all purposes with respect to the Assets to which its Bid (the "**Stalking Horse Bid**") relates and shall be included in the use of the term "Qualified Bidder". |
| **Qualification of Bids**<br><br>**Local Bankr. R. 6004-1(c)(i)(B)** | A proposal, solicitation, or offer (each, a "**Bid**") by a Qualified Bidder that is submitted in writing and satisfies each of the following requirements as determined by the Debtors, in consultation with the Consultation Parties, shall constitute a "**Qualified Bid**").  The Stalking Horse Bid will be deemed a Qualified Bid for all purposes without any further action required by the Stalking Horse Bidder.<br><br>(a) **Identification of Bidder**.  Each Bid must fully disclose the following:  (i) the legal identity of each person or entity bidding for the Assets and/or otherwise sponsoring, financing (including through the issuance of debt in connection with such Bid) or participating in (including through license or similar arrangement with respect to the Assets to be acquired in connection with such Bid) the Auction in connection with such Bid and the complete terms of any such participation; and (ii) any past or present connections or agreements with the Debtors, any Stalking Horse Bidder, any other known Potential Bidder or Qualified Bidder, or any officer or director of any of the foregoing (including any current or former officer or director of the Debtors.<br><br>(b) **Assets**.  Each Bid must clearly state which Assets (including any executory contracts and unexpired leases) and liabilities of the Debtors the Qualified Bidders are agreeing to purchase and assume.  For the avoidance of doubt, a Bid may be on the Assets in either (i) individual lots, (ii) as a collective whole, or (iii) in any combination.<br><br>(c) **Purchase Price**.  Each Bid must clearly set forth the cash purchase price to be paid for the applicable Asset Category (the "**Purchase Price**"), *provided*, *however,* that the DIP Agent and Existing Silverview Agent shall be entitled to credit bid any portion of their outstanding secured obligations consistent with section 363(k) of the Bankruptcy Code with respect to any assets on which they hold liens in accordance with an order approving the Debtors' post-petition financing.  Each Bid must also specify how the Purchase Price is allocated among the Assets.<br><br>(d) **Minimum Bid**.  The Minimum Bid for the Assets subject to the Stalking Horse Bid is $17,100,000, equal to the Staking Horse Bid amount of $15,000,000, with respect to the credit bid, and $1,600,000, with respect to the cash component, plus the Minimum Overbid Increment of $500,000.<br><br>(e) **Deposit**.  Each Bid, other than the Stalking Horse Bid, must be accompanied by a cash deposit in the amount equal to 10% of the Purchase Price of the Bid, to be held in a segregated account to be identified and established by the Debtors (the "**Deposit**"). |

| Term | Detail |
|---|---|
|  | The Debtors reserve the right to increase the Deposit requirement. |
|  | (f) **Assumption of Obligations**.    Each Bid must identify the obligations contemplated to be assumed by such Bid, and be on terms in the aggregate (together with the other consideration contemplated in such Bid) no less favorable to the Debtors than the Stalking Horse Agreement (if any), as determined in the Debtors' business judgment, and after consultation with the Consultation Parties.  Other than the obligations to be assumed, the Assets shall be sold free and clear of all liens, claims, interests, and encumbrances (collectively, the "**Encumbrances**"), and any Encumbrances shall attach to the net proceeds of the Sales. |
|  | (g) **The Same or Better Terms**.    In addition to meeting or exceeding the applicable Minimum Bid, each Bid must be on terms that are no less favorable in the aggregate (together with the other consideration contemplated in such Bid), in the Debtors' business judgment and after consultation with the Consultation Parties, than the terms of the Stalking Horse Agreement.    Each Bid must include duly executed, non-contingent purchase agreement and other transaction documents necessary to effectuate the transactions contemplated in the Bid and shall include a schedule of assumed contracts to the extent applicable to the Bid.  Each Bid should be based on the form of the Stalking Horse Agreement and must include a copy of the Stalking Horse Agreement clearly marked to show all changes requested by the Qualified Bidder, including those relating to the respective Purchase Price and assets to be acquired by such Qualified Bidder, as well as all other material documents integral to such bid, including a form of sale order marked against the applicable sale order. |
|  | (h) **Committed Financing / Adequate Assurance Information**. To the extent that a Bid is not accompanied by evidence of the Qualified Bidder's capacity to consummate the Sale set forth in its Bid with cash on hand, each Bid must include committed financing documents to the satisfaction of the Debtors (in consultation with the Consultation Parties) that demonstrate that the Qualified Bidder has: (i) received sufficient debt and/or equity funding commitments to satisfy the Qualified Bidder's Purchase Price and other obligations under its Bid; and (ii) adequate working capital financing or resources to finance going concern operations for the Assets and the proposed transactions. |
|  | In addition to evidence of financial wherewithal to timely consummate the transaction, a Bid must include adequate assurance information with respect to any executory contracts or unexpired leases included or that may be included in the Bid in a form that allows the Debtors to serve such information on any |

| Term | Detail |
|------|--------|
|  | counterparties to any contracts or leases being assumed and assigned in connection with the Sale that have requested, in writing, such information. |
|  | (i) **Contingencies; No Financing or Diligence Outs**. A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions, which shall not be more burdensome, in the Debtors' business judgment, and after consultation with the Consultation Parties, than those set forth in the Stalking Horse Agreement (if any). |
|  | (j) **Demonstrated Financial Capacity**. A Qualified Bidder must have, in the Debtors' business judgment (in consultation with the Consultation Parties) the necessary financial capacity to consummate the proposed transactions required by its Bid (including, if necessary, to obtain transfer of any of the Debtors' licenses, permits and to obtain any necessary surety bonds or other financial assurances) and provide adequate assurance of future performance under all contracts proposed to be assumed by such Bid. |
|  | (k) **Time Frame for Closing**. Closing of the Sale as to any Asset related to a Bid by a Qualified Bidder (a "**Closing**") must be reasonably likely (based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, on or before October 28, 2025. |
|  | (l) **Binding and Irrevocable**. Except as provided herein, a Qualified Bidder's Bid for the Assets shall be irrevocable unless and until the Debtors (in consultation with the Consultation Parties) accept a higher Bid for such Assets and such Qualified Bidder is not selected as the Backup Bidder for such Assets. If selected as Backup Bidder, such Bid shall be irrevocable until the Closing of a Successful Bid for such Assets. |
|  | (m) **Expenses; Disclaimer of Fees**. Each Bid must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. |
|  | (n) **Authorization**. Each Bid must contain evidence that the Qualified Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid. |
|  | (o) **As-Is, Where-Is**. Each Bid must include a written acknowledgement and representation that the Qualified Bidder: (i) has had an opportunity to conduct any and all due diligence |

| Term | Detail |
|---|---|
| | regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidder's Bid or accompanying asset purchase agreement. |
| | (p) **Adherence to Bid Procedures**.  By submitting its Bid, each Qualified Bidder is agreeing to abide by and honor the terms of the Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction. |
| | (q) **Regulatory Approvals and Covenants**.  A Bid must set forth each regulatory and third-party approval required for the Qualified Bidder to consummate the applicable Sale, if any, and the time period within which the Qualified Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the asset purchase agreement, those actions the Qualified Bidder will take to ensure receipt of such approvals as promptly as possible) and any undertakings that will be required by the Debtors in connection with such regulatory and third party approvals.   For the avoidance of doubt, each Bid must acknowledge that consummation of such Bid shall not be contingent on obtaining government, regulatory, or other third-party approvals. |
| | (r) **Consent to Jurisdiction**.  The Qualified Bidder must submit to the jurisdiction of and entry of final orders by the Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of bids, the Auction, the construction and enforcement of these Bidding Procedures, the transaction documents related to the Sale, and the Closing, as applicable. |
| | (s) **Bid Deadline**.  Each Bid must be transmitted via email (in .pdf or similar format) so as to be <u>actually received</u> on or before 4:00 p.m. (prevailing Eastern Time) on October 13, 2025 (the "**Bid Deadline**") by the Objection Notice Parties. |
| **No-Shop or No-Solicitation Provisions**<br><br>**Local Bankr. R. 6004-1(c)(i)(C)(1)** | N/A |
| **Breakup Fee/Expense Reimbursement** | N/A |

| Term | Detail |
|---|---|
| Local Bankr. R. 6004-1(c)(i)(C)(2) | |
| **Bidding Increments**<br><br>**Local Bankr. R. 6004-1(c)(i)(C)(3)** | The initial Overbid for the Assets subject to the Stalking Horse Bid, if any, shall provide for total consideration to the Debtors with a value that exceeds the value of the consideration under the Baseline Bid for the Assets by an incremental amount that is not less than $500,000 in cash or credit bid. |
| **Treatment of Break-Up and Topping Fees at Auction**<br><br>**Local Bankr. R. 6004-1(c)(i)(C)(4)** | N/A |
| **Modifications of Bidding Procedures**<br><br>**Local Bankr. R. 6004-1(c)(i)(D)** | The Debtors reserve their rights to modify the Bidding Procedures in their reasonable business judgment, and in consultation with the Consultation Parties and with the consent of the Stalking Horse Bidder, in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Assets. |
| **Back-Up Bidder**<br><br>**Local Bankr. R. 6004-1(c)(i)(E)** | If an Auction is conducted for the Assets, the Qualified Bidder with the next-highest or otherwise second-best Bid at the Auction for such Assets, as determined by the Debtors in the exercise of their reasonable business judgment, and in consultation with the Consultation Parties (the "**Backup Bid**"), shall be required to serve as a backup bidder (the "**Backup Bidder**") for such Assets, and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors.<br><br>The identity of the Backup Bidder and the amount and material terms of the Backup Bid shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder.  The Backup Bidder shall be required to keep its Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable until the closing of the transaction with the applicable Successful Bidder or as otherwise provided in the Stalking Horse Agreement.  The Backup Bidder's Deposit shall be held in escrow until the closing of the transaction with the applicable Successful Bidder or as otherwise provided in the Stalking Horse Agreement.<br><br>If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors may select the applicable Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes.  The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party.  The defaulting Successful Bidder's Deposit shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all remedies available against the defaulting Successful Bidder, including specific performance, if applicable, unless otherwise provided in the Stalking |

| Term | Detail |
|---|---|
| | Horse Agreement should the Stalking Horse Bidder be the Successful Bidder.  For the avoidance of doubt, if the Deposit becomes property of the Debtors' estates, the Deposit shall be subject to the liens and super-priority claims granted in favor of the DIP Lender under the interim order authorizing the Debtors to obtain postpetition financing and related relief and the final order thereon. |

## THE PROPOSED ASSUMPTION PROCEDURES

24.     To facilitate and effect the Sale of the Assets, the Debtors seek authority to assume and assign the Assumed Contracts, consistent with the procedures established in the Bidding Procedures Order and the Stalking Horse Agreement (the "**Assumption Procedures**"). The Debtors propose that the Assumption Procedures apply whether the Stalking Horse Bidder or any other party or parties are the Successful Bidders.

25.     The proposed Assumption Procedures are as follows:

(a)     Notice.  Within three (3) business days from the entry of the Bidding Procedures Order, or as soon as practicable thereafter, the Debtors shall file and serve by email or, if email is unavailable, by first class mail, on all counterparties (the "**Counterparties**") to their executory contracts and unexpired leases (the "**Contracts**") a notice, substantially in the form attached to the Proposed Order as **Annex 3** (the "**Cure Notice**"); *provided*, *however*, that the Debtors need not serve the Cure Notice on any party for whom the Debtors are unable to obtain, after reasonable diligence, an email or address as of the entry of the Bidding Procedures Order; *provided*, *further* that the Debtors shall not be obligated to provide supplemental service of the Cure Notice with respect to any Cure Notice that is returned to the Debtors as undeliverable so long as the Debtors have confirmed that any such Cure Notice was sent to the applicable email or physical address on file in the Debtors' books and records and no other email or physical address could be obtained after reasonable diligence.

(b)     Content of the Cure Notice.  The Cure Notice will include the following information on a schedule attached thereto (the "**Executory Contracts Schedule**"): (a) the potential assumption by the Debtors and assignment to the Successful Bidder(s) of the Contracts, and (b) the proposed amount necessary, under section 365(b)(1) of the Bankruptcy Code, to cure any outstanding monetary defaults and compensate the Counterparties for any pecuniary losses in connection with such assumption and assignment (the "**Proposed Cure Amounts**").

(c)    <u>Previously Omitted Contracts</u>.  If at any time after the issuance of the Cure Notice but prior to the Sale Hearing it is discovered that a Contract should have been listed on the Executory Contracts Schedule but was not (any such Contract, a "**Previously Omitted Contract**"), the Debtors shall (in consultation with the Consultation Parties), promptly following discovery thereof (but in no event later than two (2) Business Days following discovery thereof), file and serve a notice on the non-Debtor counterparty(ies) to such Previously Omitted Contract notifying such counterparties of the Debtors' intention to assume and assign such Previously Omitted Contract to the Successful Bidder, including the Proposed Cure Amounts relating thereto (the "**Previously Omitted Contract Notice**").

(d)    <u>Objections</u>.  Each Counterparty shall have until 4:00 p.m. (prevailing Eastern time) on the date that is fourteen (14) days after the filing and service by the Debtors to the Counterparty of the Cure Notice or the Previously Omitted Contract Notice (as applicable) (the "**Contract Objection Deadline**") to object to the assumption and assignment of its Contract on any grounds, including, without limitation, the amount of the Proposed Cure Amounts (and must state, in its objection, with specificity, what cure amount is required with appropriate documentation in support thereof) and the provision of adequate assurance of future performance by the Stalking Horse Bidder.  Any unresolved objections shall be heard at the Sale Hearing, unless otherwise agreed by the parties; provided that the Debtors shall have the right to adjourn any Sale Hearing without the consent of any objecting party.  If any objections to the amount of Proposed Cure Amounts remain unresolved as of the date of the Closing of the Sale, the Debtors may (but are not required to) deposit the disputed amount of Proposed Cure Amounts in a segregated account to hold pending resolution of such objections.

Each Counterparty may raise objections as to adequate assurance of future performance by, or on the basis of the identity of, the Successful Bidder, other than the Stalking Horse Bidder, until 4:00 p.m. (prevailing Eastern time) on October 21, 2025 (the "**Buyer Specific Objection Deadline**").  Any such objection must be filed and served on the Debtors and their counsel, the Committee and its counsel, and the applicable Successful Bidder or Stalking Horse Bidder, as applicable, and its counsel, so as to be actually received by the Buyer Specific Objection Deadline.  Any such unresolved objections shall be heard at the Sale Hearing, unless otherwise agreed by the parties.

## RELIEF REQUESTED

26.    By this Motion, the Debtors request entry of:    (a) the proposed Bidding Procedures Order, (i) approving Bidding Procedures to govern the marketing and sale of the Assets, (ii) authorizing the Debtors to schedule the Auction and scheduling the Sale Hearing, (iii) approving the designation of the Stalking Horse Bidder and the Stalking Horse Bid;

(iv) approving the form and manner of notice of the proposed Sale, the Bidding Procedures, the Auction, the Sale Hearing, and related dates and deadlines, (v) authorizing procedures governing the assumption and assignment of the Contracts to the Successful Bidder(s), and (vi) granting related relief; and (b) the Sale Order (i) approving the applicable form(s) of purchase agreement between the Debtors and the Stalking Horse Bidder or any other Successful Bidder(s), and (ii) authorizing the Sale of the Assets and the assumption and assignment of the Assumed Contracts to the Stalking Horse Bidder or such other Successful Bidder free and clear of all Liens, other than any permitted Liens as set forth in the applicable form(s) of purchase agreement.

## **BASIS FOR RELIEF**

### **THE SALE OF THE ASSETS REFLECTS A SOUND EXERCISE OF THE DEBTORS' BUSINESS JUDGMENT.**

27.     Selling the Assets as proposed herein is critical to maximizing value in these chapter 11 cases and, therefore, should be approved as reflecting a sound exercise of the Debtors' business judgment.  Section 363(b) of the Bankruptcy Code provides, in relevant part, that a debtor "may use, sell, or lease, other than in the ordinary course of business, property of the estate" after notice and a hearing.  11 U.S.C. § 363(b)(1).  Generally, the debtor is only required to "show that a sound business purpose" justifies the proposed use of property.  *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *see also In re Phoenix Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (requiring "good business reason" for use under section 363(b) of the Bankruptcy Code).  This standard prohibits other parties from second-guessing the debtor's business judgment if the debtor has shown that the proposed use will benefit the debtor's estate.  *See In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as

22

distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").

28.     The Debtors determined to undertake a sale of substantially all of their Assets after careful consideration of all potential alternatives.  Of the available alternatives, the Sale was and remains the only means to obtaining the greatest value for the Assets and distributing that value to the Debtors' stakeholders in accordance with their legal priorities.  The Debtors already have a baseline Stalking Horse Bid and now seek to continue the marketing process with the added benefits of a Court-approved section 363 sale process.  As discussed above, Hilco is continuing the Debtors' pre-petition marketing process and is scouring the market for potentially interested bidders.  After this market check, coupled with the Debtors' prepetition marketing efforts, the Debtors, their creditors, and other parties in interest can be confident that the Debtors will have obtained the highest and best value for the Assets.

**APPROVAL OF THE SALE NOTICE PROCEDURES AND BIDDING PROCEDURES IS APPROPRIATE AND IN THE BEST INTERESTS OF THE DEBTORS' ESTATES.**

**A.     The Proposed Notice of Sale, Bidding Procedures, Auction and Sale Hearing, and the Sale Objection Deadline Are Appropriate.**

29.     As described above, the Debtors submit that the Sale Notice Procedures and the Sale Objection Deadline comply with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Bidding Procedures, the Auction, the Sale Hearing, and the Sale to the Debtors' creditors and other parties in interest, and, if the Debtors believe that additional entities have a legitimate interest, then also to those who have expressed an interest, or may express an interest, in bidding on the Assets.  Based upon the foregoing, the Debtors

respectfully request that the Court approve the Sale Notice Procedures and the Sale Objection Deadline proposed above.

> **B.**     **The Bidding Procedures Are Appropriate and Will Maximize the Value of the Assets.**

30.     Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets from the estate.  *See, e.g.*, *In re Efoora, Inc.*, 472 B.R. 481, 488 (Bankr. N.D. Ill. 2012) ("A trustee has considerable discretion when it comes to the sale of estate assets, and that discretion is entitled to great judicial deference as long as a sound business reason is given.") (internal quotations and citations omitted).

31.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See, e.g.*, *Corp. Assets, Inc. v. Paloian*, 368 F.3d 761, 765 (7th Cir. 2004) (in a bankruptcy sale, the "governing principle . . . is to secure the highest price for the benefit of the estate and creditors").

32.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy sales.  *See, e.g.*, *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999); *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (observing that bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets.").

33.     The Debtors believe that the Bidding Procedures will establish sound parameters by which the proffered sale price of the Assets under the Stalking Horse Agreement may be tested and evaluated as described herein.  Such procedures will increase the likelihood that the Debtors will receive the greatest possible consideration for the Assets because they will ensure a

competitive and fair bidding process. The Bidding Procedures will also allow the Debtors to undertake the Auction process in an orderly fashion, which the Debtors believe is essential to maintaining and maximizing the value of its estate.

34.     The Debtors believe that the Auction and proposed Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction. The Debtors also believe that the Bidding Procedures will encourage active bidding for the Assets, are consistent with other procedures previously approved by courts in this and other circuits, and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.

35.     Thus, the proposed Bidding Procedures are reasonable, appropriate, and within the Debtors' sound business judgment under the circumstances because they will serve to maximize the value that the Debtors will obtain on account of the Sale of the Assets.

**THE INITIAL AND SUBSEQUENT OVERBID AMOUNTS ARE APPROPRIATE.**

36.     The Debtors submit that the proposed requirements for a Minimum Bid and Overbid are appropriate and should be approved. Courts frequently authorize debtors to require bidders to submit minimum initial bids to ensure that the debtors receive the highest and best offers possible in asset sales. In addition, the Debtors intend to conduct the Auction such that each bid at the Auction is higher or otherwise better than the previous bid. To this end, incorporating the concept of overbids in the Bidding Procedures is reasonable under the circumstances and will enable the Debtors to maximize the value for the sale of their assets while limiting any chilling effect on the Sale process. *See, e.g.*, *In re Phasebio Pharm., Inc.*, Case No. 22-10995 (LSS) (Bankr. D. Del. Nov. 28, 2022) (authorizing bidding procedures with an initial overbid increment of $1,000,000 or 2.5% of purchase price, plus break-up fees and expense

reimbursements in the amount of $2,750,000); *In re Avadim Health, Inc.*, Case No. 21-10883 (CTG) (Bankr. D. Del. June 23, 2021) (authorizing bidding procedures with an initial overbid increment of $250,000);  *In re Ruby Pipeline*, Case No. 22-10278 (CTG) (Bankr D. Del. Sept. 8, 2022) (authorizing bidding procedures requiring minimum overbid amount to be announced by the debtor at auction); *In re Sequential Brands Grp., Inc.*, Case No. 21-11194 (JTD) (Bankr. D. Del. Sept. 24, 2021) (same).

**THE PROPOSED ASSUMPTION PROCEDURES ARE APPROPRIATE.**

37.     In connection with the Sale, the Debtors believe it is necessary to establish a process by which:  (a) the Debtors and Counterparties can reconcile the Proposed Cure Costs, if any, in accordance with section 365 of the Bankruptcy Code; and (b) Counterparties can object to the assumption and assignment of the Contracts or related Proposed Cure Costs.  As described above, the proposed Assumption Procedures comply with Bankruptcy Rule 2002 and provide all Counterparties with due and adequate notice of the potential assumption and assignment of their Contracts, the Contract Objection Deadline and the Buyer Specific Objection Deadline, and the time and place for the Sale Hearing.

38.     Therefore, the Debtors respectfully request that the Court approve the Assumption Procedures.

**APPROVAL OF THE PROPOSED SALE TRANSACTION IS APPROPRIATE AND IN THE BEST INTERESTS OF THE DEBTORS' ESTATES.**

39.     In accordance with Bankruptcy Rule 6004(f)(1), sales of property rights outside the ordinary course of business may be by private sale or public auction.  The Debtors determined that a public Auction of the Assets will enable the Debtors to obtain the highest or otherwise best offer in a Sale of their Assets at this time and is in the best interests of the Debtors, their estate, and their creditors.  However, if after the Bid Deadline, the Debtors have

not received a Bid that is actionable or exceeds the value of the Stalking Horse Agreement, the Debtors will file a certification of counsel or notice with the Court indicating that the Debtors have not received a bid that is higher or otherwise better than the Stalking Horse Agreement, and the Debtors will request that the Court approve the Stalking Horse Bid at the Sale Hearing (or earlier).  In light of the Debtors' extensive pre-petition marketing and sale process, the Debtors believe that potential bidders have had ample time to engage with the Debtors, conduct diligence, and secure financing, and that a process that provides the Debtors the opportunity to test the market for the Assets postpetition, but also maintains optionality to pivot from a public auction process to a private sale with the Stalking Horse Bidder will best achieve value for all stakeholders and eliminate unnecessary administrative expenses.

**A.    The Sale of Assets and Assumed Contracts Free and Clear of Liens Is Authorized by Section 363(f) of the Bankruptcy Code.**

40.    The Debtors further submit that it is appropriate to sell the Assets and to assign the Assumed Contracts free and clear of all Liens, other than Assumed Liabilities and permitted Liens, as set forth in the Stalking Horse Agreement or in the purchase agreement with the Successful Bidder(s) pursuant to section 363(f) of the Bankruptcy Code, with any such Liens attaching to the net sale proceeds of the Assets, as and to the extent applicable.

41.    Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances if:

> (a)  applicable nonbankruptcy law permits sale of such property free and clear of such interests;

> (b)  such entity consents;

> (c)  such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

> (d)  such interest is in *bona fide* dispute; or

(e) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

42.     The Debtors believe that one or more of the tests of section 363(f) are satisfied with respect to the transfer of the Assets and the assignment of the Assumed Contracts pursuant to the Stalking Horse Agreement or an applicable purchase agreement of another Successful Bidder.  In particular, the Debtors believe that section 363(f)(2) of the Bankruptcy Code will be met because the Assets do not contain any collateral subject to GCCP II Agent, LLC's Liens, and Silverview, who holds first priority liens on the remaining collateral, is consenting to the Sale on the terms set forth in the Stalking Horse Agreement, subject to higher or better terms as may be set forth in an alternative asset purchase agreement and acceptable to the DIP Agent.  Moreover, with respect to any other parties asserting a Lien, claim, or Encumbrance against the Assets, the Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f) of the Bankruptcy Code.  In particular, known lienholders will receive notice and will be given sufficient opportunity to object to the relief requested.  Such lienholders that do not object to the Sale should be deemed to have consented.[10]  Furthermore, the Debtors propose that any Liens asserted against the Assets be transferred to and attach to the proceeds of the Sale.

**B.      The Stalking Horse Bidder Is a Good Faith Purchaser and Is Entitled to the Full Protections of the Bankruptcy Code.**

43.     The Debtors believe that the Stalking Horse Agreement has been submitted in good faith and has been, and will continue to be, negotiated in good faith and at arm's-length.

---

[10]     *See FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285-86 (7th Cir. 2002) ("[L]ack of objection (provided of course there is notice) counts as consent.  It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); *Hargrave v. Twp. of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (holding that creditor's failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); *In re Elliot*, 94 B.R. at 345 (same).

Thus, the Stalking Horse Bidder is entitled to the full protections of section 363(m) of Bankruptcy Code, which provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

44.    While the Bankruptcy Code does not define "good faith," several Circuit Courts have determined that:

> The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

*In re Andy Frain Servs., Inc.*, 798 F.2d 1113, 1125 (7th Cir. 1986) (quoting *In re Rock Indus. Machinery Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978); *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986). There has been no fraud, improper insider dealing, or collusion in connection with the negotiation or submission of the Stalking Horse Agreement.

45.    The Stalking Horse Bidder or other Successful Bidder(s) should receive the protections afforded good faith purchasers by section 363(m) of the Bankruptcy Code and the Court should find that section 363(n) of the Bankruptcy Code does not apply. Accordingly, the Debtors request that the Court make a finding at the Sale Hearing and in the Sale Order that the purchase agreement reached with the Stalking Horse Bidder or any other Successful Bidder(s) was at arm's-length and is entitled to the full protections of section 363(m) of the Bankruptcy Code.

**C.  Credit Bidding Should Be Authorized Under Section 363(k) of the Bankruptcy Code.**

46.     A secured creditor is allowed to "credit bid" the amount of its claim in a sale. Section 363(k) of the Bankruptcy Code provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property."  11 U.S.C. § 363(k).  Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the claim's economic value.

47.     The Bidding Procedures allow Silverview to credit bid up to the full amount of its secured debt and otherwise preserve Silverview's right to credit bid pursuant to section 363(k) of the Bankruptcy Code, and this aspect of the Bidding Procedures should therefore be approved.

**D.  Assumption and Assignment of the Assumed Contracts Is Authorized by the Bankruptcy Code.**

48.     Sections 365(a) and (b) of the Bankruptcy Code authorize a debtor-in-possession to assume, subject to the court's approval, executory contracts or unexpired leases of the debtor. Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a). Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee —
>
> (A)  cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;

(B)     compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)     provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

49.     The standard applied by courts to determine whether an executory contract or unexpired lease should be assumed is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate.  *See ReGen Capital I, Inc. v. UAL Corp. (In re UAL Corp.)*, 635 F.3d 312, 319 (7th Cir. 2011) ("The bankruptcy court reviews the debtor's business judgment with respect to the proposed assumption to determine if it would be beneficial or burdensome to assume the executory contract by evaluating whether assumption would serve the reorganization or whether it would take away funds available to other creditors.") (citing *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993)); *In re Network Access Sols., Corp.*, 330 B.R. 67, 75 (Bankr. D. Del. 2005).

50.     As set forth above, the Sale will yield the maximum value for the Debtors' estates and the Debtors expect that value may be achieved through the assumption, assignment, and sale of the Assumed Contracts.  In addition, under section 365(k) of the Bankruptcy Code, a debtor's assignment of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment."  11 U.S.C. § 365(k).  Thus, following an assignment to a Successful Bidder of an Assumed Contract, the Debtors will be relieved from any liability for any subsequent breach associated therewith.

51.     Furthermore, section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assumed Contracts be cured or that adequate assurance be

provided that such defaults will be promptly cured.  11 U.S.C. § 365(b)(1).  The Debtors propose to file with the Court, and serve on each Counterparty to a Contract, a Cure Notice that indicates the Proposed Cure Amount for each such contract.  As such, each Counterparty will have the opportunity to object to the proposed assumption and assignment to the Successful Bidder and to the Proposed Cure Amount, if applicable.  Moreover, the payment or reserve of the applicable Proposed Cure Amounts, as provided for in the Bidding Procedures, will be a condition to the Debtors' assumption and assignment of any Assumed Contracts.

52.    Relatedly, section 365(f)(2) of the Bankruptcy Code provides that a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided." 11 U.S.C. § 365(f)(2).  The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in light of the facts and circumstances of the proposed assumption.[11]  Specifically, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.[12]

53.    Here, any Successful Bidder will have provided adequate assurance of future performance with respect to any Assumed Contract.  For a bid to be deemed a Qualifying Bid, each Qualifying Bidder will be required to provide evidence supporting its ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if

---

[11]  *See In re Fleming Cos., Inc.*, 499 F.3d 300, 307 (3d Cir. 2007) (internal citation omitted); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (same*); see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (finding that adequate assurance of future performance does not mean absolute assurance that debtor will thrive and profit); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

[12]  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (holding that adequate assurance of future performance is given where the assignee of lease has financial resources and expressed a willingness to devote sufficient funding to the business to ensure its success, and that in the leasing context, the chief determinant of adequate assurance is whether rent will be paid).

applicable, section 365(b)(3) of the Bankruptcy Code.  Furthermore, given that the Debtors will submit evidence at the Sale Hearing that all requirements for the assumption and assignment of the Contracts have been satisfied, the Court and other interested parties will have the opportunity to evaluate the ability of the Successful Bidder to provide adequate assurance of future performance.

54.     Therefore, the Debtors respectfully request that the Court approve the proposed assumption and assignment of the Assumed Contracts.

55.     In addition, to assist in the assumption, assignment, and sale of the Assumed Contracts, the Debtors also request that the Sale Order provide that anti-assignment provisions in the Assumed Contracts shall not restrict, limit, or prohibit the assumption, assignment, and sale of the Assumed Contracts and are deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

## NOTICE

56.     Notice of this Motion will be given to:  (a) the U.S. Trustee; (b) counsel to the DIP Agent and Existing Silverview Agent; (c) the creditors listed on the Debtors' consolidated list of thirty (30) creditors holding the largest unsecured claims against the Debtors; (d) the United States Attorney for the District of Delaware; (e) the Internal Revenue Service; (f) the state attorneys general for states in which the Debtors conduct business; (g) the United States Securities and Exchange Commission; (h) all persons known or reasonably believed to have asserted an interest in the Assets within the last six months; (i) all parties who have asserted liens against the Assets; and (j) all parties entitled to notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

**WHEREFORE**, the Debtors respectfully request that the Court enter the proposed Bidding Procedures Order granting the relief requested in this Motion and such other and further relief as may be just and proper.

Dated: September 8, 2025
      Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Shella Borovinskaya*
Michael R. Nestor (No. 3526)
Sean M. Beach (No. 4070)
Elizabeth S. Justison (No. 5911)
Shella Borovinskaya (No. 6758)
Rodney Square
1000 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Emails:  mnestor@ycst.com
        sbeach@ycst.com
        ejustison@ycst.com
        sborovinskaya@ycst.com

*Proposed Counsel for the Debtors and Debtors in Possession*

**EXHIBIT A**

**Proposed Bidding Procedures Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| PINSTRIPES HOLDINGS, INC., *et al.*,[1] | Case No. 25-11677 (____) |
| Debtors. | (Jointly Administered) |
| | Ref. Docket No. __ |

**ORDER (I) APPROVING BIDDING PROCEDURES
IN CONNECTION WITH THE SALE OF THE DEBTORS' ASSETS;
(II) APPROVING FORM AND MANNER OF NOTICE; (III) APPROVING
DESIGNATION OF STALKING HORSE BIDDER AND STALKING HORSE BID;
(IV) SCHEDULING AUCTION AND SALE HEARING; (V) AUTHORIZING
PROCEDURES GOVERNING ASSUMPTION AND ASSIGNMENT OF CERTAIN
CONTRACTS AND UNEXPIRED LEASES; AND (VI) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "**Motion**")[2] of the Debtors, for the entry of an

order (this "**Order**"):  (i) approving bidding procedures, substantially in the form attached as

**Annex 1** hereto (the "**Bidding Procedures**"), to govern the marketing and sale of all or

substantially all of the Debtors' assets (the "**Assets**"); (ii) authorizing the Debtors to schedule an

auction to sell the Assets (the "**Auction**") and scheduling the hearing to approve a sale of the

Assets (the "**Sale Hearing**"); (iii) approving designation of Stalking Horse Bidder and Stalking

Horse Bid; (iv) approving the form and manner of notice of the proposed sale transactions, the

Bidding Procedures, the Auction, the Sale Hearing, and related dates and deadlines;

(v) authorizing procedures governing the assumption and assignment of certain executory

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Pinstripes Holdings, Inc. (6699); Pinstripes, Inc. (8608); Pinstripes Hillsdale LLC (6064); Pinstripes at Prairiefire, Inc. (7018); and Pinstripes Illinois, LLC (6432).  For purposes of these chapter 11 cases, the Debtors' service address is 1150 Willow Road, Northbrook, Illinois 60062.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Stalking Horse Agreement and the Motion, as applicable, and to the extent of any inconsistency in the defined terms, the Stalking Horse Agreement shall govern.

contracts and unexpired leases (the "**Assumed Contracts**") to the prevailing bidder(s) acquiring the Debtors' assets (each, a "**Successful Bidder**"); and (vi) granting related relief, as more fully described in the Motion; and the Court having reviewed the Motion and the First Day Declaration; and upon consideration of the First Day Declaration and the record of these chapter 11 cases; and due and proper notice of the Motion having been given; and it appearing that no other or further notice of the Motion is required except as otherwise provided herein; and it appearing that this Court has jurisdiction to consider the Motion in accordance with 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order; and it appearing that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and it appearing that venue of this proceeding and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having reviewed the Motion and having heard the statements in support of the relief requested in the Motion at a hearing before this Court, if any; and it appearing that the relief requested in the Motion and provided for herein is in the best interest of the Debtors, their estates, and their creditors; and after due deliberation and sufficient cause appearing therefore,

**IT IS HEREBY FOUND AND CONCLUDED THAT**:[3]

A.    The statutory bases for the relief requested in the Motion are sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), Rules 2002, 3007, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rules 2002-1 and 6004-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware.

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      Good and sufficient notice of the Motion was given and no further notice is required except as otherwise provided for herein.  A reasonable opportunity to object or be heard regarding the relief granted by this Order has been afforded to those parties entitled to notice pursuant to Bankruptcy Rule 2002 and all other interested parties.

C.      The Debtors and their advisors, including former pre-petition advisors, engaged in a robust and extensive sale process before the commencement of these chapter 11 cases, over a period of nine months, to solicit and develop offers for the Assets.

D.      The Debtors have articulated good and sufficient reasons for the Court to grant the relief requested in the Motion regarding the sale process and Bidding Procedures, including (a) the scheduling of the Bid Deadline (as defined in the Bidding Procedures), the Auction, and the Sale Hearing with respect to the proposed sale of the Assets; (b) the establishment of procedures to fix the Proposed Cure Amounts (as defined below) to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption, assignment, and/or transfer of the Assumed Contracts; (c) designation of the Stalking Horse Bidder and Stalking Horse Bid; and (d) approval and authorization to serve the Sale Notice.

E.      The Sale Notice (in substantially the form annexed hereto as **Annex 2**), is reasonably calculated to provide all interested parties with timely and proper notice of the Bidding Procedures, the Auction, the Sale Hearing, and the Sale and any and all objection deadlines related thereto.

F.      The Cure Notice (in substantially the form annexed hereto as **Annex 3**) is reasonably calculated to provide all non-Debtor counterparties (the "**Counterparties**") to the Debtors' executory contracts and unexpired leases (each, a "**Contract**" and, collectively, the "**Contracts**") with reasonable and proper notice of the potential assumption and assignment of

their Contract and any cure amounts relating thereto, although the mere listing of any Contract on the Cure Notice does not require or guarantee that such Contract will be assumed and assigned and all rights of the Debtors and Stalking Horse Bidder with respect to such Contracts are reserved (including, but not limited to, with respect to whether any Contract constitutes an executory contract and whether any Contract shall be an Assumed Contract under the Stalking Horse Agreement.

G.      The Stalking Horse Agreement was negotiated by the Debtors, their advisors, the Stalking Horse Bidder, and its advisors, in good faith and at arms'-length.  The Stalking Horse Bid represents the highest or best offer the Debtors received during the pre-petition sale process and provides the Debtors with the opportunity to sell the Assets in a competitive auction process while continuing certain of the Debtors' operations, preserving jobs, minimizing disruption to the Debtors' business, and, accordingly, will provide a clear benefit to the Debtors' estates, their creditors, and all other parties in interest.. Without the Stalking Horse Bid, the Debtors would likely realize a lower price for the Assets. As such, the contributions of the Stalking Horse Bidder to the process have indisputably provided a substantial benefit to the Debtors, their estates, and creditors in these chapter 11 cases.

H.      The Stalking Horse Bidder shall act as the "stalking horse bidder" pursuant to the Stalking Horse Agreement and the Stalking Horse Bid shall be subject to higher or better offers in accordance with the Bidding Procedures.  The Stalking Horse Bidder is not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders exists between the Stalking Horse Bidder and the Debtors.  Pursuit of the Stalking Horse Bidder as a "stalking-horse" bidder and its Stalking Horse Bid as a "stalking-horse" purchase agreement is in

the best interests of the Debtors and the Debtors' estates and creditors, and it reflects a sound exercise of the Debtors' business judgment.

I.      The Bidding Procedures are fair, reasonable, and appropriate under the circumstances and designed to maximize the recovery on, and realizable value of, the Assets, as determined by the Debtors' sound business judgment.  The Bidding Procedures were negotiated in good faith and at arms'-length and are reasonably designed to promote a competitive and robust bidding process to generate the greatest level of interest in the Debtors' business resulting in the highest or otherwise best offer.  The Bidding Procedures comply with the requirements of Local Rule 6004-1.

J.      The entry of this Order is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.

**IT IS HEREBY ORDERED THAT**:

1.      The Motion is **GRANTED** as set forth herein.

## **Bidding Procedures**

2.      The Bidding Procedures, substantially in the form attached hereto as **Annex 1**, are hereby approved and fully incorporated herein.  The Debtors are authorized, but not directed, to take any and all actions necessary or appropriate to implement the Bidding Procedures.

3.      All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are overruled except as otherwise set forth herein.

**Stalking Horse Bid and Stalking Horse Bidder**

4.      The Debtors are authorized to enter into the Stalking Horse Agreement, subject to higher or otherwise better offers, in accordance with this Order and the terms and procedures of the Bidding Procedures.

5.      The Stalking Horse Bidder is a Qualified Bidder and the bid reflected in the Stalking Horse Bid (including as may be increased at the Auction (if any)) is a Qualified Bid, as set forth in the Bidding Procedures.

6.      The Stalking Horse Bidder is designated as such for purposes of the Bidding Procedures.

**Notice Procedures**

7.      The Sale Notice, substantially in the form attached hereto as **Annex 2**, is hereby approved and shall be served within three (3) business days of entry of this Order, upon the Notice Parties identified in the Motion.  Service of the Sale Notice as described in the Motion shall be sufficient and proper notice of the Sale and sale process contemplated by this Order with respect to all known interested parties.

**Assignment Procedures**

8.      The Cure Notice, substantially in the form attached hereto as **Annex 3**, is hereby approved.  The Cure Notice shall identify the Contracts of the Debtors that may be assumed and assigned in connection with the sale of the Assets and provide the corresponding cure amounts that the Debtors believe must be paid to cure all defaults under each of the Contracts as contemplated by section 365 of the Bankruptcy Code (the "**Proposed Cure Amounts**").  No later than three (3) business days after entry of this Order, the Debtors shall serve the Cure Notice on all Counterparties.  If at any time after the issuance of the Cure Notice but prior to the Sale Hearing it is discovered that a Contract should have been listed on the Executory Contracts

6

Schedule but was not (any such Contract, a "**Previously Omitted Contract**"), the Debtors shall, promptly following discovery thereof (but in no event later than two (2) business days following discovery thereof), file and serve a notice on the non-Debtor counterparty(ies) to such Previously Omitted Contract notifying such counterparties of the Debtors' intention to assume and assign such Previously Omitted Contract to the Successful Bidder, including the Proposed Cure Amounts relating thereto (the "**Previously Omitted Contract Notice**").

## Objection Procedures

9.      Notwithstanding anything to the contrary in the Motion, any objection to any aspect of the relief requested in the Motion must:  (i) be in writing and filed with this Court; (ii) comply with the Bankruptcy Rules; (iii) set forth the name of the objecting party, the nature and amount of any claims or interests held or asserted against the Debtors' estates or properties, the basis for the objection, and the specific grounds therefor; and (iv) be served upon (so as to be received by) the following parties (collectively, the "**Objection Notice Parties**") by the applicable deadline established in this Order:

(a)     proposed counsel for the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: Michael R. Nestor, Esq. (mnestor@ycst.com), Sean M. Beach, Esq. (sbeach@ycst.com), Elizabeth S. Justison, Esq. (ejustison@ycst.com), and Shella Borovinskaya, Esq. (sborovinskaya@ycst.com);

(b)     counsel for the DIP Agent and Existing Silverview Agent, Blank Rome LLP, 1201 Market Street, Suite 800, Wilmington, Delaware 19801, Attn: Regina Stango Kelbon, Esq. (regina.kelbon@blankrome.com), John Lucian, Esq. (john.lucian@blankrome.com), Stanley B. Tarr, Esq. (stanley.tarr@blankrome.com) and Alston & Bird LLP, 90 Park Avenue, 15th Floor, New York, New York 10016, Attn: James Vincequerra, Esq. (james.vincequerra@alston.com) and Stephen Blank, Esq. (stephen.blank@alston.com);

(c)     the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware, 19801, Attn: Benjamin A. Hackman, Esq. (Benjamin.A.Hackman@usdoj.gov); and

(d)      counsel to any official committee of creditors.

10.      Objections, other than the objections served pursuant to paragraph 12, below, if any, to the relief requested in the Motion shall be considered at the Sale Hearing, other than objections expressly described in paragraph 11 of this Order, and must be served upon (such as to be received by) the Objection Notice Parties, **on or before 4:00 p.m. (prevailing Eastern Time) on October 9, 2025 (the "Sale Objection Deadline"**); *provided,* that objections, if any, to material modifications to the form of Sale Order with a Successful Bidder and to the form of asset purchase agreement with a Successful Bidder other than the Stalking Horse Bidder, must be made by the Buyer Specific Objection Deadline (defined below).

11.      Each Counterparty shall have until 4:00 p.m. (prevailing Eastern time) on the date that is fourteen (14) days after the filing and service by the Debtors to the Counterparty of the Cure Notice or the Previously Omitted Contract Notice (as applicable) (the "**Contract Objection Deadline**") to object to the assumption and assignment of its Contract on any grounds, including, without limitation, (a) the amount of the Proposed Cure Amounts (and must state, in its objection, with specificity, what cure amount is required with appropriate documentation in support thereof) and (b) the provision of adequate assurance of future performance by the Stalking Horse Bidder.  Any unresolved objections shall be heard at the Sale Hearing, unless otherwise agreed by the parties; provided that the Debtors shall have the right to adjourn any Sale Hearing without the consent of any objecting party.

12.      Each Counterparty may raise objections as to adequate assurance of future performance by, or on the basis of the identity of, the Successful Bidder, other than the Stalking Horse Bidder, until October 21, 2025 at 4:00 p.m. (ET) (the "**Buyer Specific Objection Deadline**").  Any such objection must be filed and served on the Debtors and their counsel, any statutory committee appointed in these chapter 11 cases and its proposed counsel, and the

8

applicable Successful Bidder or Stalking Horse Bidder, as applicable, and its counsel, so as to be actually received by the Buyer Specific Objection Deadline.  Any such unresolved objections shall be heard at the Sale Hearing, unless otherwise agreed by the parties.

13.    Unless the Counterparty to any Contract timely files an objection to its Cure Amount or to the assumption and assignment of its Contract and timely serves a copy of such objection in accordance with this Order, such Counterparty shall forever be barred and estopped from objecting (a) to the Cure Amount as the amount to cure all defaults to satisfy section 365 of the Bankruptcy Code and from asserting that any additional amounts are due or defaults exist; (b) that any conditions to assumption and assignment must be satisfied under such Contract before it can be assumed and assigned or that any required consent to assignment has not been given; or (c) that the Successful Bidder has not provided adequate assurance of future performance as contemplated by section 365 of the Bankruptcy Code.  For the avoidance of doubt, Counterparties may seek Cure Amounts with respect to defaults that occur between the deadline to object to Proposed Cure Amounts and the assumption of the underlying Contract, if any.

14.    The inclusion of a Contract or other agreement on the Cure Notice shall not constitute or be deemed a determination or admission by the Debtors and their estates or any other party in interest that such Contract or other agreement is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, and any and all rights of the Debtors and their estates with respect thereto are hereby reserved.

15.    If a Counterparty does not timely object to: (a) the Proposed Cure Amount for its Contracts; (b) the ability of the Successful Bidders(s) (including the Stalking Horse Bidder or such other Successful Bidders(s)) to provide adequate assurance of future performance as

required by section 365 of the Bankruptcy Code; or (c) any other matter pertaining to assumption or assignment, then the Proposed Cure Amounts owed to such Counterparty shall be paid as soon as reasonably practicable after the effective date of the assumption and assignment of such Assumed Contract or as the Counterparty and Successful Bidder may otherwise agree.

16.     In the event of a timely filed objection by a Counterparty regarding any Cure Amount with respect to any of the Contracts, the Cure Amounts owed to such Counterparty shall be paid as soon as reasonably practicable after the later of (i) the effective date of the assumption and assignment of such Assumed Contract, and (ii) the entry of a final order that resolves the dispute and approves the assumption and assignment of such Assumed Contract.

### Auction and Sale Hearing

17.     The Debtors shall file a notice identifying all Qualified Bidders (the "**Qualified Bid Notice**") within twenty-four (24) hours after the Debtors determine which Bids (if any) are Qualified Bids.  The Debtors shall serve the Qualified Bid Notice on all parties that have requested notice pursuant to Bankruptcy Rule 2002.

18.     The Debtors are authorized to conduct the Auction as set forth in the Bidding Procedures.  To the extent the Stalking Horse Bidder is the only Qualified Bid, the Debtors shall cancel the Auction and seek approval of the Stalking Horse Bid at the Sale Hearing.

19.     The Debtors are authorized to conduct the Sale without the necessity of complying with any state or local bulk transfer laws or requirements.

20.     Each bidder participating at the Auction shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale.

21.     No entity shall be entitled to any expense reimbursement, break-up fee, "topping," termination, contribution, or other similar fee or payment.

22.     **The Bid Deadline is October 13, 2025 at 4:00 p.m. (Prevailing Eastern Time). The Auction shall commence on October 17, 2025 at 10:00 a.m. (Prevailing Eastern Time). The Sale Hearing will be conducted on _____, 2025 at __:00 __.m. (Prevailing Eastern Time)**.  The Debtors will seek the entry of an order of this Court at the Sale Hearing approving and authorizing the Sale to the Stalking Horse Bidder or, if there is an Auction, the highest or otherwise best offer(s) at the Auction, as applicable, on terms and conditions consistent with the applicable purchase agreement.  The Sale Hearing may be adjourned or rescheduled with the consent of the DIP Agent without notice to other parties other than a notice or hearing agenda filed with the Court or by an announcement of the adjourned date at the Sale Hearing.

23.     The Debtors shall file a notice identifying the Successful Bidder and the material terms of the Successful Bidder's bid within twenty-four (24) hours of the conclusion of the Auction, if any.

## Miscellaneous Provisions

24.     The DIP Lenders and Silverview are allowed, but not required, to credit bid, pursuant to section 363(k) of the Bankruptcy Code, with respect to any assets on which they hold liens, up to the full amount of their secured debt at any Auction.  Nothing herein shall prejudice or impair the right of DIP Lenders or Silverview to increase the amount of their credit bid and the DIP Agent's and Existing Silverview Agent's rights under section 363(k) of the Bankruptcy Code are expressly reserved.

25.     Notice of the Motion as provided therein shall be deemed good and sufficient notice, and the requirements of Bankruptcy Rule 6004(a) are satisfied by such notice or otherwise deemed waived.

26.     Notwithstanding Bankruptcy Rule 6004(h), 6006(d), 7062, 9014, or any other provisions of the Bankruptcy Rules of the Local Rules stating the contrary, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

27.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

28.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

29.     Attached hereto as **<u>Schedule A</u>** is a summary of the key dates established by this Order.

30.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

**SCHEDULE A**

| Event | Date |
|---|---|
| Hearing to Consider Approval of Bidding Procedures | **September 22, 2025 at _____ (ET)** |
| Service of Sale Notice and Cure Notice | **Three (3) business days after the entry of this Order** |
| Contract Objection Deadline | **October 9, 2025 at 4:00 p.m. (ET); Fourteen (14) days after service of a Cure Notice for Previously Omitted Contracts** |
| Sale Objection Deadline | **October 9, 2025 at 4:00 p.m. (ET)** |
| Bid Deadline | **October 13, 2025 at 4:00 p.m. (ET)** |
| Auction (if applicable) | **October 17, 2025 at 10:00 a.m. (ET)** |
| Deadline to file Notice of Successful Bidder | **Within twenty-four (24) hours of the conclusion of the Auction (if applicable)** |
| Buyer Specific Objection Deadline | **October 21, 2025 at 4:00 p.m. (ET)** |
| Sale Hearing | **October 23, 2025 at _____ (ET)** |

## **Annex 1**

**Bidding Procedures**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| PINSTRIPES HOLDINGS, INC., *et al.*,[1] | Case No. 25-11677 (___) |
| Debtors. | (Jointly Administered) |

**BIDDING PROCEDURES FOR THE SALE OF THE DEBTORS' ASSETS**

On [●], 2025, the United States Bankruptcy Court for the District of Delaware (the "**Court**") entered the *Order (I) Approving Bidding Procedures in Connection with Sale of the Debtors' Assets; (II) Approving Form and Manner of Notice; (III) Scheduling Auction and Sale Hearing; (IV) Authorizing Procedures Governing Assumption and Assignment of Certain Contracts and Unexpired Leases; and (V) Granting Related Relief* [Docket No. [●]] (the "**Bidding Procedures Order**"),[2] by which the Court approved the following procedures (these "**Bidding Procedures**"). These Bidding Procedures set forth the process by which the Debtors are authorized to conduct an auction (the "**Auction**") for the sale (the "**Sale**") of substantially all of the Debtors' assets (collectively, the "**Assets**").

Subject to the terms of these Bidding Procedures, interested parties may bid on the Assets (i) in individual lots, (ii) as a collective whole, or (iii) in any combination.

**I.      Submissions to the Debtors.**

All submissions to the Debtors required to be made under these Bidding Procedures must be directed to each of the following persons unless otherwise provided (collectively, the "**Notice Parties**"):

**A.      Debtors' Proposed Chief Restructuring Officer.** Pinstripes Holdings, Inc., *et al.*, 1150 Willow Road, Northbrook, Illinois 60062, Attn: James Katchadurian (james.katchadurian@cr3partners.com).

**B.      Debtors' Proposed Counsel.** Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, Delaware 19801, Attn: Michael R. Nestor, Esq. (mnestor@ycst.com), Sean M. Beach, Esq. (sbeach@ycst.com), Elizabeth S.

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Pinstripes Holdings, Inc. (6699); Pinstripes, Inc. (8608); Pinstripes Hillsdale LLC (6064); Pinstripes at Prairiefire, Inc. (7018); and Pinstripes Illinois, LLC (6432). For purposes of these chapter 11 cases, the Debtors' service address is 1150 Willow Road, Northbrook, Illinois 60062.

[2]      All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order.

Justison, Esq. (ejustison@ycst.com), and Shella Borovinskaya, Esq. (sborovinskaya@ycst.com).

C. **Debtors' Proposed Investment Banker.** Hilco Corporate Finance, LLC, 5 Revere Drive, Suite 206, Northbrook, Illinois 60062, Attn: Teri Stratton (tstratton@hilcocf.com) and Richard S. Klein (rklein@hilcocf.com).

D. **Counsel for the DIP Agent and Existing Silverview Agent.** Blank Rome LLP, 1201 Market Street, Suite 800, Wilmington, Delaware 19801, Attn: Regina Stango Kelbon, Esq. (regina.kelbon@blankrome.com), John Lucian, Esq. (john.lucian@blankrome.com), Stanley B. Tarr, Esq. (stanley.tarr@blankrome.com) and Alston & Bird LLP, 90 Park Avenue, 15th Floor, New York, New York 10016, Attn: James Vincequerra, Esq. (james.vincequerra@alston.com) and Stephen Blank, Esq. (stephen.blank@alston.com).

## II.    Potential Bidders.

To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity (other than the Stalking Horse Bidder) interested in consummating a Sale (a "**Potential Bidder**") must deliver or have previously delivered:

(i)     an executed confidentiality agreement on terms acceptable to the Debtors (a "**Confidentiality Agreement**"), to the extent not already executed; and

(ii)    information demonstrating (in the Debtors' reasonable business judgment) that the Potential Bidder has the financial capability to consummate the applicable Sale, including, but not limited to, the most current audited and latest unaudited financial statements (the "**Financials**") of the Potential Bidder (or such other form of financial disclosure acceptable to the Debtors in their discretion) (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, (x) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtors, in consultation with (a) the legal and financial advisors for the Committee, if any, and (b) solely to the extent they are not an active or prospective bidder with respect to the relevant Assets, or are participating in any way in any active or prospective bid with respect to such relevant Assets, the legal advisors for the Consenting Lenders (the "**Consultation Parties**"), and (y) a written funding commitment acceptable to the Debtors and their advisors, in consultation with the Consultation Parties, of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the applicable Sale).

To the extent any of the Consultation Parties are or become potential bidders, such Consultation Party shall immediately cease being a Consultation Party and, in the case of the Committee, shall immediately be walled off from any discussions with the Committee's advisors in their capacity as Consultation Parties, until such time as their bid may be withdrawn.

III.     **Stalking Horse Bidder.**

The Debtors have entered into (as more fully described in the Stalking Horse Agreement) a purchase agreement (the "**Stalking Horse Agreement**") with Silverstrike, LLC, the entity currently identified by the Consenting Lenders to make the Stalking Horse Bid (the "**Stalking Horse Bidder**") for certain of the Debtors' Assets, as set forth in the Stalking Horse Agreement. The Stalking Horse Bidder is deemed a Qualified Bidder without needing to comply with any of the requirements set forth in these Bidding Procedures.

IV.     **Qualified Bidders.**

(a)     A "**Qualified Bidder**" is a Potential Bidder whose Financials, or the Financials of its equity holder(s), as applicable, demonstrate the financial capability to consummate the applicable Sale and whose Bid is a Qualified Bid (as defined below), that the Debtors, in consultation with the Consultation Parties, determine should be considered a Qualified Bidder. Prior to the commencement of the Auction, the Debtors' advisors will (i) notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder and (ii) provide to the Qualified Bidders for such Assets copies of all Qualified Bids with respect to such Assets. The Stalking Horse Bidder shall be deemed a Qualified Bidder at all times and for all purposes with respect to the Assets to which its Bid (the "**Stalking Horse Bid**") relates, and notwithstanding anything in these Bidding Procedures, the Stalking Horse Bid shall be deemed a Qualified Bid for all purposes and the Stalking Horse Bidder shall be included in the use of the term "Qualified Bidder".

(b)     The Debtors shall provide regular updates to the Consultation Parties on Potential Bidders and shall specifically identify any Potential Bidder who did not qualify to be a Qualified Bidder and the Debtors' basis for such determination. If any Potential Bidder is determined by the Debtors, in consultation with Consultation Parties, not to be a Qualified Bidder, the Debtors will refund such Qualified Bidder's Deposit and all accumulated interest thereon promptly after the Bid Deadline.

(c)     Between the date that the Debtors notify a Potential Bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Except as otherwise set forth in the Stalking Horse Agreement, without the written consent of the Debtors, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided that* any Qualified Bid may be improved at the Auction as set forth herein. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

V.     **Due Diligence.**

Potential Bidders shall be eligible to receive due diligence information and access to the Debtors' electronic data room (the "**Data Room**") and to additional non-public information regarding the Debtors. In addition, the Debtors will provide to Potential Bidders reasonable due

diligence information, as requested by such Potential Bidders in writing, as soon as reasonably practicable after such request, and the Debtors shall post to the Data Room all written due diligence provided to any Potential Bidder.  For all Potential Bidders other than the Stalking Horse Bidder, the due diligence period will end on the Bid Deadline, and subsequent to the expiration of the due diligence period, the Debtors shall have no obligation to furnish any due diligence information. The Stalking Horse Bidder's due diligence period with respect to its Stalking Horse Bid has expired or will expire in accordance with the Stalking Horse Agreement; *provided, however*, that the Stalking Horse Bidder shall retain access to the Data Room and shall receive all other due diligence information provided to any Potential Bidders on the same terms and timing that such Data Room access and due diligence information are made available to other Potential Bidders.

The Debtors shall not furnish any confidential information relating to the Assets, liabilities of the Debtors, or a Sale to any person except to the Stalking Horse Bidder, a Potential Bidder or to such Potential Bidder's duly authorized representatives to the extent expressly permitted by the applicable Confidentiality Agreement.  The Debtors and their advisors shall coordinate all reasonable requests from Potential Bidders for additional information and due diligence access; *provided that*, the Debtors may decline to provide such information to Potential Bidders who, at such time and in the Debtors' reasonable business judgment after consultation with the Consultation Parties, have not established, or who have raised doubt, that such Potential Bidder intends in good faith to, or has the capacity to, consummate the applicable Sale.

The Debtors also reserve the right, subject to the terms of the Stalking Horse Agreement and after consultation with the Consultation Parties, to withhold any diligence materials that the Debtors determine are sensitive after notifying the Potential Bidder requesting such materials of such determination.  Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Potential Bidder in accordance with these Bidding Procedures.

**ALL DUE DILIGENCE REQUESTS MUST BE DIRECTED TO HICLO CORPORATE FINANCE**

A.     **Communications with Potential Bidders.**

Notwithstanding anything to the contrary in these Bidding Procedures, all direct communications between and amongst Potential Bidders regarding the Debtors or their Assets shall involve the Debtors and the Debtors' advisors.  No Potential Bidder shall communicate with any other Potential Bidder absent prior written consent from the Debtors.

B.     **Due Diligence from Potential Bidders.**

Each Potential Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors regarding the ability of the Potential Bidder to consummate the applicable Sale.  Failure by a Potential Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors to determine, in consultation with the Consultation Parties, that such bidder is no longer a Potential Bidder or that a bid made by such Potential Bidder is not a Qualified Bid.

The Debtors and each of their respective advisors and representatives shall be obligated to maintain in confidence any such confidential information in accordance with any applicable confidentiality agreement, except as otherwise set forth in these Bidding Procedures or with the prior written consent of such bidder. Each recipient of confidential information agrees to use, and to instruct their advisors and representatives to use, such confidential information only in connection with the evaluation of Bids during the bidding process or in accordance with the terms of any applicable confidentiality agreement.

## VI.    Bid Requirements.

A proposal, solicitation, or offer (each, a "**Bid**") by a Qualified Bidder that is submitted in writing and satisfies each of the following requirements as determined by the Debtors, in consultation with the Consultation Parties, shall constitute a "**Qualified Bid**"). The Stalking Horse Bid will be deemed a Qualified Bid for all purposes without any further action required by the Stalking Horse Bidder.

(a)    **Identification of Bidder.**  Each Bid must fully disclose the following:  (i) the legal identity of each person or entity bidding for the Assets and/or otherwise sponsoring, financing (including through the issuance of debt in connection with such Bid) or participating in (including through license or similar arrangement with respect to the Assets to be acquired in connection with such Bid) the Auction in connection with such Bid and the complete terms of any such participation; and (ii) any past or present connections or agreements with the Debtors, any Stalking Horse Bidder, any other known Potential Bidder or Qualified Bidder, or any officer or director of any of the foregoing (including any current or former officer or director of the Debtors.

(b)    **Assets.**  Each Bid must clearly state which Assets (including any executory contracts and unexpired leases) and liabilities of the Debtors the Qualified Bidders are agreeing to purchase and assume.   For the avoidance of doubt, a Bid may be on the Assets in either (i) individual lots, (ii) as a collective whole, or (iii) in any combination.

(c)    **Purchase Price.**  Each Bid must clearly set forth the cash purchase price to be paid for the applicable Asset Category (the "**Purchase Price**"), *provided*, *however,* that the DIP Agent and Existing Silverview Agent shall be entitled to credit bid any portion of their outstanding secured obligations consistent with section 363(k) of the Bankruptcy Code with respect to any assets on which they hold liens in accordance with the final order approving the Debtors' post-petition financing. Each Bid must also specify how the Purchase Price is allocated among the Assets.

(d)    **Minimum Bid.**  The Minimum Bid for the Assets subject to the Stalking Horse Bid is $17,100,000 equal to the Stalking Horse Bid amount of $15,000,000, with respect to the credit bid, and $1,600,000, with respect to the cash component,  plus the Minimum Overbid Increment of $500,000.

(e)    **Deposit.**  Each Bid, other than the Stalking Horse Bid, must be accompanied by a cash deposit in the amount equal to 10% of the Purchase Price of the Bid, to be held in a segregated account to be identified and established by the Debtors (the "**Deposit**"). The Debtors reserve the right to increase the Deposit requirement.

**(f)      Assumption of Obligations.**  Each Bid must identify the obligations contemplated to be assumed such Bid, and be on terms in the aggregate (together with the other consideration contemplated in such Bid) no less favorable to the Debtors than the Stalking Horse Agreement (if any), as determined in the Debtors' business judgment, and after consultation with the Consultation Parties.  Other than the obligations to be assumed, the Assets shall be sold free and clear of all liens, claims, interests, and encumbrances (collectively, the "**Encumbrances**"), and any Encumbrances shall attach to the net proceeds of the Sales.

**(g)      The Same or Better Terms.**  In addition to meeting or exceeding the applicable Minimum Bid, each Bid must be on terms that are no less favorable in the aggregate (together with the other consideration contemplated in such Bid), in the Debtors' business judgment and after consultation with the Consultation Parties, than the terms of the Stalking Horse Agreement.  Each Bid must include duly executed, non-contingent purchase agreement and other transaction documents necessary to effectuate the transactions contemplated in the Bid and shall include a schedule of assumed contracts to the extent applicable to the Bid.  Each Bid should be based on the form of the Stalking Horse Agreement, which is available in Word format in the Data Room, and must include a copy of the Stalking Horse Agreement clearly marked to show all changes requested by the Qualified Bidder, including those relating to the respective Purchase Price and assets to be acquired by such Qualified Bidder, as well as all other material documents integral to such bid, including a form of sale order marked against the applicable sale order (collectively, the "**Qualified Bid Documents**").

**(h)      Committed Financing / Adequate Assurance Information.**  To the extent that a Bid is not accompanied by evidence of the Qualified Bidder's capacity to consummate the Sale set forth in its Bid with cash on hand, each Bid must include committed financing documents to the satisfaction of the Debtors (in consultation with the Consultation Parties) that demonstrate that the Qualified Bidder has: (i) received sufficient debt and/or equity funding commitments to satisfy the Qualified Bidder's Purchase Price and other obligations under its Bid; and (ii) adequate working capital financing or resources to finance going concern operations for the Assets and the proposed transactions.  Such funding commitments or other financing must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have only those covenants and conditions acceptable to the Debtors, in consultation with the Consultation Parties.  In addition to evidence of financial wherewithal to timely consummate the transaction, a Bid must include adequate assurance information with respect to any executory contracts or unexpired leases included or that may be included in the Bid in a form that allows the Debtors to serve such information on any counterparties to any contracts or leases being assumed and assigned in connection with the Sale that have requested, in writing, such information.

**(i)      Contingencies; No Financing or Diligence Outs.**  A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions, which shall not be more burdensome, in the Debtors' business judgment, and after consultation with the Consultation Parties, than those set forth in the Stalking Horse Agreement (if any).

**(j)      Demonstrated Financial Capacity.**  A Qualified Bidder must have, in the Debtors' business judgment (in consultation with the Consultation Parties) the necessary financial

capacity to consummate the proposed transactions required by its Bid (including, if necessary, to obtain transfer of any of the Debtors' licenses, permits, and to obtain any necessary surety bonds or other financial assurances) and provide adequate assurance of future performance under all contracts proposed to be assumed by such Bid.

(k) **Time Frame for Closing.** Closing of the Sale as to any Asset related to a Bid by a Qualified Bidder (a "**Closing**") must be reasonably likely (based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, on or before October 28, 2025.

(l) **Binding and Irrevocable.** Except as provided herein, a Qualified Bidder's Bid for the Assets shall be irrevocable unless and until the Debtors (in consultation with the Consultation Parties) accept a higher Bid for such Assets and such Qualified Bidder is not selected as the Backup Bidder for such Assets. If selected as Backup Bidder, such Bid shall be irrevocable until the Closing of a Successful Bid for such Assets.

(m) **Expenses; Disclaimer of Fees**. Each Bid must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. For the avoidance of doubt, no Qualified Bidder will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

(n) **Authorization.** Each Bid must contain evidence that the Qualified Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

(o) **As-Is, Where-Is.** Each Bid must include a written acknowledgement and representation that the Qualified Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidder's Bid or accompanying asset purchase agreement.

(p) **Adherence to Bid Procedures.** By submitting its Bid, each Qualified Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

(q) **Regulatory Approvals and Covenants.** A Bid must set forth each regulatory and third-party approval required for the Qualified Bidder to consummate the applicable Sale, if any, and the time period within which the Qualified Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is

7

expected to take more than thirty (30) days following execution and delivery of the asset purchase agreement, those actions the Qualified Bidder will take to ensure receipt of such approvals as promptly as possible) and any undertakings that will be required by the Debtors in connection with such regulatory and third party approvals.  For the avoidance of doubt, each Bidder must acknowledge that consummation of such Bidders' Bid shall not be contingent on obtaining government, regulatory, or other third-party approvals.

      **(r)**     **Consent to Jurisdiction.**  The Qualified Bidder must submit to the jurisdiction of and entry of final orders by the Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of bids, the Auction, the construction and enforcement of these Bidding Procedures, the transaction documents related to the Sale, and the Closing, as applicable.

      **(s)**     **Bid Deadline.**  Each Bid must be transmitted via email (in .pdf or similar format) so as to be <u>actually received</u> on or before October 13, 2025 at 4:00 p.m. (prevailing Eastern Time) (the "**Bid Deadline**") by the Notice Parties.

## VII.    Auction.

If the Debtors receive a Qualified Bid for the Assets, in addition to the Stalking Horse Bid for such Assets, if any, the Debtors will conduct the Auction to determine the Successful Bidder with respect to such Assets.  If the Debtors do not receive a Qualified Bid for the Assets (other than the Stalking Horse Bid for such Assets), the Debtors will not conduct the Auction as to such Assets and shall designate the Stalking Horse Bidder's Bid for such Assets as the Successful Bid for such Assets and shall seek approval of the Stalking Horse Bid at the Sale Hearing.

Prior to the commencement of the Auction, the Debtors will notify each Qualified Bidder of the highest or otherwise best Qualified Bid for the Assets for which such Qualified Bidder submitted a Bid, as determined in the Debtors' reasonable business judgment, in consultation with the Consultation Parties (the "**Baseline Bid**"), and provide copies of the applicable Qualified Bid Documents supporting the applicable Baseline Bid to each Qualified Bidder.  The Debtors shall consult with the Consultation Parties as to how the Debtors are valuing the Bids made by Qualified Bidders during the Auction.

The Auction shall take place at the offices of Young Conaway Stargatt & Taylor, LLP on October 17, 2025 at 10:00 a.m. (prevailing Eastern Time), or such later date and time as selected by the Debtors and acceptable to the DIP Agent.  For the avoidance of doubt, the Stalking Horse Bidder is deemed to have participated in the Auction for all purposes, whether or not the Stalking Horse Bidder makes a bid at the Auction.

The Debtors will file a notice of any change to the time or location of the Auction and will serve such notice on all bidders and all parties requesting service under Bankruptcy Rule 2002 at least twenty-four (24) hours prior to the Auction or as soon as the Debtors become aware of such change.

The Auction shall be conducted in a timely fashion according to the following procedures:

### A.    The Debtors Shall Conduct the Auction.

The Debtors and their advisors shall direct and preside over the Auction.  At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid for the Assets.  All incremental Bids made thereafter shall be Overbids (defined below) for such Assets and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders who submitted Bids on such Assets.  The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid, all applicable Overbids, and the Successful Bid.

Only the Debtors, the Qualified Bidders, the DIP Agent and the Existing Silverview Agent, members of any appointed official committee of creditors, and each such parties' respective legal and financial advisors shall be entitled to attend the Auction, along with any other creditor, and any other party the Debtors deem appropriate (*provided, however,* that any party other than the Qualified Bidders, the DIP Agent and the Existing Silverview Agent, members of any appointed official committee of creditors, and each such parties' respective legal and financial advisors shall be required to provide notice to the Debtors at least two (2) days prior to the auction by sending an email to Troy Bollman, paralegal for counsel to the Debtors, at tbollman@ycst.com; the Debtors will provide copies of any such notices to the Qualified Bidders, the DIP Agent and the Existing Silverview Agent, members of any appointed official committee of creditors, and each such parties' respective legal and financial advisors within one (1) day of receipt.  The Qualified Bidders shall appear at the Auction in person and may speak or bid themselves or through duly authorized representatives.  Only Qualified Bidders shall be entitled to bid at the Auction.

### B.    Terms of Overbids.

"**Overbid**" means any bid made at the Auction by a Qualified Bidder subsequent to the Debtors' announcement of the Baseline Bid and accepted by the Debtors, in consultation with the Consultation Parties, as a higher or otherwise better bid.  Each applicable Overbid must comply with the following conditions:

(i)    **Minimum Overbid Increment.**  The initial Overbid for the Assets subject to the Stalking Horse Bid, if any, shall provide for total consideration to the Debtors with a value that exceeds the value of the consideration under the Baseline Bid for the subject Assets by an incremental amount that is not less than $500,000 in cash or credit bid (the "**Minimum Overbid Increment**").  Except as may be otherwise provided in the Stalking Horse Agreement, the Debtors reserve the right, after consultation with the Consultation Parties, to announce reductions or increases in the Minimum Overbid Increment for the Assets at any time during the Auction.

(ii)    **Conclusion of Each Overbid Round.**  Upon the solicitation of each round of applicable Overbids, the Debtors may announce a deadline by which time any Overbids must be submitted to the Debtors.

(iii)    **Overbid Alterations.**  An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable in the aggregate to the Debtors' estates than any prior Bid or Overbid, as determined in the Debtors' reasonable business judgment, but shall otherwise comply with the terms of these Bidding Procedures.

C.    **Closing the Auction.**

(i)    The Auction shall continue until there is only one Bid for the Assets that the Debtors determine, in their reasonable business judgment, in consultation with the Consultation Parties, to be the highest or otherwise best Bid for such Assets.  Such Bid shall be declared the "**Successful Bid**," for such Assets and such Qualified Bidder, the "**Successful Bidder**" for such Assets at which point the Auction will be closed as to such Assets.  Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Court of the Successful Bid.

(ii)    The Debtors shall have no obligation to consider any Bids or Overbids submitted after the conclusion of the Auction, and any such Bids or Overbids shall be deemed untimely and shall not constitute a Qualified Bid.

(iii)    Within twenty-four (24) hours after closing the Auction, the Debtors shall cause the Qualified Bid Documents for each Successful Bid and Backup Bid to be filed with the Court.

D.    **No Collusion; Good-Faith *Bona Fide* Offer.**

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that: (i) it has not engaged in any collusion with respect to the bidding, and (ii) its Bid is a good-faith *bona fide* offer and it intends to consummate the proposed transaction on the terms of its Qualified Bid if selected as the Successful Bidder.

VIII.  **Backup Bidder.**

(a)    Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted for the Assets, the Qualified Bidder with the next-highest or otherwise second-best Bid at the Auction for such Assets, as determined by the Debtors in the exercise of their reasonable business judgment, and in consultation with the Consultation Parties (the "**Backup Bid**"), shall be required to serve as a backup bidder (the "**Backup Bidder**") for such Assets, and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors.

(b)    The identity of the Backup Bidder and the amount and material terms of the Backup Bid shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the

Successful Bidder. The Backup Bidder shall be required to keep its Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable until the closing of the transaction with the applicable Successful Bidder or as otherwise provided in the Stalking Horse Agreement. The Backup Bidder's Deposit shall be held in escrow until the closing of the transaction with the applicable Successful Bidder or as otherwise provided in the Stalking Horse Agreement.

(c)     If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors may select the applicable Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes. The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party. The defaulting Successful Bidder's Deposit shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all remedies available against the defaulting Successful Bidder, including specific performance, if applicable, unless otherwise provided in the Stalking Horse Agreement should the Stalking Horse Bidder be the Successful Bidder. For the avoidance of doubt, if the Deposit becomes property of the Debtors' estates, the Deposit shall be subject to the liens and super-priority claims granted in favor of the DIP Lender under the interim authorizing the Debtors to obtain postpetition financing and related relief and the final order thereon.

## IX.     Reservation of Rights.

The Debtors reserve their rights to modify these Bidding Procedures in their reasonable business judgment, in a manner acceptable to the DIP Agent, and in consultation with the Consultation Parties, at or prior to the Auction, with respect to: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) cancelling the Auction; and (e) rejecting any or all bids or Bids; *provided, however*, that nothing in this Section shall limit any rights or remedies of the Stalking Horse Bidder under the Stalking Horse Agreement with respect to material modifications to these Bidding Procedures, the Bidding Procedures Order or the agreed form of sale order; *provided further* that any modification of these Bidding Procedures shall not be inconsistent with the Stalking Horse Agreement, the Bidding Procedures Order, or any other order of the Bankruptcy Court entered in these chapter 11 cases, and shall be disclosed to each Qualified Bidder at the Auction.

## X.     Sale Hearing.

A hearing to consider approval of the Sale of the Assets to the Successful Bidders (or to approve the Stalking Horse Agreement, as applicable, if no Auction is held) (the "**Sale Hearing**") is currently scheduled to take place at __:00 p.m. (ET) on [●], 2025 before the Honorable [●] in

the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, [●] Floor, Courtroom No. [●], Wilmington, Delaware 19801.

**THE SALE HEARING MAY BE CONTINUED TO A LATER DATE BY THE DEBTORS, WITH THE CONSENT OF THE DIP AGENT, BY FILING A HEARING AGENDA AND/OR SENDING NOTICE PRIOR TO, OR MAKING AN ANNOUNCEMENT AT, THE SALE HEARING. NO FURTHER NOTICE OF ANY SUCH CONTINUANCE WILL BE REQUIRED TO BE PROVIDED TO ANY PARTY (EXCLUDING THE STALKING HORSE BIDDER).**

At the Sale Hearing, the Debtors shall present the Successful Bids to the Court for approval.

## XI.    Return of Deposit; Remedies.

The Deposit of the Successful Bidder shall be applied to the respective Purchase Price of such transaction at closing.  The Deposits for each Qualified Bidder shall be held in one or more interest-bearing escrow accounts on terms acceptable to the Debtors (in consultation with the Consultation Parties) and shall be returned (other than with respect to the Successful Bidder, and the Backup Bidder) on or within five (5) business days after the Auction, including the Deposit of the Stalking Horse Bidder if it is not the Successful Bidder or Backup Bidder.  Upon the return of the Deposits, their respective owners shall receive any and all interest that will have accrued thereon.

If a Successful Bidder fails to consummate a proposed transaction because of a breach by such Successful Bidder, and except as otherwise provided in the Stalking Horse Agreement, the Debtors will not have any obligation to return the Deposit deposited by such Successful Bidder, which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors (except, in the case of a Stalking Horse Bidder, as otherwise provided in the Stalking Horse Agreement), and the Debtors shall be free to consummate the proposed transaction with the applicable Backup Bidder without the need for an additional hearing or order of the Court, *provided* that nothing herein shall prohibit any party from seeking an additional hearing or order of the Court.

## XII.   Fiduciary Out.

Nothing in these Bidding Procedures shall require the board of directors, board of managers, or similar governing body of a Debtor to take any action, or to refrain from taking any action, with respect to these Bidding Procedures, to the extent such board of directors, board of managers, or such similar governing body determines, or based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law.

## XIII.  Contract Procedures.

Within three (3) business days from the entry of the Bidding Procedures Order, the Debtors shall file and serve on all counterparties (the "**Counterparties**") to their executory contracts and unexpired leases (the "**Contracts**") a notice (the "**Cure Notice**") of (a) the potential assumption by the Debtors and assignment to the Successful Bidder(s) of the Contracts, and (b) the proposed

amount necessary, under section 365(b)(1) of the Bankruptcy Code, to cure any outstanding monetary defaults and compensate the Counterparties for any pecuniary losses in connection with such assumption and assignment (the "**Proposed Cure Amounts**"), which shall be included on a schedule attached to the Cure Notice (the "**Executory Contracts Schedule**").

If at any time after the issuance of the Cure Notice but prior to the Sale Hearing it is discovered that a Contract should have been listed on the Executory Contracts Schedule but was not (any such Contract, a "**Previously Omitted Contract**"), the Debtors shall (in consultation with the Consultation Parties), promptly following discovery thereof (but in no event later than two (2) Business Days following discovery thereof), file and serve a notice on the non-Debtor counterparty(ies) to such Previously Omitted Contract notifying such counterparties of the Debtors' intention to assume and assign such Previously Omitted Contract to the Successful Bidder, including the Proposed Cure Amounts relating thereto (the "**Previously Omitted Contract Notice**").

Each Counterparty shall have until 4:00 p.m. (prevailing Eastern time) on the date that is fourteen (14) days after the filing and service by the Debtors to the Counterparty of the Cure Notice or the Previously Omitted Contract Notice (as applicable) to object to the assumption and assignment of its Contract on any grounds, including, without limitation, (a) the amount of the Proposed Cure Amounts (and must state, in its objection, with specificity, what cure amount is required with appropriate documentation in support thereof) and (b) the provision of adequate assurance of future performance by the Stalking Horse Bidder. Any unresolved objections shall be heard at the Sale Hearing, unless otherwise agreed by the parties; *provided* that the Debtors shall have the right to adjourn any Sale Hearing without the consent of any objecting party. If any objections to the amount of Proposed Cure Amounts remain unresolved as of the date of the Closing of the Sale of any Assets, the Debtors may (but are not required to) deposit the disputed amount of Proposed Cure Amounts relating to such Asset(s) in a segregated account to hold pending resolution of such objections. The Debtors' proposed Chief Restructuring Officer shall facilitate communications between Qualified Bidders and the Counterparties in connection with such Qualified Bidder's Bid, the Proposed Cure Amounts, and the terms of assumption and assignment of the Contracts.

Each Counterparty may raise objections as to adequate assurance of future performance by, or on the basis of the identity of, the Successful Bidder, other than the Stalking Horse Bidder, until October 21, 2025 at 4:00 p.m. (ET) (the "**Buyer Specific Objection Deadline**"). Any such objection must be filed and served on the Debtors and their counsel, the Committee and its counsel and the applicable Successful Bidder or Stalking Horse Bidder (if any), as applicable, and its counsel, so as to be actually received by the Buyer Specific Objection Deadline. Any such unresolved objections shall be heard at the Sale Hearing, unless otherwise agreed by the parties.

*[Remainder of Page Intentionally Left Blank]*

**<u>Annex 2</u>**

**Sale Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PINSTRIPES HOLDINGS, INC., *et al.*,[1] | Case No. 25-11677 (___) |
| Debtors. | (Jointly Administered) |

## NOTICE OF SALE, BIDDING PROCEDURES,
## AUCTION, SALE HEARING, AND OBJECTION DEADLINE

**PLEASE TAKE NOTICE THAT**, on September [●], 2025, the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") filed with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") their motion (the "**Motion**")[2] for entry of (i) an order (a) approving bidding procedures, substantially in the form attached as Annex 1 to the Bidding Procedures Order (the "**Bidding Procedures**"), to govern the marketing and sale of all or substantially all of the Debtors' assets (the "**Assets**"), (b) authorizing the Debtors to schedule an auction to sell the Assets (the "**Auction**"), (c) scheduling the hearing to approve a sale of the Assets (the "**Sale Hearing**"), (d) designating the Stalking Horse Bidder and Stalking Horse Bid, (e) approving the form and manner of notice of the proposed sale transactions, the Bidding Procedures, the Auction, the Sale Hearing, and related dates and deadlines, and (f) authorizing procedures governing the assumption and assignment of certain executory contracts and unexpired leases (the "**Assigned Contracts**") to the prevailing bidder(s) acquiring the Debtors' assets (each, a "**Successful Bidder**"); and (ii) one or more orders (collectively, the "**Sale Order**") (a) approving the applicable form(s) of purchase agreement between the Debtors and the Stalking Horse Bidder (as defined below) or any other Successful Bidder(s), and (b) authorizing the sale(s) (collectively, the "**Sale**") of the Assets and the assumption and assignment of the Assigned Contracts to the Stalking Horse Bidder or such other Successful Bidder free and clear of all liens, claims, encumbrances, and other interests (collectively, "**Liens**"), other than any permitted Liens as set forth in the applicable form(s) of purchase agreement.

**PLEASE TAKE FURTHER NOTICE THAT**, on [●], 2025, the Bankruptcy Court entered the *Order (I) Approving Bidding Procedures in Connection with Sale of the Debtors' Assets;*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Pinstripes Holdings, Inc. (6699); Pinstripes, Inc. (8608); Pinstripes Hillsdale LLC (6064); Pinstripes at Prairiefire, Inc. (7018); and Pinstripes Illinois, LLC (6432). For purposes of these chapter 11 cases, the Debtors' service address is 1150 Willow Road, Northbrook, Illinois 60062.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or in the Bidding Procedures. Any summary of the Bidding Procedures Order or the Bidding Procedures contained herein is qualified in its entirety by the actual terms and conditions thereof. To the extent that there is any conflict between any such summary and such actual terms and conditions, the actual terms and conditions shall control.

*(II) Approving Form and Manner of Notice; (III) Approving Designation of Stalking Horse Bidder and Stalking Horse Bid; (IV) Scheduling Auction and Sale Hearing; (V) Authorizing Procedures Governing Assumption and Assignment of Certain Contracts and Unexpired Leases; and (VI) Granting Related Relief* [Docket No. [●]] (the "**Bidding Procedures Order**") and approved the Bidding Procedures attached thereto as <u>Annex 1</u>.  Pursuant to the Bidding Procedures Order, the Auction shall be held at the offices of Young Conaway Stargatt & Taylor, LLP, on October 17, 2025 at 10:00 a.m. (prevailing Eastern Time).  Only Qualified Bidders and the Stalking Horse Bidder shall be entitled to make any bids at the Auction.

**PLEASE TAKE FURTHER NOTICE THAT** to participate in the bidding process or otherwise be considered for any purpose under the Bidding Procedures, a person or entity interested in consummating a Sale (a "**Potential Bidder**") must deliver or have previously delivered, if determined to be necessary by the Debtors in their sole discretion, among other things:

(i) an executed confidentiality agreement on terms acceptable to the Debtors (a "**Confidentiality Agreement**"), to the extent not already executed; and

(ii) information demonstrating (in the Debtors' reasonable business judgment) that the Potential Bidder has the financial capability to consummate the applicable Sale, including, but not limited to, the most current audited and latest unaudited financial statements (the "**Financials**") of the Potential Bidder (or such other form of financial disclosure acceptable to the Debtors in their discretion) (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, (x) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtors, in consultation with (a) the legal and financial advisors for the Committee, if any, and (b) solely to the extent they are not an active or prospective bidder with respect to the relevant Assets, or are participating in any way in any active or prospective bid with respect to such relevant Assets, the legal advisors for the Consenting Lenders (the "**Consultation Parties**"), and (y) a written funding commitment acceptable to the Debtors and their advisors, in consultation with the Consultation Parties, of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the applicable Sale).

Each Bid must be transmitted via email (in .pdf or similar format) so as to be <u>actually received</u> by the Notice Parties on or before 4:00 p.m. (prevailing Eastern Time) on October 13, 2025 (the "**Bid Deadline**").

The Prevailing Bid will be subject to Bankruptcy Court approval.  The Sale Hearing to approve the Sale to the Successful Bidder(s), free and clear of all liens, claims, interests, charges, and encumbrances (with any such liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the Sale with the same rights and priorities therein as in the sold Assets), shall take place at **___:00___.m. (prevailing Eastern time) on October [23], 2025**, before the Honorable [●] in the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, [●] Floor, Courtroom No. [●], Wilmington, Delaware 19801.  The Debtors may, in consultation with the Consultation Parties, designate the Backup Bid (and the corresponding Backup Bidder) to

purchase the Assets without the need for further order of the Bankruptcy Court and without the need for further notice to any interested parties, in the event that the Successful Bidder(s) does not close the Sale. The Sale Hearing may be adjourned by the Debtors with the consent of the DIP Agent from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or by filing a notice or hearing agenda on the docket of the Debtors' chapter 11 cases.

**PLEASE TAKE FURTHER NOTICE THAT** any objections to the Sale or the relief requested in connection with the Sale (a "**Sale Objection**") must: (a) be in writing; (b) comply with the Bankruptcy Rules; (c) set forth the specific basis for the Sale Objection; and (d) be served upon (such as to be <u>actually received</u> by) the following parties (the "**Objection Notice Parties**") on or before **4:00 p.m. (prevailing Eastern Time) on October 9, 2025** (the "**Sale Objection Deadline**").

(a)    proposed counsel for the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: Michael R. Nestor, Esq. (mnestor@ycst.com), Sean M. Beach, Esq. (sbeach@ycst.com), Elizabeth S. Justison, Esq. (ejustison@ycst.com), and Shella Borovinskaya, Esq. (sborovinskaya@ycst.com);

(b)    counsel for the DIP Agent and Existing Silverview Agent, Blank Rome LLP, 1201 Market Street, Suite 800, Wilmington, Delaware 19801, Attn: Regina Stango Kelbon, Esq. (regina.kelbon@blankrome.com), John Lucian, Esq. (john.lucian@blankrome.com), Stanley B. Tarr, Esq. (stanley.tarr@blankrome.com) and Alston & Bird LLP, 90 Park Avenue, 15th Floor, New York, New York 10016, Attn: James Vincequerra, Esq. (james.vincequerra@alston.com) and Stephen Blank, Esq. (stephen.blank@alston.com);

(c)    the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware, 19801, Attn: Benjamin A. Hackman, Esq. (Benjamin.A.Hackman@usdoj.gov); and

(d)    counsel to the Committee, if any.

Objections, if any, to the form of asset purchase agreement with a Successful Bidder other than the Stalking Horse Bidder, must be made by the Buyer Specific Objection Deadline, which is October 21, 2025 at 4:00 p.m. (ET). For the avoidance of doubt, objections to approval of the Stalking Horse Agreement must be made by the Sale Objection Deadline.

---

**If a Sale Objection is not filed and served in accordance with the foregoing requirements, the objecting party shall be barred from objecting to the Sale and shall not be heard at the Sale Hearing, and the Bankruptcy Court may enter the Sale Order without further notice to such party.**

---

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain copies of the Motion, the Bidding Procedures, the Bidding Procedures Order, the applicable underlying agreements, or any other pleadings or orders of the Bankruptcy Court, they are publicly available, for a fee via PACER at: http://www.deb.uscourts.gov, or free of charge from the claims agent at https://dm.epiq11.com/pinstripes.  Such documents and pleadings may also be obtained by calling the Debtors' restructuring hotline at (888) 832-5989 (toll-free) or +1 (971) 306-5089 (international).

Dated: [●], 2025
    Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/* [●]

Michael R. Nestor (No. 3526)
Sean M. Beach (No. 4070)
Elizabeth S. Justison (No. 5911)
Shella Borovinskaya (No. 6758)
Rodney Square
1000 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Emails:  mnestor@ycst.com
        sbeach@ycst.com
        ejustison@ycst.com
        sborovinskaya@ycst.com

*Proposed Counsel for the Debtors
and Debtors in Possession*

## **Annex 3**

**Cure Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PINSTRIPES HOLDINGS, INC., *et al.*,[1] | Case No. 25-11677 (___) |
| Debtors. | (Jointly Administered) |

## NOTICE OF POSSIBLE ASSUMPTION AND
## ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES IN CONNECTION WITH SALE

**PLEASE TAKE NOTICE THAT** on September [●], 2025, the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") filed with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") their motion (the "**Motion**")[2] for entry of (i) an order (a) approving bidding procedures, substantially in the form attached as Annex 1 to the Bidding Procedures Order (the "**Bidding Procedures**"), to govern the marketing and sale of all or substantially all of the Debtors' assets (the "**Assets**"), (b) authorizing the Debtors to schedule an auction to sell the Assets (the "**Auction**"), (c) scheduling the hearing to approve a sale of the Assets (the "**Sale Hearing**"), (d) designating the Stalking Horse Bidder and Stalking Horse Bid, (e) approving the form and manner of notice of the proposed sale transactions, the Bidding Procedures, the Auction, the Sale Hearing, and related dates and deadlines, and (f) authorizing procedures governing the assumption and assignment of certain executory contracts and unexpired leases (the "**Assigned Contracts**") to the prevailing bidder(s) acquiring the Debtors' assets (each, a "**Successful Bidder**"); and (ii) one or more orders (collectively, the "**Sale Order**") (a) approving the applicable form(s) of purchase agreement between the Debtors and the Stalking Horse Bidder (as defined below) or any other Successful Bidder(s), and (b) authorizing the sale(s) (collectively, the "**Sale**") of the Assets and the assumption and assignment of the Assigned Contracts to the Stalking Horse Bidder or such other Successful Bidder free and clear of all liens, claims, encumbrances, and other interests (collectively, "**Liens**"), other than any permitted Liens as set forth in the applicable form(s) of purchase agreement.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Pinstripes Holdings, Inc. (6699); Pinstripes, Inc. (8608); Pinstripes Hillsdale LLC (6064); Pinstripes at Prairiefire, Inc. (7018); and Pinstripes Illinois, LLC (6432). For purposes of these chapter 11 cases, the Debtors' service address is 1150 Willow Road, Northbrook, Illinois 60062.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or in the Bidding Procedures. Any summary of the Bidding Procedures Order or the Bidding Procedures contained herein is qualified in its entirety by the actual terms and conditions thereof. To the extent that there is any conflict between any such summary and such actual terms and conditions, the actual terms and conditions shall control.

**PLEASE TAKE FURTHER NOTICE THAT** the Sale Hearing to approve the Sale to the Successful Bidder, free and clear of all Liens (with any such Liens attaching to the net proceeds of the Sale with the same rights and priorities therein as in the sold Assets), shall take place at **___:00 _.m. (prevailing Eastern time) on [●], 2025**, before the Honorable [●] in the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, [●] Floor, Courtroom No. [●], Wilmington, Delaware 19801.

**PLEASE TAKE FURTHER NOTICE THAT**, pursuant to the Bidding Procedures Order, the Auction shall be held at the offices of Young Conaway Stargatt & Taylor, LLP on October 17, 2025 at 10:00 a.m. (prevailing Eastern Time). Only Qualified Bidders and the Stalking Horse Bidder shall be entitled to bid at the Auction. The Debtors may, in consultation with the Consultation Parties, designate the Backup Bid (and the corresponding Backup Bidder) to purchase the Assets, without the need for further order of the Bankruptcy Court and without the need for further notice to any interested parties, in the event that a Successful Bidder does not close the Sale. The Sale Hearing may be adjourned by the Debtors with the consent of the DIP Agent from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or by filing a notice or hearing agenda on the docket of the Debtors' chapter 11 cases.

**PLEASE TAKE FURTHER NOTICE THAT**, to facilitate the Sale, the Debtors are seeking to assume and assign to the Successful Bidder the Assumed Contracts in accordance with the Bidding Procedures Order. The Assumed Contracts that the Debtors may, but are not required to, seek to assume and assign in connection with the Sale and the corresponding cure amount (each, a "**Proposed Cure Amount**"), if any, that the Debtors believe is required to be paid to the applicable counterparty (each, a "**Counterparty**," and collectively, the "**Counterparties**") to each of the Assumed Contracts under sections 365(b)(1)(A) and (B) of the Bankruptcy Code are identified on **Exhibit 1** attached hereto.

**PLEASE TAKE FURTHER NOTICE THAT** each Counterparty shall have until **4:00 p.m. (prevailing Eastern time) on October 9, 2025** (the "**Contract Objection Deadline**") to object to the assumption and assignment of its Contract on any grounds, including, without limitation, (a) the amount of the Proposed Cure Amounts (and must state, in its objection, with specificity, what cure amount is required with appropriate documentation in support thereof) and (b) the provision of adequate assurance of future performance by the Stalking Horse Bidder (each, a "**Contract Objection**"). Any such objection must be filed and served on the following parties (collectively, the "**Objection Notice Parties**"), so as to be actually received by the Contract Objection Deadline:

    (a)        proposed counsel for the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: Michael R. Nestor, Esq. (mnestor@ycst.com), Sean M. Beach, Esq. (sbeach@ycst.com), Elizabeth S. Justison, Esq. (ejustison@ycst.com), and Shella Borovinskaya, Esq. (sborovinskaya@ycst.com);

    (b)        counsel for the DIP Agent and Existing Silverview Agent, Blank Rome LLP, 1201 Market Street, Suite 800, Wilmington, Delaware 19801, Attn: Regina Stango Kelbon, Esq. (regina.kelbon@blankrome.com), John Lucian, Esq.

2

(john.lucian@blankrome.com), Stanley B. Tarr, Esq. (stanley.tarr@blankrome.com) and Alston & Bird LLP, 90 Park Avenue, 15th Floor, New York, New York 10016, Attn: James Vincequerra, Esq. (james.vincequerra@alston.com) and Stephen Blank, Esq. (stephen.blank@alston.com);

(c)     the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware, 19801, Attn: Benjamin A. Hackman, Esq. (Benjamin.A.Hackman@usdoj.gov); and

(d)     counsel to any official committee of creditors (the "**Committee**").

Any unresolved Contract Objections shall be heard at the Sale Hearing, unless otherwise agreed by the parties; *provided that*, the Debtors shall have the right to adjourn any Sale Hearing without the consent of any objecting party.  If any objections to the amount of the Proposed Cure Amounts remain unresolved as of the date of the Closing of the Sale of the Assets, the Debtors may (but are not required to) deposit the disputed amount of Proposed Cure Amounts relating to such Asset(s) in a segregated account to hold pending resolution of such objections.

**PLEASE TAKE FURTHER NOTICE THAT**, pursuant to the Bidding Procedures Order, each Counterparty may raise objections as to adequate assurance of future performance by, or on the basis of the identity of, the Successful Bidder, other than the Stalking Horse Bidder, until October 21, 2025 at 4:00 p.m. (ET) (the "**Buyer Specific Objection Deadline**").  Any such objection must be filed and served on the Objection Notice Parties, so as to be actually received by the Buyer Specific Objection Deadline.  Any such objection must be filed and served on the Debtors and their counsel, the Committee and its proposed counsel, and the applicable Successful Bidder or Stalking Horse Bidder (if any), as applicable, and its counsel, so as to actually be received by the Buyer Specific Objection Deadline.  Any such unresolved objections shall be heard at the Sale Hearing, unless otherwise agreed by the parties.

**PLEASE TAKE FURTHER NOTICE THAT**, at the Sale Hearing, the Debtors will seek Court approval of the assumption and assignment to the Successful Bidder of only those Assumed Contracts that have actually been selected by the Successful Bidder to be assumed and assigned (collectively, the "**Assumed Contracts**").  The Debtors and their estates reserve any and all rights with respect to any Assumed Contracts that are not ultimately designated as Assumed Contracts.

**PLEASE TAKE FURTHER NOTICE THAT nothing contained in this notice or on the exhibits hereto shall constitute a waiver of any rights of the Debtors and their estates or an admission with respect to the Debtors' chapter 11 cases, including, but not limited to, any issues involving objections to claims, setoff or recoupment, equitable subordination or recharacterization of debt, defenses, characterization or re-characterization of contracts, leases and claims, assumption or rejection of contracts and leases and/or causes of action arising under the Bankruptcy Code or any other applicable laws.**

> **If no Contract Objection is timely received with respect to an Assumed Contract: (i) the Counterparty to such Assumed Contract shall be deemed to have consented to the assumption by the Debtors and assignment to the Successful Bidder of the Assumed Contract, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Successful Bidder); (ii) any and all defaults under the Assumed Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code upon payment of the Proposed Cure Amount set forth in this Cure Notice for such Assumed Contract; and (iii) the Proposed Cure Amount set forth in this Cure Notice for such Assumed Contract shall be controlling, notwithstanding anything to the contrary in such Assumed Contract, or any other related document, and the Counterparty shall be deemed to have consented to the Proposed Cure Amount and shall be forever barred from asserting any other claims related to such Assumed Contract against the Debtors and their estates or the Successful Bidder, or the property of any of them, that existed prior to the entry of the order resolving the Contract Objections.**

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain copies of the Motion, the Bidding Procedures, the Bidding Procedures Order, the applicable underlying agreements, or any other pleadings or orders of the Bankruptcy Court, they are publicly available, for a fee via PACER at: http:/www.deb.uscourts.gov, or free of charge from the claims agent at **https://dm.epiq11.com/pinstripes**.  Such documents and pleadings may also be obtained by calling the Debtors' restructuring hotline at (888) 832-5989 (toll-free) or +1 (971) 306-5089 (international).

*[Remainder of Page Intentionally Left Blank]*

Dated: [●], 2025
    Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

/s/ [●]
Michael R. Nestor (No. 3526)
Sean M. Beach (No. 4070)
Elizabeth S. Justison (No. 5911)
Shella Borovinskaya (No. 6758)
Rodney Square
1000 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Emails:  mnestor@ycst.com
       sbeach@ycst.com
       ejustison@ycst.com
       sborovinskaya@ycst.com

*Proposed Counsel for the Debtors and Debtors in Possession*

# **EXHIBIT 1**

**Proposed Cure Amounts**

*[Intentionally Omitted]*

**EXHIBIT B**

**Stalking Horse Agreement**

## ASSET PURCHASE AGREEMENT

by and among

## PINSTRIPES HOLDINGS, INC.,

## PINSTRIPES, INC.,

## PINSTRIPES HILLSDALE, LLC

## AND

## PINSTRIPES ILLINOIS, LLC,

as the Sellers

and

## SILVERSTRIKE, LLC,

as the Buyer

Dated as of September 8, 2025

# TABLE OF CONTENTS

**Page**

ARTICLE I. DEFINITIONS..................................................................................................5

    Section 1.1    Certain Defined Terms ............................................5
    Section 1.2    Table of Definitions ...............................................18

ARTICLE II. PURCHASE AND SALE............................................................................19

    Section 2.1    Purchase and Sale ..................................................19
    Section 2.2    Excluded Assets ......................................................21
    Section 2.3    Assumed Liabilities ................................................22
    Section 2.4    Excluded Liabilities ...............................................23
    Section 2.5    Consents to Certain Assignments............................25
    Section 2.6    Assumption/Rejection of Certain Contracts............26
    Section 2.7    Consideration..........................................................28
    Section 2.8    Closing....................................................................28
    Section 2.9    Intended Tax Treatment; Tax Allocation; Tax Sharing
                  Agreements ............................................................30
    Section 2.10    Withholding...........................................................31
    Section 2.11    Exclusion of Transferred Assets............................31

ARTICLE III. REPRESENTATIONS AND WARRANTIES OF THE SELLERS ....................31

    Section 3.1    Organization ..........................................................31
    Section 3.2    Authority ...............................................................31
    Section 3.3    No Conflict; Required Filings and Consents.........32
    Section 3.4    Transferred Assets.................................................33
    Section 3.5    Financial Statements; No Undisclosed Liabilities....................33
    Section 3.6    Absence of Certain Changes or Events .................34
    Section 3.7    Compliance with Law; Permits .............................34
    Section 3.8    Litigation ...............................................................35
    Section 3.9    Employee Benefit Plans ........................................35
    Section 3.10    Labor and Employment Matters............................37
    Section 3.11    Real Property.........................................................39
    Section 3.12    Intellectual Property .............................................40
    Section 3.13    Taxes ....................................................................42
    Section 3.14    Environmental Matters.........................................44
    Section 3.15    Material Contracts ................................................45
    Section 3.16    Affiliate Transactions ..........................................48
    Section 3.17    Insurance ...............................................................48
    Section 3.18    Suppliers ...............................................................49
    Section 3.19    Working Capital Assets; Equipment; Inventory .....................49
    Section 3.20    Books and Records................................................49
    Section 3.21    Bank Accounts ......................................................50
    Section 3.22    OFAC and Related Matters ...................................50

1

Section 3.23    Anti-Corruption; Anti-Bribery ..................................................51
Section 3.24    Exclusivity of Representations and Warranties..........................51

ARTICLE IV. REPRESENTATIONS AND WARRANTIES OF THE BUYER .......................52

Section 4.1    Organization .........................................................................52
Section 4.2    Authority ..............................................................................52
Section 4.3    No Conflict; Required Filings and Consents............................52
Section 4.4    Brokers .................................................................................53
Section 4.5    Litigation ..............................................................................53
Section 4.6    Exclusivity of Representations and Warranties..........................53
Section 4.7    Financial Capacity ................................................................53

ARTICLE V. BANKRUPTCY COURT MATTERS........................................................54

Section 5.1    Bankruptcy Actions ..............................................................54

ARTICLE VI. COVENANTS ....................................................................................57

Section 6.1    Conduct of Business Prior to the Closing ..............................57
Section 6.2    Covenants Regarding Information ........................................61
Section 6.3    Notification of Certain Matters ............................................61
Section 6.4    Employee Matters..................................................................61
Section 6.5    Consents and Filings; Further Assurances ............................63
Section 6.6    Refunds and Remittances .....................................................64
Section 6.7    Public Announcements.........................................................65
Section 6.8    Seller Use of Transferred Marks; Use of Seller Marks ............65
Section 6.9    Sale Free and Clear...............................................................66
Section 6.10    Intellectual Property Registrations .......................................66
Section 6.11    Confidentiality.......................................................................66

ARTICLE VII. TAX MATTERS ...............................................................................67

Section 7.1    Transfer Taxes......................................................................67
Section 7.2    Tax Cooperation ...................................................................67
Section 7.3    Allocation of Taxes ...............................................................67
Section 7.4    Bulk Sales .............................................................................67
Section 7.5    Deferred Revenue.................................................................68

ARTICLE VIII. CONDITIONS TO CLOSING .............................................................68

Section 8.1    General Conditions................................................................68
Section 8.2    Conditions to Obligations of the Sellers.................................68
Section 8.3    Conditions to Obligations of the Buyer..................................69

ARTICLE IX. TERMINATION .................................................................................70

Section 9.1    Termination ..........................................................................70

2

Section 9.2    Effect of Termination ...................................................................................72

ARTICLE X. GENERAL PROVISIONS.........................................................................................72

Section 10.1    Non-Survival of Representations, Warranties and Covenants .................72
Section 10.2    Fees and Expenses.....................................................................................72
Section 10.3    Amendment and Modification....................................................................73
Section 10.4    Waiver ........................................................................................................73
Section 10.5    Notices........................................................................................................73
Section 10.6    Interpretation..............................................................................................74
Section 10.7    Entire Agreement .......................................................................................74
Section 10.8    Parties in Interest .......................................................................................75
Section 10.9    Governing Law...........................................................................................75
Section 10.10   Submission to Jurisdiction.........................................................................75
Section 10.11   Disclosure Generally ..................................................................................76
Section 10.12   No Recourse ...............................................................................................76
Section 10.13   Assignment; Successors .............................................................................76
Section 10.14   Enforcement ...............................................................................................77
Section 10.15   Severability.................................................................................................77
Section 10.16   Waiver of Jury Trial ...................................................................................77
Section 10.17   Counterparts ...............................................................................................77
Section 10.18   No Presumption Against Drafting Party ....................................................77

**INDEX OF EXHIBITS**

EXHIBIT A          FORM OF SALE PROCEDURES ORDER

## ASSET PURCHASE AGREEMENT

**ASSET PURCHASE AGREEMENT**, dated as of September 8, 2025 (this "<u>Agreement</u>"), by and among (i) Pinstripes Holdings, Inc., a Delaware corporation ("<u>Holdings</u>"), Pinstripes, Inc., a Delaware corporation ("<u>Pinstripes</u>"), Pinstripes Hillsdale, LLC, a California limited liability company ("<u>Hillsdale</u>"), and Pinstripes Illinois, LLC, an Illinois limited liability company (together with Holdings, Pinstripes, and Hillsdale, each a "<u>Seller</u>" and collectively, the "<u>Sellers</u>"), and (ii) SilverStrike, LLC, a Delaware limited liability company (the "<u>Buyer</u>").

## RECITALS

A.      The Sellers are engaged in the business of experiential dining and entertainment, focused on combining Italian-American cuisine with recreational activities like bowling and bocce (such business as and to the extent performed at the locations set forth on <u>Schedule 1.1</u> hereto, the "<u>Business</u>").

B.      The Sellers intend to file voluntary cases (collectively, the "<u>Bankruptcy Case</u>") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") on September 8, 2025 (the "<u>Petition Date</u>").

C.      The Sellers desire to sell to the Buyer all of the Transferred Assets and transfer to the Buyer the Assumed Liabilities, and the Buyer desires to purchase from the Sellers the Transferred Assets and assume the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105, 363 and 365 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and the Sale Order.

D.      The execution and delivery of this Agreement and the Sellers' ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Sale Order under, *inter alia*, sections 105, 363 and 365 of the Bankruptcy Code, as further set forth herein.  The Parties desire to consummate the proposed transaction as promptly as practicable after the Bankruptcy Court enters the Sale Order.

## AGREEMENT

In consideration of the foregoing and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE I.
## DEFINITIONS

Section 1.1      <u>Certain Defined Terms</u>.  For purposes of this Agreement:

"<u>Accounts Receivable</u>" means any and all (a) accounts receivable, notes receivable, trade accounts, unbilled receivables, rights to payment, negotiable instruments, chattel paper, contract billings and other amounts owed to any Seller (whether current or non-current), together

5

with all security or collateral therefor and any interest or unpaid financing charges accrued thereon, including all causes of action pertaining to the collection of amounts payable, or that may become payable, to any Seller with respect to products sold or services performed on or prior to the Closing Date, (b) license and royalty receivables, (c) rebate receivables from suppliers or vendors, (d) any other amounts due to any Seller, classified as accounts receivable in accordance with GAAP, (e) all accounts receivable and other amounts owed to any Seller (whether current or non-current) in connection with any customer purchases that are made with credit cards or any other related amounts owing (including deposits or holdbacks to secure chargebacks, offsets or otherwise) from credit card processors to the Sellers, and (f) any and all claims, remedies or other rights relating to any of the foregoing, together with any interest or unpaid financing charges accrued thereon.

"Action" means any claim, charge, investigation, audit, complaint, action, suit, arbitration or proceeding (including any civil, criminal, administrative, investigative or appellate proceeding or any informal proceeding) by or before any Governmental Authority, other than an Avoidance Action.

"Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person, where "control," "controlled by" and "under common control with," means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, as trustee or executor, as general partner or managing member, by Contract or otherwise. Notwithstanding the foregoing, except with respect to Section 6.7, Section 10.12 and Section 10.13, in no event shall Buyer be considered an Affiliate of Silverview Credit Partners LP or any portfolio company Affiliated with or managed by Silverview Credit Partners LP or any of its Affiliates.

"Alternative Transaction" means any proposal, offer or transaction with respect to a plan of reorganization or dissolution, winding up, liquidation, reorganization, assignment for the benefit of creditors, merger, consolidation, business combination, joint venture, partnership, sale of assets or equity interests, financing (debt or equity), refinancing or restructuring involving the Sellers (other than the transactions contemplated in this Agreement) that competes with or renders consummation of this Agreement or the transactions contemplated hereby unable to be consummated or would reasonably be expected to materially frustrate the purposes of this Agreement.  For the avoidance of doubt, any proposal, offer, or transaction involving the sale of any of, any portion of or any subset of the Transferred Assets, including in connection with the Auction, shall be deemed to constitute an "Alternative Transaction" for purposes of this Agreement.

"Ancillary Agreements" means, collectively, the agreements to be executed in connection with the transactions contemplated by this Agreement, including the Assignment Agreement, the Bill of Sale, the IP Assignment Agreement and the Transition Services Agreement.

"Anti-Bribery and Anti-Corruption Laws" means all Laws of any applicable jurisdiction related to anti-bribery or anti-corruption (governmental or commercial) including, without limitation, the U.S. Foreign Corrupt Practices Act and all national and international Laws

enacted to implement the OECD Convention on Combating Bribery of Foreign Officials in International Business Transactions.

"Anti-Terrorism and Money Laundering Laws and Regulations" means applicable Laws (a) prohibiting transactions with Persons who (i) commit, threaten to commit, or support terrorism, (ii) engage in transactions or conduct operations that are illegal, nefarious, and/or criminal in nature, and (iii) participate in monetary transactions in property derived from specified unlawful activity, or (b) otherwise relating to prohibitions regarding the illegal laundering of the proceeds of any criminal activity and preventing the funds, proceeds and revenue of the Business and the Transferred Assets from being used in connection with the advancement of criminal activity, including the USA PATRIOT Act of 2001 and all "know your customer" rules and other applicable regulations.

"Auction" has the meaning set forth in the Sale Procedures Order.

"Avoidance Actions" means any and all claims for relief of the Sellers under chapter 5 of the Bankruptcy Code or state fraudulent conveyance, fraudulent transfer, or similar Laws.

"Backup Bidder" has the meaning set forth in the Sale Procedures Order.

"Books and Records" means the files, documents, instruments, books, reports and records, in each case whether hard copy, electronic or otherwise, maintained by or on behalf of the Sellers that are related to the Business, the Transferred Assets, the Hired Employees or the Assumed Liabilities.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in the State of New York.

"Business Employees" means all individuals employed by (or providing consulting services to) the Sellers whose duties relate primarily to the Business.

"Buyer Material Adverse Effect" means any event, change, occurrence or effect that would materially and adversely affect the ability of the Buyer to perform its obligations under this Agreement or the Ancillary Agreements or to consummate the transactions contemplated hereby or thereby.

"Cash and Cash Equivalents" means all of Sellers' cash (including (i) Restaurant Petty Cash and (ii) checks received on the Closing Date whether or not then deposited or cleared), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, credit card receivables, accounts receivable, commodity Contracts, commodity accounts, government securities and any other cash equivalents, in each case whether on hand, in transit, in banks or other financial institutions, or otherwise held.

"Code" means the Internal Revenue Code of 1986, as amended.

"Competing Bid" means any bid contemplating an Alternative Transaction.

"Contract" means any contract, agreement, insurance policy, lease, sublease, indenture, mortgage, guaranty, loan or credit agreement, note, bond, license, sublicense, sales order, purchase order, instrument, or other commitment (whether written or oral), that is binding on any Person or any part of its assets or properties under applicable Law.

"Credit Bid" means a credit bid by Buyer, pursuant to 363(k) of the Bankruptcy Code, equal to the Credit Bid Amount.

"Credit Bid Amount" means Buyer's secured debt against the Seller in an amount equal to $15,000,000, consisting of $3,800,000 of DIP Loan Claims and $11,200,000 of Silverview Loan Claims (as defined in the Interim Financing Order and Final Financing Order).

"Data Room" means the electronic data room established by the Sellers or any of their Affiliates or Representatives and to which the Buyer or any of its Affiliates or Representatives had access.

"DIP" means that certain debtor in possession financing facility reflected by the DIP Term Sheet, Interim Financing Order and Final Financing Order and which facility was approved by the Bankruptcy Court pursuant to the Interim Financing Order and Final Financing Order, together with any documents and agreements required or otherwise contemplated by the DIP Term Sheet, Interim Financing Order and Final Financing Order.

"DIP Agent" means the administrative agent and collateral agent under the DIP (as defined in the Interim Financing Order and Final Financing Order), including any successor thereto.

"DIP Loan Claims" means any and all claims against the Sellers arising from or based upon the DIP, including, without limitation, all accrued but unpaid principal, interest, premiums, costs, fees, expenses and indemnities.

"DIP Term Sheet" means that certain debtor in possession credit facility term sheet approved by the Bankruptcy Court pursuant to the Interim Financing Order and Final Financing Order.

"DIP Obligations" means as defined in the Interim Financing Order and Final Financing Order.

"Disclosure Schedule Delivery Date" means September 15, 2025.

"Economic Sanctions and Trade Controls Laws and Regulations" means (a) all applicable U.S. and applicable international economic and trade sanctions, including any sanctions or regulations administered or enforced by the U.S. Department of State, the U.S. Department of Treasury (including the Office of Foreign Assets Control) and any executive Orders, rules and regulations relating thereto; (b) all applicable Laws concerning exportation, including rules and regulations administered by the U.S. Department of Commerce, the U.S. Department of State or the Bureau of Customs and Border Protection of the U.S. Department of Homeland Security; and (c) any applicable federal or international anti-boycott Laws, including any executive Orders, rules and regulations.

"Employee Benefit Plans" means each (a) "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA, (b) other benefit and compensation plan, Contract, policy, program, practice, arrangement or agreement, including pension, profit-sharing, savings, termination, executive compensation, phantom stock, change-in-control, retention, salary continuation, vacation, sick leave, disability, death benefit, insurance, hospitalization, medical, dental, life (including all individual life insurance policies as to which any Seller is an owner or a beneficiary), employee loan, educational assistance, fringe benefit, deferred compensation, retirement or post-retirement, severance, equity or equity-based compensation, incentive and bonus plan and (c) other employment, consulting or other individual agreement, plan, practice, policy, contract, program, and arrangement, or plans or arrangements providing compensation to employee and non-employee directors, in each case, (i) that is sponsored or maintained or contributed to by any Seller or any of their respective ERISA Affiliates in respect of any current or former employees, directors, independent contractors, consultants or leased employees of any Seller or (ii) with respect to which any Seller has any actual or contingent Liability (including any such plan or arrangement formerly maintained by any Seller or any current or former ERISA Affiliates thereof).

"Encumbrance" shall have the broadest meaning possible pursuant to the Bankruptcy Code including any lien, encumbrance, claim, right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interest, title defect, hypothecation, easement, right of way, restrictive covenant, encroachment, right of first refusal, preemptive right, judgment, conditional sale or other title retention agreement, and all other impositions, imperfections, defects, limitations, or restrictions of any nature or kind whatsoever.

"Environmental Claim" means any action, cause of action, claim, suit, proceeding, investigation, enquiry, Order, demand or notice by any Person alleging Liability (including Liability for investigatory costs, governmental response costs, remediation or clean-up or the costs thereof, natural resources damages, property damages, personal injuries, attorneys' fees, fines or penalties) arising out of, based on, resulting from or relating to (a) the presence, Release or threatened Release of, or exposure to any Hazardous Material; (b) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law; or (c) any other matters for which liability is or may be imposed under any Environmental Law.

"Environmental Law" means any Law relating to pollution, the protection of, restoration or remediation of the environment (including natural resources and endangered or threatened species), or the protection of human health and safety (to the extent relating to exposure to Hazardous Material), including the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et. seq.*, as amended, and other Laws relating to: (a) the exposure to, or Releases or threatened Releases of, Hazardous Material; (b) the presence, generation, manufacture, processing, labeling, distribution, use, transport, treatment, containment, storage, disposal, or handling of Hazardous Material; or (c) recordkeeping, notification, disclosure and reporting requirements respecting Hazardous Material.

"Environmental Permit" means any Permit required under or issued pursuant to any Environmental Law.

"Equity Interest" means, with respect to any Person, any share of capital stock of, or other equity interest in, such Person or any security exercisable or exchangeable for, or convertible into, any share of capital stock of, or other equity interest (including any security exercisable or exchangeable for, or convertible into, any share of capital stock or other equity interest) in, such Person, including any warrant, option, convertible or exchangeable note or debenture, profits interest or phantom equity right, whether voting or non-voting.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any employers (whether or not incorporated) that would be treated together with the Sellers as a single employer within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"Excluded Cash" means an amount of cash of the Sellers (including cash received by the Sellers from loans made to the Sellers under the DIP on the Closing Date) equal to the Wind-Down Amount.

"Final Financing Order" means that certain final order, dated on or prior to October 13, 2025, by the Bankruptcy Court approving the DIP on a final basis.

"Final Order" means an Order of the Bankruptcy Court or any other court of competent jurisdiction (a) as to which the time to appeal shall have expired and as to which no appeal shall then be pending or (b) if a timely appeal shall have been filed or sought, either (i) no stay of the Order shall be in effect, (ii) no motion or application for a stay of the Order shall be filed and pending or such motion or application shall have been denied, or (iii) if such a stay shall have been granted, then (A) the stay shall have been dissolved or (B) a final Order of the district court or circuit court having jurisdiction to hear such appeal shall have affirmed the Order and the time allowed to appeal from such affirmance or to seek review or rehearing (other than a motion pursuant to Rule 60(b) of the Federal Rules of Civil Procedure) thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible, and if a timely appeal of such district court or circuit court Order or timely motion to seek review or rehearing of such Order shall have been made, any appellate court having jurisdiction to hear such appeal or motion (or any subsequent appeal or motion to seek review or rehearing) shall have affirmed the district court's (or lower appellate court's) Order upholding the Order of the Bankruptcy Court and the time allowed to appeal from such affirmance or to seek review or rehearing thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible; provided, however, that the Buyer in its sole discretion may treat any Order for which a motion or application for a stay is filed or pending as a Final Order by affirmatively agreeing to such treatment in a writing signed by the Buyer; provided, further, that any Sale Order that waives Bankruptcy Rule 6004(h) shall be considered and deemed, upon its entry by the Bankruptcy Court, a Final Order for purposes of this Agreement.

"Fundamental Representations" means the representations and warranties set forth in Section 3.1, Section 3.2, Section 3.3, Section 3.4 and Section 3.6(b)(i).

"GAAP" means United States generally accepted accounting principles as in effect from time to time.

"Government Official" means any officer or employee of a Governmental Authority, or any person acting in an official capacity for or on behalf of any such Governmental Authority, or any political party, party official or candidate thereof.

"Governmental Authority" means any United States or non-United States national, federal, municipal, state, provincial, territorial, or local governmental or quasi-governmental, administrative, Taxing or regulatory authority, department, agency, board, bureau, official, court, commission or any other judicial or arbitral body or other similar authority or instrumentality (including any self-regulatory authority, securities exchange, court or similar tribunal), including the Bankruptcy Court.

"Hazardous Material" means any material, substance, chemical, or waste (or combination thereof) that (a) is listed, defined, designated, regulated or classified as hazardous, toxic, radioactive, dangerous, a pollutant, a contaminant, petroleum, petroleum products and byproducts, oil, or words of similar meaning or effect under any Environmental Law, including without limitation asbestos, radon, urea-formaldehyde, per- or polyfluoroalkyl substances or other emerging contaminants, explosives, polychlorinated biphenyls (PCBs) or substances containing PCBs, radioactive materials, Stachybotrys mold and Legionella bacteria, and known carcinogens; or (b) pursuant to which Liability is or could be imposed under any Environmental Law.

"Indebtedness" means, as to any Person as of any date of determination, without duplication, all obligations of such Person (a) for borrowed money, (b) evidenced by notes, bonds, debentures or similar instruments, (c) for the deferred purchase price of goods or services (other than trade payables or accruals incurred in the ordinary course of business consistent with past practice), (d) any off-balance sheet financings, (e) for amounts drawn with respect to any letter of credit issued on behalf of such Person, (f) in the nature of guaranties by such Person made with respect to the obligations described in clauses (a) through (e) of this definition of any other Person, and (g) all accrued or unpaid interest, premiums, penalties, breakage costs, unwind costs, fees, termination costs, redemption costs, expenses, and other charges with respect thereto, in each case with respect to the obligations described in clauses (a) through (f) of this definition.

"Intellectual Property" means any and all intellectual property and any and all right, title and interest therein or thereto, of every kind and description throughout the world in any jurisdiction, including (a) trade names, trademarks, service marks, business names, corporate names, domain names, internet protocol addresses, certification marks, trade dress, logos, slogans, design rights, brand names, and other similar designations of source or origin whether registered or unregistered (including all translations, adaptations, derivations, and combinations of the foregoing), together with the goodwill connected with the use of and symbolized by any of the foregoing ("Trademarks"); (b) patents, patent applications, invention disclosures, patent disclosures and improvements to any of the foregoing, together with all provisionals, continuations, continuations-in-part, divisionals, revisions, reissues, re-examinations, substitutions, and restorations thereof, and all foreign counterparts and all rights in any of the foregoing ("Patents"); (c) works of authorship (whether copyrightable or not), copyrights and copyrightable subject matter (whether registered or unregistered), including copyrights in

11

Software, and all moral rights and special rights of authorship or attribution associated with any of the foregoing ("Copyrights"); (d) computer software, programs and applications (whether in source code, object code, or other form), systems, algorithms, databases, compilations and data, tools, firmware, specifications, application programming interfaces, scripts, executables, libraries and other technology, and all documentation, including user manuals and training materials, and all versions, updates, releases, patches, corrections, enhancements and modifications, related to any of the foregoing ("Software"); (e) any information and materials, whether proprietary or not and whether patentable or not, including trade secrets and other proprietary or confidential information, ideas, concepts, unpatented inventions (whether patentable or unpatentable and whether or not reduced to practice), formulas, recipes, methods, processes, procedures, designs, compositions, plans, documents, inventions, discoveries, components, materials, drawings, specifications, financial, accounting, customer and other sensitive business data, technical data, personal information, customer lists, supplier lists, business plans, know-how, and rights in any data ("Know-How"); (f) rights of publicity, privacy rights, and rights in all social media usernames and accounts, (g) all rights in the foregoing and in other similar intangible assets; (h) all copies and tangible embodiments of all of the foregoing (in whatever form or medium); (i) all applications, registrations, issuances, renewals, reversions, or extensions for any of the foregoing; (j) rights of any kind accruing under any of the foregoing provided by applicable law of any jurisdiction, by international treaties and conventions, and otherwise throughout the world, as well as all rights of indemnity, warranty rights, rights of contribution, refund, reimbursement or other rights of recovery possessed by Sellers (regardless of whether such rights are currently exercisable); (k) royalties, fees, income, payments, and other proceeds now or hereafter due or payable with respect to any and all of the foregoing; and (l) claims and causes of action with respect to any of the foregoing, whether accruing before, on, or after the date hereof, including all rights to and claims for damages, restitution, and injunctive and other legal and equitable relief for past, present, and future infringement, dilution, misappropriation, violation, misuse, breach, or default, with the right but not the obligation to sue for such legal and equitable relief and to collect, or otherwise recover, any such damage.

"Inter-Company Payable" means any accounts payable, trade accounts payable and other amounts payable owed to a Seller by or from a Seller.

"Inter-Company Receivable" means any accounts receivable, trade accounts and other amounts receivable owed to a Seller by or from a Seller.

"Interim Financing Order" means that certain interim order, dated on or prior to September 11, 2025, by the Bankruptcy Court approving the DIP on an interim basis.

"IRS" means the Internal Revenue Service of the United States.

"IT Assets" means any and all computers, Software, databases, hardware, servers, workstations, routers, hubs, switches, platforms, data communications lines, websites (including the content thereon) and all other information technology equipment, rights, and assets, including those provided pursuant to outsourced or cloud computing arrangements.

"Knowledge" with respect to the Sellers means the actual knowledge of the persons listed in Section 1.1(a) of the Disclosure Schedule after reasonable due inquiry.

"Law" means any federal, state, provincial, local, municipal, foreign or other statute, law, legislation, constitution, principle of common law, resolution, ordinance, code, regulation, rule, proclamation, treaty, convention, code, injunction, judgment, decree, ruling, directive, pronouncement, requirement, determination, decision, opinion, Order, ordinances and regulations (including binding determinations and interpretations) of any Governmental Authority.

"Lease" means a lease, sublease, license, or other use or occupancy agreement with respect to the real property to which a Seller is a party as lessee, sublessee, tenant, subtenant or in a similar capacity.

"Leased Real Property" means the leasehold interests held by a Seller under a Lease (other than any Leases withdrawn pursuant to Section 2.6).

"Liability" means any debt, adverse claim, loss, claim, lien, damage, demand, fine, Taxes, judgment, penalty, liability, duty, responsibility, expense (including interest, court costs, reasonable fees of attorneys, accountants and other experts or other reasonable expenses of litigation or other Action or of any claim, default or assessment) or obligation of any kind, character, or description (whether known or unknown, asserted or unasserted, direct or indirect, fixed, absolute or contingent, matured or unmatured, accrued or unaccrued, ascertained or ascertainable, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, vested or unvested, executory, determined, determinable, in contract, tort, strict liability, or otherwise, or otherwise due or to become due).

"Liquor Licenses" means all liquor licenses (including, without limitation, beer and wine licenses) held or used by each Seller, including the Seller in whose name such license is issued, date of issuance and renewal date.

"Material Adverse Effect" means any event, change, condition, occurrence or effect that individually or in the aggregate has had, or would reasonably be expected to have, a material adverse effect on (a) the business, properties, liabilities, financial condition or results of operations of the Business, including the Transferred Assets and Assumed Liabilities, taken as a whole, or (b) the ability of the Sellers to perform their obligations under this Agreement or the Ancillary Agreements or to consummate the transactions contemplated hereby or thereby, in each case of the preceding clause (a), other than any event, change, condition, occurrence or effect to the extent arising out of, attributable to or resulting from, alone or in combination, (i) general changes or developments in the industry in which the Business operates, (ii) changes in general domestic or foreign economic, social, political, financial market or geopolitical conditions (including the existence, occurrence, escalation, outbreak or worsening after the date hereof of any hostilities, war, police action, acts of terrorism or military conflicts, whether or not pursuant to the declaration of an emergency or war), (iii) natural disasters or calamities, (iv) changes in any applicable Laws or GAAP after the date of this Agreement, (v) the announcement of this Agreement or the transactions contemplated hereby, (vi) the commencement of the Bankruptcy Case, or (vii) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics (but, for the avoidance or doubt, not the underlying causes of any such failure to the extent such underlying cause is not otherwise excluded from the definition of Material Adverse Effect); provided, however, that the events, changes, conditions, occurrences or effects set forth in clauses (i), (ii), (iii) or (iv) may be taken into account in

13

determining whether there has been or is a Material Adverse Effect if such event, change, condition, occurrence or effect has a disproportionate impact on the Business, taken as a whole, relative to the other participants in the industries and markets in which the Business operates.

"OFAC" means the U.S. Department of Treasury's Office of Foreign Assets Control.

"OFAC Blocked Parties List" means the list of "Specially Designated Nationals and Blocked Persons" maintained by OFAC.

"Off-the-Shelf Software" means non-exclusive licenses for Software that are (a) licensed under "shrink-wrap" or "click-through" Contracts, (b) generally commercially available on reasonable nondiscriminatory terms through commercial distributors or in a retail store, or (c) licensed from a third-party for amounts less than $15,000 annually.

"Order" means any award, writ, injunction, judgment, order, decree, rule, ruling, directive, determination or award entered, issued, made, or rendered by any Governmental Authority, whether preliminary, interlocutory or final, including by the Bankruptcy Court in the Bankruptcy Cases (including the Sale Order).

"Ordinary Course of Business" means the operation of the Business in the ordinary and usual course consistent with past practice of the Sellers in accordance with applicable Law.

"Organizational Documents" means, with respect to any Person that is not a natural person (a) the articles or certificate of incorporation, formation or organization, memorandum of association, articles of association and by-laws, limited partnership agreement, partnership agreement, limited liability company agreement or operating agreement or such other organizational documents of such Person or which establish the legal personality of such Person and (b) the minute books, membership interest certificates and membership interest transfer ledgers of such Person.

"Owned IP" means any and all Intellectual Property owned (or purported to be owned), in whole or in part, by, or exclusively licensed to, in whole or in part, any of the Sellers, and includes all Intellectual Property required to be set forth on Section 3.12(a) of the Disclosure Schedule.

"Party" or "Parties" means, individually or collectively, the Buyer and the Sellers.

"Permit" means any authorization, approval, consent, license (including any Liquor License), permit, variance, waiver, certificate of authority, franchise, ruling, tariff, certification, exemption, filing, notice to, declaration of, or registration by or with any Governmental Authority.

"Permitted Encumbrance" means (a) statutory liens for current Taxes not yet due and payable or the validity or amount of which is being contested in good faith by appropriate proceedings, in each case for which adequate reserves have been established on the Seller Financial Statements in accordance with GAAP and for which there is no material risk of seizure of any property or asset, (b) mechanics', carriers', workers', repairers' and other similar liens arising or incurred in the Ordinary Course of Business relating to obligations (i) as to which there is no

14

default on the part of any of the Sellers, (ii) for a period with respect to amounts not yet overdue (<u>provided</u> that such amounts arising or accruing prior to Closing remain Excluded Liabilities) and (iii) that are not individually or in the aggregate material to the continued use, value or operation of the Transferred Assets in the conduct of the Business as currently conducted, or pledges, deposits or other liens securing the performance of bids, trade Contracts, leases or statutory obligations, (c) with respect to the Leased Real Property, minor title defects or irregularities that do not, individually or in the aggregate, materially impair the value or the current use of such Leased Real Property, and (d) any Encumbrances that will be removed or released by operation of the Sale Order on or prior to the Closing Date.

"<u>Person</u>" means an individual, corporation, partnership, limited liability company, limited liability partnership, syndicate, person, trust, association, organization or other entity, including any Governmental Authority, and including any successor, by merger or otherwise, of any of the foregoing.

"<u>Post-Closing Tax Period</u>" means any Tax year or Tax period that begins after the Closing Date, and with respect to the Straddle Period, the portion of such period that begins after the Closing Date.

"<u>Post-Closing Wind-Down Budget</u>" means a budget in form and substance agreed upon by the Parties that provides for the funding of all fees, costs and expenses arising out of or relating to the Bankruptcy Case and all other transactions contemplated by this Agreement, which fees, costs and expenses in the aggregate shall not exceed the Wind-Down Amount, that are expected to be incurred by the Sellers to wind-down their respective corporate existence and operations following the Closing Date, including (but not limited to) professional advisor and legal fees, noticing fees and any other fees, costs and expenses incurred for the Bankruptcy Case to be compliant with the Bankruptcy Code.

"<u>Pre-Closing Tax Period</u>" means any Tax year or Tax period that ends on or before the Closing Date and, with respect to the Straddle Period, the portion of such period that ends on, and including, the Closing Date.

"<u>Related Party</u>" means (a) any Seller or (b) any Affiliate of any Seller.

"<u>Release</u>" means any release, spill, emission, discharge, leaking, pouring, dumping or emptying, pumping, injection, deposit, disposal, dispersal, leaching or migration into the indoor or outdoor environment (including soil, ambient air, surface water, groundwater and surface or subsurface strata) or into or out of any property, including the migration of Hazardous Materials through or in the air, soil, surface water, groundwater or property.

"<u>Representatives</u>" means, with respect to any Person, the officers, managers, directors, principals, employees, agents, attorneys, accountants, auditors, advisors, bankers and other representatives of such Person.

"<u>Restaurant Petty Cash</u>" means any cash of the Sellers on the premises of any restaurant operated by the Sellers.

15

"Sale Hearing" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement.

"Sale Procedures" means the bidding procedures reflected in the Sale Procedures Order.

"Sale Procedures Motion" means the motion filed in the Bankruptcy Court by the Sellers seeking entry of the Sale Procedures Order.

"Sale Procedures Order" means the Order of the Bankruptcy Court, dated on or prior to September 26, 2025, that, among other things, approves (a) bidding procedures, (b) the form and manner of notice of Auction(s), sale transaction(s), and Sale Hearing(s), and the conduct of the Auction, (d) the procedures for assumption and assignment of Contracts and Leases, and (e) the date for the Auction, if necessary, and Sale Hearing, the form of which Order is attached hereto as Exhibit A, with such changes as may be required by the Bankruptcy Court that are in form and substance reasonably acceptable to the Buyer and the Sellers.

"Sale Order" means an Order of the Bankruptcy Court approving this Agreement and the transactions contemplated hereby, acceptable to Buyer in all respects.

"Silverview Agent" means Silverview Credit Partners LP, in its capacity as agent under the Silverview Loan Agreement and the other "Loan Documents" (as defined in the Silverview Loan Agreement), including any successor thereto.

"Silverview Loan Agreement" means that certain Loan Agreement, dated as of March 7, 2023, by and among Pinstripes, as borrower, Holdings, as holdings, the lenders party thereto from time to time, and the Silverview Agent, as amended, modified, supplemented, or amended and restated from time to time.

"Silverview Loan Claims" means any and all claims against the Sellers arising from or based upon the Silverview Loan Agreement or the other "Loan Documents" (as defined in the Silverview Loan Agreement), including, without limitation, all accrued but unpaid principal, interest, premiums, costs, fees, expenses and indemnities.

"Straddle Period" means any taxable period beginning on or before the Closing Date and ending after the Closing Date.

"Subsidiary" of any Person means any entity (a) of which 50% or more of the outstanding share capital, voting securities or other voting equity interests are owned, directly or indirectly, by such Person, (b) of which such Person is entitled to elect, directly or indirectly, at least 50% of the board of directors or similar governing body of such entity or (c) if such entity is a limited partnership or limited liability company, of which (i) such Person or one of its Subsidiaries is a general partner or managing member or has the power to direct the policies, management or affairs or (ii) such Person possesses, directly or indirectly, a 50% or greater interest in the total capitalization or total income of such partnership, limited liability company or similar entity.

"Successful Bidder" has the meaning set forth in the Sale Procedures Order.

16

"Support Agreement" means that certain Support Agreement, dated as of August 27, 2025, by and among the Sellers, Silverview Credit Partners LP and the Guarantors (as defined therein).

"Target of Sanctions" means any Person that is located in, incorporated under the Laws of, or owned or (directly or indirectly) controlled by Persons with which applicable Economic Sanctions and Trade Controls Laws and Regulations prohibit or restrict dealings.

"Tax Return" means any return, document, declaration, report, claim for refund, statement, estimation, disclosure, information statement or other information or filing relating to Taxes, including any schedule or attachment thereto or amendment thereof, that is filed with or supplied to, or required to be filed with or supplied to, any Governmental Authority.

"Taxes" means (a) any and all U.S. federal, state and local, non-U.S., and other taxes, charges, fees, duties, levies, tariffs, imposts, tolls, customs or other assessments, including all net income, gross income, capital gains, gross receipts, sales, use, ad valorem, transfer, franchise, profits, branch profits, profit share, license, lease, service, service use, value added, unclaimed property, escheat, withholding, payroll, employment, fringe, fringe benefits, excise, estimated, severance, stamp, occupation, premium, property, windfall profits, wealth, net wealth, net worth, payment or fee in lieu of taxes (or similar arrangement), export and import fees and charges, registration fees, tonnage, vessel, deposits, or other taxes, fees, assessments, customs, duties, levies, tariffs, imposts, tolls, or charges of any kind whatsoever imposed by any Governmental Authority, together with any interest, penalties, inflationary adjustments, additions to tax, fines or other additional amounts imposed thereon, with respect thereto, or related thereto, or in lieu thereof, wherever and whenever imposed, (b) any and all liability for the payment of any items described in clause (a) above arising from, through, attributable to, or with respect to a place of business, permanent establishment, or a branch or as a result of being (or ceasing to be) a member of a fiscal unity, affiliated, consolidated, combined, unitary, or other similar group or being included (or ceasing to be included) in any Tax Return related to such group, (c) any and all liability for the payment of any amounts as a result of any successor or transferee liability, or by operation of law, in respect of any items described in clause (a) or (b) above, and (d) any and all liability for the payment of any items described in clause (a) or (b) above as a result of, or with respect to, any express or implied obligation to indemnify any other Person pursuant to any tax sharing, tax indemnity or tax allocation agreement or similar agreement or arrangement with respect to taxes.

"Transferred Contracts" means all Contracts and Leases of each Seller that are listed in Section 1.1(a) of the Disclosure Schedules, which schedule shall be provided by Buyer to the Sellers as provided in, and may be adjusted pursuant to, Section 2.6.

"Treasury Regulations" means the final and temporary regulations promulgated by the U.S. Department of the Treasury pursuant to the Code.

"United States Person" means a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"Wind-Down Amount" means an amount not to exceed $50,000.

17

Section 1.2    <u>Table of Definitions</u>.  The following terms have the meanings set forth in the Sections referenced below:

<u>Definition</u>                                                                  <u>Location</u>

Agreement................................................................Preamble
Allocation.................................................................Section 2.9(b)
AML Laws ..............................................................Section 3.23(b)
Assignment Agreement.............................................Section 2.8(b)(i)
Assumed Liabilities ..................................................Section 2.3(a)
Audited Financial Statements ...................................Section 3.5(a)
Balance Sheet Date ..................................................Section 3.5(a)
Bankruptcy Case ......................................................Recitals
Bankruptcy Code .....................................................Recitals
Bankruptcy Court.....................................................Recitals
Bill of Sale               ..............................................Section 2.8(b)(i)
Business ...................................................................Recitals
Business Permits ......................................................Section 2.1(e)
Buyer.......................................................................Preamble
Closing ....................................................................Section 2.8(a)
Closing Date.............................................................Section 2.8(a)
Consent or Governmental Authorization ..................Section 2.6(c)
Cure Costs ...............................................................Section 2.3(a)(ii)
Current Receivables.................................................Section 3.19(b)
Credit Bid Amount...................................................Section 2.7
Disclosure Limitations .............................................Section 6.2
Disclosure Schedule .................................................Article III
Enforceability Exceptions.........................................Section 3.2
Equipment................................................................Section 2.1(c)
Event .......................................................................Section 1.1
Excluded Assets .......................................................Section 2.2
Excluded Contracts ..................................................Section 2.2(f)
Excluded Liabilities .................................................Section 2.4
Excluded Plans.........................................................Section 2.2(e)
Go-Shop Actions......................................................Section 5.1(a)(i)
Go-Shop Period........................................................Section 5.1(a)(i)
Hillsdale ..................................................................Preamble
Hired Employee .......................................................Section 6.4(a)
Holdings...................................................................Preamble
Improvements...........................................................Section 3.11(c)
Inactive Employee ...................................................Section 6.4(a)
Insurance Policies ....................................................Section 3.17
Intended Tax Treatment...........................................Section 2.9(a)
Inventory..................................................................Section 2.1(d)
IP Assignment Agreement ........................................Section 2.8(b)(iii)
Know-How................................................................Section 1.1
Latest Balance Sheet.................................................Section 3.5(a)

Legal Restraint .........................................................Section 8.1(a)
Material Contract .....................................................Section 3.15(a)
Material Supplier .....................................................Section 3.18
Non-Party Affiliates.................................................Section 10.12
OFAC Rep Party .......................................................Section 3.22(a)
Offered Employee.....................................................Section 6.4(a)
Outside Date.............................................................Section 9.1(b)(iii)
Patents .....................................................................Section 1.1
Pinstripes.................................................................Preamble
Petition Date............................................................Recitals
Prairiefire ................................................................Preamble
Purchase Price .........................................................Section 2.7
Registered IP ...........................................................Section 3.12(a)
Related Orders .........................................................Section 5.1(b)(iii)
Related Party Agreement .........................................Section 3.16
Seller .......................................................................Preamble
Seller Financial Statements......................................Section 3.5(a)
Software ..................................................................Section 1.1
Terminated Employee...............................................Section 6.4(b)
Terrorism Order .......................................................Section 3.22(a)
Trademarks ..............................................................Section 1.1
Transfer Taxes .........................................................Section 7.1
Transferred Assets ...................................................Section 2.1
Transferred Tax Assets ............................................Section 2.1(g)
Unaudited Financial Statements ...............................Section 3.5(a)
WARN .....................................................................Section 3.10(f)

## ARTICLE II.
## PURCHASE AND SALE

Section 2.1    Purchase and Sale.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, upon the terms and subject to the conditions of this Agreement, at the Closing, the Sellers shall sell, assign, transfer, convey and deliver to the Buyer, or any subsidiary, affiliate or designee of Buyer designated in writing prior to the Closing, all of the Sellers' right, title and interest in, to and under the Transferred Assets, and the Buyer, or any subsidiary, affiliate or designee of Buyer designated in writing prior to the Closing, shall purchase, acquire and accept the Transferred Assets free and clear of all Encumbrances (other than Permitted Encumbrances).  "Transferred Assets" shall mean all of the properties, rights, interests and other assets of the Sellers of every kind and description, wherever located, whether real, personal or mixed, tangible or intangible, in each case, relating to the Business, including all right, title and interest of the Sellers in, to or under the following properties, rights, interests and other assets (but excluding in each case, any Excluded Assets):

(a)    all Transferred Contracts (as may be adjusted pursuant to Section 2.6);

(b)    all Leased Real Property (subject to Section 2.6) and other interests in real property, together in each case with the Sellers' right, title and interest in and to all structures,

fixtures, facilities or improvements located thereon and all easements, licenses, rights, privileges and appurtenances relating to the foregoing;

(c)    all machinery, equipment, consumables, supplies, furniture, furnishings, parts, spare parts, vehicles and other tangible personal property and fixed assets owned, leased (to the extent the underlying lease is a Transferred Contract) or used (or held for use) by the Sellers (the "Equipment");

(d)    all inventory (including raw materials, component parts, spare parts, works-in-progress, finished goods and goods in transit, supplies and packaging materials, consumable food, alcoholic beverages, and other beverages, all of Sellers' tangible property used in the preparation of, serving, and cleaning up from, food and drinks, including napkins, silverware, plates and dining ware, cups, glassware, mugs, cooking and cleaning utensils, packaging materials, paper products, ingredients, miscellaneous consumables, materials, supplies, inventories and all of Sellers' tangible property used in connection with bowling, bocce and other entertainment) owned or used (or held for use) by any of the Sellers, wherever located and whether in the Sellers' facilities, held by any third parties or otherwise (the "Inventory");

(e)    all Permits issued to, or for the benefit of, any Seller (the "Business Permits"), all rights and benefits thereunder and all pending applications or filings therefor and renewals thereof, in each case, which are related to the Transferred Assets or the Business, but only to the extent such Permits may be transferred under applicable Law;

(f)    all Cash and Cash Equivalents, all bank accounts, all cash collateral held by third parties as security for the Assumed Liabilities, and all deposits (including maintenance deposits, customer deposits, and security deposits for rent, electricity, telephone, utilities or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by any Seller, but excluding the Excluded Cash;

(g)    any interest in or right to any Tax refund, rebate, credit or attribute or other Tax asset, benefit or receivable, in each case, that relates to, or with respect to, the Transferred Assets or the Business (collectively, the "Transferred Tax Assets"), including (for the avoidance doubt) any Transferred Tax Assets that become available or utilizable to, or received by, any Seller in a Post-Closing Tax Period in respect of a Tax paid or incurred by the Buyer with respect to the Transferred Assets;

(h)    copies of all Tax Returns of, with respect to, or related to the Transferred Assets or the Business (and all Tax books and records, including note papers and work papers, related thereto);

(i)    all Accounts Receivable (including Inter-Company Receivables);

(j)    all rights under non-disclosure or confidentiality, non-compete, non-solicitation, non-interference, non-disparagement or similar agreements to which any Seller is a party, with respect to which any Seller is a beneficiary or has any rights thereunder, including any such agreement with current or former directors, managers, officers, employees or agents, or with third parties;

(k)    all rights (including lien rights), claims (including commercial tort claims), credits, settlement proceeds, causes of action, choses in action, rights of recovery, rights of recoupment, rights of set off, equity rights and defenses relating or with respect to the Business, any of the Transferred Assets (including, for the avoidance of doubt, those arising under, or otherwise relating to, any of the Transferred Contracts) or any of the Assumed Liabilities, including all rights under vendors', manufacturers' and contractors' representations, warranties, indemnities and guarantees;

(l)    except as contemplated by Section 2.2(b), all of such Seller's insurance policies and rights and benefits thereunder (including (i) all rights to indemnification for losses, defense costs and settlements, credits, refunds, proceeds, claims (including first party and third party insurance claims), causes of action or other rights arising under or relating to such insurance policies, (ii) all claims, demands, proceedings and causes of action asserted or that may be asserted by any Seller under such insurance policies relating, directly or indirectly, to the Business, any Transferred Asset or any Assumed Liability and (iii) any letters of credit or other credit support related thereto);

(m)    all Owned IP and any and all other Intellectual Property owned, licensed, used or held for use by any of the Sellers, in each case, that is used (or held for use in) or otherwise relates to the Business;

(n)    all goodwill, customer and referral relationships, other intangible assets and all privileges associated with, or relating to, the Business, the Transferred Assets or the Assumed Liabilities;

(o)    all IT Assets owned, licensed, leased, used, or held for use by any of the Sellers, in each case, that is used (or held for use in) or otherwise relates to the Business (collectively, the "Transferred IT Assets");

(p)    all rights to the social media accounts, telephone and facsimile numbers and e-mail account contents and addresses used by any Seller, as well as rights to receive mail and other communications addressed to any Seller (including mail and communications to and from customers, vendors, suppliers, distributors, agents and Governmental Authorities);

(q)    except to the extent set forth in Section 2.2(a), all Books and Records; and

(r)    the properties, rights, interests and other assets set forth on Section 2.1(r) of the Disclosure Schedules.

Section 2.2    Excluded Assets.    Notwithstanding anything contained in Section 2.1 to the contrary, the Sellers are not selling, transferring, assigning, conveying or delivering, and the Buyer is not purchasing, any of the Sellers' right, title and interest to, in and under, the following assets, properties, rights and interests of the Sellers, all of which shall be retained by the Sellers (collectively, the "Excluded Assets"):

(a)    the Sellers' documents, written files, papers, books, reports and records (i) prepared in connection with this Agreement or the transactions contemplated hereby or relating to the Bankruptcy Case or (ii) that any Seller is required by Law to retain; provided that, to the

extent not prohibited by applicable Law or any of any Seller's reasonable applicable privacy policies or contractual restrictions and to the extent materially relevant to the Transferred Assets, Assumed Liabilities, or the Business, Buyer shall be entitled to copies of all or any portions of such documents;

(b)    all director and officer insurance policies, fiduciary policies (in each case of the foregoing, including any automatic or purchased extended reporting periods, tail policies or coverage thereon), and any of such Seller's rights, benefits, indemnifications, claims, demands, proceedings, credits, causes of action or rights of set off thereunder;

(c)    all rights, claims and causes of action to the extent relating to any Excluded Asset or any Excluded Liability;

(d)    shares of capital stock or other Equity Interests of any Seller or securities convertible into or exchangeable or exercisable for shares of capital stock or other Equity Interests of any Seller;

(e)    all Employee Benefit Plans, along with the assets under each Employee Benefit Plan (collectively, the "Excluded Plans"), together with all funding arrangements related thereto (including all assets, trusts, insurance policies and administrative service Contracts);

(f)    any Contract to which any of the Sellers is a party that is not a Transferred Contract, including those set forth on Section 2.2(f) of the Disclosure Schedule (the "Excluded Contracts"), which schedule shall be provided by Buyer to the Sellers as provided in, and may be adjusted pursuant to, Section 2.6;

(g)    all retainers or similar prepaid amounts paid to the accountants, attorneys, consultants, advisors, investment bankers or other professional service providers of the Sellers;

(h)    the Excluded Cash;

(i)    the assets of the Sellers listed in Section 2.2(i) of the Disclosure Schedules;

(j)    all Avoidance Actions; and

(k)    all rights of the Sellers under this Agreement and the Ancillary Agreements.

Section 2.3    Assumed Liabilities.

(a)    On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Closing, Buyer, or any subsidiary of Buyer designated in writing prior to the Closing, shall assume from the Sellers (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and the Sellers shall irrevocably convey, transfer, and assign to Buyer (or any subsidiary of Buyer designated in writing prior to the Closing), only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (the "Assumed Liabilities"):

(i)      all Liabilities of the Sellers under the Transferred Contracts solely to the extent first arising from and after the Closing, excluding with respect to events, circumstances or occurrences that first arise prior to the Closing or as otherwise agreed between Buyer and counterparty to such Transferred Contracts;

(ii)      cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Transferred Contracts or as otherwise agreed between Buyer and counterparty or landlord to applicable Transferred Contracts (the "Cure Costs");

(iii)      the payment obligation, in an amount up to $300,000, to the Sellers' proposed investment banker, Hilco Corporate Finance; and

(iv)      all Inter-Company Payables.

(b)      The transactions contemplated by this Agreement shall in no way expand the rights or remedies of any third party against the Buyer or the Sellers as compared to the rights and remedies that such third party would have had against the Sellers or the Buyer absent the Bankruptcy Case or the Buyer's assumption of such Assumed Liabilities.  Notwithstanding the foregoing and for the avoidance of doubt, (i) all post-petition administrative rent costs for the month of September, if any, for the locations set forth on Schedule 1.1, in each case accrued in accordance with the budget and treated as a Cure Cost, for the Transferred Contracts are Assumed Liabilities, and (ii) Assumed Liabilities shall not include any (1) Excluded Liability, (2) any obligation to pay any expenses for winding down the Bankruptcy Case, other than the Wind-Down Amount in accordance with the Post-Closing Wind-Down Budget, (3) fees and expenses for any professional employed by the Sellers or their estates, (4) any post-petition Liabilities of any of the Sellers that were incurred in violation of the Interim Financing Order, the Final Financing Order, or the DIP, or (5) Liability relating to or arising out of any violation of Law by, or any Action against, any Seller or any breach, default or violation by any Seller or any of its Affiliates of or under any Transferred Contracts, all of which shall constitute Excluded Liabilities.  Other than the Assumed Liabilities, the Buyer is not assuming and shall not be liable for any Liabilities of the Sellers.

Section 2.4      Excluded Liabilities.  Buyer and its designated subsidiaries shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, the Sellers or the Business or relating to the Transferred Assets, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "Excluded Liabilities"), including but not limited to the following:

(a)      any and all Liabilities for (i) any Taxes related to, arising from or with respect to the Transferred Assets, the Assumed Liabilities or the operation of the Business, in each case that are incurred in, or attributable to, any Pre-Closing Tax Period (determined, in the case of any Straddle Period, in accordance with Section 7.3), including any such Taxes which are not due

23

or assessed until after the Closing Date, (ii) any Taxes related to, arising from or with respect to the Excluded Assets or other Excluded Liabilities for any taxable period, (iii) any Taxes of or with respect to the Sellers or any direct or indirect equityholder or former equityholder of the Sellers or any of their respective Affiliates thereof for any taxable period, or (iv) any Taxes of or with respect to any Person (other than the Sellers) imposed on the Buyer as a transferee or successor to the Transferred Assets, the Assumed Liabilities or the operation of the Business, by Contract or assumption, or pursuant to any law, rule, or regulation, which Taxes are incurred in, relate to, or attributable to, any Pre-Closing Tax Period;

(b)     any and all Liabilities of the Sellers under any Excluded Contract whether accruing prior to, at, or after the Closing Date (including, for the avoidance of doubt, any and all Liabilities relating to the return of deposits or other prepaid amounts to counterparties to any Excluded Contract);

(c)     any and all Liabilities resulting from the failure to comply with any applicable "bulk sales," "bulk transfer" or similar Law;

(d)     any Liabilities arising out of, resulting from or relating to (i) the employment or service or termination of employment or service, or the provision of compensation, severance, benefits or payments of any nature owed to any current or former employees, officers, directors or service providers of the Sellers, whenever arising and whether or not such Persons become Hired Employees or are otherwise employed by or perform other services for Buyer or their Affiliates after the Closing, relating to services performed, or claims accrued or incurred on or prior to the Closing, (ii) the employment or termination of employment of any Business Employee by the Sellers on or prior to the Closing, including any gratuity payment, severance, notice or other payment or benefit due on the termination of employment of any such Business Employee by the Sellers at the Closing, (iii) claims incurred on or prior to the Closing under any Employee Benefit Plan and all Liabilities with respect thereto, including all wages, commission, severance, bonus, damages for wrongful dismissal, paid-time-off, accrued vacation, and other post-termination payments so incurred on or prior to the Closing, and (iv) Liabilities expressly retained by the Sellers pursuant to Section 6.4;

(e)     any Indebtedness of the Sellers;

(f)     any Liability to distribute to any Seller's shareholders (or other equity holders) or otherwise apply all or any part of the consideration received hereunder;

(g)     any and all Liabilities arising under any Environmental Law or with respect to Hazardous Materials or any other environmental matter and arising from or related to (i) the ownership or operation of the Business or the Transferred Assets on or before the Closing Date, (ii) any action or inaction of the Sellers or any third party relating to the Business or Transferred Assets on or before the Closing Date, (iii) any formerly owned, leased or operated properties of the Sellers that are not the Leased Real Property, or (iv) any condition first occurring or arising on or before the Closing Date with respect to the Business or the Transferred Assets;

(h)     except with respect to the Wind-Down Amount provided by Buyer pursuant to the Post-Closing Wind-Down Budget, any and all Liability for: (i) costs and expenses incurred

24

by the Sellers or owed in connection with the administration of the Bankruptcy Case (including the U.S. Trustee fees, the fees and expenses of attorneys, accountants, financial advisors, consultants and other professionals retained by the Sellers, and any official or unofficial creditors' or equity holders' committee and the fees and expenses of the post-petition lenders or the pre-petition lenders incurred or owed in connection with the administration of the Bankruptcy Case); (ii) all costs and expenses of the Sellers incurred in connection with the negotiation, execution and consummation of the transactions contemplated under this Agreement; and (iii) all costs and expenses arising out of or related to any third party claims against the Sellers, pending or threatened, including any warranty or product claims;

(i)     any Liability of the Sellers under this Agreement or the Ancillary Agreements; and

(j)     any Liability or obligation to the extent relating to an Excluded Asset.

Section 2.5    Consents to Certain Assignments.

(a)     Notwithstanding anything in this Agreement or any Ancillary Agreement to the contrary, this Agreement and the Ancillary Agreements shall not constitute an agreement to transfer or assign any asset, Permit, claim or right or any benefit arising thereunder or resulting therefrom if an attempted assignment thereof, without the consent of a third party, would constitute a breach or other contravention under any Contract or Law to which any Seller is a party or by which it is bound, or materially and adversely affect the rights of the Sellers or, upon transfer, the Buyer under such asset, Permit, claim or right, unless the applicable provisions of the Bankruptcy Code permits and/or the Sale Order authorizes the assumption and assignment of such asset, Permit, claim, or right irrespective of the consent or lack thereof of a third party.  If, with respect to any Transferred Asset, such consent is not obtained or such assignment is not attainable pursuant to the Bankruptcy Code or the Sale Order, then such Transferred Asset shall not be transferred hereunder, and, subject to Section 8.3(g), the Closing shall proceed with respect to the remaining Transferred Assets and the Sellers shall, through the earlier of such time as such consent or assignment is so obtained and eighteen (18) months following the Closing, use commercially reasonable efforts, and the Buyer shall cooperate with the Sellers, to obtain any such consent and to resolve the impracticalities of assignment after the Closing; provided, however, that Sellers shall only be obligated to provide such post-Closing assistance so long as Buyer complies with the Post-Closing Wind-Down Budget.

(b)     Except with respect to Transferred Contracts and Business Permits that are governed by Section 2.6(c) below, if (i) notwithstanding the applicable provisions of sections 363 and 365 of the Bankruptcy Code and the Sale Order and the commercially reasonable efforts of the Sellers, any consent is not obtained prior to Closing and as a result thereof the Buyer shall be prevented by a third party from receiving the rights and benefits with respect to a Transferred Asset intended to be transferred hereunder, (ii) any attempted assignment of a Transferred Asset would adversely affect the rights of the Sellers thereunder so that the Buyer would not in fact receive all the rights and benefits contemplated, or (iii) any Transferred Asset is not otherwise capable of sale and/or assignment (after giving effect to the Sale Order and the Bankruptcy Code), then, in any such case, the Sellers shall, subject to any approval of the Bankruptcy Court that may be required and at the request of the Buyer, cooperate with Buyer in any lawful arrangement under which the

Buyer would, to the extent practicable, obtain the economic claims, rights and benefits under such asset and assume the economic burdens and obligations with respect thereto in accordance with this Agreement, including by subcontracting, sublicensing or subleasing to the Buyer.  The Sellers shall as promptly as practicable pay to the Buyer when received all monies received by the Sellers or their Affiliates attributable to such Transferred Asset from and after the Closing Date and the Buyer shall indemnify and promptly pay the Sellers for all Liabilities of the Sellers associated with such arrangement.

Section 2.6    Assumption/Rejection of Certain Contracts.

(a)    Assumption and Assignment of Executory Contracts.  The Sellers shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to any executory Contracts or unexpired leases to which any Seller is a party that are Transferred Contracts and take all other actions necessary to cause such Contracts to be assumed by the Sellers and assigned to Buyer or its designee pursuant to section 365 of the Bankruptcy Code to the extent that such Contracts are Transferred Contracts at Closing.  At the Closing, the Sellers shall, pursuant to the Sale Order, and the Assignment Agreement, assume and assign to Buyer, or any subsidiary, affiliate or designee of Buyer designated in writing prior to the Closing (the consideration for which is included in the Purchase Price), all Transferred Contracts that may be assigned by any such Seller to Buyer (or any subsidiary, affiliate or designee of Buyer designated in writing prior to the Closing) pursuant to sections 363 and 365 of the Bankruptcy Code, subject to adjustment pursuant to Section 2.6(b).  At the Closing, Buyer or its applicable designee shall (i) pay all Cure Costs, (ii) cure any and all other defaults and breaches under the Transferred Contracts so that such Contracts may be assumed by the applicable Seller and assigned to Buyer (or any subsidiary, affiliate or designee of Buyer designated in writing prior to the Closing) in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement, and (iii) assume, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and perform all of the obligations under each Transferred Contract pursuant to section 365 of the Bankruptcy Code.

(b)    Excluding or Adding Transferred Contracts Prior to Closing.  Section 2.6(b) of the Disclosure Schedule sets forth a list of each executory Contract (including Leases) of the Sellers and the Sellers' good faith estimate of the amount of Cure Costs applicable to each such executory Contract (and, if no Cure Cost is estimated to be applicable with respect to any particular executory Contract, the estimated amount of any such Cure Cost for such executory Contract shall be designated as "$0.00").  Notwithstanding anything to the contrary set forth herein, Buyer shall have the right to notify the Sellers in writing of (i) any Transferred Contract that it does not wish to assume up to one (1) Business Day prior to the Closing Date and any such previously considered Transferred Contract that Buyer no longer wishes to assume shall be automatically deemed removed from Section 1.1(a) of the Disclosure Schedule and automatically deemed added to Section 2.2(f) of the Disclosure Schedules, in each case, without any adjustment to the Purchase Price and (ii) any Contract to which any Seller is a party that Buyer wishes to add as a Transferred Contract up to five (5) Business Days after the Closing Date (which time period may be extended by mutual consent of the Parties) and any such previously considered Excluded Contract that Buyer wishes to assume as a Transferred Contract shall be automatically deemed added to Section 1.1(a) of the Disclosure Schedule related to Transferred Contracts, automatically deemed removed from Section 2.2(f) of the Disclosure Schedules, and assumed by Sellers to sell and assign

26

to Buyer (or any subsidiary, affiliate or designee of Buyer designated in writing prior to the Closing), in each case, without any adjustment to the Purchase Price.  If any Contract is added to (or excluded from) the Transferred Contracts or Excluded Contracts pursuant to this Section 2.6(b), the Sellers shall promptly take such steps as are reasonably necessary, including, if applicable, prompt delivery of notice to the non-Seller counterparty to such Contract to cause such Contract to be assigned to Buyer (or any subsidiary, affiliate or designee of Buyer designated in writing), or excluded or rejected, as applicable.  Promptly following any such changes to the information set forth on Section 1.1(a) of the Disclosure Schedule or Section 2.2(f) of the Disclosure Schedules, the Sellers shall provide an updated schedule setting forth the Cure Costs applicable to each Contract set forth on Section 1.1(a) of the Disclosure Schedules.

      (c)      Non-Assignment.  Notwithstanding the foregoing, a Contract shall not be a Transferred Contract hereunder and shall not be assigned to, or assumed by, Buyer (or any subsidiary, affiliate or designee of Buyer) to the extent that such Contract (i) is rejected by a Seller or terminated by a Seller or any other party thereto, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Buyer (or any subsidiary, affiliate or designee of Buyer) as a Transferred Contract hereunder and is not continued or otherwise extended upon assumption; provided, however, the Buyer may irrevocably designate any such Contract as a Transferred Contract in accordance with Section 2.6(b) and the Sellers shall not move to reject such Contract; or (ii) requires an approval or Order from, or consent by, any Governmental Authority or other Person (other than, and in addition to, that of the Bankruptcy Court), except for any such approval, Order, or consent that is not required due to the Sale Order ("Consent or Governmental Authorization") in order to permit the sale or transfer to Buyer (or any subsidiary, affiliate or designee of Buyer designated in writing prior to the Closing) of the applicable Seller's rights under such Contract, and such Consent or Governmental Authorization has not been obtained prior to such time as it is to be assumed by Buyer (or any subsidiary, affiliate or designee of Buyer designated in writing prior to the Closing) as a Transferred Contract hereunder or the Bankruptcy Court has not issued an Order that such Consent or Governmental Authorization is not required. In the event that any Transferred Contract is deemed not to be assigned pursuant to clause (ii) of the first sentence of this Section 2.6(c), the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Consent or Governmental Authorization is obtained and eighteen (18) months following the Closing (or the remaining term of such Contract or the closing of the Bankruptcy Case, if shorter), Sellers and Buyer shall (A) use reasonable best efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by Buyer, including subcontracting, licensing, or sublicensing to Buyer (or any subsidiary, affiliate or designee of Buyer designated in writing prior to the Closing)  any or all of any Seller's rights and obligations with respect to any such Transferred Contract, under which (1) Buyer (or any subsidiary, affiliate or designee of Buyer designated in writing prior to the Closing) shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits under such Transferred Contract with respect to which the Consent or Governmental Authorization has not been obtained and (2) Buyer (or any subsidiary, affiliate or designee of Buyer designated in writing prior to the Closing) shall assume any related burden (taking into account the amount of any related Tax benefit obtained by Sellers or their respective Affiliates) and obligation (including performance) with respect to such Transferred Contract; provided, however, that Sellers shall only be obligated to provide such post-Closing assistance so long as Buyer complies with the

27

Post-Closing Wind-Down Budget.  Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Transferred Contract after the Closing, such Transferred Contract shall promptly be transferred and assigned to Buyer (or any subsidiary, affiliate or designee of Buyer designated in writing prior to the Closing) in accordance with the terms of this Agreement.

(d)    Negotiations.  Notwithstanding anything herein to the contrary, each Seller hereby authorizes, consents to, and agrees that, Buyer and its Affiliates and designees shall be permitted to discuss, negotiate and/or communicate directly with any of the counterparties on any matters relating to any of the Contracts of the Sellers (including, without limitation, Cure Costs related thereto and/or the terms of such Contracts).  The Sellers hereby undertake to take all steps and actions and use commercially reasonable efforts to cooperate with Buyer and its Affiliates and designees to facilitate any such discussions, negotiations and/or communications as may be requested by Buyer and/or its Affiliates or designees.  If a non-debtor counterparty to a Contract objects to the assumption or assignment or to the proposed Cure Costs asserted by the Sellers with regard to any Contract (a "Disputed Contract"), the Sellers shall use commercially reasonable efforts to either settle the objection of such party or shall litigate such objection under procedures as the Bankruptcy Court shall approve and proscribe, provided, however, that (i) if the Disputed Contract is identified on Section 2.6(a) of the Disclosure Schedule, the Sellers shall not settle a Cure Cost objection without the express written consent of Buyer and (ii) Sellers shall only be obligated to provide such post-Closing assistance so long as Buyer complies with the Post-Closing Wind-Down Budget.

Section 2.7    Consideration.  In consideration for the transfer of the Transferred Assets to the Buyer (or any subsidiary, affiliate or designee of Buyer) and the other undertakings set forth herein, the purchase price (the "Purchase Price") for the Transferred Assets shall be (a) the assumption of the Assumed Liabilities by the Buyer (or any subsidiary, affiliate or designee of Buyer designated in writing prior to the Closing) at Closing, plus (b) the Credit Bid plus (c) the provision of an amount equal to the Wind-Down Amount for the Post-Closing Wind-Down Budget plus (d) $1,600,000 in cash (the "Cash Component").  Notwithstanding anything to the contrary herein, (i) under no circumstances shall any portion of the Credit Bid Amount be converted into or otherwise require a cash payment and the Cash Component is the only cash portion of the Purchase Price and (ii) each dollar of DIP Loan Claims, or Silverview Loan Claims, as applicable, that is subject to the Credit Bid or assumed as Assumed Liabilities shall be treated as the same as a dollar of cash.

Section 2.8    Closing.

(a)    The sale and purchase of the Transferred Assets and the assumption of the Assumed Liabilities contemplated by this Agreement shall take place at a closing (the "Closing") to be held by electronic exchange of documents at 10:00 a.m. New York Time on the second (2nd) Business Day following the satisfaction or, to the extent permitted by applicable Law, waiver of all conditions to the obligations of the Parties set forth in Article VIII (other than such conditions as may, by their terms, only be satisfied at the Closing or on the Closing Date, but subject to the satisfaction or waiver of such conditions), or at such other place or at such other time or on such other date as the Sellers and the Buyer mutually may agree in writing.  The day on which the Closing takes place is referred to as the "Closing Date."

(b)     At or prior to the Closing, the Sellers shall deliver or cause to be delivered to the Buyer:

(i)     the bill of sale substantially in form and substance agreed upon by the Parties (the "Bill of Sale"), duly executed by the applicable Sellers;

(ii)     the assignment and assumption agreement substantially in form and substance agreed upon by the Parties (the "Assignment Agreement"), duly executed by the applicable Sellers;

(iii)     the intellectual property assignment agreement substantially in form and substance agreed upon by the Parties (the "IP Assignment Agreement"), duly executed by the applicable Sellers;

(iv)     the Transition Services Agreement substantially in form and substance agreed upon by the Parties (the "Transition Services Agreement"), duly executed by the applicable Sellers;

(v)     a copy of the Sale Order, as entered by the Bankruptcy Court, which must be a Final Order;

(vi)     an IRS Form W-9 from each Seller duly executed by each such Seller, dated as of the Closing Date, certifying that such Seller (or if such Seller is a disregarded entity within the meaning of Treasury Regulation Section 301.7701-3, its regarded owner for U.S. federal income Tax purposes) is a United States Person and is not subject to backup withholding; and

(vii)     a duly executed certificate of a duly authorized officer of each Seller certifying the satisfaction of the conditions set forth in Section 8.3(a),  Section 8.3(b) and Section 8.3(e).

(c)     At or prior to the Closing, the Buyer shall deliver or cause to be delivered to the Sellers:

(i)     a payoff letter, release letter or other similar document acknowledging the Credit Bid of the Credit Bid Amount pursuant to section 363(k) of the Bankruptcy Code as partial consideration for the transfer of the Transferred Assets;

(ii)     a payoff letter, release letter or other similar document acknowledging the Credit Bid of the DIP Loan Claims pursuant to section 363(k) of the Bankruptcy Code as partial consideration for the transfer of the Transferred Assets;

(iii)     the Bill of Sale, duly executed by the Buyer and, to the extent applicable, any subsidiary, affiliate or designee of Buyer designated in writing prior to the Closing to receive the Transferred Assets;

(iv)    the Assignment Agreement, duly executed by the Buyer and, to the extent applicable, any subsidiary, affiliate or designee of Buyer designated in writing prior to the Closing to receive the Transferred Assets;

(v)    the IP Assignment Agreement, duly executed by the Buyer and, to the extent applicable, any subsidiary, affiliate or designee of Buyer designated in writing prior to the Closing to receive the Transferred Assets;

(vi)    the Transition Services Agreement, duly executed by the Buyer; and

(vii)    a duly executed certificate of a duly authorized officer of the Buyer certifying the satisfaction of the conditions set forth in <u>Section 8.2(a)</u> and <u>Section 8.2(b)</u>.

Section 2.9    <u>Intended Tax Treatment; Tax Allocation; Tax Sharing Agreements</u>.

(a)    For U.S. federal income Tax purposes (and applicable state and local income Tax purposes), the sale of the Transferred Assets by each Seller to Buyer under this Agreement shall be treated as an asset sale governed by Treasury Regulations Section 1.166-6 and Section 1001 of the Code (the "<u>Intended Tax Treatment</u>").  The Parties will, and will cause each of their respective Affiliates to, prepare and file all Tax Returns in a manner consistent with the Intended Tax Treatment, and none of the Parties or their respective Affiliates will take any position with any Governmental Authority or otherwise that is inconsistent with the Intended Tax Treatment, except as Sellers and Buyer may otherwise agree or as may be otherwise required by a final, non-appealable "determination" within the meaning of Section 1313(a) of the Code (or any corresponding or similar provision of state, local, or non-U.S. Tax Law).

(b)    The Purchase Price (including the applicable Assumed Liabilities and any other amounts, to the extent properly taken into account under applicable Tax Law, and including any adjustments thereto), shall be allocated among the applicable Transferred Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (such allocation, the "<u>Allocation</u>").  The Allocation shall be prepared by the Buyer and delivered to the Sellers promptly following the Closing Date.    Buyer and Sellers shall, and shall cause their respective Affiliates to, prepare and file all Tax Returns, including Internal Revenue Service Form 8594 (Asset Acquisition Statement under Section 1060 of the Code), in a manner consistent with the Allocation, as finally determined under this <u>Section 2.9(b)</u>, and none of the Sellers or Buyer (or any of their respective Affiliates) shall take any position inconsistent therewith on any Tax Return or in connection with any Tax audit, claim or similar Action, in each case, unless otherwise required by a "determination" within the meaning of Section 1313(a) of the Code. Sellers shall use commercially reasonable efforts to timely and properly deliver all such documents, forms and other information as Buyer may reasonably request to the extent necessary to prepare the Allocation and any adjustments thereto. Buyer, on the one hand, and Sellers, on the other hand, shall notify the other if it receives notice that any Governmental Authority proposes any allocation different from the Allocation (as finally determined under this <u>Section 2.9(b)</u>.

(c)    All Tax sharing agreements or similar agreements and all powers of attorney that relate in any way to the Transferred Assets or the Business will be terminated effective as of the Closing and, after the Closing, no such agreement or power of attorney will have any effect on

the Transferred Assets, and Buyer and its Affiliates shall not have any Liability with respect thereto.

Section 2.10    <u>Withholding</u>.  Buyer and its Affiliates (and any person who is a withholding agent for applicable Tax purposes) shall be entitled to deduct and withhold from amounts payable pursuant to this Agreement to any Person such amounts as are required by applicable Law to be deducted and withheld from such payment.  To the extent that amounts are so deducted or withheld, such deducted or withheld amounts shall be treated for all purposes of this Agreement as having been paid to such Person in respect of which such deduction and withholding was made.

Section 2.11    <u>Exclusion of Transferred Assets</u>.    Except with respect to the Transferred Contracts (which are subject to <u>Section 2.6</u>), at any time on or prior to the third (3rd) Business Day after the date of the Auction, the Buyer may, in its discretion by written notice to the Sellers, designate any of the Transferred Assets as additional Excluded Assets, which notice shall set forth in reasonable detail the Transferred Assets so designated; <u>provided</u> that (a) there shall be no reduction in the Purchase Price if the Buyer elects to designate any Transferred Asset as an Excluded Asset and (b) the Liabilities of the Sellers under or related to any Transferred Asset excluded under this paragraph will constitute Excluded Liabilities.

## ARTICLE III.
## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except as set forth in the Disclosure Schedules delivered by the Sellers to the Buyer which are consistent with the Support Agreement and satisfactory to the Buyer in its sole discretion (the "<u>Disclosure Schedules</u>") (with specific reference to the representations and warranties in this <u>Article III</u> to which the information in such schedule relates; <u>provided</u>, <u>however</u>, that, disclosure in the Disclosure Schedule as to a specific representation or warranty shall qualify any other sections of this Agreement to the extent (notwithstanding the absence of a specific cross reference) it is readily apparent on its face that such disclosure relates to such other sections), as of the Disclosure Schedule Delivery Date and as of the Closing Date (other than representations and warranties made as of a specified date), each of the Sellers jointly and severally represents and warrants to the Buyer as follows:

Section 3.1    <u>Organization</u>.  Each Seller (a) is an entity duly incorporated or organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, as applicable, and (b) has all requisite power and authority to own and operate its properties and assets and to carry on its businesses as now conducted, subject to the provisions of the Bankruptcy Code. Each Seller is qualified to do business and is in good standing (or its equivalent) in every jurisdiction in which its ownership of property or the conduct of its business as now conducted requires it to qualify, except where the failure to be so qualified is not and would not reasonably be expected to be material to the Business, taken as a whole.

Section 3.2    <u>Authority</u>.  Subject to required Bankruptcy Court approvals, (i) each Seller has all requisite legal capacity and the full power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it is or will be a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby

and thereby, (ii) the execution, delivery and performance by such Seller of this Agreement and each of the Ancillary Agreements to which it is or will be a party and the consummation by such Seller of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate (or equivalent) action and (iii) this Agreement has been, and upon its execution each of the Ancillary Agreements to which such Seller will be a party will have been, duly executed and delivered by such Seller and, assuming due execution and delivery by each of the other parties hereto and thereto, this Agreement constitutes, and upon its execution each of the Ancillary Agreements to which such Seller will be a party will constitute, the legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with their respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether considered in a proceeding in equity or at Law) (the "Enforceability Exceptions").

Section 3.3     No Conflict; Required Filings and Consents.

(a)     Except as set forth in Section 3.3(a) of the Disclosure Schedule and assuming that (x) requisite Bankruptcy Court approvals are obtained, and (y) the notices, authorizations, approvals, Orders, permits or consents set forth in Section 3.3(b) of the Disclosure Schedule are made, given or obtained (as applicable), the execution, delivery and performance by the Sellers of this Agreement and the Ancillary Agreements to which they are (or will be) a party and the consummation by the Sellers of the transactions contemplated hereby and thereby, will not: (i) conflict with or result in any violation or breach of or default under or give rise to a right of termination, cancellation, modification or acceleration of any obligation, to any put or call or similar rights or to loss of a benefit under, any provision of the Organizational Documents of any Seller; (ii) conflict with or result in a violation or breach of any Law or Order applicable to any Seller or by which any Transferred Asset or any property or asset of any Seller is bound; (iii) violate or render void or voidable any Permit or Order applicable to the Sellers or by which any Transferred Asset is bound or (iv) conflict with or result in a violation or breach of, constitute (with or without notice or lapse of time) a default under, require any Seller to obtain consent or approval from any Person under the terms of, give rise to any right of termination, cancellation, acceleration or modification under the terms of, or result in the creation or imposition of any Encumbrance (other than Permitted Encumbrances) upon any properties or assets of any Seller under the terms of, in each case, any Lease or Contract to which any Seller is a party; except, with respect to clauses (ii), (iii) or (iv), for any such conflicts, violations, breaches, defaults or other occurrences which have not had and would not reasonably be expected to have a Material Adverse Effect.

(b)     Except as set forth in Section 3.3(b) of the Disclosure Schedule, no Seller is required to file, seek or obtain any notice, authorization, approval, Order, Permit, or consent of or with any Governmental Authority in connection with the execution, delivery and performance by the Sellers of this Agreement and each of the Ancillary Agreements to which they are or will be a party or the consummation by the Sellers of the transactions contemplated hereby or thereby, except (i) requisite Bankruptcy Court approvals (including the entry of the Sale Procedures Order and the Sale Order), or (ii) as would be required solely as a result of the specific identity or the specific legal or regulatory status of the Buyer or any of its Affiliates as compared to any other unaffiliated third party purchaser.

Section 3.4    Transferred Assets.

(a)    Each Seller, as applicable, has indefeasible title to, and owns and possesses all rights and interests in, including the right to use, each of the Transferred Assets, or with respect to leased Transferred Assets, valid leasehold interests in such Transferred Assets, or with respect to licensed Transferred Assets, valid licenses to use such Transferred Assets.

(b)    This Agreement and the instruments and documents to be delivered by the Sellers to the Buyer at the Closing shall be adequate and sufficient to transfer (i) Sellers' entire right, title and interest in and to the Transferred Assets and (ii) to the Buyer, good title to the Transferred Assets, free and clear of all Encumbrances (other than Permitted Encumbrances), claims, and interests, other than Assumed Liabilities, subject to entry of the Sale Order.

(c)    Except (a) as has not had and would not reasonably be expected to have, individually or in the aggregate, an adverse effect on the Business or the Transferred Assets, taken as a whole, in any material respect and as would not materially impair or delay the ability of any Seller to consummate the transactions contemplated hereby, or (b) as set forth on Section 3.4(c) of the Disclosure Schedule, the right, title and interest of the Sellers in the Transferred Assets constitute substantially all of the assets of Sellers owned or held by, used or intended for use, leased, licensed or accrued in connection with the conduct of the Business as currently conducted, and immediately after the Closing, the Transferred Assets shall be sufficient for Buyer to continue to operate and conduct the Business as currently conducted.

(d)    Except as set forth on Section 3.4(d) of the Disclosure Schedules, all tangible assets of the Transferred Assets are (i) in good working order and condition in all material respects, ordinary wear and tear excepted, (ii) have been reasonably maintained, (iii) are suitable in all material respects for the uses for which they are being utilized in the Transferred Assets and the Businesses as conducted by the Sellers as of the date hereof, (iv) do not require more than regularly scheduled maintenance in the Ordinary Course of Business and the established maintenance policies of Sellers in order to keep them in good operating condition, and (v) comply in all material respects with all requirements under any Laws and any licenses which govern the use and operation thereof.

(e)    There are no existing Contracts, options, commitments or rights with, to or in any third party to acquire the Transferred Assets or any interest therein or in the Business or the Business itself.

Section 3.5    Financial Statements; No Undisclosed Liabilities.

(a)    The Sellers have delivered to the Buyer true, correct and complete copies of (x) the audited consolidated balance sheets of the Sellers as of April 28, 2024, together with the related consolidated statements of operations, redeemable convertible preferred stock and stockholders' deficit and cash flows for the fiscal year then ended (the "Audited Financial Statements"), and (y) the unaudited consolidated balance sheets of the Sellers as of January 5, 2025 (the "Balance Sheet Date", and, such balance sheets the "Latest Balance Sheet"), together with the related consolidated statements of operations, redeemable convertible preferred stock and stockholders' deficit and cash flows for that portion of the fiscal year then ended (the "Unaudited

Financial Statements" and, together with the Audited Financial Statements, the "Seller Financial Statements").  The Seller Financial Statements (i) are based on the Books and Records, (ii) have been prepared in accordance with GAAP, applied on a consistent basis (except as may be indicated in the notes thereto) and, in the case of the Unaudited Financial Statements, subject to (A) normal year-end audit adjustments (none of which are expected to be material, individually or in the aggregate) and (B) the absence of notes (none of which, if presented, would materially differ in amount or nature from those included in the Audited Financial Statements) and (iii) fairly present, in all material respects, the financial position of the Sellers and the Business as of the respective dates therein indicated and the results of operations and cash flows for the periods therein specified.

(b)     Sellers do not have any Liabilities, whether or not required to be set forth on a balance sheet of Sellers prepared in accordance with GAAP, except for Liabilities (i) set forth on Section 3.5(b) of the Disclosure Schedule, (ii) arising under any Material Contract, Permit, or applicable Law, or otherwise in the Ordinary Course of Business since the Balance Sheet Date (other than Liabilities arising out of any breach or default under any such Material Contract or failure to comply with any such Permit or applicable Law), (iii) which would not reasonably be expected to be material to the Business, taken as a whole, or (iv) which are expressly reflected or reserved against in the Seller Financial Statements.

Section 3.6     Absence of Certain Changes or Events.  Since the Balance Sheet Date through the date of this Agreement, (a) each Seller has (i) conducted the Business in the Ordinary Course of Business, (ii) maintained all of their respective assets, Permits, business relationships and operations, in each case, in accordance with past custom and practice and applicable Law, and (iii) used the same book or Tax accounting methods, except as required by GAAP, and (b) there has not (i) been any event, change, condition, occurrence or effect that, individually or in the aggregate, has had, or would be reasonably expected to have, a Material Adverse Effect or (ii) without limiting the generality of the foregoing, except (x) for the solicitation of, discussions and negotiations with, presentations and provision of other diligence to and similar engagement with other potential bidders for the Transferred Assets, the negotiation and execution of this Agreement, or (y) as set forth on Section 3.6 of the Disclosure Schedule, from the Balance Sheet Date until the date hereof, no Seller has taken any action that, if taken after the Disclosure Schedule Delivery Date, would require Buyer's consent pursuant to Section 6.1.

Section 3.7     Compliance with Law; Permits.

(a)     The Business is being conducted in material compliance with, and the Sellers have in all material respects complied with all applicable Laws, Permits, and Orders relating to the operation of the Business and the Transferred Assets.  No investigation with respect to actual or alleged noncompliance with applicable Laws, and Orders by any Seller has been threatened or commenced, and no notice, charge, claim, action or assertion has been received by any Seller with respect to any actual or alleged noncompliance with applicable Laws and Orders.

(b)     The Sellers are in possession of all material Permits (which, for the avoidance of doubt, includes all Liquor Licenses) necessary for them to own, lease or otherwise hold their assets and properties and to carry on the Business as currently conducted.  All such Permits, and the holders thereof, are set forth on Section 3.7(b) of the Disclosure Schedule.  The Sellers have delivered to Buyer a true, correct and complete copy of each Permit.

34

(c)     No event has occurred that permits or would permit any material adverse modification, revocation, suspension, or termination of, or any other material adverse change in, or would prevent any Seller from obtaining, or any Seller's compliance with, any Permit.  Each such Permit (i) is held in the name of the applicable Seller, (ii) is valid and in full force and effect, (iii) is final and, if the statute or regulation pursuant to which such Permit is issued establishes a limited administrative or judicial appeal period, all such periods have expired and (iv) has not expired or been terminated, suspended, revoked or modified in any material respect (except for such modifications as have been delivered to Buyer).  No Seller is in material breach or default (nor, with the giving of notice or lapse of time, would be in material breach or default) under any such Permit.

(d)     No event has occurred and is continuing that could reasonably be expected to result in any adverse modification, revocation, suspension, or termination of, or any other material adverse change in, any Permit.  No Seller has received notice from any Governmental Authority regarding (i) any material breach or default under any Permit listed on Section 3.7(b) of the Disclosure Schedule, (ii) the expiration, revocation, suspension or termination of, or any material modification of the requirements under, any such Permit or (iii) any administrative investigation, administrative appeal, or judicial proceeding with respect to any such Permit (other than rulemaking proceedings of general applicability).

(e)     Subject to the entry of the Sale Order, each such Permit (including each Liquor License) may be transferred or reissued to the Buyer in accordance with this Agreement and without the approval of any Person (other than the Bankruptcy Court).  Such Permits are readily transferable to the Buyer without material expense and without causing such Permits to be revoked, cancelled, suspended or modified.

Section 3.8     Litigation.  Except for the Bankruptcy Case, and any Order entered in the Bankruptcy Case, and except as set forth on Section 3.8 of the Disclosure Schedule there is not, and has not been for the past three (3) years, any Action pending, or to the Knowledge of the Sellers, threatened by or against any Seller involving any of the Transferred Assets, the Assumed Liabilities or the Business.  In the past three (3) years, there has been no Order to which any of the Transferred Assets, the Assumed Liabilities or the Business is subject, except as has not resulted in and would not reasonably be expected to be material to the Sellers, taken as a whole.  None of the Sellers or any of their respective Affiliates has received written notice of any such Order described in this Section 3.8.

Section 3.9     Employee Benefit Plans.

(a)     Section 3.9(a) of the Disclosure Schedule sets forth a true and complete list of each Employee Benefit Plan. True, complete and correct copies of the following documents, with respect to each Employee Benefit Plan, where applicable, has been made available to Buyer: (i) all documents embodying or governing such Employee Benefit Plan (or for unwritten Employee Benefit Plans a written description of the material terms of such Employee Benefit Plan) and any funding medium for the Employee Benefit Plan; (ii) the most recent IRS determination or opinion letter; (iii) the most recently filed Form 5500; (iv) the most recent actuarial valuation report; (v) the most recent summary plan description (or other descriptions provided to employees) and all

35

modifications thereto; (vi) the last three years of non-discrimination testing results; and (vii) all non-routine correspondence to and from any Governmental Authority.

(b)     With respect to the Employee Benefit Plans, (i) each of the Employee Benefit Plans has been operated and administered in all respects in accordance with applicable Law and administrative or governmental rules and regulations, including ERISA, the Patient Protection and Affordable Care Act and the Code, and with any applicable collective bargaining agreement and all other agreements or instruments applicable to any Employee Benefit Plan, (ii) there is no pending or threatened Action by, on behalf of or against any Employee Benefit Plan or any administrator or fiduciary thereof (other than routine claims for benefits), nor, to the Knowledge of the Sellers, is there any basis for such Action.

(c)     Each Employee Benefit Plan intended to be "qualified" within the meaning of Section 401(a) of the Code is so qualified and has received a favorable determination or opinion letter as to such qualification from the IRS and, to the Knowledge of the Sellers, has, in operation, been qualified under the Code from the effective date of such Employee Benefit Plan. No event has occurred, either by reason of any action or failure to act, which would reasonably be expected to cause the loss of any such qualification or require corrective action to the IRS or Employee Plan Compliance Resolution System to maintain such qualification.

(d)     None of the Sellers or any of their ERISA Affiliates has ever maintained, sponsored, contributed to, or had an obligation to maintain, sponsor or contribute to, or has any Liability with respect to (i) a "defined benefit plan," as defined in Section 3(35) of ERISA and Section 414(j) of the Code, (ii) a plan subject to Title IV of ERISA or Sections 412 or 430 of the Code or to the minimum funding standards of Section 302 of ERISA, (iii) a "multiemployer plan," as defined in Section 3(37) of ERISA or (iv) a "multiple employer welfare arrangement", as defined in Section 3(4) of ERISA.

(e)     Neither any Seller, nor any ERISA Affiliate of any Seller, provides, nor have they ever provided, coverage under any welfare plan, as defined in Section 3(1) of ERISA, (including, but not limited to, life insurance, disability, medical, dental, prescription drugs or accidental death or dismemberment) to any of their former employees, other than any continuation coverage which any such former employee may have purchased at his or her own expense.

(f)     The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement could not, alone or in combination with any other event, (i) entitle any Business Employee to any payment (including severance pay, unemployment compensation or any other compensation), (ii) accelerate the time of payment or vesting, or increase the amount of compensation due to any Business Employee or (iii) cause any individual to accrue or receive additional benefits, service or accelerated rights to payment of benefits under any Employee Benefit Plan or employment agreement, (iv) directly or indirectly cause the Sellers or any of their ERISA Affiliates to transfer or set aside any assets to fund or otherwise provide for benefits for any individual, (v) limit or restrict the right to merge, materially amend, terminate or transfer the assets of any Employee Benefit Plan on or following the Closing Date, or (vi) require a "gross-up," indemnification for, or payment to any individual for any taxes imposed under Section 409A or Section 4999 of the Code or any other tax.

36

(g)     The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement will not result in any payment or benefit that would constitute an "excess parachute payment" (as such term is defined in Section 280G(b)(1) of the Code) or subject any Person to Liability for Tax under Section 4999 of the Code or cause the loss of deduction to any Seller under Section 280G of the Code.

(h)     Each Employee Benefit Plan that is a "nonqualified deferred compensation plan" within the meaning of Section 409A(d)(1) of the Code and any award thereunder, in each case that is subject to Section 409A of the Code, (i) has at all times been operated in compliance in all respects with Section 409A of the Code and all applicable IRS guidance promulgated thereunder, and (ii) either (A) has at all times been in a form which complies with the requirements of Section 409A of the Code or (B) has been timely amended under guidance issued pursuant to Section 409A of the Code so that its terms and provisions comply with the requirements of Section 409A of the Code.

(i)     There have been no statements, either written or oral, or communications made, or materials provided to any Business Employee by Sellers, or, to the Knowledge of Sellers, any of Sellers' officers, that provide for or could be construed as a Contract or promise regarding employment or terms and conditions of employment with the Buyer or its Affiliates following the Closing.

(j)     All contributions and premiums required by Law or by the terms of any Employee Benefit Plan have been timely made to any funds or trusts established thereunder or in connection therewith in all material respects.

Section 3.10     Labor and Employment Matters.

(a)     Section 3.10(a) of the Disclosure Schedule contains a true and correct list of all of the Business Employees as of the Disclosure Schedule Delivery Date, specifying their position, employer, date of hire, exempt or non-exempt status, hourly wage rate or annual base salary, all bonus opportunities, and accrued vacation, sick leave time and other paid time off, earned and accrued wages, salaries, commissions, bonuses, and any other material compensation, whether the employee is absent from active employment on approved leave, and, if so, the nature of such leave, the date such employee commenced such leave, and the anticipated date of return to active employment.

(b)     Except as disclosed in Section 3.10(b) of the Disclosure Schedules, no Seller is a party to or bound by any organized labor agreement, collective bargaining agreement, or any similar labor-related agreements or arrangements with any labor union, labor organization, or works council applicable to the Business Employees; there are no labor agreements, collective bargaining agreements, or any similar labor-related agreements or arrangements that pertain to any Business Employees; and no Business Employees are represented by any labor union, labor organization or works council with respect to their employment with the Sellers.

(c)     There are no material unfair labor practice charges, work stoppages, slowdowns, strikes, lockouts, grievances, picketings, or other similar material activities relating to labor matters pending or threatened against any Seller that pertain to the Business Employees.

(d)     No labor union, labor organization, works council or group of Business Employees has made a pending demand for recognition or certification, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or threatened to be brought or filed with the National Labor Relations Board or any other labor relations tribunal or authority pertaining to the Business Employees.  There are no labor union organizing activities with respect to any Business Employees.

(e)     As of the Closing Date, the Sellers will have satisfied any material legal or Contractual requirement to provide notice to, or to enter into any consultation procedure with, any labor union, labor organization or works council, which is representing any Business Employee, in connection with the execution, delivery or performance of this Agreement or the transactions contemplated by this Agreement.

(f)     Each Seller is in compliance in all material respects with all applicable Laws respecting labor, labor relations, employment and employment practices pertaining to the Business Employees, including but not limited to all Laws respecting collective bargaining, the terms and conditions of employment, wages, hours, equal employment opportunity, employment discrimination, worker classification (including the proper classification of workers as independent contractors and consultants, and employees as exempt or non-exempt for overtime pay), immigration, work authorization, occupational health and safety, workers' compensation, paid sick leave, vacation pay, the payment of social security and other employment Taxes, disability rights or benefits, plant closures and layoffs, affirmative action, labor relations, employee leave issues and unemployment insurance.  As of the Closing Date, the Sellers will not incur, nor have they incurred, Liabilities or other charges under the Worker Adjustment and Retraining Notification Act or any similar state law (collectively referred to as "WARN"), and none of the Sellers reasonably expects to conduct a layoff of employees of any of the Sellers as of or following the date hereof (other than individual terminations for just cause), regardless of whether any such layoff shall be deemed to effectuate or cause to be effectuated a "plant closing" or "mass layoff" (each as defined under WARN) or to trigger any statutory notice requirements under similar state law.

(g)     No employee of any of the Sellers is in any material respect in violation of any term of any employment agreement, nondisclosure agreement, common law nondisclosure obligation, fiduciary duty, non-competition agreement, restrictive covenant or other obligation: (i) to any of the Sellers or (ii) to a former employer of any such employee relating (A) to the right of any such employee to be employed by any such Seller or (B) to the knowledge or use of trade secrets or proprietary information.

(h)     Within the past three (3) years, there have not been any (i) unfair labor practice charges or complaints pending or threatened before the National Labor Relations Board or any other Governmental Authority against them, (ii) complaints, grievances, or arbitrations arising out of any collective bargaining agreement or any other complaints, grievances, or arbitration procedures against them, (iii) charges or complaints with respect to or relating to them pending before the Equal Employment Opportunity Commission or any other Governmental Authority responsible for the prevention of unlawful employment practices, (iv) written notice of the intent of any Governmental Authority responsible for the enforcement of labor, employment, wages and hours of work, child labor, immigration, or occupational safety and health laws to

38

conduct an investigation with respect to or relating to them or notices that such investigation is in progress, or (v) Actions pending or threatened in any forum by or on behalf of any present or former employee of such entities, any applicant for employment, or classes of the foregoing alleging breach of any express or implied Contract of employment, any applicable law governing employment or the termination thereof, or other discriminatory, wrongful, or tortious conduct in connection with the employment relationship.

(i)      The execution of this Agreement and the consummation of the transactions contemplated by this Agreement will not result in any breach or other violation of any collective bargaining agreement, employment agreement, consulting agreement or any other labor-related agreement to which the Sellers are a party that is applicable to the Business Employees.

(j)      The Sellers have in their files a U.S. Citizenship and Immigration Services Form I-9 that was validly and properly completed and, if necessary, that has been properly updated, in accordance with applicable Law for each Business Employee with respect to whom such form is required to be maintained under applicable Law.  The Sellers have not knowingly hired or continued to employ unauthorized workers.  No Seller has used the services of any individual through a staffing agency, Contract or subcontract knowing that the individual was an unauthorized worker.

(k)      Within the past three (3) years, (i) the Sellers have not been a party to any material settlement agreement with any Person resolving any allegation of sexual harassment or sexual misconduct by the Sellers or any of their respective employees; and (ii) there have been no material legal proceedings pending or threatened, against the Sellers involving allegations that an employee or a current or former officer or director of the Sellers engaged in sexual harassment or sexual misconduct with respect to any employee of the Sellers.

(l)      Section 3.10(l) of the Disclosure Schedule includes a list of employees of the Sellers whose employment has been involuntarily terminated within the ninety (90) day period preceding the date hereof and includes such employees' position and title (if any), their date of hire, the then-current rate of compensation as of his or her termination date and whether such employee is exempt or non-exempt.  Except as disclosed on Section 3.10(l) of the Disclosure Schedules, the Sellers have no unsatisfied Liability to any such previously terminated employee, officer, director, consultant, or independent contractor.

Section 3.11   Real Property.

(a)      None of the Sellers own, or have ever owned, any real property.

(b)      Section 3.11(b) of the Disclosure Schedule sets forth the address of each Leased Real Property, and a true, correct and complete list of all Leases to which the Sellers are a party (including all amendments, extensions, renewals, guaranties and other agreements with respect thereto) for such Leased Real Property.  Except as set forth on Section 3.11(b) of the Disclosure Schedules, the Sellers do not own, lease, license or otherwise have and have not had any interests (including option interests) in any real property other than the Leases.

(c)      To the Knowledge of the Sellers, the buildings, material building components, structural elements of the improvements, roofs, foundations, parking and loading

39

areas and mechanical systems (including all heating, ventilating, air conditioning, plumbing, electrical, elevator, security, utility and fire/life safety systems) (collectively, the "Improvements") included in the Leased Real Property and used by any of the Sellers in the operation of its business as currently conducted are, in all material respects, in good working condition and repair and sufficient for the operation of the business by each applicable Seller as currently conducted. There are no material structural deficiencies or material latent defects affecting any of the Improvements and, to the Knowledge of the Sellers, there are no facts or conditions affecting any of the Improvements, in each case, which would, individually or in the aggregate, interfere with the use or occupancy of the Improvements or any portion thereof in the operation of the Sellers in a manner that is or would be reasonably expected to be material to the Sellers, taken as a whole. No Seller has received notice of (i) any condemnation, eminent domain or similar Action affecting any parcel of Leased Real Property; (ii) any special assessment or pending improvement liens to be made by any Governmental Authority affecting any parcel of Leased Real Property; or (iii) violations of any building codes, zoning ordinances, governmental regulations or covenants or restrictions affecting any Leased Real Property that would be reasonably expected to result in a Material Adverse Effect. Each parcel of Leased Real Property has direct access to a public street adjoining such Leased Real Property, and such access is not dependent on any land or other real property interest which is not included in the Leased Real Property. None of the Improvements or any portion thereof is dependent for its access, use or operation on any privately owned land, building, improvement or other real property interest which is not included in the Leased Real Property. To the Knowledge of the Sellers, there are no recorded or unrecorded agreements, easements or encumbrances that materially interfere with the continued access to or operation of the Business of the Sellers as currently conducted on the Leased Real Property.

(d)    Each Seller has enjoyed the continuous and uninterrupted quiet possession, use and operation of the Leased Real Property, without complaint or objection by any Person.

Section 3.12    Intellectual Property.

(a)    A true, correct and complete list of all U.S. and foreign (1) issued Patents and pending Patent applications, (2) registered Trademarks (including domain names) and applications to register any Trademarks (including domain names), (3) registered Copyrights and applications for registration of Copyrights, and (4) domain name registrations, (5) other registered, issued or applied for Intellectual Property, (items (1) through (5), collectively, "Registered IP"), (6) any material unregistered Trademarks, and (7) any material Software, in each case, which is owned by (or purportedly owned by) whether in whole or part, or registered to a Seller is set forth on Section 3.12(a) of the Disclosure Schedule. The Sellers are the sole and exclusive beneficial and record owners of all of the Intellectual Property set forth in Section 3.12(a) of the Disclosure Schedules, and all Registered IP is subsisting, enforceable and valid.

(b)    All Registered IP has been duly registered in, filed in, or issued by the United States Patent and Trademark Office, United States Copyright Office, a duly accredited and appropriate domain name registrar, or corresponding appropriate state or foreign Governmental Entity. None of the Registered IP has been cancelled, abandoned, rejected, repudiated, or otherwise terminated and Sellers have paid all fees (including registration, renewal, maintenance and other relevant filing fees) and filed all documents and taken all actions due prior to the date hereof that are necessary to obtain or maintain such Registered IP in force and effect and no such

filings, payments, or other actions must be made, paid, or taken within one hundred eighty (180) days following the Closing Date.

(c)     The Sellers possess and solely and exclusively own (and upon Closing, Buyer will possess and be the sole and exclusive owner of) all right, title and interest in and to all of the Owned IP and have a valid right to use, free and clear of all Encumbrances (other than Permitted Encumbrances), all other Intellectual Property and IT Assets used or held for use in the Business.

(d)     The conduct of the Business (including the products and services of the Sellers) does not infringe, misappropriate, dilute, or otherwise violate (and, in the past six (6) years, has not infringed, misappropriated, diluted, or otherwise violated), in each case, any Person's Intellectual Property rights, and in the past six (6) years there has been no such Action asserted or, to the Knowledge of the Sellers, threatened against any Seller or, to the Knowledge of the Sellers, any other Person.

(e)     To the Knowledge of the Sellers, no Person is infringing, misappropriating, diluting, using without authorization, or otherwise violating, any Owned IP, and in the past six (6) years no such Actions have been asserted or threatened against any Person by any Seller.

(f)     All Persons (including all past and current employees, contractors and consultants of the Sellers) who have (i) had access (or been privy) to any material Know-How or confidential information or Intellectual Property contained in the Transferred IP or (ii) participated in or contributed to the creation, conception, authoring, reduction to practice, or development of any Owned IP have executed and delivered to the Sellers a valid written agreement, respectively, that (x) sufficiently restricts the disclosure and use by such Person of any such Know-How and such confidential information and Intellectual Property and (y) validly and presently assigns from such Person to one of the Sellers all of the entire right, title, and interest in and to such Owned IP (or, in the case of (y), all such right, title, and interest have vested in one of the Sellers by operation of Law), or where such rights are moral or similar rights that are incapable of assignment, they have been waived.  To the Knowledge of the Sellers, no Person is in breach of any such agreement.  There are no royalties, fees, honoraria or other payments payable by the Sellers to any Person by reason of the ownership, development, use, license, sale or disposition of any Owned IP.

(g)     All officers, and consultants of the Sellers have executed agreements or have existing obligations under applicable Law and obligating the individual to maintain as confidential all Know-How and other confidential information and Intellectual Property of the Sellers and the Business; and the Sellers have taken all reasonable precautions to preserve the confidentiality of all Know-How and confidential information and Intellectual Property included in the Transferred Assets.

(h)     The Sellers have in place privacy policies regarding the collection, use and disclosure of personal information in their possession, custody or control.  Each Seller has at all times in the past three (3) years complied with all applicable Laws, as well as its own rules, policies, and procedures, relating to privacy, data protection, data security and the collection and use of personal information collected, used, or held for use by the Sellers.  In the past three (3) years, no Actions have been asserted or threatened against any Seller alleging a violation of any

Laws relating to a Person's privacy or personal information or data rights or any information security related incidents. No Seller has notified in writing or been required by applicable Law or Contract to notify in writing, any person or entity of any personal data or information security-related incident. The consummation of the transactions contemplated by this Agreement will not result in any violation of any data privacy or cybersecurity Laws.

(i)     Each Seller has implemented, and required that its third party vendors implement, adequate policies and commercially reasonable security (a) regarding the collection, use, disclosure, retention, processing, transfer, confidentiality, integrity and availability of personal data and business proprietary or sensitive information, in its possession, custody or control, or held or processed on its behalf, and (b) regarding the integrity and availability of the Transferred IT Assets. No Seller has experienced any information security incident that has compromised the integrity or availability of the Transferred IT Assets, and there has been no loss, damage or unauthorized access, disclosure, use or breach of security of any information in the possession, custody or control, or otherwise held or processed on behalf of such Seller. The Transferred IT Assets (i) are adequate for, and operate and perform in material conformance with their documentation and functional specifications; (ii) operate and perform in all material respects as currently required and as currently contemplated to be required to conduct and operate the Business, and (iii) do not contain any "time bombs," "Trojan horses," "back doors," "trap doors," worms, viruses, spyware, keylogger software or other vulnerability, faults or malicious code or damaging devices designed or reasonably expected to adversely impact the functionality of or permit unauthorized access or to disable or otherwise harm any information technology or software applications.

(j)     In the past three (3) years, (i) the Sellers have not experienced any material defects in the Software used in the Business or the Transferred IT Assets that have not been remediated as of the date hereof, (ii) there have been no security breaches of the Transferred IT Assets, and (iii) there have been no disruptions in any of the Transferred IT Assets that adversely affected the Business and that have not been remediated as of the date hereof.

Section 3.13   Taxes.   Except as set forth in Section 3.13 of the Disclosure Schedules:

(a)     (i) the Sellers have duly and timely filed (taking into account valid extensions) all required Tax Returns relating to the Transferred Assets, the Assumed Liabilities, and the Business, in each case, required to be filed by any Seller, as the case may be, (ii) all such Tax Returns are true, correct and complete in all material respects; (iii) each Seller has timely paid in full all Taxes (whether or not required to be shown on any Tax Return) relating to the Transferred Assets, the Assumed Liabilities, or the Business; and (iv) no Liability for Taxes has been incurred outside the Ordinary Course of Business by or with respect to the Transferred Assets, the Assumed Liabilities, or the Business since the date of the Seller Financial Statements.

(b)     All Taxes relating to or arising in connection with the Transferred Assets, the Assumed Liabilities or the Business, in each case, that are required to be withheld and collected and, to the extent required by applicable Law, paid and remitted (including in connection with any amounts owing to any employee, independent contractor, creditor, stockholder or other third party), have been timely withheld, collected, paid and remitted to the appropriate Governmental

Authority, and all IRS Forms W-2 and 1099 and all other Tax Returns required to be filed with respect thereto have been properly completed and timely filed.

(c)     There is no Action pending, proposed (tentatively or definitively), contemplated or asserted, or threatened in writing, by any Governmental Authority with respect to Taxes or Tax Returns of or with respect to the Transferred Assets, the Assumed Liabilities, or the Business, and no Governmental Authority has indicated in writing an intent to investigate, commence or open such an Action with respect to any such Tax or Tax Return.  No deficiencies for Taxes have been claimed, proposed or assessed by any Governmental Authority against any of the Sellers with respect to the Transferred Assets, the Assumed Liabilities or the Business, except for deficiencies which have been fully satisfied by payment, settled or withdrawn.

(d)     No Seller has received any claim from a Governmental Authority in a jurisdiction where such Seller has not filed a Tax Return that such Seller is or may be subject to taxation, or required to file a Tax Return in, such jurisdiction with respect to the Transferred Assets, the Assumed Liabilities, or the Business, which such claim has not been fully resolved.

(e)     There are no Encumbrances for Taxes upon the Transferred Assets other than for Taxes not yet due and payable.

(f)     Neither the Business, any of the Transferred Assets nor any of the Assumed Liabilities is subject to any Tax allocation, indemnity or sharing agreement or similar agreement, arrangement or understanding, other than any such agreement entered into in the Ordinary Course of Business and the principal purpose of which is not to address Taxes.

(g)     No agreement, waiver, extension or consent regarding the application of the statute of limitations with respect to any Taxes or Tax Returns of or with respect to the Transferred Assets, the Assumed Liabilities or the Business is outstanding, nor is there pending any request for such an agreement, waiver, extension or consent and Sellers have not agreed to any extension of time with respect to an assessment or deficiency for such Taxes (other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course of Business), which waiver or extension is currently in effect.  The Sellers have not agreed to any extension of time for filing any Tax Return with respect to the Transferred Assets, the Assumed Liabilities or the Business that has not been filed. No power of attorney has been granted with respect to any matter relating to Taxes payable by or with respect to any of the Transferred Assets, Assumed Liabilities or the Business, in each case that is currently in force.

(h)     No Seller (i) has received any ruling from a Governmental Authority relating exclusively to Taxes due with respect to any of the Transferred Assets, Assumed Liabilities or the Business that will remain in effect following the Closing or (ii) has withdrawn a request for such a ruling before the ruling was issued. No Seller is subject to any voluntary disclosure or similar agreement with any taxing authority with respect to the Transferred Assets, the Assumed Liabilities or the Business that is still pending or otherwise has not been fully resolved.

(i)     Each of the Sellers is a "United States person" within the meaning of Section 7701(a)(30) of the Code.

(j)     None of the Transferred Assets constitute stock, partnership interests or other equity interests in any Person for U.S. federal, state, local, or non-U.S. Tax purposes.

(k)     There is no taxable income of any Seller, or for which successor liability may attach to the Transferred Assets, that will be required under applicable Tax law to be reported by the Buyer or any of its Affiliates for a taxable period beginning on or after the Closing Date which taxable income was realized (and reflects economic income arising) prior to the Closing Date.

(l)     None of the Sellers have engaged in, or have been a party to, any reportable transaction described in Treasury Regulation Section 1.6011-4. Each Seller has disclosed on its federal income Tax Returns all positions taken therein that could give rise to a substantial understatement of federal income Tax within the meaning of Section 6662 of the Code.

(m)     Each of the Sellers is in compliance with all U.S. federal, state, local and non-U.S. Law applicable to abandoned or unclaimed property or escheat and has timely paid, remitted or delivered to each jurisdiction all unclaimed or abandoned property required by any applicable Laws to be paid, remitted or delivered to that jurisdiction, in each case with respect to the Transferred Assets and the Business.  None of the Sellers hold any property or owe any amount that is presumed abandoned under the Laws of any state or other jurisdiction, in each case with respect to the Transferred Assets or the Business.

(n)     No Seller has a permanent establishment or other taxable presence in any foreign country, as determined pursuant to non-U.S. applicable Laws and any applicable Tax treaty or convention between the United States and such foreign country.

Section 3.14   <u>Environmental Matters</u>.

(a)     The Sellers, the Transferred Assets and the Business are, and have for the past three (3) years been, in compliance in all material respects with all applicable Environmental Laws, which compliance includes obtaining, maintaining and complying with all Environmental Permits required in connection with the conduct or operation of the Business and the ownership or use of the Transferred Assets.  There is no claim or action currently pending or, to the Knowledge of the Sellers, threatened, that is or would reasonably be expected to result in the cancellation, revocation, non-renewal or other adverse or limiting modification or amendment of any such Environmental Permit.

(b)     There is no material Environmental Claim pending or, to the Knowledge of the Sellers, threatened against or affecting any Seller, Transferred Asset or the Business.  Neither the Sellers, the Transferred Assets nor the Business is or has been the subject or a party to any claim, action, investigation or proceeding relating to an Environmental Claim where there is an outstanding actual or potential material Liability.  Other than Orders of general applicability, none of the Transferred Assets is subject to any Order with respect to it relating to or arising under Environmental Law that would reasonably be expected to impose any restriction, value impairment or burdensome requirement on any of the Transferred Assets after Closing.  For the avoidance of doubt and without limitation, there are no pending claims against the Sellers, the Transferred Assets or the Business from any alleged exposure to asbestos or asbestos-containing materials.

(c)     Neither the Sellers, the Transferred Assets nor the Business (1) has breached any Environmental Law or (2) has any actual or contingent liabilities under any Environmental Law, including any liability for the disposal of waste material, which in either case is outstanding.

(d)     Neither the Sellers, Transferred Assets nor the Business has assumed or agreed to assume any Liability of a third party under Environmental Law.

(e)     There are no circumstances or environmental conditions which would be reasonably likely to form the basis of any material Liability of the Business or any Transferred Asset, or of any Environmental Claim against or affecting any Seller or the Business.

(f)     No former property, including the ground and groundwater underlying or the surface water at such former property, is or has been contaminated or polluted by any Hazardous Material in circumstances which could result in an Environmental Claim against or involving any Seller, Transferred Asset or the Business.

Section 3.15    Material Contracts.

(a)     Section 3.15(a) of the Disclosure Schedule sets forth, as of the Disclosure Schedule Delivery Date, a true, correct and complete list of the following Contracts to which any Seller is a party or is bound or by which any Transferred Assets are subject (each, a "Material Contract" and collectively, the "Material Contracts"):

(i)     each organized labor agreement, collective bargaining agreement or other Contract with any labor union, labor organization, works council, or other employee representative;

(ii)     each Contract with any Material Supplier;

(iii)     each Contract that creates or evidences any Liabilities or sources of revenue of the Business in an amount in excess of $100,000 in a calendar year or $200,000 in the aggregate over the life of such Contract;

(iv)     each Contract involving any severance, change of control, retention or similar payments or benefits;

(v)     each Contract evidencing the granting of any Encumbrance (other than any Permitted Encumbrance) on any material portion of the Transferred Assets;

(vi)     each Contract for the development of (x) material Intellectual Property that is embodied in or distributed with any products or services of a Seller or is otherwise material Intellectual Property of a Seller (other than Contracts with any employee or contractor entered into in the Ordinary Course of Business under which such employee or contractor presently assigns all right, title and interest in and to any developed Intellectual Property to one (1) or more of the Sellers) and (y) any Intellectual Property for any Person by the Sellers under which Contract any Sellers has any material unperformed obligations (other than Contracts with any employee or contractor entered into in the Ordinary Course of Business under which such employee or

contractor presently assigns all right, title and interest in and to any developed Intellectual Property to one (1) or more of the Sellers);

(vii)   each (x) Contract entered into for the settlement or avoidance of any dispute regarding the ownership, use, validity or enforceability of Intellectual Property (including consent-to-use and similar contracts) with material ongoing obligations of any Seller, (y) Contract pursuant to which any Seller licenses such Seller's owned Intellectual Property or (z) Contract or license under which the Sellers acquire or license any material Intellectual Property from any Person other than Off-the-Shelf Software;

(viii)   each Contract providing for aggregate future payments to or from any Seller in excess of $100,000 in any calendar year, other than those that can be terminated without material penalty by such Seller upon ninety (90) days' notice or less and can be replaced with a similar Contract on materially equivalent terms in the Ordinary Course of Business;

(ix)   each Contract pursuant to which any Seller has formed or agreed to form a partnership, joint venture, strategic alliance or other similar arrangement;

(x)   each power of attorney that relates to the Business, any Transferred Asset or any Assumed Liability;

(xi)   each Contract that restricts, or purports to limit or restrict, any Seller's freedom or ability to (x) engage or compete in any line of business or business activity, compete with any Person or operate in any geographic area, or (y) acquire any product or receive any service from any Person or sell any product or asset or perform any service for any Person;

(xii)   each Contract containing (v) "most-favored-nation," "most-favored-customer" or similar pricing provisions for the benefit of any Person (other than any Seller); (w) a provision providing for the sharing of any revenue or cost-savings with any other Person (other than any Seller); (x) a "minimum purchase" requirement; (y) rights of first refusal or first offer (other than those related to the Leased Real Property); or (z) a "take or pay" provision;

(xiii)   each Contract pursuant to which any Seller has granted any sponsorship rights, exclusive marketing, sales representative relationship, franchising consignment, distribution or any other similar right to any third party (including in any geographic area or with respect to any product of the Business of the Sellers);

(xiv)   each Contract involving the settlement, conciliation or similar agreement (x) of any Action within the past three (3) years, (y) with any Governmental Authority or (z) with respect to any dispute pursuant to which any Seller will have any material outstanding obligation after the date hereof;

(xv)   each Contract concerning non-solicitation obligations that are on-going (other than non-solicitation agreements with any of the Sellers' employees set forth in the applicable Seller's standard terms and conditions of sale or standard form of employment agreement or offer letter, copies of which have previously been delivered to the Buyer, or non-disclosure agreements entered into by any of the Sellers with respect to possible business transactions);

46

(xvi)    each Contract or group of related Contracts for the lease or use of any Equipment by any Seller or for the storage of any Equipment of the Sellers (including any warehousing Contracts), except for any Contract under which the aggregate annual rental payments do not exceed $50,000;

(xvii)    each Contract under which any Seller is lessor of or permits any third party to hold or operate, in each case, any Equipment, except for any Contract under which the aggregate annual rental payments do not exceed $50,000;

(xviii)  each Contract requiring any capital commitment or capital expenditure (or series of capital commitments or expenditures) by any Seller in an amount in excess of $50,000 annually or $100,000 over the life of such Contract;

(xix)    each Contract evidencing or relating to Indebtedness for borrowed money (including leases which are or should be, in accordance with GAAP, recorded as finance leases) or any extension of credit,

(xx)    each Contract requiring any Seller to guarantee the Liabilities of any Person (other than any other Seller) or pursuant to which any Person (other than a Seller) has guaranteed the Liabilities of a Seller;

(xxi)    each material interest rate, currency, option or other hedging Contract;

(xxii)   each Contract providing for indemnification by any Seller, except for any such Contract that is entered into in the Ordinary Course of Business and is not material to any Seller;

(xxiii)  each Contract that relates to the future disposition or acquisition by any Seller of (x) any business (whether by merger, consolidation or other business combination, sale of securities, sale of assets or otherwise) or (y) any material assets or properties, except for (i) any agreement related to the transactions contemplated hereby, (ii) any non-disclosure or similar agreement entered into in connection with the potential sale of a Seller or (iii) any agreement for the purchase or sale of Inventory in the Ordinary Course of Business;

(xxiv)  each Contract that relates to any completed disposition or acquisition by any Seller of (x) any business (whether by merger, consolidation or other business combination, sale of securities, sale of assets or otherwise) or (y) any material assets or properties, in each case, entered into or consummated within the past three (3) years, other than sales of Inventory in the Ordinary Course of Business;

(xxv)   each Contract involving the payment of any earn-out or similar contingent payment on or after the date hereof;

(xxvi)  each Related Party Agreement;

(xxvii) each Lease;

(xxviii) each Tax sharing, allocation, indemnification or similar agreement;

(xxix) any assignments, amendments, modifications and supplements of any of the foregoing; and

(xxx) each Contract to enter into any of the foregoing.

(b)     Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, each of the Material Contracts is in full force and effect and is a valid, binding and enforceable obligation of the applicable Seller party thereto and, to the Knowledge of the Seller, each of the other parties thereto, except as may be limited by the Enforceability Exceptions. Except as set forth on Section 3.15(b) of the Disclosure Schedule, as a result of the commencement of the Bankruptcy Case or as would not reasonably be expected to be material to the Business taken as a whole, none of the Sellers is in material default, or is alleged by the counterparty thereto to have materially breached or to be in material default, under any Material Contract, and, to the Knowledge of the Seller, the other party to each Material Contract is not in material default thereunder.  The Sellers have made available to Buyer complete and correct copies of all Material Contracts.  None of the Material Contracts has been canceled or otherwise terminated, and none of the Sellers has received any written notice from any Person regarding any such cancellation or termination.  There are no claims pending or threatened against any Seller under any Material Contract.

Section 3.16    Affiliate Transactions.  Except (a) as set forth on Section 3.16 of the Disclosure Schedule, (b) employment or consulting agreements with any employee, officer or consultant of the Sellers, entered into in the Ordinary Course of Business that have been made available to the Buyer, (c) participation by employees, officers and directors in any Employee Benefit Plan and (d) rights to indemnification or insurance as an officer or director of any Seller, no Seller is party to or otherwise bound by any transaction or Contract with any Related Party (a "Related Party Agreement"), and no Related Party, (i) has any material interest in any material property used by the Sellers or (ii) owns any material interest in, or is an officer, director, employee or consultant of, any Person which is, or is engaged in business as a material supplier or customer of the Sellers.

Section 3.17    Insurance.  Section 3.17 of the Disclosure Schedule includes, as of the Disclosure Schedule Delivery Date, a true and complete list of all insurance policies maintained by or covering the Business, the Transferred Assets and the Assumed Liabilities (the "Insurance Policies"), inclusive of insurer, policy holder, coverage type, limits, deductibles and expiry dates for all current claims-made and occurrence-based policies.  Each such Insurance Policy is in full force and effect, all premiums due and payable thereunder have been paid in full, and no Seller has received a written notice of cancellation or termination of any such Insurance Policy.  The insurance coverage provided by any of the Insurance Policies will not terminate or lapse by reason of the transactions contemplated by this Agreement.  There are no pending or unpaid claims under any Insurance Policy.

Section 3.18    Suppliers.    Section 3.18 of the Disclosure Schedule sets forth a complete and accurate list of the ten (10) largest distributors and suppliers (measured by fees paid or payable) of the Business (collectively, the "Material Suppliers") for the twelve (12) month period ended July 31, 2025 and the amount for which the Business was invoiced by such Material Supplier during the applicable period.  Except as disclosed on Section 3.18 of the Disclosure Schedule, (i) no Material Supplier has materially reduced, or indicated in writing its intention to materially reduce, its business with the Business, and (ii) no Seller has received any written notice or written communication to the effect that (A) any such Material Supplier has cancelled or terminated, or presently intends to cancel or terminate, its relationship with the Business, (B) any such Material Supplier intends to amend any material terms of any Contract with any Seller, cease to sell to, or substantially reduce sales, or (C) except in the Ordinary Course of Business, any such Material Supplier has increased or will increase the prices it charges the Business or has reduced, will reduce or has threatened to reduce the discounts it offers to the Business.  Except as set forth on Section 3.18 of the Disclosure Schedule, no Seller is, and within the past three (3) years no Seller has been, involved in any Action, or entered into any written settlement agreement, with any Material Supplier.

Section 3.19    Working Capital Assets; Equipment; Inventory.

(a)    All Inventory is owned by a Seller free and clear of all Encumbrances (other than Permitted Encumbrances) and is valued on the books and records of such Seller at the lower of cost or fair market value thereof, based upon the "first in, first out" method of accounting, and is in good condition and consists of a quality and quantity useable and saleable in the Ordinary Course of Business, except for obsolete items and items of below standard quality, all of which have been written off or written down to net realizable value in the Latest Balance Sheet.  Except as set forth on Section 3.19(a) of the Disclosure Schedule, all inventory not written off has been valued in accordance with GAAP and, with respect to inventory intended for sale, was or will be saleable within a reasonable time.  Inventory that was acquired subsequent to the Balance Sheet Date was acquired in the Ordinary Course of Business.

(b)    All of the accounts and notes receivable of the Business (the "Current Receivables") represent amounts receivable for products actually delivered or services actually provided (or, in the case of non-trade accounts or notes represent amounts receivable in respect of other bona-fide business transactions), have arisen in the Ordinary Course of Business and have been or will be billed.  All such Current Receivables are fully collectible in the normal and Ordinary Course of Business.

(c)    No Inventory that is Inventory is materially damaged in any significant way, except for any such damage which would not be material to the purchased Inventory taken as a whole.  The Inventory is in material compliance with applicable Law for such products as of the Disclosure Schedule Delivery Date, except for any such noncompliance which would not be material to the Business taken as a whole.

Section 3.20    Books and Records.    The Sellers have delivered to the Buyer true, correct and complete copies of all the Books and Records of each Seller required by applicable Law and maintained by or in the possession or control of (or otherwise reasonably accessible to)

any Seller, and such Books and Records have been maintained and reported in accordance with applicable Law and GAAP, where applicable.

Section 3.21   <u>Bank Accounts</u>.  <u>Section 3.21</u> of the Disclosure Schedule sets forth a true and correct list of each bank account, credit line or safety deposit box maintained by or for the benefit of the Business, including the name and location of each bank and the names of all Persons authorized to draw thereon or, with respect to safety deposit boxes, to have access thereto.

Section 3.22   <u>OFAC and Related Matters</u>.

(a)   None of the transactions contemplated by this Agreement violate (i) the United States Trading with the Enemy Act, (ii) any of the foreign assets control regulations of the U.S. Department of the Treasury (31 C.F.R., Subtitle B, Chapter V) or any enabling legislation or executive Order relating thereto, (iii) Executive Order No. 13,224, 66 Fed. Reg. 49,079 (2001), issued by the President of the United States (Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism) (the "<u>Terrorism Order</u>") or (iv) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, Public Law 107-56 (October 26, 2001). For purposes of this <u>Section 3.22</u>, the term "<u>OFAC Rep Party</u>" shall mean (A) each Seller, (B) any Affiliate of any Seller that is a counterparty to a Material Contract and (C) the officers, directors or agents of the entities listed in <u>clauses (A)</u> and <u>(B)</u>.  No OFAC Rep Party (1) is a "blocked person" as described in Section 1 of the Terrorism Order, (2) engages in any dealings or transactions, or is otherwise associated, with any such blocked person or (3) appears on the OFAC Blocked Parties List. To the Knowledge of Sellers, no OFAC Rep Party: (I) is owned by, controlled by, acting for or on behalf of, providing assistance, support, sponsorship, or services of any kind to, any of the Persons referred to or described in the OFAC Blocked Parties List; or (II) has conducted business with or engaged in any transaction with any Person named on the OFAC Blocked Parties List. Each OFAC Rep Party has complied with all U.S. and applicable international economic and trade sanctions, including as applicable any sanctions or regulations administered and enforced by the U.S. Department of State, the U.S. Department of Treasury (including the OFAC) and any executive Orders, rules and regulations relating thereto.

(b)   Neither any Seller nor any of its respective officers, directors, employees or agents, has (i) violated any provision of any applicable Anti-Bribery and Anti-Corruption Laws or (ii) directly or indirectly offered, paid, promised to pay, or authorized the offer, payment or promise of anything of value to any representative or agent of a Governmental Authority while knowing or having reason to know that all or a portion of such thing of value would be offered, given, or promised to such representative or agent of a Governmental Authority for the purposes of (A) (1) influencing any act or decision of any such representative or agent of a Governmental Authority in his or her official capacity or (2) rewarding the improper performance by any Person of its business or official activities; or (B) assisting any member of any Seller, or any of their respective Affiliates, in obtaining or retaining business or a business advantage for the Business.

(c)   The operations of each Seller have been conducted at all times in compliance with Anti-Terrorism and Money Laundering Laws and Regulations.

(d)      Each OFAC Rep Party has complied with all Economic Sanctions and Trade Controls Laws and Regulations.

(e)      Each OFAC Rep Party is now in compliance with Anti-Bribery and Anti-Corruption Laws, Anti-Terrorism and Money Laundering Laws and Regulations and applicable Economic Sanctions and Trade Controls Laws and Regulations and the Sellers have implemented and maintain in effect policies and procedures designed to ensure compliance by each such Seller, and each of their respective directors, officers and agents, with Anti-Bribery and Anti-Corruption Laws, Anti-Terrorism and Money Laundering Laws and Regulations and applicable Economic Sanctions and Trade Controls Laws and Regulations.

(f)      Neither any Seller nor any of its respective officers, directors or agents, or any agent that will act in any capacity in connection with the transactions contemplated by this Agreement, is a Target of Sanctions.

(g)      No part of the transactions contemplated by this Agreement will cause any of the Sellers to violate Anti-Bribery and Anti-Corruption Laws, Anti-Terrorism and Money Laundering Laws and Regulations or applicable Economic Sanctions and Trade Controls Laws and Regulations.

Section 3.23    Anti-Corruption; Anti-Bribery.  Neither any Seller nor any of their respective Representatives authorized to act, and acting, on behalf of any Seller has, directly or indirectly, in connection with the Business:

(a)      used any corporate funds to make or offer any unlawful payment, loan or transfer of anything of value to or for the benefit of any Government Official, candidate for public office, political party or political campaign, in each case, in violation of applicable AML Laws, for the purpose of (i) influencing any act or decision of such Government Official, candidate, party or campaign, (ii) inducing such Government Official, candidate, party or campaign to do or omit to do any act in violation of a lawful duty, (iii) obtaining or retaining business for or with any Person, (iv) expediting or securing the performance of official acts of a routine nature or (v) otherwise securing any improper advantage; or

(b)      received written notice from any Governmental Authority alleging that such Person has violated any provision of the Foreign Corrupt Practices Act of 1977, 15 U.S.C. §§78dd-1, *et seq.,* or any other applicable anticorruption or anti-bribery Laws (collectively, "AML Laws").

Section 3.24    Exclusivity of Representations and Warranties.  None of the Sellers or any of their Affiliates or Representatives is making, and none of the Buyer or any of its Affiliates or Representatives is relying on, any representation or warranty of any kind or nature whatsoever, oral or written, express or implied (including any relating to financial condition or results of operations of the Business or maintenance, repair, condition, design, performance, value, merchantability or fitness for any particular purpose of the Transferred Assets), except as expressly set forth in this Article III (as modified by the Disclosure Schedules), and the Sellers hereby disclaim all Liability and responsibility for any such other representations or warranties, including any representation, warranty, projection, forecast, statement or information made, communicated or furnished (orally or in writing) to Buyer or its Affiliates or Representatives (including any

opinion, information, projection or advice that may have been or may be provided to Buyer by any director, officer, agent, consultant or Representative of Sellers or any of their Affiliates).

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Sellers as follows:

Section 4.1    <u>Organization</u>.  The Buyer is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization and has all necessary corporate (or equivalent) power and authority to perform its obligations hereunder and under any Ancillary Agreement to which it is or will be a party.

Section 4.2    <u>Authority</u>.  The Buyer has all requisite legal capacity and the full power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it is or will be a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by the Buyer of this Agreement and each of the Ancillary Agreements to which it will be a party and the consummation by the Buyer of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate (or equivalent) action and this Agreement has been, and upon its execution each of the Ancillary Agreements to which the Buyer will be a party will have been, duly executed and delivered by the Buyer and assuming due execution and delivery by each of the other parties hereto and thereto, this Agreement constitutes, and upon its execution each of the Ancillary Agreements to which the Buyer will be a party will constitute, the legal, valid and binding obligations of the Buyer, enforceable against the Buyer in accordance with its respective terms, except as enforcement may be limited by the Enforceability Exceptions.

Section 4.3    <u>No Conflict; Required Filings and Consents</u>.

(a)    The execution, delivery and performance by the Buyer of this Agreement and each of the Ancillary Agreements to which the Buyer is or will be a party, and the consummation by the Buyer of the transactions contemplated hereby and thereby, will not:

(i)    conflict with or result in any violation or breach of or default under, the Organizational Documents of such Buyer;

(ii)    conflict with or result in a violation or breach of any Law or Order applicable to the Buyer or by which any property or asset of such Buyer is bound; or

(iii)    conflict with, result in a violation or breach of, constitute (with or without notice or lapse of time) a default under, require the Buyer to obtain consent or approval from any Person under the terms of, or give rise to a right of termination, cancellation, acceleration or modification under the terms of any Contract to which such Buyer is a party;

except, in the case of <u>clause (ii)</u> and <u>(iii)</u>, for any such conflicts, violations, breaches, defaults or other occurrences which have not had and would not reasonably be expected to have a Buyer Material Adverse Effect.

(b)     The Buyer is not required to file, seek or obtain any notice, authorization, approval, Order, Permit or consent of or with any Governmental Authority in connection with the execution, delivery and performance by the Buyer of this Agreement and each of the Ancillary Agreements to which it is or will be a party or the consummation of the transactions contemplated hereby or thereby, except (i) for the entry of the Sale Procedures Order and the Sale Order by the Bankruptcy Court or (ii) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to have a Buyer Material Adverse Effect.

Section 4.4     Brokers.  No broker, finder or investment banker or other Person is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated hereby as a result of an engagement by the Buyer that that would be payable by the Sellers.

Section 4.5     Litigation.  There is no Action pending or threatened in writing against the Buyer which would result in the issuance of an Order restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by this Agreement and the other Ancillary Agreements.

Section 4.6     Exclusivity of Representations and Warranties.  None of the Buyer or any of its Affiliates or Representatives is making, and none of the Sellers or any of their Affiliates or Representatives is relying on, any representation or warranty of any kind or nature whatsoever, oral or written, express or implied, except as expressly set forth in this Article IV, and the Buyer hereby disclaims all Liability and responsibility for any such other representations or warranties, including any representation, warranty, projection, forecast, statement or information made, communicated or furnished (orally or in writing) to the Sellers or their Affiliates or Representatives (including any opinion, information, projection or advice that may have been or may be provided to any Seller by any director, officer, agent, consultant or Representative of the Buyer or any of its Affiliates).

Section 4.7     Financial Capacity.  At the Closing, the Buyer will have sufficient available funds to permit the Buyer to pay all amounts to be paid by the Buyer under this Agreement to the extent payable on or about the Closing Date, including amounts to be paid for the Cure Costs.

Section 4.8     Certain     Acknowledgments.     BUYER     HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ARTICLE III ABOVE, SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE TRANSFERRED ASSETS INCLUDING EXPENSES TO BE INCURRED IN CONNECTION WITH THE TRANSFERRED ASSETS, THE PHYSICAL CONDITION OF ANY PERSONAL PROPERTY COMPRISING A PART OF THE TRANSFERRED ASSETS OR THAT IS THE SUBJECT OF ANY OTHER ASSUMED LEASE OR TRANSFERRED CONTRACT TO BE ASSUMED BY BUYER AT THE CLOSING, THE ENVIRONMENTAL CONDITION OR OTHER MATTER RELATING TO THE PHYSICAL CONDITION OF ANY LEASED REAL PROPERTY OR IMPROVEMENTS THAT ARE THE SUBJECT OF ANY REAL PROPERTY LEASE TO BE ASSUMED BY BUYER AT THE

CLOSING, THE ZONING OF ANY SUCH LEASED REAL PROPERTY OR IMPROVEMENTS, THE VALUE OF THE TRANSFERRED ASSETS (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF PROPERTY, THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY OR ANY OTHER PORTION OF THE TRANSFERRED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER OR THING RELATING TO THE TRANSFERRED ASSETS OR ANY PORTION THEREOF. WITHOUT IN ANY WAY LIMITING THE FOREGOING, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ARTICLE III ABOVE, SELLERS HEREBY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE TRANSFERRED ASSETS. BUYER FURTHER ACKNOWLEDGES THAT BUYER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE TRANSFERRED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE TRANSFERRED ASSETS AS BUYER DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH BUYER'S ACQUISITION OF THE TRANSFERRED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE III, BUYER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, SUBJECT TO THE FOREGOING, BUYER WILL ACCEPT THE TRANSFERRED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS." BUYER HEREBY EXPRESSLY ACKNOWLEDGES THAT THE ASSIGNMENT AND ASSUMPTION OF THE ASSUMED LEASES AND TRANSFERRED CONTRACTS FORMING PART OF THE TRANSFERRED ASSETS WILL BE CONSUMMATED IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT NOTWITHSTANDING ANY AND ALL OUTSTANDING DEFAULTS AND OTHER CLAIMS FOR FAILURES TO COMPLY WITH THE PROVISIONS OF SUCH ASSUMED LEASES AND TRANSFERRED CONTRACTS, CERTAIN OF WHICH DEFAULTS OR CLAIMS MAY NOT BE SUBJECT TO CURE OR WAIVER.

## ARTICLE V.
## BANKRUPTCY COURT MATTERS

Section 5.1    Bankruptcy Actions.

(a)    Competing Transaction.

(i)    This Agreement is subject to approval of the procedures set forth in the Sale Procedures Order and the consideration by Sellers of higher or better Competing Bids in respect of all or any part of the Transferred Assets in accordance with the Sale Procedures Order. From the date hereof (and any prior time) and until (i) the completion of the Auction in accordance with the Sale Procedures Order, or (ii) if no Qualified Bids (as defined in the Sale Procedures Order) are received by the Bid Deadline (as defined in the Sale Procedures Order), the Bid Deadline (such period being the "Go-Shop Period"), Sellers are permitted to and to cause their Representatives and Affiliates to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its Affiliates and Representatives) in connection with a Competing Bid, including, to (and to cause their

Representatives and Affiliates to) respond to any inquiries or offers to purchase all or any part of the Transferred Assets (including supplying information relating to the Business and the assets of Sellers to prospective purchasers) (the "Go-Shop Actions"); provided, that, from and after the date hereof, the Sellers' consideration of other bids for the Transferred Assets or the Business (including the taking by the Sellers or any of their respective Representatives and Affiliates of any of the Go-Shop Actions) shall be exercised solely in compliance with, and not in a manner inconsistent with, the Sale Procedures (it being understood that, prior to the time at which the Sale Procedures Order is entered by the Bankruptcy Court, the Sellers shall comply with the Sale Procedures as if the Bankruptcy Court had entered the Sale Procedures Order and such Sale Procedures Order was in effect).

(ii)    The Sellers shall provide (x) notice of any Competing Bid or combination of Competing Bids (whether written or oral) which Sellers deem higher or better than the terms of this Agreement and (y) a copy of each such Competing Bid to Buyer within 48 hours after the time of receiving such Competing Bid. In addition to the foregoing, the Sellers shall (i) promptly (and in any event within 48 hours of receipt thereof by Sellers or any Representative or Affiliate of the Sellers) advise the Buyer in writing of any proposal that may reasonably be expected to lead to a Competing Bid, (ii) keep the Buyer reasonably informed in all material respects on a reasonably current basis of the status and details (including any change to the terms thereof) of any Competing Bid, and (iii) provide to the Buyer as soon as practicable after receipt or delivery thereof copies of all material documentation exchanged between the Sellers or any of their Representatives and any Person that describes any of the material terms or conditions of any Competing Bid. The Sellers shall also notify the Buyer promptly if the board of directors, board of managers or similar governing body of any Seller determines that the failure of the board of directors, board of managers or similar governing body of any Seller to pursue such Competing Bid would reasonably be expected to result in a breach of or be inconsistent with the fiduciary duties of the board of directors, board of managers or similar governing body of any Seller under applicable Law, and in any event no later than 24 hours following such determination.

(iii)    Following the Go-Shop Period and until the Closing or the earlier valid termination of this Agreement in accordance with its terms, the Sellers and their Affiliates are neither permitted to, nor permitted to cause their Representatives or Affiliates to, (i) initiate contact with, solicit or knowingly encourage, induce or facilitate any Competing Bid or any inquiry or proposal that would reasonably be expected to lead to a Competing Bid or (ii) participate or engage in any discussions or negotiations with any Person regarding, or furnish to any Person any information with respect to, or cooperate in any way with any Person (whether or not a Person making a Competing Bid) with respect to, any Competing Bid or any inquiry or proposal that would reasonably be expected to lead to a Competing Bid.

(iv)    Anything in this Agreement or any of the Ancillary Agreements to the contrary notwithstanding, the Buyer, the DIP Agent and the Silverview Agent shall be entitled to participate in the Auction and shall be permitted, pursuant to section 363(k) of the Bankruptcy Code, to credit bid all or any portion of the DIP Loan Claims or the Silverview Loan Claims, as applicable, to acquire the Transferred Assets (each dollar of such obligations that is so credit bid shall be treated the same as a dollar of cash).  The Sellers shall not seek (or support any other Person in seeking) to limit the Buyer's, the DIP Agent's or the Silverview Agent's ability to make such credit bid "for cause" under section 363(k) of the Bankruptcy Code.

(b)    Bankruptcy Court Filings.

(i)    On the Petition Date, Sellers shall file with the Bankruptcy Court a motion seeking entry of the Sale Procedures Order and shall diligently prosecute such motion. Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Procedures Order.  In the event the entry of the Sale Procedures Order shall be appealed, Sellers and Buyer shall use their respective commercially reasonable efforts to defend such appeal.

(ii)    The Sellers shall: (i) obtain entry by the Bankruptcy Court of the Sale Procedures Order no later than the date that is fourteen (14) calendar days after the Petition Date, subject to the Bankruptcy Court's availability, (ii) ensure that Qualified Bids are due no later than the date that is thirty-five (35) calendar days after the Petition Date, (iii) ensure that the Auction, which will be conducted in accordance with the Sale Procedures Order, shall be held and closed no later than the date that is forty (40) calendar days after the Petition Date; provided, that the Sellers shall not have to comply with this clause (iii) if the Sellers are not required to hold an Auction pursuant to the Sale Procedures (as approved by the Sale Procedures Order), (iv) obtain entry by the Bankruptcy Court of the Sale Order no later than on or before the date that is forty-five (45) calendar days after the Petition Date, subject to the Bankruptcy Court's availability, and (v) subject to the satisfaction or waiver of the conditions precedent contained in this Agreement, consummate the Closing as soon as reasonably practicable after the entry by the Bankruptcy Court of the Sale Order.

(iii)    Provided Buyer is selected as the winning bidder in respect of the Transferred Assets at the Auction, if any, undertaken in accordance with the Sale Procedures Order, or if no Competing Bid is submitted with respect to the Transferred Assets, Sellers shall diligently seek entry of the Sale Order and any other necessary orders to close the sale of the Transferred Assets (the "Related Orders") by the Bankruptcy Court in accordance with the terms and conditions of the Sale Procedures Order.  Buyer and Sellers understand and agree that the consummation of the transactions contemplated by this Agreement is subject to approval by the Bankruptcy Court.  Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and any Related Orders including a finding of adequate assurance of future performance by Buyer, including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code and entitled to a finding that section 363(n) of the Bankruptcy Code does not apply. Buyer shall not, without the prior written consent of Sellers, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Transferred Assets hereunder.  In the event the entry of the Sale Order shall be appealed, Sellers and Buyer shall use their respective commercially reasonable efforts to defend such appeal.

(iv)    The proposed forms of any Orders of the Bankruptcy Court relating to this Agreement or the Business to be filed by the Sellers shall be in form and substance acceptable to the Buyer and consistent with the terms of this Agreement.  Sellers shall file such motions or pleadings, in form and substance reasonably acceptable to Buyer, as may be appropriate or necessary to assume and assign the Transferred Contracts and to determine the amount of the

Cure Costs; <u>provided</u>, that nothing herein shall preclude Sellers from filing such motions, including upon commencement of the Bankruptcy Cases, subject to <u>Section 2.6</u>, to reject any Contracts that are not Transferred Contracts.

(v)     The Sellers shall provide draft copies of all motions, notices, statements, schedules, applications, reports and other papers the Sellers intend to file with the Bankruptcy Court in connection with the Sale Procedures Order, the Sale Order or any other Bankruptcy Court Order to the Buyer within a reasonable period of time prior to the date the Sellers intend to file any of the foregoing and consult in advance in good faith with the Buyer regarding the form and substance of any such proposed filing with the Bankruptcy Court.

(vi)     The Sellers covenant and agree that, after the Closing, the terms of any reorganization plan or plan of liquidation it submits to the Bankruptcy Court for confirmation, if any, shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement, including any transaction contemplated by or approved pursuant to the Sale Procedures Order or the Sale Order.

(c)     <u>Backup Bidder</u>.  Sellers and Buyer agree that, in the event that Buyer is not the winning bidder at the Auction, if and only if (i) Buyer submits the second highest or second best bid at the Auction for the Transferred Assets which is memorialized by an agreement reasonably acceptable to Buyer that incorporates the terms established at the Auction, or the terms of this Agreement constitute the second highest or best bid for the Transferred Assets, and (ii) Sellers give written notice to Buyer on or before the date that is ten (10) Business Days from the entry of an Order of the Bankruptcy Court approving the winning bidder's definitive agreement, stating that Sellers (A) failed to consummate the sale of the Transferred Assets with the winning bidder, and (B) terminated the purchase agreement with the winning bidder, so long as Buyer has not previously terminated this Agreement in accordance with its terms, Buyer shall promptly consummate the transactions contemplated hereby upon the terms and conditions as set forth herein, or as set forth on the record of the Auction, including the Purchase Price, as the same may be increased by Buyer at the Auction.

## ARTICLE VI.
## COVENANTS

Section 6.1     <u>Conduct of Business Prior to the Closing</u>.  From the date of this Agreement until the Closing Date or earlier valid termination of this Agreement in accordance with its terms:

(a)     Except (1) as otherwise expressly required by this Agreement, (2) as required by Law, or (3) with the prior written consent of the Buyer, from the date of this Agreement until the Closing Date or earlier valid termination of this Agreement in accordance with its terms, each of the Sellers shall:

(i)     conduct the Business in the Ordinary Course of Business consistent with the Budget and preserve its material business relationships with customers, suppliers,

partners, licensors, licensees, distributors, Governmental Authorities and others with whom any of the Sellers deal in the Ordinary Course of Business;

(ii)    maintain the Transferred Assets in good working condition and repair (normal wear and tear excepted); and

(iii)    use commercially reasonable efforts to maintain from Governmental Authorities all Permits required to conduct the Business in the Ordinary Course of Business.

(b)    Except (1) as otherwise expressly required by this Agreement, (2) as required by Law, or (3) with the prior written consent of the Buyer, from the date of this Agreement until the Closing Date or earlier valid termination of this Agreement in accordance with its terms, each of the Sellers shall not:

(i)    sell, transfer, lease, sublease, encumber or otherwise dispose of any Transferred Assets other than Inventory sold or disposed of in the Ordinary Course of Business;

(ii)    issue, sell, grant, pledge, dispose or transfer any Equity Interests in any Seller;

(iii)    acquire (A) any material assets or properties, tangible or intangible, other than in the Ordinary Course of Business or (B) any corporation, partnership, limited liability company, other business organization or division thereof;

(iv)    merge or consolidate with or into any legal entity, dissolve, liquidate or otherwise terminate its existence;

(v)    split, combine, consolidate, subdivide or reclassify any of their capital stock, other Equity Interests or voting securities, or securities convertible into or exchangeable or exercisable for capital stock or other Equity Interests or voting securities, or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for its capital stock, other Equity Interests or voting securities or enter into silent partnership agreements granting the silent partner entitlements to its proceeds;

(vi)    declare, set aside or pay any dividend or other distribution (whether in cash, stock or property or any combination thereof) in respect of any securities of any Seller, or repurchase, redeem or otherwise acquire, or offer to repurchase, redeem or otherwise acquire, any capital stock or voting securities of, or Equity Interests in, any Seller or any securities of any Seller convertible into or exchangeable or exercisable for capital stock or voting securities of, or Equity Interests in, any Seller, or any warrants, calls, options or other rights to acquire any such capital stock, securities or interests, other than any transfers among Sellers;

(vii)    amend the Organizational Documents of any Seller;

(viii)    enter into any joint venture agreement that involves a sharing of profits, cash flows, expenses or losses with other Persons related to or affecting the Business or the Transferred Assets;

(ix)    take any action (other than any actions required by the Bankruptcy Court or applicable Law) in breach of the Sale Procedures or the Sale Order;

(x)    (1) reject or terminate (other than by expiration in accordance with its terms, except as a result of a breach by any Seller) any Material Contract or seek Bankruptcy Court approval to do so or otherwise reject any Material Contract, (2) fail to use commercially reasonable efforts to oppose any action by a third party to so terminate (including any action by a third party to obtain Bankruptcy Court approval to terminate) any Material Contract, except in each case, to the extent the Buyer has indicated in writing that it wishes the Sellers to reject such Contract, (3) waive, release or assign any material rights or claims under any Material Contract or any Contract that would be a Material Contract if in effect on the date hereof, (4) amend or modify any Material Contract, or (5) enter into any Contract that would have been a Material Contract had it been entered into prior to the date hereof;

(xi)    with respect to any Transferred Asset (1) agree to allow any form of relief from the automatic stay in the Bankruptcy Cases; or (2) fail to use commercially reasonable efforts to oppose any action by a third party to obtain relief from the automatic stay in the Bankruptcy Cases;

(xii)    change, make or revoke any Tax election, change any method of accounting with respect to Taxes, file any amended Tax Return, surrender or compromise any right to claim a Tax refund, settle or compromise any audit, claim, notice, audit, assessment or other Action related to Taxes, enter into any agreement affecting any Tax Liability or any Tax refund or file any request for rulings or special Tax incentives with any Governmental Authority, enter into any Tax allocation, sharing or indemnity agreement, extend or waive the statute of limitations period applicable to any Tax or Tax Return or take or cause (or cause any other Person to take or cause) any other action, in each case for this clause (xii), to the extent such action could reasonably be expected to (1) increase the Buyer's or any of its Affiliates' Liability for Taxes with respect to the Transferred Assets, the Assumed Liabilities or the Business or (2) adversely impact any of the Transferred Assets, the Assumed Liabilities or the Business;

(xiii)    make any change in any method of accounting or accounting practice or policy, except as required by applicable Law or GAAP;

(xiv)    fail to maintain in full force and effect existing insurance policies;

(xv)    (1) fail to maintain in full force and effect, or allow to lapse, any Permits, (2) cancel, modify or terminate (other than by expiration in accordance with its terms) any Permit or seek Bankruptcy Court approval to do so, or (3) fail to use commercially reasonable efforts to oppose any action by a third party to so terminate (including any action by a third party to obtain Bankruptcy Court approval to terminate) any Permit;

(xvi)    make any loans, advances or capital contributions to, or investments in, any other Person (other than to a Seller);

(xvii)    voluntarily pursue or seek, or fail to use commercially reasonable efforts to oppose any third party in pursuing or seeking, a conversion of the Bankruptcy Cases to

cases under chapter 7 of the Bankruptcy Code, the appointment of a trustee under chapter 11 or chapter 7 of the Bankruptcy Code and/or the appointment of an examiner with expanded powers;

(xviii)  subject any of the Transferred Assets to any Encumbrance;

(xix)   other than the DIP, incur any Indebtedness for borrowed money, enter into any capital lease or guarantee any such Indebtedness;

(xx)   enter into any commitment for capital expenditures or otherwise make any capital expenditures, except as permitted by the DIP;

(xxi)   (1) make or grant any wage or salary increase to any Business Employee (other than standard merit increases to individuals who are not officers or directors consistent with past practice within the past three (3) years that are less than 5% individually or 3% in the aggregate), (2) make any increase in the payment of benefits under any Employee Benefit Plan, (3) take any action with respect to the grant of any severance or termination pay (other than pursuant to policies or agreements in effect on the date of this Agreement) which will become due, (4) adopt, amend or terminate any Employee Benefit Plan, or plan or agreement that would be an Employee Benefit Plan, if adopted, (5) grant, amend or modify, or accelerate the vesting or payment of, any award under any Employee Benefit Plan, (6) enter into any employment, consulting or similar agreement or amend any existing employment agreement with respect to a Business Employee, (7) cause the funding of any rabbi trust or similar arrangement or take any action to fund or in any other way secure the payment of compensation or benefits under any Employee Benefit Plan, (8) enter into, amend or terminate any collective bargaining agreement or other agreement with a labor union, works council or similar organization, (9) forgive any loans, or issue any loans (other than routine travel advances issued in the ordinary course of business) to any Business Employee or (10) hire or engage any new Business Employee, or terminate the employment or engagement, other than for cause, of any Business Employee, if such Business Employee will receive, or has received, annual base compensation in excess of $100,000, other than in the ordinary course of business;

(xxii)   (1) transfer, assign, abandon, dispose, permit to lapse or grant any license or sublicense of, or any rights to use, any rights under or with respect to any Intellectual Property; (2) take any action or fail to take any action that would reasonably be expected to result in the abandonment, cancellation or unenforceability of any Intellectual Property; (3) enter into any settlement regarding breach or infringement of any Intellectual Property; or (4) disclose to any Person any Intellectual Property not heretofore a matter of public knowledge;

(xxiii)  institute, settle or agree to settle any litigation, proceeding or other Action;

(xxiv)  agree to any limitations on any Seller from engaging or competing in any line of business or in any geographic area or location or otherwise with any Person or from soliciting or hiring any Person;

(xxv)   permit or suffer to exist any event of default under the DIP, Interim Financing Order or Final Financing Order;

60

(xxvi)  return Inventory with an aggregate value of more than $5,000 unless defective;

(xxvii) make any material change in the nature of the Business; or

(xxviii)agree or commit to any of the foregoing.

Section 6.2     Covenants Regarding Information.  From the date hereof until the Closing Date or earlier valid termination of this Agreement in accordance with its terms, upon reasonable request, the Sellers shall afford the Buyer and its Affiliates and each of their respective Representatives reasonable access to make investigation of the properties, offices, plants and other facilities, books and records (including Tax books and records) of the Sellers, and shall furnish the Buyer with such financial, operating and other data and information, and access to all the officers, accountants and other Representatives of the Sellers as the Buyer may reasonably request and to make extracts and copies of such books and records.  Notwithstanding anything to the contrary in this Agreement, the Sellers shall not be required to disclose any information to the Buyer or its Representatives if such disclosure would cause the forfeiture of any attorney-client or other legal privilege or contravene any applicable Laws (the "Disclosure Limitations"); provided that the Parties shall reasonably cooperate in seeking to find a way to allow disclosure of such information to the extent doing so would not (in the good faith belief of the Sellers after consultation with outside counsel) reasonably be likely to cause such privilege to be undermined with respect to such information.

Section 6.3     Notification of Certain Matters.  The Sellers shall promptly notify the Buyer in writing of any fact, change, condition, circumstance or occurrence or nonoccurrence of any event of which it is aware that will or is reasonably likely to result in any of the conditions set forth in Section 8.3(a),  Section 8.3(b) or Section 8.3(e) becoming incapable of being satisfied.

Section 6.4     Employee Matters.

(a)     Prior to the Closing, the Buyer or its designee shall make an offer of employment, to commence as of the Closing, to some or all of the Business Employees employed or engaged by any of the Sellers immediately prior to the Closing (in the sole discretion of Buyer) (each such Business Employee, an "Offered Employee"); provided, however, that with respect to a Business Employee that it makes an offer of employment or other service offer to who is on a leave of absence as of the Closing (an "Inactive Employee"), such offer shall be for employment or other service as of the date he or she is able to again commence employment, but only to the extent such date is within six (6) months following the Closing.  Each Offered Employee who receives and accepts such an offer of employment or other service with the Buyer or its designee (and commences employment or other service) is referred to herein as a "Hired Employee", and the Buyer or its designee shall employ or engage each Hired Employee in accordance with such accepted offer as of the Closing.  In addition, any offer of employment or other service to any such Offered Employee will require, as a condition to the acceptance of such offer of employment or other service, that such employee waive in writing his or her right to receive any severance from the Sellers, the Buyer or any of its Affiliates arising from such employee's termination of employment or other service with any of the Sellers; provided, however, that the Buyer or any of its Affiliates shall be entitled to waive such condition, without any liability to the Sellers or any

other parties, if such employee does not agree to provide such waiver. Notwithstanding the foregoing, nothing in this Agreement will, after the Closing Date, impose on the Buyer or its designee any obligation to retain any Hired Employee in its employment or engagement or the employment or engagement of any of its Affiliates.

(b)    Effective at or immediately prior to the Closing, the Sellers shall terminate, or cause to be terminated, the employment of each Offered Employee (other than an Inactive Employee) who does not accept an offer of employment with the Buyer or its designee prior to the Closing (each, a "Terminated Employee") and will be responsible for all Liabilities associated with such terminations, including all Liabilities under the WARN Act. Neither the Buyer nor its designee shall have any Liability with respect to any employee of a Seller prior to the time he or she becomes a Hired Employee and neither the Buyer nor its designee shall have any Liability with respect to any current or former employee, independent contractor or service provider of a Seller that does not become a Hired Employee.

(c)    In respect of any employees of the Sellers or their Affiliates or the Business Employees who will not become Hired Employees whether on account of not being offered employment by Buyer or its designee hereunder or declining an offer of employment from Buyer or its designee hereunder, including the Terminated Employees, the Sellers shall be responsible for (i) any and all Liabilities to any such individuals, including Liabilities arising out of such termination, (ii) all current compensation, all compensation reflected on Section 6.4(c) of the Disclosure Schedules, salary, wages, unused vacation pay, overtime pay, holiday pay, sick days, personal days or leave earned and/or accrued through the Closing, (iii) statutory, Contractual, and/or common law notice, pay in lieu of notice and/or any severance obligations or Liabilities, including any obligations or Liabilities that arise under any Employee Benefit Plan and (iv) any Liabilities arising under an employee incentive or retention program or similar arrangement. For the avoidance of doubt and notwithstanding anything to the contrary herein, none of Buyer or its Affiliates shall have any Liability or obligation with respect to any Business Employee who does not become a Hired Employee and any Hired Employee for any period prior to the time he or she becomes a Hired Employee.

(d)    At the Closing, the Sellers shall furnish the Buyer with information concerning the location, identity, date of termination and reason for termination with respect to any Business Employee involuntary terminated during the ninety (90) days immediately preceding the Closing. The Sellers shall be solely responsible, on a joint and several basis, for any obligations or other Liabilities under the WARN Act that might arise on or prior to the Closing Date, or as a consequence of the transactions contemplated by this Agreement, including providing any notice of layoff or plant closing, or maintaining the employees of any Seller on such Seller's payroll for any period of notice required by the WARN Act. The Sellers shall retain all Liabilities, if any, for any severance or termination costs relating to employees of any Seller who, on, prior to or at the Closing, experience a termination of employment by any Seller as a result of the transactions contemplated by this Agreement.

(e)    For the avoidance of doubt, the Sellers shall retain all Liabilities for (i) the payment or provision of severance, separation pay or similar benefits in connection with the termination of employment of any Hired Employee as of the Closing Date, or the termination of employment of any current or former employee of a Seller who is not a Hired Employee (whether

before, as of, or after the Closing Date) and (ii) the payment or provision of any change in control payment, transaction bonus, retention payment or similar benefits arising as a result of the transactions described herein, and no such Liabilities shall be assumed by the Buyer or its designee under this <u>Section 6.4</u> or <u>Section 2.3</u>.

(f)     Nothing express or implied in this <u>Section 6.4</u> or this Agreement shall (i) confer upon any Business Employee, or legal representative or beneficiary thereof, any rights or remedies, including any third-party beneficiary rights with respect to the compensation, terms and conditions of employment and/or benefits that may be provided to any Business Employee by Buyer or its designee or the Sellers under any benefit plan or compensation arrangement or a right to employment or benefits for any specified period, of any nature or kind whatsoever, under or by reason of this Agreement, (ii) be treated as an amendment to, or prevent the termination of any Employee Benefit Plan, or any other employee benefit plan, program, arrangement or agreement sponsored or maintained by the Buyer or its designee, the Sellers or their respective Affiliates, as applicable, or (iii) obligate the Buyer or its designee, the Sellers or any of their respective Affiliates to maintain any particular employee benefit plan, program or arrangement.

Section 6.5     <u>Consents and Filings; Further Assurances</u>.

(a)     Each of the Parties shall use commercially reasonable efforts to take, or cause to be taken, all appropriate action to do, or cause to be done, all things necessary, proper or advisable under applicable Law or otherwise to consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements and to confirm the Buyer's ownership of the Transferred Assets as promptly as practicable, including to obtain all necessary waivers, consents and approvals and effecting all necessary registrations and filings, including all necessary waivers, consents and approvals from other parties.  Without limiting the generality of the previous sentence, the Parties shall (i) use commercially reasonable efforts to obtain from Governmental Authorities all consents, approvals, authorizations, qualifications and Orders as are necessary for the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements; (ii) promptly make all necessary filings, and thereafter make any other required submissions, with respect to this Agreement under applicable Law, as may be required to consummate the transactions contemplated herein, in accordance with the terms of this Agreement; and (iii) coordinate and cooperate with each other in exchanging such information and supplying such reasonable assistance as may be reasonably requested by each in connection with the foregoing.

(b)     From time to time, whether at or following the Closing, the Sellers and the Buyer shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions and releases and such other instruments, and shall, and shall cause their respective Affiliates to, take such further actions, as may be necessary or appropriate to vest in the Buyer all the right, title, and interest in, to or under the Transferred Assets, to provide the Buyer and the Sellers all rights and obligations to which they are entitled and subject pursuant to this Agreement and the Ancillary Agreements, and to otherwise make effective as promptly as practicable the transactions contemplated by this Agreement and the Ancillary Agreements.  Each of the Parties will use commercially reasonable efforts to cause all of the obligations imposed upon it in this Agreement to be duly complied with and to cause all conditions precedent to such obligations to be satisfied.

(c)     The Sellers and the Buyer shall cooperate with each other and, as promptly as practicable after the date of this Agreement use commercially reasonable efforts to obtain the issuance, transfer or reissuance to the Buyer or its designee of all Permits (including Liquor Licenses) necessary to lawfully own and operate the Business and Transferred Assets.  The Parties shall use commercially reasonable efforts to respond promptly to any requests for additional information made by such Governmental Authorities or agencies, use their respective commercially reasonable efforts to participate in any presentations, hearings, settlement proceedings or other proceedings ordered with respect to applications to transfer or reissue such Permits (including Liquor Licenses), and use respective commercially reasonable efforts to cause approval to be obtained as soon as practicable after the date of filing.  Each Party will bear its costs of the preparation and review of any such filing.  The Sellers and the Buyer shall have the right to review in advance all characterizations of the information relating to the transactions contemplated by this Agreement which appear in any filing made in connection with any filings to transfer the Permits (including Liquor Licenses) and the filing Party shall consider in good faith any revisions reasonably requested by the non-filing Party.

(d)     To the extent that, as of the Closing Date, the Buyer or its designee has not obtained all of the Permits included in the Transferred Assets that are necessary for the Buyer or its designee to take title to all of the Transferred Assets at the Closing and to operate all aspects of the Business as of, and immediately following, the Closing in the same manner in all material respects as it was operated by the Sellers immediately prior to the Closing, the Sellers shall, to the extent permitted by applicable Laws, maintain after the Closing, and permit Buyer or its designee full use of, the Liquor Licenses and such other Permits that the Buyer or its designee reasonably requests, at the Buyer's sole expense, until the earlier of the time the Buyer or its designee has obtained such Permits and eighteen (18) months following the Closing; provided, however, that Sellers shall only be obligated to provide such post-Closing assistance so long as Buyer complies with the Post-Closing Wind-Down Budget.

Section 6.6     <u>Refunds and Remittances</u>.

(a)     After the Closing: (i) if the Sellers or any of their Affiliates receive any refund, cash, checks with appropriate endorsements, payment of an Account Receivable or other account, any Transferred Tax Asset, trade, note receivable or other payment or other property or asset that is a Transferred Asset or is otherwise properly due and owing to the Buyer in accordance with the terms of this Agreement, the Sellers shall hold such amounts in trust for the Buyer's benefit and accounts and promptly shall remit, or shall cause to be remitted, such amount to the Buyer from time to time as and when received and (ii) if the Buyer or any of its Affiliates receive any refund or other amount that is an Excluded Asset or is otherwise properly due and owing to the Sellers or any of their Affiliates in accordance with the terms of this Agreement, the Buyer shall hold such amounts in trust for the Sellers' benefit and accounts and promptly shall remit, or shall cause to be remitted, such amounts to the Sellers.  For the avoidance of doubt, except as otherwise provided in this Agreement, following the Closing, if any payments due with respect to the Business are paid to any Seller or any of their Affiliates, the Sellers shall, or shall cause the applicable Affiliate to, promptly remit by wire or draft such payment to an account designated in writing by the Buyer.

(b)      In the event that, from and after the Closing, (i) Sellers or any of their Affiliates have retained ownership of a Transferred Asset, then, for no additional consideration to the Sellers or any of their Affiliates, the Sellers shall, and shall cause their Affiliates to, promptly notify the Buyer and as soon as practicable thereafter, convey, assign, transfer or deliver such Transferred Asset to the Buyer or its designees, and the Parties shall execute all other documents and instruments, and take all other lawful actions reasonably requested, in order to assign and transfer such Transferred Asset to the Buyer or its designees or (ii) any Excluded Asset has been conveyed to or is received by the Buyer, then, without any consideration payable to the Buyer or any of its Affiliates, the Buyer shall promptly notify the Sellers and as soon as practicable thereafter, convey, assign, transfer or deliver such Excluded Asset to the Sellers, and the Parties shall execute all other documents and instruments, and take all other lawful actions reasonably requested, in order to assign and transfer such Excluded Asset to Sellers or their designees.

Section 6.7      <u>Public Announcements</u>.  From and after the date hereof, the Parties shall consult with each other before making any press release or otherwise making any public statements with respect to this Agreement or the transactions contemplated hereby, and neither the Buyer nor the Sellers shall make any such press release or any public statement prior to obtaining Holding's (in the case of the Buyer) or the Buyer's (in the case of the Sellers) written approval, which approval shall not be unreasonably withheld, except that no such approval shall be necessary to the extent disclosure is made in any filing made to any court or may be required by applicable Law or by the Bankruptcy Court or as required by the rules of any stock exchange; <u>provided</u>, that, promptly following the Closing, the Parties hereto will release a mutually agreed upon joint press release with respect to this Agreement and the transactions contemplated by this Agreement; <u>provided</u>, <u>further</u>, that nothing in this Agreement shall restrict or prohibit (a) the Sellers, the Buyer or their respective Affiliates from making any announcement to their respective customers and other business relations to the extent that such announcement consists solely of, or is otherwise consistent in all material respects with previous press releases, public disclosures or public statements made by any Party hereto in accordance with this Agreement, in each case, to the extent such disclosure is still accurate in all material respects (and not misleading), (b) any Party from making any announcement to any of their or any of their Affiliates' respective auditors, attorneys, financing sources, actual or potential investors or limited partners or other agents, in each case so long as the disclosing party informs the recipient of the confidential nature of such information and instructs such recipient to keep such information confidential or (c) the Buyer or its Affiliates from making any announcement to their employees or existing or prospective limited partners or other investors.

Section 6.8      <u>Seller Use of Transferred Marks; Use of Seller Marks</u>.  The Sellers shall, as promptly as practicable (but in no event later than ten (10) days) after the Closing, cease using and displaying any Trademarks that are included in the Transferred Assets, including the names and marks set forth in <u>Section 6.8</u> of the Disclosure Schedule or any derivatives thereof, and in accordance with such requirement, the Sellers shall use commercially reasonable efforts to, no later than fifteen (15) days after the Closing, legally change their corporate and business names (to the extent such names include such Trademarks or confusingly similar Trademarks) to names that are not confusingly similar to such Trademarks, and file notices of such name changes with the Bankruptcy Court.  Within fifteen (15) days of Closing, Sellers shall file a motion with the Bankruptcy Court requesting entry of an Order authorizing change of case caption to remove references to "Pinstripes".  Under no circumstance shall the Sellers, after the Closing, use or

otherwise exploit the Trademarks included in the Transferred Assets or any other indicia confusingly similar to the Trademarks included in the Transferred Assets, Copyrights included in the Transferred Assets, or any work substantially similar to the Copyrights included in the Transferred Assets, as a source identifier in connection with any Seller product, service or corporate, business or domain name.  Notwithstanding the foregoing, the Sellers are not prohibited from using such Trademarks for non-trademark uses, including to factually describe their prior ownership of the Business or in a manner that constitutes fair use under applicable Law.

Section 6.9   <u>Sale Free and Clear</u>.  The Sellers acknowledge and agree, and the Sale Order shall be drafted to provide, without limitation, that, (a) on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, Liabilities and Encumbrances, against or created by the Sellers, any of their Affiliates, or the bankruptcy estate, to the fullest extent permitted by section 363 of the Bankruptcy Code, shall be fully released from and with respect to the Transferred Assets and that the Buyer shall be a good faith purchaser within the meaning of Bankruptcy Code Section 363(m) and (b) the Buyer is not a successor to any Seller or the bankruptcy estate by reason of any theory of Law or equity, and the Buyer shall not assume or in any way be responsible for any Liability of the Sellers, any of their Affiliates and/or the bankruptcy estate, except as expressly provided in this Agreement.  On the Closing Date, the Transferred Assets shall be transferred to the Buyer free and clear of all obligations, Liabilities and Encumbrances (other than Permitted Encumbrances) to the fullest extent permitted by section 363 of the Bankruptcy Code.

Section 6.10   <u>Intellectual Property Registrations</u>.  Prior to the Closing Date, upon the reasonable request of Buyer, the Sellers shall use commercially reasonable efforts to effect the necessary change of ownership and recordals with all patent, trademark, and copyright offices and domain name registrars and other similar authorities (i) where Intellectual Property of any Seller is still recorded in the name of legal predecessors of any Seller or any Person other than a Seller or (ii) where, to the Knowledge of the Sellers, the relevant recordals of the patent, copyright, and trademark offices, and domain name registrars, and other similar authorities, with respect to any Seller's Intellectual Property, are materially incorrect for any other reason.

Section 6.11   <u>Confidentiality</u>.  Following the Closing, the Sellers shall, and the Sellers shall cause their respective Affiliates and Representatives to, maintain as confidential and not use or disclose, (a) any confidential, proprietary or non-public information or materials relating to the Business, the Transferred Assets, or the Assumed Liabilities and (b) any materials developed by the Buyer or any of its Representatives or provided by the Buyer or any of its Representatives to any Seller.  In the event any Seller or any of their respective Affiliates or Representatives is required by applicable Law to disclose any such information or materials, such Seller shall, to the extent not prohibited by applicable Law, promptly notify the Buyer in writing, which notification shall include the nature of the legal requirement and the extent of the required disclosure, and shall reasonably cooperate with the Buyer, at the Buyer's sole expense, to obtain a protective Order and otherwise preserve the confidentiality of such information or materials consistent with applicable Law.  Information and materials subject to the confidentiality obligations in this <u>Section 6.11</u> do not include any information or materials which (i) at the time of disclosure is or thereafter becomes generally available to or known by the public (other than as a result of the disclosure of such information or materials by the Sellers or their Affiliates or Representatives in breach of this <u>Section 6.11</u>) or (ii) becomes available to any of the Sellers or their Affiliates and Representatives

on a non-confidential basis from a Person (other than the Buyer or any of its Affiliates) who is not bound by a confidentiality agreement with the Buyer or any of its Affiliates.

## ARTICLE VII.
## TAX MATTERS

Section 7.1    Transfer Taxes.  Any and all sales, harmonized sales, use, property transfer or gains, real estate or land transfer or gains, documentary, stamp, registration, recording, filing, goods and services, value-added or other similar Taxes payable as a result of or with respect to the sale or transfer of the Transferred Assets and the Business and the assumption of the Assumed Liabilities pursuant to this Agreement ("Transfer Taxes") shall be borne by the Buyer and Buyer shall timely file all Tax Returns related to any Transfer Taxes.  The Sellers and the Buyer shall use commercially reasonable efforts and cooperate in good faith to mitigate, reduce, or eliminate any such Transfer Taxes.

Section 7.2    Tax Cooperation.  The Buyer and the Sellers agree to furnish or cause to be furnished to each other, upon reasonable request, as promptly as practicable, such information (including access to books and records relating to Taxes) and assistance relating to the Business, the Transferred Assets and the Assumed Liabilities with respect to Pre-Closing Tax Periods as is reasonably necessary for determining any Liability for Taxes, the filing of any Tax Returns, the making of any election relating to Taxes, the preparation for any audit or any other Action relating to any Tax by any Governmental Authority and the prosecution or defense of any Action relating to any Tax; provided, however, that the Buyer shall not be required to disclose the contents of its Tax Returns to any Person.  Any reasonable expenses incurred in furnishing such information or assistance pursuant to this Section 7.2 shall be borne by the Party requesting it.

Section 7.3    Allocation of Taxes.  To the extent it is necessary for purposes of this Agreement to determine the allocation of Taxes relating to a Straddle Period between the Pre-Closing Tax Period and the Post-Closing Tax Period, (a) the amount of any such Taxes that are based on or measured by income or receipts or that are sales or use taxes, employment taxes, or withholding taxes and any other Taxes not described in clause (b) of this Section 7.3 for the portion of such Straddle Period ending on the Closing Date shall be determined based on an interim closing of the books as of the close of business at the end of the day on the Closing Date, and (b) the amount of any property, ad valorem Taxes and any other Taxes imposed on a periodic basis for such Straddle Period that relates to the portion of such Straddle Period ending on the Closing Date shall be deemed to be the amount of such Tax for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of days in such Straddle Period ending as of the close of business on the Closing Date and the denominator of which is the total number of days in such Straddle Period.  In the case of clause (b) of the preceding sentence, exemptions, allowances or deductions that are calculated on an annual basis (including depreciation and amortization deductions computed as if the Closing Date was the last day of the Straddle Period) shall be allocated between the portion of the Straddle Period ending on the Closing Date and the portion of the Straddle Period thereafter in proportion to the number of days in each such portion.

Section 7.4    Bulk Sales.  Notwithstanding any other provisions in this Agreement, the Buyer and the Sellers hereby waive compliance with all "bulk sales," "bulk

transfer" and similar Laws that may be applicable with respect to the sale and transfer of any or all of the Transferred Assets to the Buyer or any designee thereof.

Section 7.5    <u>Deferred Revenue</u>.    Notwithstanding anything to the contrary herein, the Parties agree that no cash payment is being made actually or constructively by the Sellers to Buyer for the assumption of any deferred revenue in connection with this Agreement, and accordingly the Parties agree that Rev. Rul. 68-112 and Rev. Rul. 71-450 shall not apply to the assumption of any deferred revenue in connection with this Agreement.

# ARTICLE VIII.
## CONDITIONS TO CLOSING

Section 8.1    <u>General Conditions</u>.    The respective obligations of the Buyer and the Sellers to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may, to the extent permitted by applicable Law, be waived in a joint writing by the Buyer and Holdings (<u>provided</u> that such waiver shall only be effective as to the obligations of the Sellers, in the case of a waiver by Holdings, and the Buyer, in the case of the Buyer):

(a)    No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law or Order (whether temporary, preliminary or permanent), or shall have initiated and be actively pursuing any legal proceedings seeking any such Order, that enjoins, restrains, prevents, makes illegal or otherwise prohibits the consummation of the transactions contemplated by this Agreement or the Ancillary Agreements (any such Law or Order, a "<u>Legal Restraint</u>").

(b)    The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be a Final Order.

Section 8.2    <u>Conditions to Obligations of the Sellers</u>.    The obligations of the Sellers to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may, to the extent permitted by applicable Law, be waived in writing by Holdings in its sole discretion:

(a)    The representations and warranties of the Buyer contained in this Agreement shall be true and correct in all respects both as of the Disclosure Schedule Delivery Date and as of the Closing Date (other than in the case of representations and warranties that are made as of a specified date, which representations and warranties shall be true and correct in all material respects as of such specified date), without giving effect to any limitation or qualification by a materiality standard (including "in all material respects," "material" or "Buyer Material Adverse Effect") set forth therein, except where the failure to be so true and correct has not had or would not reasonably be expected to have, individually or in the aggregate, a Buyer Material Adverse Effect.

(b)    The Buyer shall have, in all material respects, performed all obligations and agreements and complied with all covenants and conditions required by this Agreement to be performed or complied with by it prior to or at the Closing.

68

(c)    The Sellers shall have received the documents listed in <u>Section 2.8(c)</u>.

Section 8.3    <u>Conditions to Obligations of the Buyer</u>.  The obligations of the Buyer to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may, to the extent permitted by applicable Law, be waived in writing by the Buyer in its sole discretion:

(a)    Representations and Warranties.

(i)    Each Fundamental Representation shall be true and correct in all respects both as of the Disclosure Schedule Delivery Date and as of the Closing Date (other than in the case of Fundamental Representations that are made as of a specified date, which Fundamental Representations shall be true and correct in all respects as of such specified date).

(ii)    The representations and warranties of the Sellers contained in this Agreement (other than the Fundamental Representations) shall be true and correct in all respects both as of the Disclosure Schedule Delivery Date and as of the Closing Date (other than in the case of representations and warranties that are made as of a specified date, which representations and warranties shall be true and correct in all material respects as of such specified date), without giving effect to any limitation or qualification by a materiality standard (including "in all material respects," "material" or "Material Adverse Effect") set forth therein, except where the failure to be so true and correct has not had or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    The Sellers shall have, in all material respects, performed all obligations and agreements and complied with all covenants and conditions required by this Agreement to be performed or complied with by them prior to or at the Closing.

(c)    The Buyer shall have received the documents listed in <u>Section 2.8(b)</u>.

(d)    (i) A "Termination Date" (as defined in the DIP) shall not have occurred, (ii) an "Event of Default" (as defined in the DIP) shall not have occurred and be continuing and (iii) the Indebtedness outstanding under the DIP shall not have otherwise been paid off.

(e)    There shall not have occurred and be continuing any event, change, condition, occurrence or effect that has, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(f)    The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be a Final Order.

(g)    Sellers shall (i) have delivered to the applicable counterparty the notices, and obtained from the applicable counterparty the consents, approvals and authorizations, listed on <u>Section 8.3(g)</u> of the Disclosure Schedule, and (ii) have delivered evidence thereof to the Buyer.

# ARTICLE IX.
# TERMINATION

Section 9.1    Termination.  This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written consent of the Buyer and Holdings;

(b)    either Holdings or the Buyer, if:

(i)    a Legal Restraint is in effect that has become final and non-appealable; provided, that the right to terminate this Agreement under this Section 9.1(b)(i) shall not be available to (x) Holdings if any Seller is then in material breach or violation of this Agreement and such breach or violation proximately caused such Legal Restraint or (y) Buyer if Buyer is then in material breach or violation of this Agreement and such breach or violation proximately caused such Legal Restraint;

(ii)    subject to compliance with Section 5.1, any Seller enters into a definitive agreement with respect to an Alternative Transaction because the Buyer is not the Successful Bidder at the Auction; provided, however, that if the Buyer is the Backup Bidder, then the Buyer may not terminate this Agreement pursuant to this Section 9.1(b)(ii) for a period of ten (10) Business Days from the entry of an Order of the Bankruptcy Court approving such definitive agreement and the transactions contemplated thereby (for the avoidance of doubt, nothing in this Section 9.1(b)(ii) shall restrict the ability of the Buyer to terminate this Agreement in accordance with any other provision of this Agreement); or

(iii)    the Closing shall not have occurred on or before November 14, 2025 (the "Outside Date"); provided that the right to terminate this Agreement under this Section 9.1(b)(iii) shall not be available to (x) Holdings if any Seller is then in material breach or violation of this Agreement and such breach or violation proximately caused the failure of the Closing to occur prior to such date or (y) Buyer if Buyer is then in material breach or violation of this Agreement and such breach or violation proximately caused the failure of the Closing to occur prior to such date;

(c)    by the Buyer, if:

(i)    the Buyer is not in material breach of this Agreement such that the conditions in Section 8.2(a) or Section 8.2(b) would not be satisfied, and the Sellers breach or fail to perform in any respect any of their representations, warranties or covenants contained in this Agreement and such breach or failure to perform (1) would give rise to the failure of a condition set forth in Section 8.3(a) or Section 8.3(b) and (2) cannot be or has not been cured before the earlier to occur of (A) fifteen (15) days following delivery of written notice of such breach or failure to perform and (B) one (1) day prior to the Outside Date;

(ii)    the Bankruptcy Court has not entered the Sale Procedures Order on or before the date that is fourteen (14) calendar days after the Petition Date, or if approval of the Sale Procedures Order is delayed due to the Bankruptcy Court's unavailability, the next Business Day on which the Bankruptcy Court is available;

(iii)    the Sale Hearing is not held on or before the date that is forty-five (45) calendar days after the Petition Date, or if the Sale Hearing is delayed due to the Bankruptcy Court's unavailability, the next Business Day on which the Bankruptcy Court is available;

(iv)    the Auction, if any, is not held on or before the date that is forty (40) calendar days after the Petition Date;

(v)    the Bankruptcy Court has not entered the Sale Order on or before the date that is forty-five (45) calendar days after the Petition Date, or if approval of the Sale Order is delayed due to the Bankruptcy Court's unavailability, the next Business Day on which the Bankruptcy Court is available;

(vi)    the Bankruptcy Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code, and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement;

(vii)    the Sellers withdraw or seek authority to withdraw the Sale Procedures Motion or, after entry of the Sale Procedures Order, the Sellers withdraw the request for authority to sell the Transferred Assets and assign the Transferred Contracts;

(viii)    the Sellers modify or amend the Sale Procedures (as defined in the Sale Procedures Order) in a manner adverse to the Buyer without the prior written consent of the Buyer unless such modification or amendment is permitted by the Sale Procedures Order or required by the Bankruptcy Court;

(ix)    any of the Sellers or any chapter 11 trustee appointed for any Seller file any pleading with the Bankruptcy Court for relief that would not permit the Closing without the prior written consent of the Buyer; provided, that taking any action in respect of soliciting Competing Bids, or accepting a winning bid, in connection with the Auction shall not entitle the Buyer to terminate this Agreement pursuant to this Section 9.1(c)(ix).

(x)    a Material Adverse Effect has occurred since the Petition Date;

(xi)    the Sellers publicly announce any plan of reorganization or plan of liquidation or support any such plan filed by any third party, other than any such transaction related to the wind down of the Sellers and that would not prevent or materially delay the Closing from occurring in accordance with the terms of this Agreement; or

(xii)    (i) any Seller enters into one or more Alternative Transactions with one or more Persons other than Buyer or the Successful Bidder or the Backup Bidder at the Auction or (ii) the Bankruptcy Court approves an Alternative Transaction other than with the Buyer or the Successful Bidder or the Backup Bidder;

(xiii)    for any reason the Buyer is unable, pursuant to section 363(k) of the Bankruptcy Code, to credit bid all or any portion of the Credit Bid Amount in payment of the Purchase Price as set forth in Section 2.7;

(xiv)    any party receives relief under Section 362 of the Bankruptcy Code with respect to any Lease, Leased Real Property or other or Material Contract of any Debtor;

(xv)    the occurrence of any "Event of Default" under the DIP; or

(xvi)    the Support Agreement is validly terminated in accordance with its terms;

(d)    by Holdings, if the Sellers are not in material breach of this Agreement such that the conditions in Section 8.3(a) or Section 8.3(b) would not be satisfied, and the Buyer breaches or fails to perform in any respect any of its representations, warranties or covenants contained in this Agreement and such breach or failure to perform (1) would give rise to the failure of a condition set forth in Section 8.2(a) or Section 8.2(b) and (2) cannot be or has not been cured before the earlier to occur of (A) fifteen (15) days following delivery of written notice of such breach or failure to perform and (B) one (1) day prior to the Outside Date.

The Party seeking to terminate this Agreement pursuant to this Section 9.1 (other than Section 9.1(a)) shall, if such Party is Holdings, give prompt written notice of such termination to the Buyer, and if such Party is the Buyer, give prompt written notice of such termination to the Sellers.

Section 9.2    Effect of Termination.  In the event of termination of this Agreement as provided in Section 9.1, this Agreement shall forthwith become void and there shall be no liability on the part of any Party except (i) for the provisions of Article V (Bankruptcy Court Matters), Section 6.7 (Public Announcements), Section 10.2 (Fees and Expenses), Section 10.5 (Notices), Section 10.8 (Parties in Interest), Section 10.9 (Governing Law), Section 10.10 (Submission to Jurisdiction) and this Article IX and (ii) that no such termination shall relieve any Party from liability for any fraud or willful and material breach of this Agreement.

## ARTICLE X.
## GENERAL PROVISIONS

Section 10.1    Non-Survival of Representations, Warranties and Covenants.  The respective representations, warranties and covenants of the Sellers and the Buyer contained in this Agreement and any certificate delivered pursuant hereto shall terminate at, and not survive, the Closing; provided that this Section 10.1 shall not limit any covenant or agreement of the Parties to the extent that its terms require performance after the Closing, which shall survive in accordance with their terms.

Section 10.2    Fees and Expenses.  Except as otherwise provided herein (including Section 5.1 and Section 7.1) or in the Interim Financing Order, the Final Financing Order or the DIP, all fees and expenses incurred in connection with or related to this Agreement and the Ancillary Agreements and the transactions contemplated hereby and thereby shall be paid by the Party incurring such fees or expenses, whether or not such transactions are consummated.  For the avoidance of doubt, Buyer shall pay all recording fees arising from the transfer of the Transferred Assets.

Section 10.3  Amendment and Modification.  This Agreement may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing specifically designated as an amendment hereto, signed on behalf of each Party.

Section 10.4  Waiver.  No failure or delay of any Party in exercising any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right or power.  Any agreement on the part of either Party to any such waiver shall be valid only if set forth in a written instrument executed and delivered by a duly authorized officer on behalf of such Party.

Section 10.5  Notices.  All notices and other communications hereunder shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally, (b) on the first Business Day following the date of dispatch if delivered utilizing a next-day service by a recognized next-day courier, (c)  if sent via email transmission to the email address(es) given below upon non-auto generated confirmation of receipt or (d) on the earlier of confirmed receipt or the fifth (5th) Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid.  All notices hereunder shall be delivered to the addresses set forth below, or pursuant to such other instructions as may be designated in writing by the Party to receive such notice:

(i)  if to the Sellers, to:

Pinstripes, Inc.
1150 Willow Road
Northbrook, IL 60062
Attention: James Katchadurian
Email: james.katchadurian@cr3partners.com

with a copy (which shall not constitute notice) to:

Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
Attention:  Sean M. Beach and Elizabeth Justison
Email:  sbeach@ycst.com; ejustison@ycst.com

(ii)  if to the Buyer, to:

Silverview Credit Partners
100 South Ashley Drive, Suite 600
Tampa, FL 33602
Attention: Nelson Sproat
Email: nelson.sproat@silverview.com

with a copy (not constituting notice) to:

Alston & Bird LLP
90 Park Avenue, 15th Floor
New York, NY 10016
Attention: James Vincequerra
Email: james.vincequerra@alston.com

Section 10.6  <u>Interpretation</u>.  When a reference is made in this Agreement to a Section, Article, Exhibit or Schedule such reference shall be to a Section, Article, Exhibit or Schedule of this Agreement unless otherwise indicated.  The table of contents and headings contained in this Agreement or in any Exhibit or Schedule are for convenience of reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  All words used in this Agreement will be construed to be of such gender or number as the circumstances require.  Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall have the meaning as defined in this Agreement.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth herein.  The word "including" and words of similar import when used in this Agreement will mean "including, without limitation," unless otherwise specified.  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to the Agreement as a whole and not to any particular provision in this Agreement.  The term "or" is not exclusive and the use of the word "or" to connect two or more phrases shall be construed as inclusive of all such phrases (*e.g.*, "A or B" means "A or B, or both").  The word "will" shall be construed to have the same meaning and effect as the word "shall."  References to days mean calendar days unless otherwise specified.  All references to "dollars" or "$" in this Agreement or any Ancillary Agreement refer to United States dollars, which is the currency used for all purposes in this Agreement and any Ancillary Agreement. Any reference to any federal, state, provincial, territorial, local or foreign statute or Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded.  If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day. For purposes of this Agreement, the Sellers shall be deemed to have "delivered" or "made available" information and documents if such information or documents were uploaded to the Data Room at least two (2) Business Days prior to the Closing Date, and remained in the Data Room through to the Closing Date.

Section 10.7  <u>Entire Agreement</u>.  This Agreement (including the Exhibits and Schedules hereto) and the Ancillary Agreements constitute the entire agreement, and supersede all prior written agreements, arrangements, communications and understandings and all prior and

contemporaneous oral agreements, arrangements, communications and understandings between the Parties with respect to the subject matter hereof and thereof.  Neither this Agreement nor any Ancillary Agreement shall be deemed to contain or imply any restriction, covenant, representation, warranty, agreement or undertaking of any Party with respect to the transactions contemplated hereby or thereby other than those expressly set forth herein or therein or in any document required to be delivered hereunder or thereunder, and none shall be deemed to exist or be inferred with respect to the subject matter hereof.

Section 10.8    Parties in Interest.  This Agreement shall be binding upon and inure solely to the benefit of each Party, and nothing in this Agreement, express or implied, is intended to or shall confer upon any Person (including employees of the Sellers) other than the Parties and their respective successors and permitted assigns any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement. Notwithstanding anything herein to the contrary, this Agreement and any Sale Order shall be binding on the Debtors' successors and assigns, including any trustee appointed in any of the Bankruptcy Cases and, if the Debtors' Bankruptcy Cases convert to cases under chapter 7 of the Bankruptcy Code, any trustee appointed in such chapter 7 case.

Section 10.9    Governing Law.  Except to the extent of the mandatory provisions of the Bankruptcy Code, this Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby (in contract or tort) shall be governed by, and construed in accordance with the internal Laws of the State of Delaware, without regard to the Laws of any other jurisdiction that might be applied because of the conflicts of Laws principles of the State of Delaware.

Section 10.10  Submission to Jurisdiction.  Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (b) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or proceeding; provided, however, that, if the Bankruptcy Court is closed or declines jurisdiction, each of the Parties irrevocably agrees that any Action or proceeding arising out of or relating to this Agreement brought by another Party or its successors or assigns shall be heard and determined in a Delaware state court or a federal court sitting in Delaware, and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action arising out of or relating to this Agreement and the transactions contemplated hereby.  Each of the Parties further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient, without limiting any other manner of service permitted by Law.  Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any Action arising out of or relating to this Agreement or the transactions contemplated hereby, (i) any claim that it is not personally subject to the jurisdiction of the courts in Delaware as described herein for any reason, (ii) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process

commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise), and (iii) that (A) the Action in any such court is brought in an inconvenient forum, (B) the venue of such Action is improper or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.

Section 10.11 <u>Disclosure Generally</u>.  The fact that any item of information is disclosed in any Disclosure Schedule shall not be construed to be an admission by any Party to any third party of any liability or obligation with respect thereto or to mean that such information is material or immaterial, within or outside of the Ordinary Course of Business, or required to be disclosed by this Agreement.  Such information and the dollar thresholds set forth herein shall not be used as a basis for interpreting the terms "material" or "Material Adverse Effect" or other similar terms in this Agreement.  No information set forth in the Disclosure Schedule will be deemed to broaden in any way the scope of the Parties' representations, warranties or covenants set forth in this Agreement.

Section 10.12 <u>No Recourse</u>.  All Actions, obligations, Liabilities, or causes of action (whether in contract or in tort, in Law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to this Agreement or any Ancillary Agreement, or the negotiation, execution, or performance of this Agreement and the other Ancillary Agreements (including any representation or warranty made in, in connection with, or as an inducement to, this Agreement), may be made only against the parties hereto.  No Person who is not a party hereto, including any past, present or future director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, representative or assignee of, and any financial advisor or lender to, any party hereto, or any past, present or future director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, representative or assignee of, and any financial advisor or lender to, any of the foregoing (collectively, the "<u>Non-Party Affiliates</u>"), shall have any Liability (whether in contract or in tort, in Law or in equity, or granted by statute) for any Liabilities or causes of action arising under, out of, in connection with, or related in any manner to this Agreement or the other Ancillary Agreements or based on, in respect of, or by reason of this Agreement or the other Ancillary Agreements or their negotiation, execution, performance, or breach, and, to the maximum extent permitted by Law, each party hereto hereby waives and releases all such Liabilities and causes of action against any such Non-Party Affiliates (except pursuant to this Agreement or the other Ancillary Agreements to which they are a party).  Without limiting the foregoing, to the maximum extent permitted by Law, each party hereto disclaims any reliance upon any Non-Party Affiliate with respect to the performance of this Agreement or the other Ancillary Agreements or any representation or warranty made in, in connection with, or as an inducement to this Agreement.

Section 10.13 <u>Assignment; Successors</u>.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned or delegated, in whole or in part, by operation of Law or otherwise, by any Seller without the prior written consent of the Buyer, and by the Buyer without the prior written consent of Holdings, and any such assignment without such prior written consent shall be null and void; <u>provided</u>, <u>however</u>, that Buyer may assign all or any portion of its rights or obligations hereunder to (a) one or more of its Affiliates or (b) New PBS HoldCo, LLC or one or more of its Affiliates, in either case without the prior written

consent of any other Party.  Subject to the preceding sentences, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the Parties and their respective successors and assigns.

Section 10.14 <u>Enforcement</u>.  The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement.  Accordingly, (a) each of the Parties shall be entitled to specific performance of the terms hereof or other equitable relief, including an injunction or injunctions, to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, without proof of damages or otherwise (this being in addition to any other remedy to which any such Party may be entitled under this Agreement) and (b) the right of specific performance and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither the Sellers nor Buyer would have entered into this Agreement.  Each of the Parties hereby further waives (i) any defense in any Action for specific performance that a remedy at Law would be adequate and (ii) any requirement under any Law to post security as a prerequisite to obtaining equitable relief.

Section 10.15 <u>Severability</u>.  Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable Law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or portion of any provision in such jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision or portion of any provision had never been contained herein.

Section 10.16 <u>Waiver of Jury Trial</u>.   EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 10.17 <u>Counterparts</u>.  Notwithstanding anything else herein to the contrary, this Agreement may be executed in two or more counterparts, all of which shall be considered one and the same instrument and shall become effective when one or more counterparts have been signed by each of the Parties and delivered to the other Parties.  Delivery of an executed counterpart of a signature page to this Agreement via electronic mail, portable document format (.pdf) or any electronic signature complying with the U.S. federal ESIGN Act of 2000 (including DocuSign), shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

Section 10.18 <u>No Presumption Against Drafting Party</u>.  Each of the Buyer and the Sellers acknowledges that each Party to this Agreement has been represented by legal counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of Law or any legal decision that would require interpretation of any claimed

ambiguities in this Agreement against the drafting Party has no application and is expressly waived.

[The remainder of this page is intentionally left blank.]

IN WITNESS WHEREOF, the Sellers and the Buyer have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLERS:**

**PINSTRIPES HOLDINGS, INC.**

By: _____

Name: Dale Schwartz
Title: CEO

**PINSTRIPES, INC.**

By: _____

Name: Dale Schwartz
Title: CEO

**PINSTRIPES HILLSDALE, LLC**

By: _____

Name: Dale Schwartz
Title: CEO

**PINSTRIPES ILLINOIS, LLC**

By: _____

Name: Dale Schwartz
Title: CEO

*[Signature Page to Asset Purchase Agreement]*

**BUYER**:

**SILVERSTRIKE, LLC**

By:  *Nelson Sproat*
      Name:  Nelson Sproat
      Title:    Authorized Signatory

[*Signature Page to Asset Purchase Agreement*]

**Schedule 1.1**

*Acquired Locations*

- 1150 Willow Road, Northbrook, IL 60062

- 7 Oakbrook Center Mall, Oak Brook, IL 60523

- 11920 Grand Park Ave., North Bethesda, MD 20852

- 36 Hillsdale Mall, San Mateo, CA 94403

- 100 W. Higgins Road, South Barrington, IL 60010

- 3849 Gallagher Drive, Edina, MN 55435

- 1064 Wisconsin Ave NW, Washington, DC 20007

- 111 Park Avenue, Beachwood, OH 44122

**Exhibit A**

<u>Form of Sale Procedures Order</u>

*Attached.*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| PINSTRIPES HOLDINGS, INC., *et al.*,[1] | Case No. 25-_____ (___) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. __** |

**ORDER (I) APPROVING BIDDING PROCEDURES
IN CONNECTION WITH THE SALE OF THE DEBTORS' ASSETS;
(II) APPROVING FORM AND MANNER OF NOTICE; (III) APPROVING
DESIGNATION OF STALKING HORSE BIDDER AND STALKING HORSE BID;
(IV) SCHEDULING AUCTION AND SALE HEARING; (V) AUTHORIZING
PROCEDURES GOVERNING ASSUMPTION AND ASSIGNMENT OF CERTAIN
CONTRACTS AND UNEXPIRED LEASES; AND (VI) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "**Motion**")[2] of the Debtors, for the entry of an

order (this "**Order**"):  (i) approving bidding procedures, substantially in the form attached as

**Annex 1** hereto (the "**Bidding Procedures**"), to govern the marketing and sale of all or

substantially all of the Debtors' assets (the "**Assets**"); (ii) authorizing the Debtors to schedule an

auction to sell the Assets (the "**Auction**") and scheduling the hearing to approve a sale of the

Assets (the "**Sale Hearing**"); (iii) approving designation of Stalking Horse Bidder and Stalking

Horse Bid; (iv) approving the form and manner of notice of the proposed sale transactions, the

Bidding Procedures, the Auction, the Sale Hearing, and related dates and deadlines;

(v) authorizing procedures governing the assumption and assignment of certain executory

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Pinstripes Holdings, Inc. (6699); Pinstripes, Inc. (8608); Pinstripes Hillsdale LLC (6064); Pinstripes at Prairiefire, Inc. (7018); and Pinstripes Illinois, LLC (6432).  For purposes of these chapter 11 cases, the Debtors' service address is 1150 Willow Road, Northbrook, Illinois 60062.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Stalking Horse Agreement and the Motion, as applicable, and to the extent of any inconsistency in the defined terms, the Stalking Horse Agreement shall govern.

contracts and unexpired leases (the "**Assumed Contracts**") to the prevailing bidder(s) acquiring the Debtors' assets (each, a "**Successful Bidder**"); and (vi) granting related relief, as more fully described in the Motion; and the Court having reviewed the Motion and the First Day Declaration; and upon consideration of the First Day Declaration and the record of these chapter 11 cases; and due and proper notice of the Motion having been given; and it appearing that no other or further notice of the Motion is required except as otherwise provided herein; and it appearing that this Court has jurisdiction to consider the Motion in accordance with 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order; and it appearing that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and it appearing that venue of this proceeding and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having reviewed the Motion and having heard the statements in support of the relief requested in the Motion at a hearing before this Court, if any; and it appearing that the relief requested in the Motion and provided for herein is in the best interest of the Debtors, their estates, and their creditors; and after due deliberation and sufficient cause appearing therefore,

**IT IS HEREBY FOUND AND CONCLUDED THAT**:[3]

    A.    The statutory bases for the relief requested in the Motion are sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), Rules 2002, 3007, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rules 2002-1 and 6004-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware.

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.       Good and sufficient notice of the Motion was given and no further notice is required except as otherwise provided for herein.  A reasonable opportunity to object or be heard regarding the relief granted by this Order has been afforded to those parties entitled to notice pursuant to Bankruptcy Rule 2002 and all other interested parties.

C.       The Debtors and their advisors, including former pre-petition advisors, engaged in a robust and extensive sale process before the commencement of these chapter 11 cases, over a period of nine months, to solicit and develop offers for the Assets.

D.       The Debtors have articulated good and sufficient reasons for the Court to grant the relief requested in the Motion regarding the sale process and Bidding Procedures, including (a) the scheduling of the Bid Deadline (as defined in the Bidding Procedures), the Auction, and the Sale Hearing with respect to the proposed sale of the Assets; (b) the establishment of procedures to fix the Proposed Cure Amounts (as defined below) to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption, assignment, and/or transfer of the Assumed Contracts; (c) designation of the Stalking Horse Bidder and Stalking Horse Bid; and (d) approval and authorization to serve the Sale Notice.

E.       The Sale Notice (in substantially the form annexed hereto as **Annex 2**), is reasonably calculated to provide all interested parties with timely and proper notice of the Bidding Procedures, the Auction, the Sale Hearing, and the Sale and any and all objection deadlines related thereto.

F.       The Cure Notice (in substantially the form annexed hereto as **Annex 3**) is reasonably calculated to provide all non-Debtor counterparties (the "**Counterparties**") to the Debtors' executory contracts and unexpired leases (each, a "**Contract**" and, collectively, the "**Contracts**") with reasonable and proper notice of the potential assumption and assignment of

3

their Contract and any cure amounts relating thereto, although the mere listing of any Contract on the Cure Notice does not require or guarantee that such Contract will be assumed and assigned and all rights of the Debtors and Stalking Horse Bidder with respect to such Contracts are reserved (including, but not limited to, with respect to whether any Contract constitutes an executory contract and whether any Contract shall be an Assumed Contract under the Stalking Horse Agreement.

G.      The Stalking Horse Agreement was negotiated by the Debtors, their advisors, the Stalking Horse Bidder, and its advisors, in good faith and at arms'-length.  The Stalking Horse Bid represents the highest or best offer the Debtors received during the pre-petition sale process and provides the Debtors with the opportunity to sell the Assets in a competitive auction process while continuing certain of the Debtors' operations, preserving jobs, minimizing disruption to the Debtors' business, and, accordingly, will provide a clear benefit to the Debtors' estates, their creditors, and all other parties in interest.. Without the Stalking Horse Bid, the Debtors would likely realize a lower price for the Assets. As such, the contributions of the Stalking Horse Bidder to the process have indisputably provided a substantial benefit to the Debtors, their estates, and creditors in these chapter 11 cases.

H.      The Stalking Horse Bidder shall act as the "stalking horse bidder" pursuant to the Stalking Horse Agreement and the Stalking Horse Bid shall be subject to higher or better offers in accordance with the Bidding Procedures.  The Stalking Horse Bidder is not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders exists between the Stalking Horse Bidder and the Debtors.  Pursuit of the Stalking Horse Bidder as a "stalking-horse" bidder and its Stalking Horse Bid as a "stalking-horse" purchase agreement is in

the best interests of the Debtors and the Debtors' estates and creditors, and it reflects a sound exercise of the Debtors' business judgment.

I.      The Bidding Procedures are fair, reasonable, and appropriate under the circumstances and designed to maximize the recovery on, and realizable value of, the Assets, as determined by the Debtors' sound business judgment.  The Bidding Procedures were negotiated in good faith and at arms'-length and are reasonably designed to promote a competitive and robust bidding process to generate the greatest level of interest in the Debtors' business resulting in the highest or otherwise best offer.  The Bidding Procedures comply with the requirements of Local Rule 6004-1.

J.      The entry of this Order is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.

**IT IS HEREBY ORDERED THAT**:

1.      The Motion is **GRANTED** as set forth herein.

### Bidding Procedures

2.      The Bidding Procedures, substantially in the form attached hereto as **Annex 1**, are hereby approved and fully incorporated herein.  The Debtors are authorized, but not directed, to take any and all actions necessary or appropriate to implement the Bidding Procedures.

3.      All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are overruled except as otherwise set forth herein.

**Stalking Horse Bid and Stalking Horse Bidder**

4.       The Debtors are authorized to enter into the Stalking Horse Agreement, subject to higher or otherwise better offers, in accordance with this Order and the terms and procedures of the Bidding Procedures.

5.       The Stalking Horse Bidder is a Qualified Bidder and the bid reflected in the Stalking Horse Bid (including as may be increased at the Auction (if any)) is a Qualified Bid, as set forth in the Bidding Procedures.

6.       The Stalking Horse Bidder is designated as such for purposes of the Bidding Procedures.

**Notice Procedures**

7.       The Sale Notice, substantially in the form attached hereto as **Annex 2**, is hereby approved and shall be served within three (3) business days of entry of this Order, upon the Notice Parties identified in the Motion.  Service of the Sale Notice as described in the Motion shall be sufficient and proper notice of the Sale and sale process contemplated by this Order with respect to all known interested parties.

**Assignment Procedures**

8.       The Cure Notice, substantially in the form attached hereto as **Annex 3**, is hereby approved.  The Cure Notice shall identify the Contracts of the Debtors that may be assumed and assigned in connection with the sale of the Assets and provide the corresponding cure amounts that the Debtors believe must be paid to cure all defaults under each of the Contracts as contemplated by section 365 of the Bankruptcy Code (the "**Proposed Cure Amounts**").  No later than three (3) business days after entry of this Order, the Debtors shall serve the Cure Notice on all Counterparties.  If at any time after the issuance of the Cure Notice but prior to the Sale Hearing it is discovered that a Contract should have been listed on the Executory Contracts

Schedule but was not (any such Contract, a "**Previously Omitted Contract**"), the Debtors shall,

promptly following discovery thereof (but in no event later than two (2) business days following

discovery thereof), file and serve a notice on the non-Debtor counterparty(ies) to such Previously

Omitted Contract notifying such counterparties of the Debtors' intention to assume and assign

such Previously Omitted Contract to the Successful Bidder, including the Proposed Cure

Amounts relating thereto (the "**Previously Omitted Contract Notice**").

**Objection Procedures**

9.      Notwithstanding anything to the contrary in the Motion, any objection to any

aspect of the relief requested in the Motion must:  (i) be in writing and filed with this Court;

(ii) comply with the Bankruptcy Rules; (iii) set forth the name of the objecting party, the nature

and amount of any claims or interests held or asserted against the Debtors' estates or properties,

the basis for the objection, and the specific grounds therefor; and (iv) be served upon (so as to be

received by) the following parties (collectively, the "**Objection Notice Parties**") by the

applicable deadline established in this Order:

(a)      proposed counsel for the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: Michael R. Nestor, Esq. (mnestor@ycst.com), Sean M. Beach, Esq. (sbeach@ycst.com), Elizabeth S. Justison, Esq. (ejustison@ycst.com), and Shella Borovinskaya, Esq. (sborovinskaya@ycst.com);

(b)      counsel for the DIP Agent and Existing Silverview Agent, Blank Rome LLP, 1201 Market Street, Suite 800, Wilmington, Delaware 19801, Attn: Regina Stango Kelbon, Esq. (regina.kelbon@blankrome.com), John Lucian, Esq. (john.lucian@blankrome.com), Stanley B. Tarr, Esq. (stanley.tarr@blankrome.com) and Alston & Bird LLP, 90 Park Avenue, 15th Floor, New York, New York 10016, Attn: James Vincequerra, Esq. (james.vincequerra@alston.com) and Stephen Blank, Esq. (stephen.blank@alston.com);

(c)      the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware, 19801, Attn: Benjamin A. Hackman, Esq. (Benjamin.A.Hackman@usdoj.gov); and

7

(d)      counsel to any official committee of creditors.

10.      Objections, other than the objections served pursuant to paragraph 12, below, if any, to the relief requested in the Motion shall be considered at the Sale Hearing, other than objections expressly described in paragraph 11 of this Order, and must be served upon (such as to be received by) the Objection Notice Parties, **on or before 4:00 p.m. (prevailing Eastern Time) on October 9, 2025 (the "Sale Objection Deadline"**); *provided,* that objections, if any, to material modifications to the form of Sale Order with a Successful Bidder and to the form of asset purchase agreement with a Successful Bidder other than the Stalking Horse Bidder, must be made by the Buyer Specific Objection Deadline (defined below).

11.      Each Counterparty shall have until 4:00 p.m. (prevailing Eastern time) on the date that is fourteen (14) days after the filing and service by the Debtors to the Counterparty of the Cure Notice or the Previously Omitted Contract Notice (as applicable) (the "**Contract Objection Deadline**") to object to the assumption and assignment of its Contract on any grounds, including, without limitation, (a) the amount of the Proposed Cure Amounts (and must state, in its objection, with specificity, what cure amount is required with appropriate documentation in support thereof) and (b) the provision of adequate assurance of future performance by the Stalking Horse Bidder.  Any unresolved objections shall be heard at the Sale Hearing, unless otherwise agreed by the parties; provided that the Debtors shall have the right to adjourn any Sale Hearing without the consent of any objecting party.

12.      Each Counterparty may raise objections as to adequate assurance of future performance by, or on the basis of the identity of, the Successful Bidder, other than the Stalking Horse Bidder, until October 21, 2025 at 4:00 p.m. (ET) (the "**Buyer Specific Objection Deadline**").  Any such objection must be filed and served on the Debtors and their counsel, any statutory committee appointed in these chapter 11 cases and its proposed counsel, and the

applicable Successful Bidder or Stalking Horse Bidder, as applicable, and its counsel, so as to be actually received by the Buyer Specific Objection Deadline.  Any such unresolved objections shall be heard at the Sale Hearing, unless otherwise agreed by the parties.

13.     Unless the Counterparty to any Contract timely files an objection to its Cure Amount or to the assumption and assignment of its Contract and timely serves a copy of such objection in accordance with this Order, such Counterparty shall forever be barred and estopped from objecting (a) to the Cure Amount as the amount to cure all defaults to satisfy section 365 of the Bankruptcy Code and from asserting that any additional amounts are due or defaults exist; (b) that any conditions to assumption and assignment must be satisfied under such Contract before it can be assumed and assigned or that any required consent to assignment has not been given; or (c) that the Successful Bidder has not provided adequate assurance of future performance as contemplated by section 365 of the Bankruptcy Code.  For the avoidance of doubt, Counterparties may seek Cure Amounts with respect to defaults that occur between the deadline to object to Proposed Cure Amounts and the assumption of the underlying Contract, if any.

14.     The inclusion of a Contract or other agreement on the Cure Notice shall not constitute or be deemed a determination or admission by the Debtors and their estates or any other party in interest that such Contract or other agreement is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, and any and all rights of the Debtors and their estates with respect thereto are hereby reserved.

15.     If a Counterparty does not timely object to: (a) the Proposed Cure Amount for its Contracts; (b) the ability of the Successful Bidders(s) (including the Stalking Horse Bidder or such other Successful Bidders(s)) to provide adequate assurance of future performance as

9

required by section 365 of the Bankruptcy Code; or (c) any other matter pertaining to assumption or assignment, then the Proposed Cure Amounts owed to such Counterparty shall be paid as soon as reasonably practicable after the effective date of the assumption and assignment of such Assumed Contract or as the Counterparty and Successful Bidder may otherwise agree.

16.     In the event of a timely filed objection by a Counterparty regarding any Cure Amount with respect to any of the Contracts, the Cure Amounts owed to such Counterparty shall be paid as soon as reasonably practicable after the later of (i) the effective date of the assumption and assignment of such Assumed Contract, and (ii) the entry of a final order that resolves the dispute and approves the assumption and assignment of such Assumed Contract.

**Auction and Sale Hearing**

17.     The Debtors shall file a notice identifying all Qualified Bidders (the "**Qualified Bid Notice**") within twenty-four (24) hours after the Debtors determine which Bids (if any) are Qualified Bids.  The Debtors shall serve the Qualified Bid Notice on all parties that have requested notice pursuant to Bankruptcy Rule 2002.

18.     The Debtors are authorized to conduct the Auction as set forth in the Bidding Procedures.  To the extent the Stalking Horse Bidder is the only Qualified Bid, the Debtors shall cancel the Auction and seek approval of the Stalking Horse Bid at the Sale Hearing.

19.     The Debtors are authorized to conduct the Sale without the necessity of complying with any state or local bulk transfer laws or requirements.

20.     Each bidder participating at the Auction shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale.

21.     No entity shall be entitled to any expense reimbursement, break-up fee, "topping," termination, contribution, or other similar fee or payment.

22.     **The Bid Deadline is October 13, 2025 at 4:00 p.m. (Prevailing Eastern Time). The Auction shall commence on October 17, 2025 at 10:00 a.m. (Prevailing Eastern Time). The Sale Hearing will be conducted on _____, 2025 at __:00 __.m. (Prevailing Eastern Time)**.  The Debtors will seek the entry of an order of this Court at the Sale Hearing approving and authorizing the Sale to the Stalking Horse Bidder or, if there is an Auction, the highest or otherwise best offer(s) at the Auction, as applicable, on terms and conditions consistent with the applicable purchase agreement.  The Sale Hearing may be adjourned or rescheduled with the consent of the DIP Agent without notice to other parties other than a notice or hearing agenda filed with the Court or by an announcement of the adjourned date at the Sale Hearing.

23.     The Debtors shall file a notice identifying the Successful Bidder and the material terms of the Successful Bidder's bid within twenty-four (24) hours of the conclusion of the Auction, if any.

### Miscellaneous Provisions

24.     The DIP Lenders and Silverview are allowed, but not required, to credit bid, pursuant to section 363(k) of the Bankruptcy Code, with respect to any assets on which they hold liens, up to the full amount of their secured debt at any Auction.  Nothing herein shall prejudice or impair the right of DIP Lenders or Silverview to increase the amount of their credit bid and the DIP Agent's and Existing Silverview Agent's rights under section 363(k) of the Bankruptcy Code are expressly reserved.

25.     Notice of the Motion as provided therein shall be deemed good and sufficient notice, and the requirements of Bankruptcy Rule 6004(a) are satisfied by such notice or otherwise deemed waived.

26.     Notwithstanding Bankruptcy Rule 6004(h), 6006(d), 7062, 9014, or any other provisions of the Bankruptcy Rules of the Local Rules stating the contrary, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

27.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

28.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

29.     Attached hereto as **Schedule A** is a summary of the key dates established by this Order.

30.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

**SCHEDULE A**

| Event | Date |
|---|---|
| Hearing to Consider Approval of Bidding Procedures | **September 22, 2025 at _____ (ET)** |
| Service of Sale Notice and Cure Notice | **Three (3) business days after the entry of this Order** |
| Contract Objection Deadline | **October 9, 2025 at 4:00 p.m. (ET); Fourteen (14) days after service of a Cure Notice for Previously Omitted Contracts** |
| Sale Objection Deadline | **October 9, 2025 at 4:00 p.m. (ET)** |
| Bid Deadline | **October 13, 2025 at 4:00 p.m. (ET)** |
| Auction (if applicable) | **October 17, 2025 at 10:00 a.m. (ET)** |
| Deadline to file Notice of Successful Bidder | **Within twenty-four (24) hours of the conclusion of the Auction (if applicable)** |
| Buyer Specific Objection Deadline | **October 21, 2025 at 4:00 p.m. (ET)** |
| Sale Hearing | **October 23, 2025 at _____ (ET)** |

## **Annex 1**

**Bidding Procedures**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| PINSTRIPES HOLDINGS, INC., *et al.*,[1] | Case No. 25-_____ (___) |
| Debtors. | (Jointly Administered) |

## BIDDING PROCEDURES FOR THE SALE OF THE DEBTORS' ASSETS

On [●], 2025, the United States Bankruptcy Court for the District of Delaware (the "**Court**") entered the *Order (I) Approving Bidding Procedures in Connection with Sale of the Debtors' Assets; (II) Approving Form and Manner of Notice; (III) Scheduling Auction and Sale Hearing; (IV) Authorizing Procedures Governing Assumption and Assignment of Certain Contracts and Unexpired Leases; and (V) Granting Related Relief* [Docket No. [●]] (the "**Bidding Procedures Order**"),[2] by which the Court approved the following procedures (these "**Bidding Procedures**"). These Bidding Procedures set forth the process by which the Debtors are authorized to conduct an auction (the "**Auction**") for the sale (the "**Sale**") of substantially all of the Debtors' assets (collectively, the "**Assets**").

Subject to the terms of these Bidding Procedures, interested parties may bid on the Assets (i) in individual lots, (ii) as a collective whole, or (iii) in any combination.

## I.    Submissions to the Debtors.

All submissions to the Debtors required to be made under these Bidding Procedures must be directed to each of the following persons unless otherwise provided (collectively, the "**Notice Parties**"):

A.    **Debtors' Proposed Chief Restructuring Officer.** Pinstripes Holdings, Inc., *et al.*, 1150 Willow Road, Northbrook, Illinois 60062, Attn: James Katchadurian (james.katchadurian@cr3partners.com).

B.    **Debtors' Proposed Counsel.** Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, Delaware 19801, Attn: Michael R. Nestor, Esq. (mnestor@ycst.com), Sean M. Beach, Esq. (sbeach@ycst.com), Elizabeth S.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Pinstripes Holdings, Inc. (6699); Pinstripes, Inc. (8608); Pinstripes Hillsdale LLC (6064); Pinstripes at Prairiefire, Inc. (7018); and Pinstripes Illinois, LLC (6432). For purposes of these chapter 11 cases, the Debtors' service address is 1150 Willow Road, Northbrook, Illinois 60062.

[2]    All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order.

Justison, Esq. (ejustison@ycst.com), and Shella Borovinskaya, Esq. (sborovinskaya@ycst.com).

C.  **Debtors' Proposed Investment Banker.** Hilco Corporate Finance, LLC, 5 Revere Drive, Suite 206, Northbrook, Illinois 60062, Attn: Teri Stratton (tstratton@hilcocf.com) and Richard S. Klein (rklein@hilcocf.com).

D.  **Counsel for the DIP Agent and Existing Silverview Agent.** Blank Rome LLP, 1201 Market Street, Suite 800, Wilmington, Delaware 19801, Attn: Regina Stango Kelbon, Esq. (regina.kelbon@blankrome.com), John Lucian, Esq. (john.lucian@blankrome.com), Stanley B. Tarr, Esq. (stanley.tarr@blankrome.com) and Alston & Bird LLP, 90 Park Avenue, 15th Floor, New York, New York 10016, Attn: James Vincequerra, Esq. (james.vincequerra@alston.com) and Stephen Blank, Esq. (stephen.blank@alston.com).

## II.  **Potential Bidders.**

To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity (other than the Stalking Horse Bidder) interested in consummating a Sale (a "**Potential Bidder**") must deliver or have previously delivered:

(i)  an executed confidentiality agreement on terms acceptable to the Debtors (a "**Confidentiality Agreement**"), to the extent not already executed; and

(ii)  information demonstrating (in the Debtors' reasonable business judgment) that the Potential Bidder has the financial capability to consummate the applicable Sale, including, but not limited to, the most current audited and latest unaudited financial statements (the "**Financials**") of the Potential Bidder (or such other form of financial disclosure acceptable to the Debtors in their discretion) (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, (x) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtors, in consultation with (a) the legal and financial advisors for the Committee, if any, and (b) solely to the extent they are not an active or prospective bidder with respect to the relevant Assets, or are participating in any way in any active or prospective bid with respect to such relevant Assets, the legal advisors for the Consenting Lenders (the "**Consultation Parties**"), and (y) a written funding commitment acceptable to the Debtors and their advisors, in consultation with the Consultation Parties, of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the applicable Sale).

To the extent any of the Consultation Parties are or become potential bidders, such Consultation Party shall immediately cease being a Consultation Party and, in the case of the Committee, shall immediately be walled off from any discussions with the Committee's advisors in their capacity as Consultation Parties, until such time as their bid may be withdrawn.

**III.    Stalking Horse Bidder.**

The Debtors have entered into (as more fully described in the Stalking Horse Agreement) a purchase agreement (the "**Stalking Horse Agreement**") with Silverstrike, LLC, the entity currently identified by the Consenting Lenders to make the Stalking Horse Bid (the "**Stalking Horse Bidder**") for certain of the Debtors' Assets, as set forth in the Stalking Horse Agreement. The Stalking Horse Bidder is deemed a Qualified Bidder without needing to comply with any of the requirements set forth in these Bidding Procedures.

**IV.    Qualified Bidders.**

(a)    A "**Qualified Bidder**" is a Potential Bidder whose Financials, or the Financials of its equity holder(s), as applicable, demonstrate the financial capability to consummate the applicable Sale and whose Bid is a Qualified Bid (as defined below), that the Debtors, in consultation with the Consultation Parties, determine should be considered a Qualified Bidder. Prior to the commencement of the Auction, the Debtors' advisors will (i) notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder and (ii) provide to the Qualified Bidders for such Assets copies of all Qualified Bids with respect to such Assets. The Stalking Horse Bidder shall be deemed a Qualified Bidder at all times and for all purposes with respect to the Assets to which its Bid (the "**Stalking Horse Bid**") relates, and notwithstanding anything in these Bidding Procedures, the Stalking Horse Bid shall be deemed a Qualified Bid for all purposes and the Stalking Horse Bidder shall be included in the use of the term "Qualified Bidder".

(b)    The Debtors shall provide regular updates to the Consultation Parties on Potential Bidders and shall specifically identify any Potential Bidder who did not qualify to be a Qualified Bidder and the Debtors' basis for such determination. If any Potential Bidder is determined by the Debtors, in consultation with Consultation Parties, not to be a Qualified Bidder, the Debtors will refund such Qualified Bidder's Deposit and all accumulated interest thereon promptly after the Bid Deadline.

(c)    Between the date that the Debtors notify a Potential Bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Except as otherwise set forth in the Stalking Horse Agreement, without the written consent of the Debtors, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided that* any Qualified Bid may be improved at the Auction as set forth herein. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

**V.    Due Diligence.**

Potential Bidders shall be eligible to receive due diligence information and access to the Debtors' electronic data room (the "**Data Room**") and to additional non-public information regarding the Debtors. In addition, the Debtors will provide to Potential Bidders reasonable due

diligence information, as requested by such Potential Bidders in writing, as soon as reasonably practicable after such request, and the Debtors shall post to the Data Room all written due diligence provided to any Potential Bidder.  For all Potential Bidders other than the Stalking Horse Bidder, the due diligence period will end on the Bid Deadline, and subsequent to the expiration of the due diligence period, the Debtors shall have no obligation to furnish any due diligence information. The Stalking Horse Bidder's due diligence period with respect to its Stalking Horse Bid has expired or will expire in accordance with the Stalking Horse Agreement; *provided, however*, that the Stalking Horse Bidder shall retain access to the Data Room and shall receive all other due diligence information provided to any Potential Bidders on the same terms and timing that such Data Room access and due diligence information are made available to other Potential Bidders.

The Debtors shall not furnish any confidential information relating to the Assets, liabilities of the Debtors, or a Sale to any person except to the Stalking Horse Bidder, a Potential Bidder or to such Potential Bidder's duly authorized representatives to the extent expressly permitted by the applicable Confidentiality Agreement.  The Debtors and their advisors shall coordinate all reasonable requests from Potential Bidders for additional information and due diligence access; *provided that*, the Debtors may decline to provide such information to Potential Bidders who, at such time and in the Debtors' reasonable business judgment after consultation with the Consultation Parties, have not established, or who have raised doubt, that such Potential Bidder intends in good faith to, or has the capacity to, consummate the applicable Sale.

The Debtors also reserve the right, subject to the terms of the Stalking Horse Agreement and after consultation with the Consultation Parties, to withhold any diligence materials that the Debtors determine are sensitive after notifying the Potential Bidder requesting such materials of such determination.  Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Potential Bidder in accordance with these Bidding Procedures.

**ALL DUE DILIGENCE REQUESTS MUST BE DIRECTED TO HICLO CORPORATE FINANCE**

**A.    Communications with Potential Bidders.**

Notwithstanding anything to the contrary in these Bidding Procedures, all direct communications between and amongst Potential Bidders regarding the Debtors or their Assets shall involve the Debtors and the Debtors' advisors.  No Potential Bidder shall communicate with any other Potential Bidder absent prior written consent from the Debtors.

**B.    Due Diligence from Potential Bidders.**

Each Potential Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors regarding the ability of the Potential Bidder to consummate the applicable Sale.  Failure by a Potential Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors to determine, in consultation with the Consultation Parties, that such bidder is no longer a Potential Bidder or that a bid made by such Potential Bidder is not a Qualified Bid.

The Debtors and each of their respective advisors and representatives shall be obligated to maintain in confidence any such confidential information in accordance with any applicable confidentiality agreement, except as otherwise set forth in these Bidding Procedures or with the prior written consent of such bidder. Each recipient of confidential information agrees to use, and to instruct their advisors and representatives to use, such confidential information only in connection with the evaluation of Bids during the bidding process or in accordance with the terms of any applicable confidentiality agreement.

## VI.     Bid Requirements.

A proposal, solicitation, or offer (each, a "**Bid**") by a Qualified Bidder that is submitted in writing and satisfies each of the following requirements as determined by the Debtors, in consultation with the Consultation Parties, shall constitute a "**Qualified Bid**"). The Stalking Horse Bid will be deemed a Qualified Bid for all purposes without any further action required by the Stalking Horse Bidder.

(a)     **Identification of Bidder.** Each Bid must fully disclose the following: (i) the legal identity of each person or entity bidding for the Assets and/or otherwise sponsoring, financing (including through the issuance of debt in connection with such Bid) or participating in (including through license or similar arrangement with respect to the Assets to be acquired in connection with such Bid) the Auction in connection with such Bid and the complete terms of any such participation; and (ii) any past or present connections or agreements with the Debtors, any Stalking Horse Bidder, any other known Potential Bidder or Qualified Bidder, or any officer or director of any of the foregoing (including any current or former officer or director of the Debtors.

(b)     **Assets.** Each Bid must clearly state which Assets (including any executory contracts and unexpired leases) and liabilities of the Debtors the Qualified Bidders are agreeing to purchase and assume. For the avoidance of doubt, a Bid may be on the Assets in either (i) individual lots, (ii) as a collective whole, or (iii) in any combination.

(c)     **Purchase Price.** Each Bid must clearly set forth the cash purchase price to be paid for the applicable Asset Category (the "**Purchase Price**"), *provided*, *however,* that the DIP Agent and Existing Silverview Agent shall be entitled to credit bid any portion of their outstanding secured obligations consistent with section 363(k) of the Bankruptcy Code with respect to any assets on which they hold liens in accordance with the final order approving the Debtors' post-petition financing. Each Bid must also specify how the Purchase Price is allocated among the Assets.

(d)     **Minimum Bid.** The Minimum Bid for the Assets subject to the Stalking Horse Bid is $17,100,000 equal to the Stalking Horse Bid amount of $15,000,000, with respect to the credit bid, and $1,600,000, with respect to the cash component, plus the Minimum Overbid Increment of $500,000.

(e)     **Deposit.** Each Bid, other than the Stalking Horse Bid, must be accompanied by a cash deposit in the amount equal to 10% of the Purchase Price of the Bid, to be held in a segregated account to be identified and established by the Debtors (the "**Deposit**"). The Debtors reserve the right to increase the Deposit requirement.

**(f)**     **Assumption of Obligations.**  Each Bid must identify the obligations contemplated to be assumed by such Bid, and be on terms in the aggregate (together with the other consideration contemplated in such Bid) no less favorable to the Debtors than the Stalking Horse Agreement (if any), as determined in the Debtors' business judgment, and after consultation with the Consultation Parties.  Other than the obligations to be assumed, the Assets shall be sold free and clear of all liens, claims, interests, and encumbrances (collectively, the "**Encumbrances**"), and any Encumbrances shall attach to the net proceeds of the Sales.

**(g)**     **The Same or Better Terms.**  In addition to meeting or exceeding the applicable Minimum Bid, each Bid must be on terms that are no less favorable in the aggregate (together with the other consideration contemplated in such Bid), in the Debtors' business judgment and after consultation with the Consultation Parties, than the terms of the Stalking Horse Agreement.  Each Bid must include duly executed, non-contingent purchase agreement and other transaction documents necessary to effectuate the transactions contemplated in the Bid and shall include a schedule of assumed contracts to the extent applicable to the Bid.  Each Bid should be based on the form of the Stalking Horse Agreement, which is available in Word format in the Data Room, and must include a copy of the Stalking Horse Agreement clearly marked to show all changes requested by the Qualified Bidder, including those relating to the respective Purchase Price and assets to be acquired by such Qualified Bidder, as well as all other material documents integral to such bid, including a form of sale order marked against the applicable sale order (collectively, the "**Qualified Bid Documents**").

**(h)**     **Committed Financing / Adequate Assurance Information.**  To the extent that a Bid is not accompanied by evidence of the Qualified Bidder's capacity to consummate the Sale set forth in its Bid with cash on hand, each Bid must include committed financing documents to the satisfaction of the Debtors (in consultation with the Consultation Parties) that demonstrate that the Qualified Bidder has: (i) received sufficient debt and/or equity funding commitments to satisfy the Qualified Bidder's Purchase Price and other obligations under its Bid; and (ii) adequate working capital financing or resources to finance going concern operations for the Assets and the proposed transactions.  Such funding commitments or other financing must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have only those covenants and conditions acceptable to the Debtors, in consultation with the Consultation Parties.  In addition to evidence of financial wherewithal to timely consummate the transaction, a Bid must include adequate assurance information with respect to any executory contracts or unexpired leases included or that may be included in the Bid in a form that allows the Debtors to serve such information on any counterparties to any contracts or leases being assumed and assigned in connection with the Sale that have requested, in writing, such information.

**(i)**     **Contingencies; No Financing or Diligence Outs.**  A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions, which shall not be more burdensome, in the Debtors' business judgment, and after consultation with the Consultation Parties, than those set forth in the Stalking Horse Agreement (if any).

**(j)**     **Demonstrated Financial Capacity.**  A Qualified Bidder must have, in the Debtors' business judgment (in consultation with the Consultation Parties) the necessary financial

capacity to consummate the proposed transactions required by its Bid (including, if necessary, to obtain transfer of any of the Debtors' licenses, permits, and to obtain any necessary surety bonds or other financial assurances) and provide adequate assurance of future performance under all contracts proposed to be assumed by such Bid.

(k)    **Time Frame for Closing.**  Closing of the Sale as to any Asset related to a Bid by a Qualified Bidder (a "**Closing**") must be reasonably likely (based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, on or before October 28, 2025.

(l)    **Binding and Irrevocable.**  Except as provided herein, a Qualified Bidder's Bid for the Assets shall be irrevocable unless and until the Debtors (in consultation with the Consultation Parties) accept a higher Bid for such Assets and such Qualified Bidder is not selected as the Backup Bidder for such Assets.  If selected as Backup Bidder, such Bid shall be irrevocable until the Closing of a Successful Bid for such Assets.

(m)    **Expenses; Disclaimer of Fees**.  Each Bid must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation.  For the avoidance of doubt, no Qualified Bidder will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

(n)    **Authorization.**  Each Bid must contain evidence that the Qualified Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

(o)    **As-Is, Where-Is.**  Each Bid must include a written acknowledgement and representation that the Qualified Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidder's Bid or accompanying asset purchase agreement.

(p)    **Adherence to Bid Procedures.**  By submitting its Bid, each Qualified Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

(q)    **Regulatory Approvals and Covenants.**  A Bid must set forth each regulatory and third-party approval required for the Qualified Bidder to consummate the applicable Sale, if any, and the time period within which the Qualified Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is

expected to take more than thirty (30) days following execution and delivery of the asset purchase agreement, those actions the Qualified Bidder will take to ensure receipt of such approvals as promptly as possible) and any undertakings that will be required by the Debtors in connection with such regulatory and third party approvals.  For the avoidance of doubt, each Bidder must acknowledge that consummation of such Bidders' Bid shall not be contingent on obtaining government, regulatory, or other third-party approvals.

(r)    **Consent to Jurisdiction.**  The Qualified Bidder must submit to the jurisdiction of and entry of final orders by the Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of bids, the Auction, the construction and enforcement of these Bidding Procedures, the transaction documents related to the Sale, and the Closing, as applicable.

(s)    **Bid Deadline.**  Each Bid must be transmitted via email (in .pdf or similar format) so as to be <u>actually received</u> on or before October 13, 2025 at 4:00 p.m. (prevailing Eastern Time) (the "**Bid Deadline**") by the Notice Parties.

## VII.    Auction.

If the Debtors receive a Qualified Bid for the Assets, in addition to the Stalking Horse Bid for such Assets, if any, the Debtors will conduct the Auction to determine the Successful Bidder with respect to such Assets.  If the Debtors do not receive a Qualified Bid for the Assets (other than the Stalking Horse Bid for such Assets), the Debtors will not conduct the Auction as to such Assets and shall designate the Stalking Horse Bidder's Bid for such Assets as the Successful Bid for such Assets and shall seek approval of the Stalking Horse Bid at the Sale Hearing.

Prior to the commencement of the Auction, the Debtors will notify each Qualified Bidder of the highest or otherwise best Qualified Bid for the Assets for which such Qualified Bidder submitted a Bid, as determined in the Debtors' reasonable business judgment, in consultation with the Consultation Parties (the "**Baseline Bid**"), and provide copies of the applicable Qualified Bid Documents supporting the applicable Baseline Bid to each Qualified Bidder.  The Debtors shall consult with the Consultation Parties as to how the Debtors are valuing the Bids made by Qualified Bidders during the Auction.

The Auction shall take place at the offices of Young Conaway Stargatt & Taylor, LLP on October 17, 2025 at 10:00 a.m. (prevailing Eastern Time), or such later date and time as selected by the Debtors and acceptable to the DIP Agent.  For the avoidance of doubt, the Stalking Horse Bidder is deemed to have participated in the Auction for all purposes, whether or not the Stalking Horse Bidder makes a bid at the Auction.

The Debtors will file a notice of any change to the time or location of the Auction and will serve such notice on all bidders and all parties requesting service under Bankruptcy Rule 2002 at least twenty-four (24) hours prior to the Auction or as soon as the Debtors become aware of such change.

The Auction shall be conducted in a timely fashion according to the following procedures:

### A.    The Debtors Shall Conduct the Auction.

The Debtors and their advisors shall direct and preside over the Auction.  At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid for the Assets.  All incremental Bids made thereafter shall be Overbids (defined below) for such Assets and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders who submitted Bids on such Assets.  The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid, all applicable Overbids, and the Successful Bid.

Only the Debtors, the Qualified Bidders, the DIP Agent and the Existing Silverview Agent, members of any appointed official committee of creditors, and each such parties' respective legal and financial advisors shall be entitled to attend the Auction, along with any other creditor, and any other party the Debtors deem appropriate (*provided, however,* that any party other than the Qualified Bidders, the DIP Agent and the Existing Silverview Agent, members of any appointed official committee of creditors, and each such parties' respective legal and financial advisors shall be required to provide notice to the Debtors at least two (2) days prior to the auction by sending an email to Troy Bollman, paralegal for counsel to the Debtors, at tbollman@ycst.com; the Debtors will provide copies of any such notices to the Qualified Bidders, the DIP Agent and the Existing Silverview Agent, members of any appointed official committee of creditors, and each such parties' respective legal and financial advisors within one (1) day of receipt.  The Qualified Bidders shall appear at the Auction in person and may speak or bid themselves or through duly authorized representatives.  Only Qualified Bidders shall be entitled to bid at the Auction.

### B.    Terms of Overbids.

"**Overbid**" means any bid made at the Auction by a Qualified Bidder subsequent to the Debtors' announcement of the Baseline Bid and accepted by the Debtors, in consultation with the Consultation Parties, as a higher or otherwise better bid.  Each applicable Overbid must comply with the following conditions:

(i)    **Minimum Overbid Increment.**  The initial Overbid for the Assets subject to the Stalking Horse Bid, if any, shall provide for total consideration to the Debtors with a value that exceeds the value of the consideration under the Baseline Bid for the subject Assets by an incremental amount that is not less than $500,000 in cash or credit bid (the "**Minimum Overbid Increment**").  Except as may be otherwise provided in the Stalking Horse Agreement, the Debtors reserve the right, after consultation with the Consultation Parties, to announce reductions or increases in the Minimum Overbid Increment for the Assets at any time during the Auction.

(ii)    **Conclusion of Each Overbid Round.**  Upon the solicitation of each round of applicable Overbids, the Debtors may announce a deadline by which time any Overbids must be submitted to the Debtors.

(iii) **Overbid Alterations.** An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable in the aggregate to the Debtors' estates than any prior Bid or Overbid, as determined in the Debtors' reasonable business judgment, but shall otherwise comply with the terms of these Bidding Procedures.

### C.   Closing the Auction.

(i) The Auction shall continue until there is only one Bid for the Assets that the Debtors determine, in their reasonable business judgment, in consultation with the Consultation Parties, to be the highest or otherwise best Bid for such Assets. Such Bid shall be declared the "**Successful Bid**," for such Assets and such Qualified Bidder, the "**Successful Bidder**" for such Assets at which point the Auction will be closed as to such Assets. Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Court of the Successful Bid.

(ii) The Debtors shall have no obligation to consider any Bids or Overbids submitted after the conclusion of the Auction, and any such Bids or Overbids shall be deemed untimely and shall not constitute a Qualified Bid.

(iii) Within twenty-four (24) hours after closing the Auction, the Debtors shall cause the Qualified Bid Documents for each Successful Bid and Backup Bid to be filed with the Court.

### D.   No Collusion; Good-Faith *Bona Fide* Offer.

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that: (i) it has not engaged in any collusion with respect to the bidding, and (ii) its Bid is a good-faith *bona fide* offer and it intends to consummate the proposed transaction on the terms of its Qualified Bid if selected as the Successful Bidder.

## VIII.  Backup Bidder.

(a) Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted for the Assets, the Qualified Bidder with the next-highest or otherwise second-best Bid at the Auction for such Assets, as determined by the Debtors in the exercise of their reasonable business judgment, and in consultation with the Consultation Parties (the "**Backup Bid**"), shall be required to serve as a backup bidder (the "**Backup Bidder**") for such Assets, and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors.

(b) The identity of the Backup Bidder and the amount and material terms of the Backup Bid shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the

Successful Bidder.  The Backup Bidder shall be required to keep its Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable until the closing of the transaction with the applicable Successful Bidder or as otherwise provided in the Stalking Horse Agreement.  The Backup Bidder's Deposit shall be held in escrow until the closing of the transaction with the applicable Successful Bidder or as otherwise provided in the Stalking Horse Agreement.

(c) If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors may select the applicable Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes.  The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party.  The defaulting Successful Bidder's Deposit shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all remedies available against the defaulting Successful Bidder, including specific performance, if applicable, unless otherwise provided in the Stalking Horse Agreement should the Stalking Horse Bidder be the Successful Bidder.  For the avoidance of doubt, if the Deposit becomes property of the Debtors' estates, the Deposit shall be subject to the liens and super-priority claims granted in favor of the DIP Lender under the interim authorizing the Debtors to obtain postpetition financing and related relief and the final order thereon.

## IX.    Reservation of Rights.

The Debtors reserve their rights to modify these Bidding Procedures in their reasonable business judgment, in a manner acceptable to the DIP Agent, and in consultation with the Consultation Parties, at or prior to the Auction, with respect to: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) cancelling the Auction; and (e) rejecting any or all bids or Bids; *provided, however*, that nothing in this Section shall limit any rights or remedies of the Stalking Horse Bidder under the Stalking Horse Agreement with respect to material modifications to these Bidding Procedures, the Bidding Procedures Order or the agreed form of sale order; *provided further* that any modification of these Bidding Procedures shall not be inconsistent with the Stalking Horse Agreement, the Bidding Procedures Order, or any other order of the Bankruptcy Court entered in these chapter 11 cases, and shall be disclosed to each Qualified Bidder at the Auction.

## X.    Sale Hearing.

A hearing to consider approval of the Sale of the Assets to the Successful Bidders (or to approve the Stalking Horse Agreement, as applicable, if no Auction is held) (the "**Sale Hearing**") is currently scheduled to take place at __:00 p.m. (ET) on [●], 2025 before the Honorable [●] in

the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, [●] Floor, Courtroom No. [●], Wilmington, Delaware 19801.

**THE SALE HEARING MAY BE CONTINUED TO A LATER DATE BY THE DEBTORS, WITH THE CONSENT OF THE DIP AGENT, BY FILING A HEARING AGENDA AND/OR SENDING NOTICE PRIOR TO, OR MAKING AN ANNOUNCEMENT AT, THE SALE HEARING.  NO FURTHER NOTICE OF ANY SUCH CONTINUANCE WILL BE REQUIRED TO BE PROVIDED TO ANY PARTY (EXCLUDING THE STALKING HORSE BIDDER).**

At the Sale Hearing, the Debtors shall present the Successful Bids to the Court for approval.

**XI.  Return of Deposit; Remedies.**

The Deposit of the Successful Bidder shall be applied to the respective Purchase Price of such transaction at closing.  The Deposits for each Qualified Bidder shall be held in one or more interest-bearing escrow accounts on terms acceptable to the Debtors (in consultation with the Consultation Parties) and shall be returned (other than with respect to the Successful Bidder, and the Backup Bidder) on or within five (5) business days after the Auction, including the Deposit of the Stalking Horse Bidder if it is not the Successful Bidder or Backup Bidder.  Upon the return of the Deposits, their respective owners shall receive any and all interest that will have accrued thereon.

If a Successful Bidder fails to consummate a proposed transaction because of a breach by such Successful Bidder, and except as otherwise provided in the Stalking Horse Agreement, the Debtors will not have any obligation to return the Deposit deposited by such Successful Bidder, which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors (except, in the case of a Stalking Horse Bidder, as otherwise provided in the Stalking Horse Agreement), and the Debtors shall be free to consummate the proposed transaction with the applicable Backup Bidder without the need for an additional hearing or order of the Court, *provided* that nothing herein shall prohibit any party from seeking an additional hearing or order of the Court.

**XII.  Fiduciary Out.**

Nothing in these Bidding Procedures shall require the board of directors, board of managers, or similar governing body of a Debtor to take any action, or to refrain from taking any action, with respect to these Bidding Procedures, to the extent such board of directors, board of managers, or such similar governing body determines, or based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law.

**XIII.  Contract Procedures.**

Within three (3) business days from the entry of the Bidding Procedures Order, the Debtors shall file and serve on all counterparties (the "**Counterparties**") to their executory contracts and unexpired leases (the "**Contracts**") a notice (the "**Cure Notice**") of (a) the potential assumption by the Debtors and assignment to the Successful Bidder(s) of the Contracts, and (b) the proposed

amount necessary, under section 365(b)(1) of the Bankruptcy Code, to cure any outstanding monetary defaults and compensate the Counterparties for any pecuniary losses in connection with such assumption and assignment (the "**Proposed Cure Amounts**"), which shall be included on a schedule attached to the Cure Notice (the "**Executory Contracts Schedule**").

If at any time after the issuance of the Cure Notice but prior to the Sale Hearing it is discovered that a Contract should have been listed on the Executory Contracts Schedule but was not (any such Contract, a "**Previously Omitted Contract**"), the Debtors shall (in consultation with the Consultation Parties), promptly following discovery thereof (but in no event later than two (2) Business Days following discovery thereof), file and serve a notice on the non-Debtor counterparty(ies) to such Previously Omitted Contract notifying such counterparties of the Debtors' intention to assume and assign such Previously Omitted Contract to the Successful Bidder, including the Proposed Cure Amounts relating thereto (the "**Previously Omitted Contract Notice**").

Each Counterparty shall have until 4:00 p.m. (prevailing Eastern time) on the date that is fourteen (14) days after the filing and service by the Debtors to the Counterparty of the Cure Notice or the Previously Omitted Contract Notice (as applicable) to object to the assumption and assignment of its Contract on any grounds, including, without limitation, (a) the amount of the Proposed Cure Amounts (and must state, in its objection, with specificity, what cure amount is required with appropriate documentation in support thereof) and (b) the provision of adequate assurance of future performance by the Stalking Horse Bidder.  Any unresolved objections shall be heard at the Sale Hearing, unless otherwise agreed by the parties; *provided* that the Debtors shall have the right to adjourn any Sale Hearing without the consent of any objecting party.  If any objections to the amount of Proposed Cure Amounts remain unresolved as of the date of the Closing of the Sale of any Assets, the Debtors may (but are not required to) deposit the disputed amount of Proposed Cure Amounts relating to such Asset(s) in a segregated account to hold pending resolution of such objections.  The Debtors' proposed Chief Restructuring Officer shall facilitate communications between Qualified Bidders and the Counterparties in connection with such Qualified Bidder's Bid, the Proposed Cure Amounts, and the terms of assumption and assignment of the Contracts.

Each Counterparty may raise objections as to adequate assurance of future performance by, or on the basis of the identity of, the Successful Bidder, other than the Stalking Horse Bidder, until October 21, 2025 at 4:00 p.m. (ET) (the "**Buyer Specific Objection Deadline**").  Any such objection must be filed and served on the Debtors and their counsel, the Committee and its counsel and the applicable Successful Bidder or Stalking Horse Bidder (if any), as applicable, and its counsel, so as to be actually received by the Buyer Specific Objection Deadline.  Any such unresolved objections shall be heard at the Sale Hearing, unless otherwise agreed by the parties.

*[Remainder of Page Intentionally Left Blank]*

**<u>Annex 2</u>**

**Sale Notice**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PINSTRIPES HOLDINGS, INC., *et al.*,[1] | Case No. 25-_____ (___) |
| Debtors. | (Jointly Administered) |

# NOTICE OF SALE, BIDDING PROCEDURES,
# AUCTION, SALE HEARING, AND OBJECTION DEADLINE

**PLEASE TAKE NOTICE THAT**, on September [●], 2025, the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") filed with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") their motion (the "**Motion**")[2] for entry of (i) an order (a) approving bidding procedures, substantially in the form attached as Annex 1 to the Bidding Procedures Order (the "**Bidding Procedures**"), to govern the marketing and sale of all or substantially all of the Debtors' assets (the "**Assets**"), (b) authorizing the Debtors to schedule an auction to sell the Assets (the "**Auction**"), (c) scheduling the hearing to approve a sale of the Assets (the "**Sale Hearing**"), (d) designating the Stalking Horse Bidder and Stalking Horse Bid, (e) approving the form and manner of notice of the proposed sale transactions, the Bidding Procedures, the Auction, the Sale Hearing, and related dates and deadlines, and (f) authorizing procedures governing the assumption and assignment of certain executory contracts and unexpired leases (the "**Assigned Contracts**") to the prevailing bidder(s) acquiring the Debtors' assets (each, a "**Successful Bidder**"); and (ii) one or more orders (collectively, the "**Sale Order**") (a) approving the applicable form(s) of purchase agreement between the Debtors and the Stalking Horse Bidder (as defined below) or any other Successful Bidder(s), and (b) authorizing the sale(s) (collectively, the "**Sale**") of the Assets and the assumption and assignment of the Assigned Contracts to the Stalking Horse Bidder or such other Successful Bidder free and clear of all liens, claims, encumbrances, and other interests (collectively, "**Liens**"), other than any permitted Liens as set forth in the applicable form(s) of purchase agreement.

**PLEASE TAKE FURTHER NOTICE THAT**, on [●], 2025, the Bankruptcy Court entered the *Order (I) Approving Bidding Procedures in Connection with Sale of the Debtors' Assets;*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Pinstripes Holdings, Inc. (6699); Pinstripes, Inc. (8608); Pinstripes Hillsdale LLC (6064); Pinstripes at Prairiefire, Inc. (7018); and Pinstripes Illinois, LLC (6432).  For purposes of these chapter 11 cases, the Debtors' service address is 1150 Willow Road, Northbrook, Illinois 60062.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or in the Bidding Procedures.  Any summary of the Bidding Procedures Order or the Bidding Procedures contained herein is qualified in its entirety by the actual terms and conditions thereof.  To the extent that there is any conflict between any such summary and such actual terms and conditions, the actual terms and conditions shall control.

*(II) Approving Form and Manner of Notice; (III) Approving Designation of Stalking Horse Bidder and Stalking Horse Bid; (IV) Scheduling Auction and Sale Hearing; (V) Authorizing Procedures Governing Assumption and Assignment of Certain Contracts and Unexpired Leases; and (VI) Granting Related Relief* [Docket No. [●]] (the "**Bidding Procedures Order**") and approved the Bidding Procedures attached thereto as <u>Annex 1</u>.  Pursuant to the Bidding Procedures Order, the Auction shall be held at the offices of Young Conaway Stargatt & Taylor, LLP, on October 17, 2025 at 10:00 a.m. (prevailing Eastern Time).  Only Qualified Bidders and the Stalking Horse Bidder shall be entitled to make any bids at the Auction.

**PLEASE TAKE FURTHER NOTICE THAT** to participate in the bidding process or otherwise be considered for any purpose under the Bidding Procedures, a person or entity interested in consummating a Sale (a "**Potential Bidder**") must deliver or have previously delivered, if determined to be necessary by the Debtors in their sole discretion, among other things:

(i) an executed confidentiality agreement on terms acceptable to the Debtors (a "**Confidentiality Agreement**"), to the extent not already executed; and

(ii) information demonstrating (in the Debtors' reasonable business judgment) that the Potential Bidder has the financial capability to consummate the applicable Sale, including, but not limited to, the most current audited and latest unaudited financial statements (the "**Financials**") of the Potential Bidder (or such other form of financial disclosure acceptable to the Debtors in their discretion) (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, (x) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtors, in consultation with (a) the legal and financial advisors for the Committee, if any, and (b) solely to the extent they are not an active or prospective bidder with respect to the relevant Assets, or are participating in any way in any active or prospective bid with respect to such relevant Assets, the legal advisors for the Consenting Lenders (the "**Consultation Parties**"), and (y) a written funding commitment acceptable to the Debtors and their advisors, in consultation with the Consultation Parties, of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the applicable Sale).

Each Bid must be transmitted via email (in .pdf or similar format) so as to be <u>actually received</u> by the Notice Parties on or before 4:00 p.m. (prevailing Eastern Time) on October 13, 2025 (the "**Bid Deadline**").

The Prevailing Bid will be subject to Bankruptcy Court approval.  The Sale Hearing to approve the Sale to the Successful Bidder(s), free and clear of all liens, claims, interests, charges, and encumbrances (with any such liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the Sale with the same rights and priorities therein as in the sold Assets), shall take place at **___:00___.m. (prevailing Eastern time) on October [23], 2025**, before the Honorable [●] in the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, [●] Floor, Courtroom No. [●], Wilmington, Delaware 19801.  The Debtors may, in consultation with the Consultation Parties, designate the Backup Bid (and the corresponding Backup Bidder) to

purchase the Assets without the need for further order of the Bankruptcy Court and without the need for further notice to any interested parties, in the event that the Successful Bidder(s) does not close the Sale. The Sale Hearing may be adjourned by the Debtors with the consent of the DIP Agent from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or by filing a notice or hearing agenda on the docket of the Debtors' chapter 11 cases.

**PLEASE TAKE FURTHER NOTICE THAT** any objections to the Sale or the relief requested in connection with the Sale (a "**Sale Objection**") must: (a) be in writing; (b) comply with the Bankruptcy Rules; (c) set forth the specific basis for the Sale Objection; and (d) be served upon (such as to be <u>actually received</u> by) the following parties (the "**Objection Notice Parties**") on or before **4:00 p.m. (prevailing Eastern Time) on October 9, 2025** (the "**Sale Objection Deadline**").

(a)     proposed counsel for the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: Michael R. Nestor, Esq. (mnestor@ycst.com), Sean M. Beach, Esq. (sbeach@ycst.com), Elizabeth S. Justison, Esq. (ejustison@ycst.com), and Shella Borovinskaya, Esq. (sborovinskaya@ycst.com);

(b)     counsel for the DIP Agent and Existing Silverview Agent, Blank Rome LLP, 1201 Market Street, Suite 800, Wilmington, Delaware 19801, Attn: Regina Stango Kelbon, Esq. (regina.kelbon@blankrome.com), John Lucian, Esq. (john.lucian@blankrome.com), Stanley B. Tarr, Esq. (stanley.tarr@blankrome.com) and Alston & Bird LLP, 90 Park Avenue, 15th Floor, New York, New York 10016, Attn: James Vincequerra, Esq. (james.vincequerra@alston.com) and Stephen Blank, Esq. (stephen.blank@alston.com);

(c)     the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware, 19801, Attn: Benjamin A. Hackman, Esq. (Benjamin.A.Hackman@usdoj.gov); and

(d)     counsel to the Committee, if any.

Objections, if any, to the form of asset purchase agreement with a Successful Bidder other than the Stalking Horse Bidder, must be made by the Buyer Specific Objection Deadline, which is October 21, 2025 at 4:00 p.m. (ET). For the avoidance of doubt, objections to approval of the Stalking Horse Agreement must be made by the Sale Objection Deadline.

> **If a Sale Objection is not filed and served in accordance with the foregoing requirements, the objecting party shall be barred from objecting to the Sale and shall not be heard at the Sale Hearing, and the Bankruptcy Court may enter the Sale Order without further notice to such party.**

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain copies of the Motion, the Bidding Procedures, the Bidding Procedures Order, the applicable underlying agreements, or any other pleadings or orders of the Bankruptcy Court, they are publicly available, for a fee via PACER at: http://www.deb.uscourts.gov, or free of charge from the claims agent at https://dm.epiq11.com/pinstripes.  Such documents and pleadings may also be obtained by calling the Debtors' restructuring hotline at (888) 832-5989 (toll-free) or +1 (971) 306-5089 (international).

Dated: [●], 2025
      Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/* [●]
Michael R. Nestor (No. 3526)
Sean M. Beach (No. 4070)
Elizabeth S. Justison (No. 5911)
Shella Borovinskaya (No. 6758)
Rodney Square
1000 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Emails:  mnestor@ycst.com
        sbeach@ycst.com
        ejustison@ycst.com
        sborovinskaya@ycst.com

*Proposed Counsel for the Debtors and Debtors in Possession*

4

**<u>Annex 3</u>**

**Cure Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| PINSTRIPES HOLDINGS, INC., *et al.*,[1] | Case No. 25-_____ (___) |
| Debtors. | (Jointly Administered) |

**NOTICE OF POSSIBLE ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES IN CONNECTION WITH SALE**

     **PLEASE TAKE NOTICE THAT** on September [●], 2025, the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") filed with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") their motion (the "**Motion**")[2] for entry of (i) an order (a) approving bidding procedures, substantially in the form attached as Annex 1 to the Bidding Procedures Order (the "**Bidding Procedures**"), to govern the marketing and sale of all or substantially all of the Debtors' assets (the "**Assets**"), (b) authorizing the Debtors to schedule an auction to sell the Assets (the "**Auction**"), (c) scheduling the hearing to approve a sale of the Assets (the "**Sale Hearing**"), (d) designating the Stalking Horse Bidder and Stalking Horse Bid, (e) approving the form and manner of notice of the proposed sale transactions, the Bidding Procedures, the Auction, the Sale Hearing, and related dates and deadlines, and (f) authorizing procedures governing the assumption and assignment of certain executory contracts and unexpired leases (the "**Assigned Contracts**") to the prevailing bidder(s) acquiring the Debtors' assets (each, a "**Successful Bidder**"); and (ii) one or more orders (collectively, the "**Sale Order**") (a) approving the applicable form(s) of purchase agreement between the Debtors and the Stalking Horse Bidder (as defined below) or any other Successful Bidder(s), and (b) authorizing the sale(s) (collectively, the "**Sale**") of the Assets and the assumption and assignment of the Assigned Contracts to the Stalking Horse Bidder or such other Successful Bidder free and clear of all liens, claims, encumbrances, and other interests (collectively, "**Liens**"), other than any permitted Liens as set forth in the applicable form(s) of purchase agreement.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Pinstripes Holdings, Inc. (6699); Pinstripes, Inc. (8608); Pinstripes Hillsdale LLC (6064); Pinstripes at Prairiefire, Inc. (7018); and Pinstripes Illinois, LLC (6432). For purposes of these chapter 11 cases, the Debtors' service address is 1150 Willow Road, Northbrook, Illinois 60062.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or in the Bidding Procedures. Any summary of the Bidding Procedures Order or the Bidding Procedures contained herein is qualified in its entirety by the actual terms and conditions thereof. To the extent that there is any conflict between any such summary and such actual terms and conditions, the actual terms and conditions shall control.

**PLEASE TAKE FURTHER NOTICE THAT** the Sale Hearing to approve the Sale to the Successful Bidder, free and clear of all Liens (with any such Liens attaching to the net proceeds of the Sale with the same rights and priorities therein as in the sold Assets), shall take place at **__:00 __.m. (prevailing Eastern time) on [●], 2025**, before the Honorable [●] in the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, [●] Floor, Courtroom No. [●], Wilmington, Delaware 19801.

**PLEASE TAKE FURTHER NOTICE THAT**, pursuant to the Bidding Procedures Order, the Auction shall be held at the offices of Young Conaway Stargatt & Taylor, LLP on October 17, 2025 at 10:00 a.m. (prevailing Eastern Time). Only Qualified Bidders and the Stalking Horse Bidder shall be entitled to bid at the Auction. The Debtors may, in consultation with the Consultation Parties, designate the Backup Bid (and the corresponding Backup Bidder) to purchase the Assets, without the need for further order of the Bankruptcy Court and without the need for further notice to any interested parties, in the event that a Successful Bidder does not close the Sale. The Sale Hearing may be adjourned by the Debtors with the consent of the DIP Agent from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or by filing a notice or hearing agenda on the docket of the Debtors' chapter 11 cases.

**PLEASE TAKE FURTHER NOTICE THAT**, to facilitate the Sale, the Debtors are seeking to assume and assign to the Successful Bidder the Assumed Contracts in accordance with the Bidding Procedures Order. The Assumed Contracts that the Debtors may, but are not required to, seek to assume and assign in connection with the Sale and the corresponding cure amount (each, a "**Proposed Cure Amount**"), if any, that the Debtors believe is required to be paid to the applicable counterparty (each, a "**Counterparty**," and collectively, the "**Counterparties**") to each of the Assumed Contracts under sections 365(b)(1)(A) and (B) of the Bankruptcy Code are identified on **Exhibit 1** attached hereto.

**PLEASE TAKE FURTHER NOTICE THAT** each Counterparty shall have until **4:00 p.m. (prevailing Eastern time) on October 9, 2025** (the "**Contract Objection Deadline**") to object to the assumption and assignment of its Contract on any grounds, including, without limitation, (a) the amount of the Proposed Cure Amounts (and must state, in its objection, with specificity, what cure amount is required with appropriate documentation in support thereof) and (b) the provision of adequate assurance of future performance by the Stalking Horse Bidder (each, a "**Contract Objection**"). Any such objection must be filed and served on the following parties (collectively, the "**Objection Notice Parties**"), so as to be actually received by the Contract Objection Deadline:

(a)     proposed counsel for the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: Michael R. Nestor, Esq. (mnestor@ycst.com), Sean M. Beach, Esq. (sbeach@ycst.com), Elizabeth S. Justison, Esq. (ejustison@ycst.com), and Shella Borovinskaya, Esq. (sborovinskaya@ycst.com);

(b)     counsel for the DIP Agent and Existing Silverview Agent, Blank Rome LLP, 1201 Market Street, Suite 800, Wilmington, Delaware 19801, Attn: Regina Stango Kelbon, Esq. (regina.kelbon@blankrome.com), John Lucian, Esq.

(john.lucian@blankrome.com), Stanley B. Tarr, Esq. (stanley.tarr@blankrome.com) and Alston & Bird LLP, 90 Park Avenue, 15th Floor, New York, New York 10016, Attn: James Vincequerra, Esq. (james.vincequerra@alston.com) and Stephen Blank, Esq. (stephen.blank@alston.com);

(c)     the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware, 19801, Attn: Benjamin A. Hackman, Esq. (Benjamin.A.Hackman@usdoj.gov); and

(d)     counsel to any official committee of creditors (the "**Committee**").

Any unresolved Contract Objections shall be heard at the Sale Hearing, unless otherwise agreed by the parties; *provided that*, the Debtors shall have the right to adjourn any Sale Hearing without the consent of any objecting party. If any objections to the amount of the Proposed Cure Amounts remain unresolved as of the date of the Closing of the Sale of the Assets, the Debtors may (but are not required to) deposit the disputed amount of Proposed Cure Amounts relating to such Asset(s) in a segregated account to hold pending resolution of such objections.

**PLEASE TAKE FURTHER NOTICE THAT**, pursuant to the Bidding Procedures Order, each Counterparty may raise objections as to adequate assurance of future performance by, or on the basis of the identity of, the Successful Bidder, other than the Stalking Horse Bidder, until October 21, 2025 at 4:00 p.m. (ET) (the "**Buyer Specific Objection Deadline**"). Any such objection must be filed and served on the Objection Notice Parties, so as to be actually received by the Buyer Specific Objection Deadline. Any such objection must be filed and served on the Debtors and their counsel, the Committee and its proposed counsel, and the applicable Successful Bidder or Stalking Horse Bidder (if any), as applicable, and its counsel, so as to actually be received by the Buyer Specific Objection Deadline. Any such unresolved objections shall be heard at the Sale Hearing, unless otherwise agreed by the parties.

**PLEASE TAKE FURTHER NOTICE THAT**, at the Sale Hearing, the Debtors will seek Court approval of the assumption and assignment to the Successful Bidder of only those Assumed Contracts that have actually been selected by the Successful Bidder to be assumed and assigned (collectively, the "**Assumed Contracts**"). The Debtors and their estates reserve any and all rights with respect to any Assumed Contracts that are not ultimately designated as Assumed Contracts.

**PLEASE TAKE FURTHER NOTICE THAT nothing contained in this notice or on the exhibits hereto shall constitute a waiver of any rights of the Debtors and their estates or an admission with respect to the Debtors' chapter 11 cases, including, but not limited to, any issues involving objections to claims, setoff or recoupment, equitable subordination or recharacterization of debt, defenses, characterization or re-characterization of contracts, leases and claims, assumption or rejection of contracts and leases and/or causes of action arising under the Bankruptcy Code or any other applicable laws.**

**If no Contract Objection is timely received with respect to an Assumed Contract: (i) the Counterparty to such Assumed Contract shall be deemed to have consented to the assumption by the Debtors and assignment to the Successful Bidder of the Assumed Contract, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Successful Bidder); (ii) any and all defaults under the Assumed Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code upon payment of the Proposed Cure Amount set forth in this Cure Notice for such Assumed Contract; and (iii) the Proposed Cure Amount set forth in this Cure Notice for such Assumed Contract shall be controlling, notwithstanding anything to the contrary in such Assumed Contract, or any other related document, and the Counterparty shall be deemed to have consented to the Proposed Cure Amount and shall be forever barred from asserting any other claims related to such Assumed Contract against the Debtors and their estates or the Successful Bidder, or the property of any of them, that existed prior to the entry of the order resolving the Contract Objections.**

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain copies of the Motion, the Bidding Procedures, the Bidding Procedures Order, the applicable underlying agreements, or any other pleadings or orders of the Bankruptcy Court, they are publicly available, for a fee via PACER at: http:/www.deb.uscourts.gov, or free of charge from the claims agent at **https://dm.epiq11.com/pinstripes**.  Such documents and pleadings may also be obtained by calling the Debtors' restructuring hotline at (888) 832-5989 (toll-free) or +1 (971) 306-5089 (international).

*[Remainder of Page Intentionally Left Blank]*

Dated: [●], 2025
     Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/* [●]
Michael R. Nestor (No. 3526)
Sean M. Beach (No. 4070)
Elizabeth S. Justison (No. 5911)
Shella Borovinskaya (No. 6758)
Rodney Square
1000 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Emails:  mnestor@ycst.com
       sbeach@ycst.com
       ejustison@ycst.com
       sborovinskaya@ycst.com

*Proposed Counsel for the Debtors and Debtors in Possession*

# **EXHIBIT 1**

## **Proposed Cure Amounts**

*[Intentionally Omitted]*